IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK SILGUERO,           §
                             §
          Plaintiff,      §
                             §
AMY WOLFE,             §
                             §
          Intervenor Plaintiff,   §   CIVIL ACTION NO. 2:16-CV-00361
                             §
v.                      §
                             §
CSL PLASMA INC.,      §
                             §
          Defendant.    §

**APPENDIX TO DEFENDANT CSL PLASMA, INC'S**

**MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

Nola Baker Deposition Excerpt ........................................................................................... 3

Melanie Garcia Deposition Excerpt ................................................................................... 11

Michelle Mailey Deposition Excerpt .................................................................................. 18

John Nelson Deposition Excerpt ........................................................................................ 33

Juliana Sanchez Deposition Excerpt .................................................................................. 61

Sam Schultz Deposition Excerpt ....................................................................................... 70

Mark Silguero Deposition Excerpt .................................................................................... 75

Reynaldo Vargas Deposition Excerpt ................................................................................ 84

Amy Wolfe Deposition Excerpt ......................................................................................... 88

Deposition Exhibit 2 .......................................................................................................... 99

Deposition Exhibit 4 Excerpt ........................................................................................... 100

Deposition Exhibit 5 Excerpt ........................................................................................... 112

Deposition Exhibit 6 Excerpt ........................................................................................... 115

Deposition Exhibit 7 Excerpt ........................................................................................... 120

John Nelson Declaration ................................................................................................... 123

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2               CORPUS CHRISTI DIVISION

3    MARK SILGUERO,                §
          Plaintiff,               §
4                                  §
     and                           §
5                                  §
     AMY WOLFE,                    §      CIVIL ACTION
6         Intervening Plaintiff,   §      NO. 2:16-CV-00361
                                   §
7    v.                            §
                                   §
8    CSL PLASMA INC.,              §
          Defendant.               §
9

10   *************************************************************

11
                    ORAL DEPOSITION OF
12
                       NOLA BAKER
13
                     June 26, 2017
14
     *************************************************************

15

16

17        ORAL DEPOSITION OF NOLA BAKER, produced as a

18   witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on the 26th of June 2017, from 10:34 a.m. to 11:51 a.m.,

21   before Isabel Connor, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of

23   U.S. Legal Support, Inc., 802 North Carancahua Street,

24   Suite 2280, Corpus Christi, Texas, pursuant to the

25   Federal Rules of Civil Procedure.

Nola Baker
June 26, 2017                                    22 to 25

Page 22

1    A.    Yes.
2    Q.    Where would you document it?
3    A.    In medical notes.
4    Q.    If a donor had a complaint about a deferral for
5  a medical reason, would you speak with that donor?
6    A.    No.
7    Q.    Who would that donor speak to?
8    A.    If it had to do with a medical deferral that
9  they had, they would talk to the medical supervisor.
10   Q.    Were the -- the medical reception technicians
11 trained to refer those complaints to the medical
12 supervisor?
13   A.    Yes.
14   Q.    Would you ever tell potential donors that they
15 were deferred?
16   A.    Can you repeat that?
17   Q.    Would you ever tell potential donors that they
18 were deferred?
19   A.    On certain circumstances, yes.
20   Q.    In what circumstance would you be the one to
21 tell potential donors they were deferred?
22   A.    If they currently had a new tattoo or piercing.
23 For example, I -- if I was the one there, I would tell
24 them that they were deferred.
25   Q.    Would you tell them they were deferred if it

Page 23

1  was for a -- another medical reason, something medical
2  that they were being deferred for?
3    A.    No.
4    Q.    Who would make that deferral?  Who would give
5  that deferral notice to the client?
6    A.    It would be the medical staff or the medical
7  supervisor.
8    Q.    So help me understand.  Why would you tell
9  someone a deferral for the new tattoo or piercing but not
10 for a medical reason?  Why did that person come to you,
11 but the medical person does not?
12   A.    The tattoo and piercings are part of the
13 medical questionnaire that they answer.  And when you're
14 screening them in a screening booth, that is something
15 that -- the tech would ask them the dates of when they
16 received the tattoo and then inform them that there's a
17 year deferral for those -- for tattoos or piercings.
18 That's outlined for us to be able to tell them.
19   Q.    And could a potential donor appeal the decision
20 of a deferral about a tattoo or piercing?
21   A.    Can you repeat that?
22   Q.    Could the potential donor appeal the decision
23 of a deferral for a new tattoo or piercing?
24   A.    They can dispute it, but that is something that
25 is outlined.  And the procedure is in black and white

Page 24

1  where it says there's a year deferral.
2    Q.    When you say that they can dispute it, what do
3  you mean by that?
4    A.    They -- a lot of times donors will try to
5  change their -- the information that they gave -- they
6  gave you originally, so -- and that's what I mean when
7  they would dispute it.
8          They would tell -- originally they can
9  tell you that they would -- they received the tattoo in
10 January of 2017.  And then when you're informing them
11 that there's a deferral for a year for a tattoo, then
12 they try to change their story and change it to January
13 of 2016.
14   Q.    And what if they can prove that the reason for
15 deferral was wrong?  What if they can prove that they
16 made a mistake and, in fact, that really was at the right
17 time?
18   A.    Unfortunately, there's usually no way to prove
19 when you got a tattoo.  We don't accept any type of
20 sterility from facilities to allow the donors to donate.
21 It's still a year deferral.
22   Q.    What reasons do you in your job title typically
23 defer people for?  You gave the new tattoo or piercing.
24 What other reasons do you typically defer people for?
25   A.    If they have unacceptable behavior, we -- I

Page 25

1  would defer them.
2    Q.    What constitutes unacceptable behavior?
3    A.    When you have a donor that is cussing at your
4  employees or throwing something at an employee or try to
5  damage your equipment, slamming doors, that sort of
6  behavior.
7    Q.    And are those individuals temporarily deferred
8  or permanently deferred?
9    A.    The -- it depends on the situation.  If you --
10 if I had a donor that was upset and raised his voice at a
11 donor, I would talk to the donor to see exactly what
12 happened.
13         Normally those donors, when they don't
14 cause a big scene like that, are temporarily deferred.
15 If you have a donor that is, you know, breaking equipment
16 or still -- after I'm talking to them, they are still
17 cursing or yelling and threatening, then, yes, they are
18 deferred permanently.
19   Q.    Are there any written policies about deferring
20 donors for conduct?
21   A.    I don't recall.
22   Q.    Are there any SOPs about donor conduct?
23   A.    Yes, there is.
24   Q.    So what it says about donor conduct -- what the
25 SOP says about donor conduct?

Nola Baker
June 26, 2017                                    30 to 33

Page 30

1    A.   No.  There's -- we've had -- I'm trying to
2  think.  We had a donor that was deferred for a day for a
3  out-of-range hematocrit.  And he did say that he would be
4  waiting outside when we got off from work and he knew
5  what I drove.
6    Q.   Did you call the police?
7    A.   Yes.
8    Q.   Are there protocols about when to call the
9  police?
10   A.   Yes.
11   Q.   Are those written protocols?
12   A.   No.
13   Q.   How do you decide whether or not you're going
14 to call the police about a threat?
15   A.   Without a threat?
16   Q.   About a threat.
17   A.   At any time that you feel your life is
18 threatened, we would call the police.  Or we feel that
19 anyone in our facility is in danger, we would call the
20 police.
21        Also, if we have a donor that is
22 threatening us and will not leave the building, we would
23 call the police.
24   Q.   The donor that you gave an example of taking
25 off his shoe and threatening you with it --

Page 31

1    A.   Uh-huh.
2    Q.   -- did he get deferred?
3    A.   Yes, he did.
4    Q.   Was he permanently deferred?
5    A.   Yes, he was.
6    Q.   What about the donor who said that he would be
7  waiting and knew what car you drove, was he permanently
8  deferred?
9    A.   Yes, he was.
10   Q.   And was there documentation made about these
11 donors' conduct?
12   A.   Yes, there was.
13   Q.   Where was that documentation made?
14   A.   In their medical notes.
15   Q.   Do you remember Mr. Silguero?
16   A.   I do not.
17   Q.   What do you know about this lawsuit?
18   A.   I -- the only thing I know is that he's suing
19 the company because he's unable to donate.
20   Q.   Do you know why he was unable to donate?
21   A.   He made a threatening comment, or he threatened
22 the -- the staff.
23   Q.   What was the threat?
24   A.   I'm not sure.  I went by what was on the
25 medical notes.

Page 32

1    Q.   When you say you went by what was on the notes,
2  are you referring to what's titled as Exhibit 2?
3    A.   Yes.
4    Q.   Ever talk to anyone about Mr. Silguero other
5  than Ms. Willing?
6    A.   One of the employees, Michelle Mailey, had
7  called me after she was not employed with the company
8  anymore, to ask me questions.  She said she was notified
9  that there was a donor that she had deferred.
10        And she wasn't sure what she was supposed
11 to do, because she no longer worked for the company and
12 didn't recall any information.
13        And the only thing I advised her was to
14 talk to whoever was calling her and that they would more
15 than likely give her the information that was noted or
16 that she had noted in the donor's medical notes.  And she
17 was the only person other than Ms. Willings.
18   Q.   And did she tell you -- did Michelle tell you
19 anything about what she remembered about the donor?
20   A.   She didn't -- she didn't mention anything.  She
21 was not sure who the donor was.
22   Q.   And that she was scared of him?
23   A.   She didn't recall who the donor was.
24   Q.   And did you tell her anything about what you
25 knew about him?

Page 33

1    A.   No.  I didn't recall who the donor was.
2    Q.   When -- when did you have that conversation
3  with her?
4    A.   It has been more than eight months ago
5  probably.  I don't recall the exact time frame.
6    Q.   But you said Michelle was no longer at CSL
7  Plasma when she called you; is that right?
8    A.   That's correct.
9    Q.   Now, help me understand.  Were you Michelle's
10 supervisor at CSL Plasma?
11   A.   I was the assistant manager over the -- yes,
12 over those positions.
13   Q.   And why do you think that she called you as
14 opposed to one of her other supervisors?
15   A.   I -- I couldn't answer that.  I'm not sure.
16   Q.   Do you feel like you and Michelle were more
17 friendly?
18   A.   No, we weren't.
19   Q.   Exhibit 2, if you can pull that in front of
20 you, please.  I'm going to ask you some questions about
21 it.
22   A.   Okay.
23   Q.   You see where it says Donor Medical SEQ, S-E-Q,
24 on the second column?
25   A.   Okay.  Yes.

Page 1

1             IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    CORPUS CHRISTI DIVISION
MARK SILGUERO,                    )
3        Plaintiff                )
                                  )
4  and                            )
                                  )
5  AMY WOLFE.                     )
         Intervening Plaintiff    )
6                                 )
VS.                               )    CIVIL ACTION NO.
7                                 )    2:16-CV-00361
CSL PLASMA INC.,                  )
8        Defendant                )

9

10       ---------------------------------------

11                  ORAL DEPOSITION OF

12                  JOSHUA CONCEPCION

13                    JULY 6, 2017

14       ---------------------------------------

15            ORAL DEPOSITION OF JOSHUA CONCEPCION, produced

16  as a witness at the instance of DEFENDANT, and duly

17  sworn, was taken in the above-styled and numbered cause

18  on July 6, 2017, from 1:56 p.m. to 3:25 p.m., before

19  Michelle Rodriguez, CSR in and for the State of Texas,

20  recorded by machine shorthand, at the offices of 1500

21  McGowen, Suite 100, Houston, Texas 77004, pursuant to

22  the Texas Rules of Civil Procedure and the provisions

23  stated on the record or attached hereto; signature

24  having been waived.

25                  JOB NO. 1-HOU-244700

Joshua Concepcion
July 06, 2017                                        10 to 13

| Page 10 | Page 11 |
|---|---|
| 1 e-mail that I would have gotten and then what the | 1    Q.  Does Stephanie have a supervisor? |
| 2 changes were. | 2    A.  Yes. |
| 3    Q.  So then you were not in charge of making sure | 3    Q.  Who is Stephanie's supervisor? |
| 4 the training department implemented the SOP's; is that | 4    A.  David Monte. |
| 5 correct? | 5    Q.  Does he oversee more locations than just your |
| 6    A.  No.  It would basically just be updating the | 6 location? |
| 7 forms. | 7    A.  Yes.  But I think that might be more in |
| 8    Q.  What were your other job duties in the quality | 8 Stephanie's scope because they get their own little |
| 9 department? | 9 regions that they cover, and then the RD covers multiple |
| 10    A.  It would just be corrective action plans as far | 10 regions.  So he has the person under them that would, |
| 11 as if there was a deviation of some -- some sort in the | 11 like, handle my center and so on.  So there's, like, |
| 12 procedure.  So if somebody didn't do an arm scrub -- | 12 clusters I guess I would say. |
| 13 this was an example -- proper on the donor floor, that | 13    Q.  So does Stephanie Shah have more than one |
| 14 could be related to safety.  So we would do a track wise | 14 center that she covers? |
| 15 which is an investigation of the issue.  So why did they | 15    A.  Yes. |
| 16 deviate from the procedure and just find means to ensure | 16    Q.  Do you handle any of the medical issues that |
| 17 that it doesn't take place again. | 17 happen at CSL Plasma? |
| 18    Q.  Aside from looking at the donor file, did you | 18    A.  No. |
| 19 do anything else to prepare for today's deposition? | 19    Q.  Do you have knowledge of some of the medical -- |
| 20    A.  No. | 20    A.  I have knowledge of it from when I worked in |
| 21    Q.  Who is your supervisor? | 21 the quality department. |
| 22    A.  It's Stephanie Shah. | 22    Q.  What -- what experience did you have on the |
| 23    Q.  And what is Stephanie Shah's position? | 23 medical side when you were in the quality department? |
| 24    A.  She is the associate director of quality and | 24    A.  That was just mainly, like, the communication |
| 25 operations. | 25 aspect between the med staff to the physician because |

| Page 12 | Page 13 |
|---|---|
| 1 there's forms that they have to complete, reviews that | 1    A.  No. |
| 2 would take place over documentation, ensure that it was | 2    Q.  Have you ever had any training about disability |
| 3 accurate -- told a story -- that it was understandable. | 3 discrimination? |
| 4 So it was more so on the lines if there was any errors | 4    A.  No.  It's just that the only experience I |
| 5 rather than, I guess, making a decision.  It was more | 5 really had with the ADA is more so on, like, the |
| 6 review. | 6 employee aspect.  So if there was issues related to |
| 7    Q.  The communication between the medical staff and | 7 where they would need, like, accommodations so on and so |
| 8 the physician, what type of communication was that? | 8 forth, I would go through HR.  And HR would give, like, |
| 9    A.  There -- there is in-center-visits where they | 9 the guidance as far as this is -- I would tell the |
| 10 come in, and they have meetings.  They do the | 10 situation.  This is what it is, and this is what would |
| 11 communication where it's over the phone, and that's when | 11 be the appropriate action.  I haven't had the example |
| 12 they would generate -- it's called an MCF, so it's a | 12 yet take place, but that's kind of what the -- the |
| 13 medical communication form.  So that would just | 13 training, I guess I would say, was told to me if there |
| 14 basically be able to document what took place as far as | 14 was something that needed to be handled.  I would just |
| 15 decisions being made, what was being asked, so on and so | 15 go through the human resources department. |
| 16 forth. | 16    Q.  Would an employee be in charge or -- I'm sorry. |
| 17    Q.  Does the MCF become part of the donor file? | 17       Would an employee go to you if they had a |
| 18    A.  Yes. | 18 need for an accommodation? |
| 19    Q.  Did you look at an MCF in preparation for this | 19    A.  It would -- it would be myself and other -- I |
| 20 case? | 20 have assistant managers, as well.  So it would be any |
| 21    A.  No, I -- oh, wait.  Yes.  I'm sorry.  I | 21 one of us, yeah. |
| 22 apologize, yes. | 22    Q.  Do you know if any CSL Plasma employees |
| 23    Q.  In any position that you had at CSL Plasma, did | 23 received training on the ADA? |
| 24 you ever participate in any sort of Americans with | 24    A.  Not to my knowledge. |
| 25 Disabilities Act or ADA training? | 25    Q.  Did you ever receive any training about how to |

Joshua Concepcion
July 06, 2017                               22 to 25

Page 22

1  honestly, that the MSA's could reach out to if they were
2  unable to reach the physician that's for our center.
3            COURT REPORTER:  For the, what?  I'm sorry.
4            THE WITNESS:  For our center.  Sorry.
5            COURT REPORTER:  Oh, "for our center."
6       Q.  (BY MS. DAVIS)  And who answers the phone at
7  the Med-Ops hotline?
8       A.  It's whoever is on duty at that time.  I
9  wouldn't know.
10      Q.  Is it a physician?
11      A.  I honestly don't know.
12      Q.  Do you ever have reason to call the Med-Ops
13 hotline?
14      A.  No.
15      Q.  Are you ever the one to tell potential donors
16 if they are deferred?
17      A.  Yeah.  I -- based on, like I said, situational.
18 It would be based on the situation.  I have told donors
19 that they're deferred.
20      Q.  In what situation have you told donors that
21 they are deferred?
22      A.  Basically -- mainly, it's behavior.  Behavior,
23 complaints basically all due from behavior or if they're
24 already deferred, like I said, due to, like, a vital
25 situation or they, you know, that's really it.

Page 23

1       Q.  Are there other times that you would tell
2  donors that they're deferred?
3       A.  I haven't -- I haven't experienced it yet.  I
4  would imagine maybe in the future.
5       Q.  In vital situations, you might be the one to
6  tell them that they're deferred?
7       A.  I would basically just reiterate what was
8  already told to them by either a tech or if they talked
9  to an MSA first.  But normally that doesn't happen
10 because the techs can tell them, "Hey, your deferred
11 based off of -- you don't meet the criteria."  So if
12 they then want to speak to a manager right away, then
13 they'll talk to me.  So realistically, it's just after
14 the tech.
15      Q.  What happens after someone gets deferred?
16      A.  Based on, what scenario?  Because there's
17 multiple reasons why they would get deferred.
18      Q.  What happens in a scenario in which someone is
19 deferred for conduct?
20      A.  Conduct?  Oh, okay.  So if they -- before
21 donate -- I'll just use an example if they haven't
22 donated yet.  Say, if they're in a reception area, and
23 they're being loud and disruptive.  So, like, talking
24 and being rude amongst each other and it's being
25 disruptive to everybody around them, of course, one of

Page 24

1  the staff members or somebody would say, "Hey, can you
2  keep it down?"  And then if it doesn't end well, it's --
3  or, "F-you," or whatever the situation may be, then of
4  course that's when they would be pulled to the side, be
5  counselled, and they would call me.  I would have to
6  talk to them.
7            So that would be the reason that we could
8  defer them if they wouldn't calm down which has happened
9  before.  So if they don't calm down, they would be
10 deferred for either the day or depending on the
11 situation if they got violent.
12      Q.  And if they're violent, they become a permanent
13 deferral?
14      A.  Yes?
15      Q.  And if it is just bad language or being angry,
16 is that a permanent deferral?
17      A.  It's -- it's basically based on the situation.
18 It's hard to really say.  Like, if somebody is being
19 super aggressive and threatening bodily harm, then, of
20 course, that would be a permanent deferral.  But if it's
21 just, like, an "F-you" or they said something on their
22 way out, then it would just be a deferral for that day
23 until they came back to be counselled.
24      Q.  And who makes that decision?
25      A.  It could be myself.  It could be one of the

Page 25

1  assistant managers.  It could be a center supervisor.
2  That's the ones that make the call for behavior.  As far
3  as vitals, that's strictly from an SOP and from the
4  techs.
5       Q.  Can a medical staff associate make a decision
6  about behavior?
7       A.  No, they don't -- they don't do that.
8       Q.  Could a potential donor disagree or complain
9  about the reason for deferral?
10      A.  Yes.
11      Q.  Who would they complain to?
12      A.  They would come to me, more than likely, if I
13 was there.
14      Q.  And would you ever have a reason to then call
15 someone above you about that deferral?
16      A.  It's just depending if -- if I couldn't make a
17 judgment call or I didn't seem -- like, if I had to
18 refer to SOP and just didn't feel comfortable making a
19 decision, then, yeah, I could call -- reach out to my
20 boss and say, "This is the scenario.  How would you want
21 me to proceed or how should I proceed?"  But I haven't
22 done that yet.  So --
23      Q.  You said you would have to refer to an SOP,
24 potentially?
25      A.  If it was related to a -- to something then I

Joshua Concepcion
July 06, 2017                                30 to 33

**Page 30**

1    A. -- sounding last name.
2    Q. I called them the same name.
3        If Oscar Beasly or Sharon Easely were at
4  the center in October of 2016?
5    A. Oscar Beasly was. I'm not 100 percent for
6  Sharon because she was a transfer from another location,
7  so I don't remember exactly what her start date was.
8    Q. Do you remember Ms. Wolf?
9    A. No, I don't remember.
10   Q. Did you ever hear anybody talk about her?
11   A. No.
12   Q. And did you ever talk to anybody about her
13 aside from Ms. Willing?
14   A. No.
15   Q. Do you know why the recommendation was to defer
16 Ms. Wolf?
17   A. Based on what I saw, the information today,
18 from my understanding it was due to the anxiety of the
19 -- high level anxiety. That's from what I gather.
20   Q. And why is somebody with anxiety not allowed to
21 donate?
22   A. Just from pure logical reasoning. I would say
23 that it was maybe due to the fact that the setting, as
24 far as the large needle being placed into their arm.
25 And depending on what, you know, heightens their

**Page 31**

1  anxiety. There's just a lot surrounding it. So I -- it
2  could be a safety risk for them and also others around
3  them.
4    Q. Has anybody with anxiety ever donated?
5    A. I haven't -- I don't know, honestly, offhand.
6    Q. Have you ever had a donor have a bad reaction
7  to donation?
8    A. Yes.
9    Q. What happened?
10   A. Just pallor which is sweating, diaphoresis --
11 diaphoresis and then, you know, discomfort, sweating,
12 loss of consciousness, emesis.
13   Q. Were they deferred after they had that bad
14 reaction?
15   A. It just depends on the -- the scenario based
16 off the MSA's evaluation and the physician's evaluation.
17 It varies from donor to donor on severity.
18   Q. Do MSA's have wide latitude to make decisions
19 about the judgment or make decisions about the client
20 and the donation of the client?
21   A. As far as from a medical standpoint?
22   Q. Yes.
23   A. Yes.
24   Q. Has a donor ever appeared anxious?
25   A. Not that I can think of, no.

**Page 32**

1    Q. Is it possible that someone who did not report
2  anxiety could still get anxious during the donation
3  process?
4    A. That's possible. I would assume that's
5  possible.
6    Q. And is it possible that somebody with anxiety
7  could still donate without any issue?
8    A. Possibly. I -- I can't say because I don't --
9  I don't know. But if they don't disclose their medical
10 history then that would be a reason.
11   Q. Has anybody ever had an anxiety attack on the
12 donor floor that you know of?
13   A. Not that I know of. It's -- it's mainly the
14 symptoms that I said.
15   Q. Do you have any reason to believe that Ms. Wolf
16 does not have a disability?
17   A. Well, I just met her right now. I wouldn't --
18 wouldn't know. I don't know. I see a service dog, but
19 I don't -- like, as far as the anxiety -- that's from
20 what I would gather. So --
21   Q. So any reason to believe that she doesn't have
22 a disability? Any reason why you do believe she does
23 not have a disability?
24   A. I wouldn't know. I don't -- that's a
25 hard answer -- I mean, question for me to answer. I

**Page 33**

1  don't know her outside of just meeting her right now.
2    Q. Any reason to believe that Ms. Wolf's service
3  animal is not a service animal?
4    A. No.
5    Q. Any reason to believe that Ms. Wolf does not
6  get a benefit from having a service animal?
7    A. Not that I'm aware of, no.
8    Q. I want to look at Exhibit 5 again. You have it
9  in front of you still.
10   A. (Indicating.)
11   Q. On the first page, page 1 of 73, do you see
12 that?
13   A. Yes.
14   Q. The second paragraph it indicates, "This does
15 not apply to those labeled regulatory requirement." Do
16 you know what the regulatory requirement is?
17   A. Not offhand, no.
18   Q. Do you know how you would be able to find out
19 or where you would look to find out what the regulatory
20 requirement is?
21   A. I would just reach out to either somebody in my
22 quality department or, again, my ADOQ if I had questions
23 regarding something I didn't understand.
24   Q. What other job duties does the quality
25 department have?

Joshua Concepcion
July 06, 2017                    42 to 45

Page 42

1  He just really kind of wanted to be heard.
2      Q.  Was he angry?
3      A.  He seemed upset.
4      Q.  And had he asked the staff that he wanted to
5  talk to with the staff supervisor?
6      A.  Yeah.
7      Q.  And you mentioned earlier that you've received
8  threats; is that right?
9      A.  Well, everybody kind of receives some sort of,
10  you know, "I'll kick your — you know — butt," or
11  whatever the case may be.  But I don't remember them all
12  right offhand.  But, yeah, we've all received some sort
13  of bodily harm or threat at some point in our career.
14      Q.  A threat of physical violence?
15      A.  Yeah.
16      Q.  Has anybody ever threatened to go to a
17  supervisor or to go above you?
18      A.  Yes.
19      Q.  Has anybody ever said that, "You'll be sorry,"
20  once they go to the supervisor?
21      A.  Yeah, I would assume so.  Yeah.  I would say,
22  yes, because, like, I've heard it kind of all.  So,
23  yeah.  I would say that happened, yes.
24      Q.  And if somebody told you, "You'll be sorry,"
25  how would you interpret that?

Page 43

1      A.  Well, depending on how they say it or how
2  aggressive — how aggressive they were, I would think it
3  was kind of a threat.  It would be threatening as far
4  as, like I said, situational on how they said it.  Were
5  they aggressive when they were saying it, flailing their
6  arms, you know, it's just all situational.  So — but I
7  would take it as a threat.
8      Q.  So if somebody said, "You'll be sorry," could
9  it mean that they were threatening to go to your
10  supervisor?
11      A.  They could.  Like I said, it's just — it's
12  based on situation.  So if they were calm and had a calm
13  demeanor and they said that, then I would just think
14  that they would think I would get in trouble or get
15  fired or whatever their mindset would have been when
16  they said it.
17      Q.  And you'd be sorry because you got fired?
18      A.  Yeah.
19      Q.  Or you'd be sorry because you got in trouble?
20      A.  Reprimanded — reprimanded of some sort.
21      Q.  Have you ever been reprimanded because of a
22  donor complained about you or your conduct?
23      A.  No.
24      Q.  Are you in charge of reprimanding staff members
25  who get — are complained about by donors?

Page 44

1      A.  Yes.
2      Q.  And when was the last time that you reprimanded
3  a staff member?
4      A.  Probably less than a week ago.
5      Q.  And what was that about?
6      A.  I guess the — well, not guess.  What happened
7  was, the — the donor — excuse me — had to use the
8  restroom.  And he actually wasn't able to hold it until
9  the restroom, so he went on himself before they could
10  take the needle out.  And the staff member just wasn't
11  as professional as she should have been as far as
12  handling the situation.  So I had to counsel her.  The
13  donor actually didn't complain.  I just saw it happen,
14  and that's when I had to reprimand her and then did a
15  corrective action with her as far as her
16  professionalism.  So — but that's — as far as that,
17  that's the only thing that comes to mind.
18      Q.  And the donor didn't — wasn't the one that
19  complained to you?
20      A.  No.
21      Q.  It was something that you observed?
22      A.  (Indicating.)
23      Q.  And you observed it because you were on the
24  floor?
25      A.  Walking through.

Page 45

1          MS. DAVIS:  Okay.  Those are all the
2  questions.  We can go off the record.
3          (Proceedings concluded at 3:25 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2               CORPUS CHRISTI DIVISION

3   MARK SILGUERO,                §
         Plaintiff,               §
4                                 §
    and                           §
5                                 §
    AMY WOLFE,                     §      CIVIL ACTION
6        Intervening Plaintiff,   §      NO. 2:16-CV-00361
                                  §
7   v.                            §
                                  §
8   CSL PLASMA INC.,              §
         Defendant.               §
9

10  *********************************************************

11                  ORAL DEPOSITION OF

12                   MELANIE GARCIA

13                    June 26, 2017

14  *********************************************************

15

16

17          ORAL DEPOSITION OF MELANIE GARCIA, produced as

18  a witness at the instance of the Plaintiff, and duly

19  sworn, was taken in the above-styled and numbered cause

20  on the 26th of June 2017, from 12:33 p.m. to 1:33 p.m.,

21  before Isabel Connor, CSR in and for the State of Texas,

22  reported by machine shorthand, at the offices of

23  U.S. Legal Support, Inc., 802 North Carancahua Street,

24  Suite 2280, Corpus Christi, Texas, pursuant to the

25  Federal Rules of Civil Procedure.

Melanie Garcia
June 26, 2017                                    10 to 13

Page 10

1    A.  Matter of who was available, yes.
2    Q.  So it wasn't a matter of what type of questions
3  she had; is that right?
4    A.  Yes.
5    Q.  And how did she know that she was supposed to
6  go to you or Rey with questions?
7    A.  What do you mean?
8    Q.  How did she know that you or Rey were the
9  people to go to with questions?
10   A.  That's how she was advised.
11   Q.  Okay.  So it was part of her training?
12   A.  Yes.
13   Q.  Okay.  And did you train her on when -- when
14 she was supposed to go to you or Rey with questions, like
15 what types of scenarios prompted her to go to you or Rey?
16   A.  With any scenario we always go to our medical
17 staff reference.  That is our go-to.  If she still had a
18 question, she could either go to me or her -- to me,
19 to -- or Rey.
20   Q.  Okay.  So her first step was to look at the
21 medical staff reference; is that right?
22   A.  Yes, ma'am.
23   Q.  And if the medical staff reference didn't
24 ask -- answer her question, her second step would be to
25 go to you or Rey; is that right?

Page 11

1    A.  Yes.
2    Q.  Were there times that you or Rey wouldn't know
3  the answer?
4    A.  Yeah.  There would be times we wouldn't know,
5  and we would ask her to contact our center physician.
6    Q.  And did you and Rey hold the same job title?
7    A.  No.
8    Q.  Because your job title was just MSA; is that
9  right?
10   A.  Yes.
11   Q.  How frequent was it that MSAs came to you -- or
12 how frequent is it that MSAs come to you with questions?
13 Do you think they ask you questions daily?
14   A.  No.
15   Q.  And if an MSA does not have any questions on a
16 particular day, what are you doing?  What is your job on
17 a day-to-day basis if not answering questions from MSAs?
18   A.  Performing MSA duties along with them.
19   Q.  And in those duties, are you doing the exact
20 same job as other MSAs?
21   A.  Yes.
22   Q.  Please look at Exhibit 4, what is marked as
23 Exhibit 4.  Is this the CSL Plasma Medical Staff
24 Reference - Conditions Guidelines?
25   A.  Yes.

Page 12

1    Q.  What is this document?
2    A.  This is our document for any condition that we
3  come upon.  Any question that we have, we go and refer to
4  it.
5    Q.  How frequently do you refer to this document?
6    A.  Just depending on the day, the situation.
7  There's no exact times we go back and reference it.
8    Q.  Are you supposed to look at it with every
9  client -- or every donor?
10   A.  If there's need to, yes.
11   Q.  So if there's need to refer to the conditions
12 guidelines, you are supposed to look at it; is that
13 right?
14   A.  Yes.
15   Q.  Were you trained on these guidelines?
16   A.  Yes.
17   Q.  Who trained you?
18   A.  Noemi.  I don't remember her last name.
19   Q.  And when was that?
20   A.  I can't recall at this time.
21   Q.  Was it when you first started?
22   A.  Oh, yes.
23   Q.  So is it fair to say that it was around
24 December 2012?
25   A.  Yes -- well, the first month or two.  I was

Page 13

1  trained in reception first.
2    Q.  Was that a medical reception technician?
3    A.  Yes.
4    Q.  And after you finished your medical reception
5  technician training, did you work with the medical
6  reception technician?
7    A.  Yes.
8    Q.  Do you know how long you worked as a medical
9  reception technician?
10   A.  No.  Shortly after I was transferred to the
11 training for the medical staff.
12   Q.  How long did it take you to get trained on the
13 conditions guidelines?
14   A.  I can't recall at this time.
15   Q.  Did you ever train anyone else on them?
16   A.  Yes.
17   Q.  Approximately how many staff would you say that
18 you've trained on the conditions guidelines?  Just an
19 approximation.
20   A.  Approximately five, six.
21   Q.  Are the conditions guidelines supposed to be
22 strictly followed?
23   A.  Yes.  What our guidelines tells us to do, we
24 have to abide by that.
25   Q.  Are there parts of the conditions guidelines

Melanie Garcia
June 26, 2017                                    14 to 17

Page 14

1  that are open to interpretation?
2        A.   If we had any question, we would get
3  clarification from our center physician.
4        Q.   So you are not supposed to make -- you are not
5  supposed to interpret the guidelines, but rather go to
6  the center physician?
7        A.   If we need clarification on anything, we would
8  have to contact the center physician.
9        Q.   So what's an example of a time that you would
10 need clarification on something?
11       A.   I can't recall at this time.
12       Q.   When was the last time that you needed
13 clarification on something and had to go to the center
14 physician?
15       A.   I believe it was for medications.
16       Q.   And was that a donor who was taking a
17 medication?
18       A.   Donor was taking multiple medications.
19       Q.   And what prompted you to go to the center
20 physician about the multiple medications?
21       A.   Due to the amount of medications, I questioned
22 exactly what the donor was taking, what -- for what
23 reason, and questioned the center physician if the donor
24 was suitable to donate or not.
25       Q.   While you're using the conditions guidelines,

Page 15

1  are you permitted to use your own clinical judgment on
2  aspects of the guidelines?
3        A.   Yes.
4        Q.   How do you know when you're supposed to use
5  your own clinical judgment versus when you're supposed to
6  get the center physician involved?
7        A.   As far as with sign of -- symptoms of
8  infection, something that we've been trained on and our
9  center physician feels confident that we can determine,
10 then, yes.  But if we have any other question, we have to
11 contact our center physician.
12       Q.   So if you've been trained on something, then
13 you're allowed to use your own clinical judgment about
14 it; is that right?
15       A.   Yes.
16       Q.   And were there written protocols about the
17 types of cases that you're supposed to discuss with the
18 center medical director or center physician?
19       A.   What do you mean?
20       Q.   Was there anything written about the times that
21 you're supposed to call the center medical director or
22 the times that you're supposed to call the center
23 physician?
24       A.   No.
25       Q.   How did you know when to call the center

Page 16

1  medical director or center physician?
2        A.   Anytime we need a clarification on any subject.
3        Q.   So was it based on when you didn't know the
4  answer?  And that varies, depending on who the MSA was;
5  is that right?
6        A.   I don't understand.
7        Q.   If you don't know the answer to something, then
8  you're supposed to call the center medical director; is
9  that right?
10       A.   Yes.
11       Q.   And what about if another MSA didn't know the
12 answer to something, was he or she supposed to call the
13 center medical director?
14       A.   They can always contact Rey.  And if they
15 didn't know the answer, then, yes, they would contact the
16 center physician.
17       Q.   Do you know if there's anything in the
18 conditions guidelines about surgery?
19       A.   Excuse me?
20       Q.   Do you know if there's anything in the
21 conditions guidelines about surgery?
22       A.   Depending on what type of surgery.
23       Q.   What does it say about surgery?
24       A.   There's major surgery and minor surgery.
25       Q.   What does it say about major surgery?

Page 17

1        A.   Acceptable if at least four months since
2  procedure.
3        Q.   Does that mean it's talking about a past
4  surgery, the past four months?
5        A.   Yes, so as long as it's been at least the
6  four-month period.
7        Q.   Why is that, that it has to have been at least
8  four months?
9        A.   Enough time for the donor to heal, for their
10 safety, before they're able to donate.
11       Q.   How many times in a seven-day period are donors
12 allowed to donate?
13       A.   Two times.
14       Q.   And why is there a restriction on the number of
15 times a donor can donate in each week?
16       A.   Because we are taking their plasma, their
17 fluid, and their body has to be able to replenish that.
18 It's for their safety.  There's those restrictions.
19       Q.   And how long does it take to replenish the
20 plasma supply?
21       A.   I cannot recall the exact amount of time at
22 this time.
23       Q.   Is there anything in the conditions guidelines
24 about a donor's future surgery?
25       A.   No.

Melanie Garcia
June 26, 2017                    18 to 21

**Page 18**

1    Q.    Are MSAs supposed to ask about future surgical
2  procedures?
3    A.    If a donor does mention, then we can get more
4  information, but no.
5    Q.    What kind of information would you then try to
6  get?
7    A.    The reason for surgery.
8    Q.    Do you also try to find out when the surgery is
9  scheduled?
10   A.    Yes.
11   Q.    If a donor says that they don't have any
12 surgery scheduled, would that impact donation that day?
13   A.    We would have to contact our center physician.
14   Q.    The protocol would be -- if a donor says, I may
15 need surgery.  I don't have anything scheduled, your
16 protocol is that you would then need to contact the
17 center physician; is that right?
18   A.    We would first evaluate the donor as to the
19 reason why they would need surgery.
20   Q.    What types of reasons would permit donation
21 that day?  What types of upcoming surgeries would permit
22 donations?
23   A.    If a person was to have surgery, one reason --
24 if someone had an active infection or if someone had an
25 injury, then at that time it wouldn't be ideal for them

**Page 19**

1  to donate, for their safety.
2    Q.    And how would it impact their safety?
3    A.    A person needs their plasma in order to heal.
4  And, also, if they do have an infection, they're actively
5  passing that infection along the plasma when they donate
6  it.
7    Q.    And if a donor does not volunteer any
8  information about an upcoming surgery, that is not
9  something that MSAs routinely ask; is that correct?
10   A.    Correct.
11   Q.    And if a donor had said that they had a
12 long-term problem, such as a knee issue, and intended to
13 have a knee replacement, would they be allowed to donate?
14   A.    We would contact the center physician.
15   Q.    So is that something that you wouldn't be able
16 to answer on your own?
17   A.    Just depending on the donor's situation, our
18 doctor would have to evaluate and determine if they're
19 suitable to continue donating.
20   Q.    So typically -- or the correct protocol is to
21 then contact the center physician if a donor were to
22 disclose that; is that right?
23   A.    That's something we would have to check with
24 our center physician.
25   Q.    Right.  So the protocol would be to check --

**Page 20**

1  the center physician; is that correct?
2    A.    If we weren't sure as to -- as far as, you
3  know, what type of situation they were having, we would
4  contact our center physician, relay the -- what type of
5  issues are -- condition the donor was in and if he's okay
6  to donate.
7    Q.    And then would you follow the input or advice
8  of the center physician?
9    A.    Yes.
10   Q.    What is marked as Exhibit 4 are the conditions
11 guidelines.  I'm going to ask you to look at the top
12 right-hand corner.  Do you see it says page blank of 71?
13   A.    Yes.
14   Q.    Turn to what is marked as page 3 of 71.
15   A.    Okay.
16   Q.    There is a box.  And in the middle of the box,
17 it says "if."  And then it has unsteady gait, falling, or
18 dizziness.  Do you see that?
19   A.    I see the unsteady gait, falling, dizziness,
20 yes.
21   Q.    What is an unsteady gait?
22   A.    Normal balanced walk.
23   Q.    So -- I'm sorry.  An unsteady gait is
24 somebody -- the way you answered the question was an
25 unsteady gait was someone with a normal balanced walk.

**Page 21**

1    A.    Oh, sorry.  I didn't hear you correctly.  The
2  phone was --
3    Q.    That -- no, that's fine.  I just want to get
4  clarification.  So what is an unsteady gait?
5    A.    If someone is unbalanced, if someone is
6  limping, if someone is kind of like having a hard time
7  walking, sort of thing, where it's not balanced.
8    Q.    And what is it about someone who is limping
9  that would prevent them from donating plasma?
10   A.    If someone is limping, we have to find out the
11 reason why.  Someone could be in pain.  That person can
12 be injured.  There would be a reason as to why they're
13 limping.
14   Q.    And if the person says that they were in pain,
15 would they be restricted from donating that day?
16   A.    At that time they're not well and healthy, so
17 yes.
18   Q.    So anytime a donor says that they have a pain
19 in their body, they're restricted from donating; is that
20 correct?
21   A.    We would have to evaluate the donor and find
22 out why they are in pain.
23   Q.    Is it possible that somebody who says that they
24 are in pain would be allowed to donate, depending on what
25 you found out?

Melanie Garcia
June 26, 2017                                        22 to 25

Page 22

1    A.   We would have to get clarification from our
2  center physician.
3    Q.   Someone who uses a cane, considered to have an
4  unsteady gait?
5    A.   Excuse me?
6    Q.   Someone who uses a cane, considered to have an
7  unsteady gait?
8    A.   Not necessarily, no.
9    Q.   When would somebody with a cane be considered
10 to have an okay gait?
11   A.   If with the cane they do have steady gait.  But
12 if -- even with the cane they have unsteady gait, that
13 wouldn't be acceptable.
14   Q.   Okay.  So somebody who uses a cane may or may
15 not have a steady gait; is that right?
16   A.   Correct.
17   Q.   And how do you know what is considered an
18 unsteady gait?
19   A.   By watching the donor walk.
20   Q.   Were you trained on how to watch the donor
21 walk?
22   A.   Yes.
23   Q.   And what did you learn about watching the donor
24 walk?  How were you trained on it?
25   A.   Anytime during a physical, before, we're

Page 23

1  supposed watch the gait.  So that's what I was trained.
2  If anytime there is any abnormality when they're walking,
3  we need to investigate why.
4    Q.   And is it fair to say that if you find out why
5  there's an abnormality in the gait, that it's not the
6  gait by itself that means they can't donate; it's the
7  reason behind the gait?  Is that right?
8    A.   Per our guidelines, if it says -- if -- it says
9  here unsteady gait, so it would be to defer.  But, yes,
10 we can also see why they have an unsteady gait.
11   Q.   Because there are times that someone may have
12 an unsteady gait that doesn't actually impact their
13 ability to donate; is that right?
14   A.   We would have to get center physician
15 clarification on that.
16   Q.   So the fact that someone limps is not just by
17 itself enough to exclude someone from donating; is that
18 right?
19   A.   According to our guidelines with unsteady gait,
20 yes, it would be.  But we can also get center physician
21 to determine what's going on with the donor.  Why are
22 they limping?
23   Q.   Is the fact that someone uses a cane by itself
24 enough to exclude someone from donating?
25   A.   We would need to evaluate why they need the

Page 24

1  cane.
2    Q.   But you would ask follow-up questions if you
3  saw that they used a cane?
4    A.   Yes.
5    Q.   So by itself using a cane is not enough to
6  exclude someone; is that correct?
7    A.   Depending on the situation, why they would need
8  the cane, and also if we needed to call center physician.
9    Q.   So MSAs are supposed to call the center
10 physician with any confusion or gray area on the
11 conditions guidelines; is that right?
12   A.   Anytime, yes, we need clarification, we can
13 always call the center physician.
14   Q.   On the same page, page 3 of 71, you see the
15 portion where it says transfer to donor bed?
16   A.   Yes.
17   Q.   What does it mean transfer to donor bed?
18   A.   If the donor is able to get on and off the
19 donor bed without any assistance.
20   Q.   And how do you determine whether or not the
21 donor can get on and off the donor bed?
22   A.   We can actually take them to the donor floor,
23 to the donor bed, and we also have the medical table and
24 the medical offices.
25   Q.   And do you ask the donor to do that?

Page 25

1    A.   During physicals they are required to get on
2  and off the medical table, so we assess at that point.
3  And we also assess on the donor floor while they get on
4  and off the donor bed.
5    Q.   And if they can transfer to and from the donor
6  bed without assistance and they meet all other criteria,
7  am I right to say that they are allowed to donate?
8    A.   According to our medical staff reference, yes.
9    Q.   Are there any SOPs about deferring donors?
10   A.   What do you mean?
11   Q.   Do you have any written guidelines about when
12 to defer donors?
13   A.   As far as our medical staff reference -- just
14 tells us when they are not acceptable.
15   Q.   Are there -- are there additional SOPs about
16 deferring donors?
17   A.   I can't recall at this time.
18   Q.   Are there any SOPs about deferring donors who
19 have or may have surgery at some point in the future?
20   A.   I'm not sure at this time.
21   Q.   Are there SOPs about the conduct of donors?
22   A.   What do you mean?
23   Q.   Are there any SOPs about how to handle donor
24 conduct, what to do about donor conduct, what is
25 acceptable donor conduct?

Melanie Garcia
June 26, 2017                                            26 to 29

**Page 26**

1    A.   I don't recall at this time.
2    Q.   During your daily duties, what SOPs do you
3  refer to?
4    A.   The medical staff reference.
5    Q.   Are there others that you refer to?
6    A.   There could be others.  I don't remember the
7  exact CTRs or SOPs, but yes.
8    Q.   At what -- it's okay if you don't remember the
9  exact CTR number, but what would they refer to?  What
10  type of information would the SOP have that you would
11  want to refer to?
12    A.   As far as information that wouldn't be in the
13  medical staff reference, for -- how can I say? -- for
14  reactive testing or if -- situations where the donor has
15  traveled to other areas.
16    Q.   And that's not listed in the medical staff
17  reference?
18    A.   Those are other SOPs.
19    Q.   Okay.  And do you refer to those frequently?
20    A.   Just depending on the donors, you know, who
21  that situation pertains to.
22    Q.   And are there other CSL policies or procedures
23  that you refer to aside from what we've discussed and the
24  conditions guidelines?
25    A.   I can't recall at this time.

**Page 27**

1    Q.   You mentioned earlier the phrase CTR.  What
2  does CTR mean?
3    A.   I can't recall at this time.
4    Q.   Do you know what it might stand for?
5    A.   I don't remember right now.
6    Q.   -- you use that -- those letters, though, do
7  you use them to describe things in your job or at CSL
8  Plasma?
9    A.   They're a certain SOP, standard of operations.
10    Q.   But CTR, is that -- do you refer to things as
11  CTR number something?  Is that a typical way for you to
12  refer to things?
13    A.   Yes.
14    Q.   Did you ever talk to the center physician about
15  a donor with an unsteady gait?
16    A.   Not that I can recall.
17    Q.   Did you ever talk to the center physician about
18  a donor who used a cane?
19    A.   Yes, I believe so.  Yes.
20    Q.   Do you know what came out of that question or
21  that discussion?
22    A.   I -- I do not remember.
23    Q.   Was the donor allowed to donate, who used a
24  cane?
25    A.   I do not remember.

**Page 28**

1    Q.   Do you know if a donor who uses a cane has ever
2  been allowed to donate?
3    A.   I believe so, yes.
4    Q.   A donor with a limp ever been allowed to
5  donate?
6    A.   I'm not sure.  I don't remember.
7    Q.   Did any donor ever express to you any
8  dissatisfaction with their experience at CSL Plasma?
9    A.   Yes.
10    Q.   What did they tell you about their
11  dissatisfaction?
12    A.   They're not -- they're just not happy that they
13  weren't able to donate or be able to get the money if
14  they were to donate plasma.
15    Q.   What were you supposed to do if that happened?
16    A.   What do you mean?
17    Q.   What were you supposed to do if a donor
18  complained to you and said that they were dissatisfied?
19    A.   Try my best to explain as to the reason why
20  they weren't able to donate.
21    Q.   Were you supposed to get any supervisor
22  involved?
23    A.   If the donor started being loud or volatile
24  where I felt my safety was in question, yes.
25    Q.   What about if the donor asked to speak to a

**Page 29**

1  supervisor?
2    A.   Of course.
3    Q.   Have you had to get supervisors involved in the
4  past?
5    A.   Yes.
6    Q.   Have you ever had a plasma donor get angry with
7  you?
8    A.   Yes.
9    Q.   What did they do that made you know they were
10  angry?
11    A.   They started yelling and stood up and walked
12  towards me.
13    Q.   And what did you do?
14    A.   Call my center manager as soon as I can and try
15  to get to safety.
16    Q.   And so what happened with that donor?
17    A.   What do you mean?
18    Q.   Well, did the supervisor come over and talk to
19  the donor?  What happened?
20    A.   Yes.  I believe they went into the office and
21  sat down and talked with the donor.
22    Q.   So was that donor allowed to donate later?
23    A.   I don't recall.
24    Q.   Was that donor deferred?
25    A.   They're already deferred to begin with, I

Melanie Garcia
June 26, 2017                           30 to 33

Page 30

1  believe was that situation.
2      Q.   So was the deferral based on something else, or
3  was the deferral based on their behavior?
4      A.   I think in that particular situation, that
5  deferral was for -- not for the behavior, but there has
6  been times in the past where people are deferred for
7  their behavior.
8      Q.   And what happens that would get somebody
9  deferred for behavior?
10     A.   With that situation, there's been times
11 where -- for other medical staff associates, where
12 someone flung a door open and almost hit an MSA.  Another
13 person cornered an MSA and started slapping on the desk
14 and almost hitting the MSA.
15          Another few donors tend to threaten us,
16 said they'll meet us outside and follow us, etc.
17     Q.   In those situations where -- that sounds like
18 they were a physical threat.  Is that right, or physical
19 actions?
20     A.   Well, not with the threatening, just the other
21 situations, yes, where they stood up and got loud or
22 cussing.
23     Q.   Would you be the one to tell potential donors
24 that they were deferred?
25     A.   For what reason?

Page 31

1      Q.   For medical reason.
2      A.   Yes.
3      Q.   And would you tell them why they were being
4  deferred?
5      A.   Yes.
6      Q.   What happens after someone gets deferred?
7      A.   We notify them the reason why.  Once we know
8  the donor understands, the donor would leave the center.
9      Q.   So it is the MSA's job to explain to the person
10 why they're being deferred; is that right?
11     A.   Yes.
12     Q.   The -- or -- I'm sorry.  Can the person being
13 deferred disagree with the reason for deferral?
14     A.   Yes.
15     Q.   And what would happen if someone said they
16 disagreed with the reason for deferral?
17     A.   Find out why they disagree.
18     Q.   And what were you supposed to do with that
19 information?
20     A.   With whatever certain situation for the
21 deferral -- if at that time they're deferred, they're
22 deferred.  We can try to explain best we can, or we can
23 get a center manager or -- or supervisor, which would be
24 Rey, or get a center manager.
25     Q.   Could the potential donor appeal the decision

Page 32

1  of a deferral?
2      A.   No.
3      Q.   Was a person who was deferred -- ever talked to
4  the center manager -- has a person who was deferred ever
5  talked to the center manager and then subsequently be
6  allowed to donate?
7      A.   Not that I can recall, no.
8      Q.   What if the person can prove that the reason
9  for a deferral was wrong?
10     A.   What do you mean?
11     Q.   What if there's something that can be proven to
12 be incorrect about the reason for deferral?
13     A.   Then, they would be okay to donate.
14     Q.   And are you authorized to defer someone for
15 donating for any other reason than those listed here on
16 the conditions guidelines?
17     A.   What do you mean?
18     Q.   Can you refer someone -- I'm sorry.  Can you
19 defer someone for reasons that are not listed here on the
20 conditions guidelines?
21     A.   I'm not sure I understand what you're asking.
22     Q.   Are there times that you defer people for
23 reasons that are not listed in the conditions guidelines?
24 So you're saying -- you're telling someone that they're
25 deferred, but the reason for deferral isn't actually

Page 33

1  written down here in the conditions guidelines?
2      A.   Not that I can recall.
3      Q.   So your deferrals really need to be listed in
4  the conditions guidelines; is that right?  In other
5  words, if you are going to defer someone, the reason
6  provided has to be written down somewhere in these
7  conditions guidelines; is that right?
8      A.   Well, the conditions guideline is a guideline,
9  yes.  If we have any other questions that we would feel
10 the donor's safety is at risk or the plasma would be --
11 the quality would be affected in any way, we can always
12 call center physician.
13     Q.   Okay.  So there are reasons you could defer
14 someone that are not listed in these conditions
15 guidelines; is that right?
16     A.   We would have to talk to our center physician.
17 But like I said, it's a guideline mainly.  Our main
18 concern is the safety of the donor.
19     Q.   Okay.  Could donors tell the MSA to call a
20 center physician?  Could they request that the center
21 physician be called about an issue?
22     A.   Yes, could.
23     Q.   And have you ever done that?  Has a donor ever
24 asked you to call the center physician and you did?
25     A.   Believe, yes.  Was over medications.

Page 1

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION

3    MARK SILGUERO,                §
          Plaintiff,               §
4                                  §
     and                           §
5                                  §
     AMY WOLFE,                     §        CIVIL ACTION
6         Intervening Plaintiff,   §        NO. 2:16-CV-00361
                                   §
7    v.                            §
                                   §
8    CSL PLASMA INC.,              §
          Defendant.               §
9

10
     ***********************************************************
11
                       ORAL DEPOSITION OF
12
                       MICHELLE MAILEY
13
                       April 11, 2017
14
     ***********************************************************
15

16

17        ORAL DEPOSITION OF MICHELLE MAILEY, produced as

18   a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on the 11th of April 2017, from 11:02 a.m. to 1:34 p.m.,

21   before Isabel Connor, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of U.S.

23   Legal Support, 802 North Carancahua Street, Suite 2280,

24   Corpus Christi, Texas, pursuant to the Federal Rules of

25   Civil Procedure.

Michelle Mailey
April 11, 2017                          14 to 17

Page 14

1    A.   Yes.
2    Q.   And why did you leave Nueces County Jail?
3    A.   Because I got a better opportunity.
4    Q.   Were you terminated from CSL Plasma?
5    A.   No, I was not.
6    Q.   And were you terminated from Nueces County
7  Jail?
8    A.   No, I was not.
9    Q.   And what was your job title while you were
10 working at CSL Plasma?
11   A.   MSA.
12   Q.   What does MSA stand for?
13   A.   Medical staff associate.
14   Q.   What were your job duties as an MSA?
15   A.   Donor screening.  We took care of donor
16 reactions.  We did the donor -- donor qualification
17 physicals.
18   Q.   Donor qualification physicals?
19   A.   Yes.  They have a physical before you can
20 donate.
21   Q.   Okay.  I'm going to ask you about --
22   A.   Physical assessment.
23   Q.   Okay.  I'm going to ask you about each of those
24 things.  What -- you said one of your job duties was a
25 donor screening.  What does that mean?  What is a donor

Page 15

1  screening?
2    A.   Donor screening, they're brought into a booth.
3  We review the questionnaire.  They get their finger stuck
4  to check the protein.  I don't remember everything that
5  goes on, vital signs, weight.
6         MSAs did new donor screening, which
7  involved documenting tattoos, medical conditions,
8  medications, medical histories.  That's on a new donor.
9    Q.   On a new donor.
10   A.   New donor screenings were more in -- more
11 in-depth.
12   Q.   So just to clarify, for previous donors,
13 weight, vital signs, finger sticks.  And you brought them
14 into the booth to do those things?
15   A.   If I was screening, yes.  I mean, we -- if we
16 were called by another staff member to assess another
17 situation, then we assessed another situation.  During
18 the screening process, if something comes up medical,
19 then they would call the MSA.
20   Q.   So typically did you do the donor screening,
21 then?
22   A.   I did several.  I did probably hundreds of
23 donor screenings.
24   Q.   And was that part of your normal job duties?
25   A.   Yes.

Page 16

1    Q.   And you said that you would be called in to do
2  an assessment occasionally?
3    A.   Well, if something came up during a donor
4  screening process or if there was a problem, they would
5  call the MSAs, because we were the medical.
6    Q.   Typically would someone else be doing the donor
7  screening?
8    A.   Yes, one of the screeners --
9    Q.   Okay.
10   A.   -- front.  I don't remember what their title
11 was.
12   Q.   And you were called into the donor screening if
13 there was something unusual?
14   A.   Or I was screening that day.
15   Q.   Or you were screening.
16   A.   If there was a big line, the MSAs assisted in
17 the front screening donors.
18   Q.   And you also said that you -- one of your job
19 duties was donor reactions?
20   A.   Uh-huh.
21   Q.   What does donor reactions mean?
22   A.   They have a negative reaction to the donation
23 process.
24   Q.   And what is a negative reaction to the donation
25 process?

Page 17

1    A.   There's a lot of different things that can
2  happen.  Some of them vomit.  Some of them faint.
3  There's a lot of different things that happen.  I can't
4  remember them all.  It's been a while.  If we were called
5  to the donor floor because there was something going on,
6  we went and took care of it.
7    Q.   And what would you do if there was a donor
8  reaction?
9    A.   Would depend on their reaction.
10   Q.   Would you provide medical care?
11   A.   Donor reactions generally consisted of an ice
12 pack, getting them fluids.  And if need be, they'd get an
13 IV started.  And if it was a severe reaction, EMS was
14 activated.
15   Q.   And would you document this?
16   A.   Yes, in -- a donor reaction, yes.
17   Q.   Where would you document it?
18   A.   In the computer.
19   Q.   You also said that one of your job duties was
20 donor qualifications?
21   A.   Yeah.  It's part of the new donor process.
22   Q.   And what did that entail?  What was the donor
23 qualification --
24   A.   There's different things that can disqualify a
25 donor.  There's different things that need more

Michelle Mailey
April 11, 2017                                    18 to 21

Page 18

1  information.  It just -- it -- it's case-specific.  It's
2  each person specific, so it's hard to tell you what --
3  there's a lot of different things that would cause an MSA
4  to have to be involved in coming and ask for more
5  information.
6      Q.   And typically you would not be the person that
7  would come in to determine donor qualifications?
8      A.   Something came up on the answer -- on the
9  donor's questionnaire.  Yes, the MSA would have to get
10 more information.  If one of the other staff members
11 asked for an MSA to come in because there was more
12 information needed, then the MSA would come in.
13     Q.   And when you would go in as an MSA, what would
14 you do when you got into the room?
15     A.   Would depend on the situation.
16     Q.   Would you ask questions?
17     A.   Yes.
18     Q.   Would you ask questions to the donor?
19     A.   Yes.
20     Q.   What is an example of a question that you would
21 ask the donor?
22     A.   Oh, my God.  I don't know.  Again, it's
23 case-specific.  So if I don't have a case in front of me,
24 it's kind of hard to tell you what I'm going to ask.  I
25 mean, I can't go back and remember every case that I ever

Page 19

1  was involved in at CSL Plasma.  It's case-specific, so I
2  don't know how to answer that.
3      Q.   I'm not asking you about a specific instance.
4  I'm asking you to recall an example of the type of
5  question that you would ask once you were called --
6      A.   Okay.  If a patient answered yes, they were on
7  medications, then we're going to interview them and find
8  out what medications, how long they've been on it, who
9  ordered it, why they're on it.
10     Q.   And if they answer that they were on
11 medication, was that not something that the individual
12 that was already screened, then, would be able to assess?
13 Is that why you were called in?
14     A.   Well, the question would have been answered by
15 the donor on the donor screening process in the front
16 where they answer the little questions.  If something
17 comes in when then they come -- then, they come in the
18 booth for screening.
19          If something is not -- or out of the norm
20 on the donor screening -- the little computer screen
21 questionnaire, then they're going to call an MSA.  They
22 get an MSA tag, and the MSA has to finish the process.
23     Q.   So would an MSA be involved any time that the
24 questionnaire had something out of the ordinary?
25     A.   If the screener felt that an MSA was necessary,

Page 20

1  they would give the donor an MSA tag and call an MSA,
2  like -- again, it was a case-specific thing.  So it's
3  hard to say that every time they answer -- sometimes it
4  was just they misread the question.  We still have to
5  ask.
6      Q.   And would the screener make that determination
7  about whether to call --
8      A.   The screener --
9      Q.   -- MSA --
10     A.   -- sends the donor to the MSA.
11     Q.   And who was your supervisor at CSL Plasma?
12     A.   I had a lot of supervisors.
13     Q.   Who was one of your supervisors?
14     A.   At the time it was Dennis Thomas, Rey Vargas,
15 Nola Baker.
16     Q.   Any other supervisors?
17     A.   We had the -- the main manager.  I don't
18 remember his name at the time.  I didn't interact with
19 him as much.  The managers were our direct supervisors.
20 Rey Vargas was the medical management.  Dennis Thomas,
21 Nola Baker were center managers.
22     Q.   So you've given the names Dennis Thomas, Rey
23 Vargas, Nola Baker.  Did you have any other supervisors?
24     A.   Yes.  I said there was a main manager, but I do
25 not remember his name.  I can't remember his name.

Page 21

1      Q.   Okay.  I'll repeat.  The main manager, whose
2  name you don't remember; Nola Baker; Rey Vargas; and
3  Dennis Thomas.  Were there any other supervisors in
4  addition to those four individuals?
5      A.   Not that I can recall.
6      Q.   And where did you work before you were at CSL
7  Plasma?
8      A.   Girling Home Health.
9      Q.   How long have you been a nurse?
10     A.   It will be 23 years this year.
11     Q.   And did you do anything before you went into
12 nursing?
13     A.   No.  I went from high school to nursing school.
14     Q.   Since you've left CSL Plasma, have you been
15 paid by them for anything?
16     A.   No.  I don't even donate there anymore.
17     Q.   Did you list CSL Plasma as a job reference?
18     A.   Yeah.  It's in my job history.  I listed it.
19     Q.   And while you were there, were you ever
20 counseled or disciplined?
21     A.   I don't remember.  Not that I -- a write-up,
22 no.
23     Q.   Did -- you did not receive any write-ups?
24     A.   I don't recall being -- ever being written up,
25 no.

Michelle Mailey
April 11, 2017                                    30 to 33

Page 30

1    A.   Yes.  And anything that may have occurred on
2  the last donation.  I mean, there's a lot of different
3  variables that questions would arise between donations.
4  It just depends on what happened the last donation.
5          I mean, an instance -- a reaction.  You
6  know, if they had a reaction on their last visit, they're
7  not just going to come in and donate.  The MSA usually
8  sees the patient first.
9    Q.   So you mentioned a reaction as something that
10  could possibly make the MSA see the -- the donor first.
11    A.   Uh-huh.
12    Q.   What were other things that could possibly make
13  an MSA see the donor first?
14    A.   Big gaps in time they were there, if anybody in
15  the front called an MSA.
16    Q.   And were the front staff -- were they free to
17  uses their own judgment about whether to call an MSA or
18  not?
19    A.   Yes.
20    Q.   Were there protocols written down about when
21  they should call an MSA?
22    A.   There's a lot of different protocols.  I don't
23  recall all of them.
24    Q.   But were there protocols about when to call
25  an -- an MSA?

Page 31

1    A.   I'm sure there were.
2    Q.   Do you remember the names of those protocols?
3    A.   I don't.
4    Q.   I'm going to ask you about something that we
5  have labeled previously as Exhibit 4.  And the exhibits
6  are here.  I will show you what Exhibit 4 is.  Have you
7  ever seen this before?
8    A.   Yeah, years ago when I worked there.
9    Q.   What is it?
10    A.   Well, to answer that completely, I'd have to
11  read the entire thing.  I know it's -- it's not the
12  entire book.  This is medical stuff that triggers on what
13  we need to do medically.  But I can tell you there's a
14  lot more to it than that.
15    Q.   Okay.  So I understand you're saying that
16  there's stuff missing from here.
17    A.   Yes.
18    Q.   Is that right?  Okay.  Do you notice what is
19  missing?
20    A.   No.  I just remember it being a lot more.
21    Q.   In your recollection of the medical staff
22  reference, what did it contain?
23    A.   Different instructions for if someone has this,
24  this is what it is.  And if they have this, this is what
25  you do.  Was a guideline.

Page 32

1    Q.   Are there any parts of this that are open to
2  interpretation?
3    A.   Well, again, I don't know without reading the
4  entire thing.  I mean, I don't know.
5    Q.   So you do not know whether or not this was open
6  to interpretation; is that correct?
7    A.   Without reading the entire thing, no, I do not
8  know.
9    Q.   When you were at CSL Plasma, do you recall
10  whether or not you would interpret these guidelines?
11    A.   No.  We went by the guidelines.  If there was a
12  question, we would go to somebody like Rey, or we would
13  call our medical director.
14    Q.   I'm going to come back to that, because I am
15  wanting to ask questions about when you would go to Rey
16  or when you would go to the medical director.  But I want
17  to ask a little bit more about the guidelines first.
18          Did you -- you did use these guide --
19  guidelines when you were at CSL Plasma; is that right?
20    A.   Yes.
21    Q.   And how often did you refer to them?
22    A.   Pretty much every time a new donor processed.
23    Q.   So is it fair to say that with almost every new
24  donor, you would need to look at these for --
25    A.   Almost every new donor.  It would depend on

Page 33

1  what was on their questionnaire.
2    Q.   Do you know who wrote these guidelines?
3    A.   Exactly, no.  It's -- they're corporate.
4    Q.   So you believe CSL corporate wrote the
5  guidelines?
6    A.   Well, I don't think CSL corporate wrote the
7  guidelines.  But someone that works for CSL wrote the
8  guidelines, yeah.  I'm pretty sure that the medical was
9  written by medical staff.
10    Q.   And who trained you on these guidelines?
11    A.   Melanie and Rey.  They don't train you on every
12  single guideline.  You're trained as an MSA.  You're
13  taught how to use the guideline, how to use it as a
14  reference.
15          I mean, they don't sit there and go
16  through every -- it's -- training at CSL is, read this.
17  And then you take a test or you get asked questions.
18    Q.   And you'd previously said that you took a lot
19  of these tests at CSL Plasma
20    A.   Yes.
21    Q.   -- is that right?  And do they have a test --
22  after every kind of training that you did, you'd have a
23  test to review?
24    A.   To move on to the next portion.  I don't --
25    Q.   Okay.

Michelle Mailey
April 11, 2017                                    34 to 37

Page 34

1     A.   -- remember how many parts there are to the MSA
2  training, but there's more than one part.  You had to
3  test to go to the next part.
4     Q.   You said you received training on how to
5  interpret these guidelines.  What information were you
6  given about how to interpret them?
7     A.   Well, I don't think I used the word interpret.
8  We used the guidelines.  We read the guidelines and
9  followed the guidelines.  When there was a question, we
10 could call either the physician or we could go to Rey.
11    Q.   Well, I can ask you now since I was going to
12 come back to these times that you had to ask questions to
13 either Rey or the physician.  Were you in charge or was
14 it your job to use your judgment about whether or not to
15 call Rey or the physician?
16    A.   Yes.
17    Q.   And how would you make the determination to
18 call Rey or the --
19    A.   Depend on the --
20    Q.   -- physician?
21    A.   -- what was going on and what -- what the
22 question was.  Would just depend.  Again, case-by-case
23 basis.
24    Q.   So you are saying that these cases were
25 supposed to be -- or these determinations were supposed

Page 35

1  to be made on a case-by-case basis?
2     A.   Each person is different.  Every person has
3  different things.  Every person got screened.  Every
4  person got questioned, and different things come up.  And
5  if you're not sure about what this says, you can call a
6  physician or go to Rey for clarification.
7     Q.   You would call Rey or the physician when you
8  are unsure?
9     A.   When you needed clarification.
10    Q.   And did you seek clarification because the
11 guidelines were not --
12    A.   Either they weren't --
13    Q.   -- clear?
14    A.   -- clear or the -- the -- the case-specific
15 issue was not necessarily on -- in the guideline.
16    Q.   And are you permitted to use your own clinical
17 judgment to follow these guidelines?
18    A.   The MSAs are trusted to use their clinical
19 judgment.  That's why we're MSAs.
20    Q.   Do you know who the center medical director,
21 the center physician, was while you were there?
22    A.   I don't remember his name.  I think we had two
23 while I was there.  I don't remember either one of their
24 name.
25    Q.   Would you call them?  Did you ever speak with

Page 36

1  them on the phone?
2     A.   Oh, yeah.
3     Q.   And you had previously said sometimes you would
4  ask Rey, and sometimes you would ask the center
5  physician.  Under what circumstances would you ask Rey?
6     A.   If something was unclear on the medical
7  reference or if I had a question about something, I would
8  ask Rey or the medical director.
9     Q.   Was Rey always the first person that you would
10 ask?
11    A.   If he was there.  Otherwise, sometimes I might
12 ask Melanie if I needed clarification on something.  She
13 had been there longer.
14    Q.   And how would you decide whether to ask Rey or
15 to ask the center physician?
16    A.   Most of the time Rey was able to answer
17 questions.  If it was more in-depth or Rey would instruct
18 me to call the medical director, I would call the medical
19 director.
20    Q.   Did you ever call the medical director on your
21 own first --
22    A.   Oh, yes.
23    Q.   -- without consulting Rey?
24    A.   Yes.  If it was something that triggered me to
25 call the medical director, I'd trigger the -- I'd call

Page 37

1  the medical director.
2     Q.   And what's an example of a time that you called
3  the medical director?
4     A.   I know I had to call him for medication
5  clarification --
6     Q.   Okay.
7     A.   -- because it wasn't on the list.  I mean, I
8  can't recall every time I called him.  I know I called
9  him on several occasions for several different reasons on
10 several different dates.  I can't tell you when or why.
11    Q.   So you talked about the medical -- or -- I'm
12 sorry.  The medication clarification was one time that
13 you called the medical director directly.  Can you recall
14 other instances?
15    A.   Oh, yeah, donor reactions.  There's a lot of
16 different reasons we would have called.  I can't sit here
17 and tell you every time I called the medical director.
18 Can't sit here and tell you every time I went and talked
19 to Rey.  I can't tell you every time I went and asked
20 Melanie a question.
21    Q.   Right.  And I'm not --
22    A.   I worked there a long time.
23    Q.   I'm not asking you to recall every single time,
24 because I understand that you may not be able to do that.
25 But I am asking about examples of times that you had --

Michelle Mailey
April 11, 2017                                    38 to 41

Page 38

1  had to call the medical director directly.
2       I do understand that you may not recall
3  every time.  You've talked about the medication
4  clarification, the donor reaction.  What other instances
5  might you call the medical director direct --
6       A.  I don't know.  I mean, I honestly don't know.
7  There's a lot of different reasons we would call a
8  medical director or Rey.  I can't give you every single
9  example of why I called the medical director or I asked
10  Rey a question.  I don't know.
11      Q.  And so you cannot recall any other time that
12  you would have asked Rey a question --
13      A.  Can I sit here and tell you why exactly I went
14  and asked Rey a question?  No, I cannot.  I don't
15  remember.  It was a while back.  We see a lot of donors.
16  I don't remember.
17      Q.  Were there any protocols in place about the
18  times that you were supposed to call the center medical
19  director, center physician?
20      A.  Oh, yes.
21      Q.  And what protocols were those?
22      A.  I don't remember.
23      Q.  Do you think they were written protocols?
24      A.  I'm sure they were.  I just — I don't
25  remember.  I know there were certain times that we had to

Page 39

1  call the doctor.  I just don't remember what they were.
2       Q.  So there were times that were indicated as you
3  must call the doctor; is --
4       A.  Yes.
5       Q.  -- that correct?
6       A.  Certain severity of reactions, we had to notify
7  the doctor.  I mean, I don't remember what the policies
8  and procedures were.  I -- I don't work there.  I don't
9  remember.
10      Q.  I'm going to ask you to turn to page 3 of this
11  exhibit.  And there -- there's front and back, so
12  apologies for that confusion, but page 3.  You can take
13  off the paper clip.
14      So let's make sure we're looking at the
15  same page.  I don't think we are.  Page 3 at the top.
16  Yes.  Okay.  And on this page, it says:  Disabilities.
17  See SOP for specific guidance.
18      Was there a specific SOP about
19  disabilities?
20      A.  Yeah, it's right there.
21      Q.  So when it says see SOP for specific guidance,
22  you're saying that this is referring to this page?
23      A.  This is the -- if I -- I don't -- I don't
24  remember what a SOP is.  This was our medical staff
25  reference.  This is what we went by.

Page 40

1       Q.  So it is your testimony that there was nothing
2  else that you referred to having to do with disabilities;
3  is that correct?
4       A.  It says see SOP for specific guidelines.  I
5  don't recall.  I'm sure I went to the SOP.  I don't
6  remember even what it is today.
7       Q.  SOP may stand for standard operating procedure.
8       A.  Uh-huh.
9       Q.  And it may be a written document.
10      A.  Uh-huh.
11      Q.  See SOP for specific guidance.  You're saying
12  that you cannot remember if there is any other written
13  documentation about disabilities; is that correct?
14      A.  It says there's an SOP for it, so I'm sure
15  there is.  Can I recall if I've actually -- no, I don't
16  recall what it says or what's on it.  No.
17      Q.  I'd like to review this specific page --
18      A.  Uh-huh.
19      Q.  -- and some of the pieces of the chart on this
20  page.  There is a "if" column.
21      A.  Uh-huh.
22      Q.  And then that is a "then" column.
23      A.  Uh-huh.
24      Q.  The "if," does that mean if the donor presents
25  with these things?

Page 41

1       A.  Uh-huh.
2       Q.  And the "then" column, does that mean that CSL
3  Plasma may find them acceptable or for a deferral if
4  these things are present?
5       A.  Uh-huh.  Or if the donor screener came up with
6  this, this would trigger them to call an MSA.  If they
7  found one of these ifs, then the MSA would come and do
8  more in-depth assessment.
9       Q.  Okay.  For the mental or behavioral on this
10  chart, it says if mental or behavioral; is that correct?
11      A.  Yes.
12      Q.  Then acceptable if able to give informed
13  consent, does not violate center standards; is that
14  correct?
15      A.  Yes.
16      Q.  What are the center standards that are
17  referenced here?
18      A.  I don't recall.  I know that behavior was a big
19  part of it.
20      Q.  What kind of behavior was part of the center
21  standards?
22      A.  Fighting, cursing at staff, threatening staff,
23  slamming doors, throwing things, fighting with another
24  donor, touching another donor, sexually harassing another
25  donor.  There were a lot of reasons when it came to

Michelle Mailey
April 11, 2017                                              42 to 45

Page 42

1 behavior.
2     Q.   And do you believe there were written policies
3 on these?
4     A.   Oh, yes.  And then the managers, of course,
5 they do -- you know, it becomes a management issue.
6     Q.   And what happens when it becomes a management
7 issue?
8     A.   It's a management issue.  Manager takes over.
9     Q.   And the management handles whatever complaint
10 has been made to them?
11     A.   Uh-huh.
12     Q.   Further on this chart, you see if unsteady
13 gait, falling, or dizziness, then defer; is that right?
14     A.   Uh-huh.
15     Q.   I'm going to -- I just -- yes or no?
16     A.   Yes.
17     Q.   Thank you.  For unsteady gait, falling, or
18 dizziness -- I think I know what falling means.  But can
19 you please explain to me what would qualify as falling?
20     A.   Somebody falls down.
21     Q.   And for dizziness, is that self-reported
22 dizziness?
23     A.   I would assume it would be self-reported
24 dizziness.  But you can kind of tell when somebody is,
25 you know, swimming in their head, if they can't walk a

Page 43

1 straight line.
2     Q.   Okay.  So what does that look like?  If it's
3 not self-reported and you're observing it, what does
4 dizziness look like?
5     A.   If someone is kind of doing this, it's a very
6 good indication that they're not seeing right.
7     Q.   And I'm going to ask you -- I apologize.
8     A.   I don't know how to explain it in words.
9     Q.   Okay.  I'm going to finish my question.  You
10 said doing this, which unfortunately the court reporter
11 can't take down.  So if you could --
12     A.   Swerving back and forth.  I don't know if
13 walking is swerving.  Stumbling can be an indication of
14 dizziness.  There's a lot of different indications that
15 someone could be dizzy or light-headed.
16          I mean, someone can stand up, get dizzy
17 and -- and fall down.  It's -- there's a lot of
18 indications for dizziness.
19     Q.   And what is unsteady gait on this?
20     A.   Unsteady gait would be an unsteady gait.
21 They're not steady on their feet.
22     Q.   So would falling be an unsteady gait?
23     A.   Falling usually results from an unsteady gait.
24 Falling is an action, not a symptom.
25     Q.   And is walking slowly considered an unsteady

Page 44

1 gait?
2     A.   No.  That's walking slowly.
3     Q.   Would limping be considered an unsteady gait?
4     A.   Yes.  That's not a normal gait, so it would be
5 an unsteady gait.
6     Q.   So is anything that's not a normal gait an
7 unsteady gait?
8     A.   If it causes issues with ambulation, it is an
9 unsteady gait.
10     Q.   And if it does not cause issues with
11 ambulation, is it not an unsteady gait?
12     A.   That would depend -- I mean, it would depend on
13 the severity.  You can have -- I mean, anyone who cannot
14 walk on their two feet, it's an unsteady gait.  If they
15 are using crutches, cane, walker, they're unsteady.  They
16 require a stabilizing device.
17     Q.   You said anybody that cannot walk on their own
18 two feet has an unsteady gait; is that correct?
19     A.   Well, unless they're in a wheelchair, then they
20 don't walk at all, but --
21     Q.   So if somebody can walk on their own two feet,
22 do they have a steady gait?
23     A.   Without assistive device, it's -- it's probable
24 that they have a steady gait.  It's not a hundred percent
25 that their gait is steady.  I mean, you can be unsteady

Page 45

1 on your feet.
2     Q.   So if you can --
3     A.   A dizzy person can become unsteady.
4     Q.   If you can walk on your own two feet without an
5 assistive device, you've said it's probable that they
6 have a steady gait.  When would they not have unsteady --
7 a steady gait in that situation?
8     A.   I don't know how to explain unsteady.  There's
9 a lot of different degrees of unsteady gait and different
10 degrees of ambulation and different degrees of assistive
11 device necessities.  I don't know how to explain that to
12 you.
13     Q.   How would you --
14     A.   I mean, from a nursing standpoint, an unsteady
15 gait is an abnormal gait.
16     Q.   And you would make the determination that
17 anybody who has an abnormal gait would be evaluated for
18 further --
19     A.   There would be further questions asked, yes.
20     Q.   And would you be the person to ask those
21 questions?
22     A.   If they call for an MSA, yes, I would.
23     Q.   And would the MSA be the ultimate one to make a
24 judgment on that?
25     A.   The MSA would ask further information.

Michelle Mailey
April 11, 2017                                        50 to 53

Page 50

1    A.   By themselves.  Get on and off the bed safely
2  without help.
3    Q.   Would you ever help donors on a --
4    A.   No.  We're not permitted to help donors on or
5  off the bed or in and out the door or -- no.
6    Q.   So based on what I'm seeing here, if a donor is
7  able to transfer to a donor bed without help, without
8  assistance --
9    A.   Safely and without help.
10   Q.   Safely and without help.
11   A.   Safety is a big thing at CSL.
12   Q.   If they met all other criteria, they should be
13  able to donate?
14   A.   It would, again, depend on the case-by-case
15  basis, because if we're called for a reason and we
16  interview and things come up in the interview, then more
17  information may be required.
18   Q.   Right.  If they meet all other criteria and can
19  transfer to the donor bed without assistance, would they
20  be able to donate, if they meet all the other criteria?
21   A.   If no further information was required.
22   Q.   So the answer is yes?
23   A.   No.  That's not what I said.  I said if no
24  further information was -- you want me to say yes or no
25  on a yes or no.  Yes or no.  It's -- it's a case-by-case

Page 51

1  process.
2            If we pull somebody in the booth because
3  they have an unsteady gait or they're walking with
4  something and something comes up in the question process
5  and we need more information for clarification, then, no,
6  we're not going to let them donate till we get more
7  information.
8    Q.   And after you've gotten that more
9  information --
10   A.   If everything comes back okay, then, yes, they
11  would be able to donate.
12   Q.   Understood.
13           MS. DAVIS:  I think I'd like to take a
14  short break --
15           THE WITNESS:  So would I.
16           MS. DAVIS:  Okay.  Good.  Off the record.
17   (Break taken from 11:59 a.m. to 12:20 p.m.)
18   Q.   (By Ms. Davis)  Ms. Mailey, have you ever
19  participated in Americans with Disabilities Act or ADA
20  training?
21   A.   A what?
22   Q.   Have you ever participated in Americans with
23  Disabilities Act or ADA, some people call it, training?
24   A.   I don't remember.
25   Q.   Have you ever had any kind of training about

Page 52

1  avoiding disability discrimination?
2    A.   I'm -- I don't remember.  I'm sure I have at
3  some point, but I don't remember.
4    Q.   You -- you -- you say you're sure you have.
5  Can you tell me more about the training you may have
6  received --
7    A.   I don't remember.
8    Q.   Who may have conducted the training that you
9  are sure you may have had in the past?
10   A.   I don't remember.
11   Q.   Was there any documentation confirming that you
12  would have attended a training?
13   A.   I don't have any documentation, so I don't
14  know.
15   Q.   Have you ever received any training on how to
16  interact with people with disabilities?
17   A.   No.
18   Q.   Did you know that you weren't supposed to
19  discriminate against people with disabilities?
20   A.   I don't discriminate against people with
21  disabilities.
22   Q.   Did you know that you were not supposed to?
23   A.   I know you're not supposed to discriminate
24  anybody for any reason.
25   Q.   And how do you know that?

Page 53

1    A.   I'm an adult, and I know that.  I was raised
2  that way.
3    Q.   What kinds of things were you raised to not do
4  in terms of discrimination?
5    A.   I was not raised to even look at someone with a
6  disability any different than I would look at anybody
7  else.
8    Q.   And in your job as an MSA, were you required to
9  look at people with disabilities differently than anyone
10  else?
11   A.   It would depend on the disability.  I mean, a
12  seizure disorder person can't donate.  So some
13  disabilities would defer a donor.
14   Q.   Was there any internal policies at CSL Plasma
15  about disability discrimination?
16   A.   I don't remember.
17   Q.   Are there other SOPs about screening donors
18  other than the medical staff reference that we have
19  already discussed?
20   A.   If I remember correctly, there are a lot of
21  SOPs.  I don't remember.
22   Q.   Are there any SOPs about deferring donors?
23   A.   I'm sure there are.
24   Q.   Do you recall what those would have been
25  called?

Michelle Mailey
April 11, 2017                                    58 to 61

Page 58

1    Q.   What did the donor say over the phone?
2    A.   I don't remember exactly.
3    Q.   How did you know it was a physical threat?
4    A.   Because he threatened to do bodily damage.
5    Q.   And what did he say?
6    A.   I don't remember the exact conversation.  I
7    just remember being extremely upset and getting a
8    manager.
9    Q.   How did you know that he threatened bodily
10   damage?
11   A.   Because I was on the phone, and he threatened
12   me.
13   Q.   And how did you know it was a physical threat?
14        MS. WILLING:  Counsel, objection.  You've
15   asked the question like three times now.  She's answered.
16   Q.   (By Ms. Davis)  I'm going to ask you again:
17   How did you know it was a physical threat?
18   A.   Because he threatened to hurt me on the phone.
19   Q.   And you spoke with a manager after that
20   happened; is that correct?
21   A.   Yes.
22   Q.   Who was the manager that you spoke with --
23   A.   I don't remember.
24   Q.   Can you think of any other examples?
25   A.   Yes.  I was almost physically attacked in

Page 59

1    the -- in the MSA room.
2    Q.   What happened in that incident?
3    A.   She charged at me and almost hit me while I was
4    typing on the computer.
5    Q.   What did you do in reaction?
6    A.   I screamed.
7    Q.   Did somebody hear you scream?
8    A.   Yes.  They came to help.
9    Q.   And what did they do to that donor?
10   A.   She was escorted out of the building and
11   permanently deferred.
12   Q.   And did a manager get involved in that example?
13   A.   Yes.
14   Q.   What manager --
15   A.   I don't remember.
16   Q.   -- was involved?  What did the manager do after
17   that?
18   A.   The donor was permanently deferred.
19   Q.   Did the manager call to tell the donor they
20   were permanently --
21   A.   I don't remember.
22   Q.   -- deferred?  Did you call the police in that
23   instance?
24   A.   I -- I don't know.  I don't remember if -- I
25   don't remember if they were going to call.  I think they

Page 60

1    were going to call, but she left the center.  She didn't
2    make contact.
3    Q.   She did make contact?
4    A.   She didn't --
5    Q.   She didn't.
6    A.   -- make contact with my -- with me.
7    Q.   Do you remember who came --
8    A.   I don't.
9    Q.   -- over once they heard you scream?
10   A.   I don't.  That was a blur.  I don't.
11   Q.   Were there other times that you were physically
12   threatened?
13   A.   No.  Usually it was just -- a lot of the staff
14   would get cussed out pretty severely when someone was
15   told they couldn't donate, or slam doors, knock over
16   the -- I don't remember what those things are called when
17   you have the queue line and you have those metal posts
18   with the ropes.  They'd knock those over on their way
19   out.  Just aggressive and violent behaviors.
20   Q.   How often would that happen?
21   A.   Oh, it's pretty frequent.  Donors get told they
22   can't donate.  They get mad.  Donor has a tattoo that's
23   not old enough.  Or donor comes back after being gone for
24   a while, and they've gotten a tattoo since, and they
25   can't -- you can't donate unless the tattoo is 12 months

Page 61

1    old.  Then -- there's all kinds of things that trigger
2    donors to get verbally abusive.
3    Q.   And those donors that were threatening would
4    cuss frequently?
5    A.   They become verbally abusive.  I can't remember
6    everything every donor ever said.  It could get ugly.
7    Q.   Are there any other times that someone
8    threatened physical violence?
9    A.   At the plasma center?
10   Q.   Correct.
11   A.   No.  Those are the only two.  I mean, I was --
12   there have been threats but not necessarily physical
13   harm.
14   Q.   And did you get training on how to react to
15   these kinds of threats?
16   A.   I don't think anybody trains you for how to
17   take a physical threat or a threat at all.  I call the
18   management.  When things get out of hand, I call the
19   management.  That's why they're there.
20   Q.   And was that what you were instructed to do?
21   A.   Yes, we call management.
22   Q.   The management that you would call, would that
23   be Rey Vargas?
24   A.   It would be whatever manager was at the center
25   that day, different managers.  They work different

Michelle Mailey
April 11, 2017                          62 to 65

**Page 62**

1  shifts.  It's the manager.
2      Q.  And I'm sorry.  I'm going to have to ask you
3  again, because I may not remember.  But the managers at
4  the time --
5      A.  The ones I can remember are Rey Vargas, Nola
6  Baker, and Dennis Thomas.
7      Q.  Okay.
8      A.  We also had the quality control people, but
9  they were not managers.  We had another main manager.  I
10  can't remember.  We had two while I was there.  I don't
11  remember which one was there.  I don't remember their
12  names.
13      Q.  And the quality control, who were they?
14      A.  They weren't managers.
15      Q.  Where did the quality control individuals sit?
16      A.  In their offices.  They weren't managers.  They
17  just worked in quality control.
18      Q.  Did they ever interact with donors?
19      A.  No.  I think the only one that -- they would
20  help on the donor floor when we're backed up.  That's it.
21  Not the screening process, just donor floor.
22      Q.  Did you ever have to call upon the quality
23  control staff?
24      A.  No.
25      Q.  So --

**Page 63**

1      A.  They weren't managers.
2      Q.  You didn't go to them with questions?
3      A.  We went to them with -- when tattoo stuff came
4  up, because they'd have to pull the plasma that was
5  related to the donor.
6      Q.  Did you enjoy working at CSL Plasma?
7      A.  I did the time I was there.
8      Q.  And were plasma donors challenging patients?
9      A.  No, not all the time.  Some of them were a
10  blast.  I mean, you get to know them.  They're like
11  family.  They're there twice a week every week.  They're
12  there.  They're -- you know them.  You get to know their
13  faces, their birthdays.  It's not always bad.
14      Q.  Do -- do donors express dissatisfaction
15  sometimes to you with their experience at CSL Plasma?
16      A.  Oh, I'm sure they did.
17      Q.  Why would they express their dissatisfaction?
18      A.  I don't know.  Probably come up in
19  conversation.  I don't recall exactly.  I don't even know
20  an instance where somebody did, so I don't know.  I'm sure
21  in conversation somebody might have said something
22  happened last week.  I don't know.
23      Q.  Did anybody ever ask to speak with a
24  supervisor, your supervisor, and they ask you -- sorry.
25  Did anybody ever ask you to speak with your supervisor?

**Page 64**

1      A.  I'm sure they did, but I couldn't remember an
2  incident.  I mean, it's a while back.  I don't remember.
3      Q.  Any times that somebody told you that they were
4  going to call corporate or anything like that?
5      A.  Yeah.  We got threats like that all the time.
6  Uh-huh.
7      Q.  And what would you do when somebody said they
8  were going to call corporate?
9      A.  Nothing.
10      Q.  Were --
11      A.  If they were being verbally aggressive or
12  abusive, we would get management.  Otherwise, that --
13  that's well within their rights.  They can call
14  corporate.
15      Q.  Were you worried when they said they --
16      A.  No.
17      Q.  -- were going to call corporate?  Would you
18  be -- would you be scared when they said they were going
19  to call corporate?
20      A.  No.  I did my job.  So, no, I was not scared.
21      Q.  Plasma donors would get angry sometimes,
22  correct?
23      A.  Yes.
24      Q.  And how could you tell that they were angry?
25      A.  There's different degrees of anger.  There's

**Page 65**

1  some that just got mad.  And then there's some that
2  became verbally abusive and aggressive.  There's some
3  that became physically aggressive.  So there's different
4  degrees of anger.  There's different degrees of behavior.
5      Q.  And if somebody became verbally aggressive,
6  what would they do?
7      A.  First, we would try to instruct them to calm
8  down.  And if they didn't, they would be -- management
9  would come out.  And then management would take over.
10  Nine times out of ten, if a donor became verbally
11  aggressive or abusive, they were permanently deferred.
12      Q.  And if management didn't come out or wasn't
13  called, does that mean the person wasn't being verbally
14  aggressive?
15      A.  Probably.
16      Q.  If somebody was being verbally aggressive, you
17  would call the manager?
18      A.  Yes.
19      Q.  Is that correct?
20      A.  Uh-huh.
21      Q.  And would you stay with the donor and the
22  manager --
23      A.  No.
24      Q.  -- while they --
25      A.  If I was the one being verbally attacked, no, I

Michelle Mailey
April 11, 2017                                    66 to 69

Page 66

1  don't stay.  No.
2      Q.   You were able to leave and remove yourself from
3  the --
4      A.   Manager takes over.
5      Q.   -- situation; is that correct?  Sorry.  Let me
6  just finish the question.  So you were able to leave and
7  remove yourself from the --
8      A.   Yes.
9      Q.   -- situation, correct?  And would there be
10  documentation of this -- this aggression or this verbal
11  aggression?
12     A.   The manager typically puts in a note.
13     Q.   And would you ever be the one that was required
14  to --
15     A.   I know I put in notes on donors, yeah.
16     Q.   What kinds of notes would you put in?
17     A.   Well, it would depend on the situation.  It
18  would be a note explaining the situation, if I put it in.
19  Generally when the managers took over, it becomes a
20  management problem, not a medical problem.
21     Q.   Would you be the one to tell potential donors
22  if they were deferred?
23     A.   If it was for a medical purpose.  For a
24  permanent deferral?  No.
25     Q.   What about for a temporary deferral?

Page 67

1      A.   It would depend on the situation again.
2  It's -- every -- it's a case-by-case.  Would depend on
3  what the deferral was for.
4      Q.   If it was a medical deferral and it was your
5  donor, would you be the MSA that would tell --
6      A.   They would be informed of a temp or permanent.
7      Q.   I'm sorry.  I am going to finish the question.
8  I know it's difficult.  If you were the individual that
9  was assessing the donor, you were the MSA, and it was a
10  temporary deferral, would you be the individual to tell
11  the donor about the deferral?
12     A.   If I was deferring a donor for either the day
13  or it was going to be a permanent medical deferral, I
14  would be the one, if it was a medical deferral.  And it
15  would be me or another MSA.
16     Q.   And what would you tell them when you were
17  deferring them for the day?
18     A.   We would explain the reason for the deferral
19  and what they needed to get the deferral lifted.
20     Q.   You would give them information about what they
21  could do to get the deferral lifted?
22     A.   If it was something that could be lifted, yes,
23  if it wasn't a permanent.  If it was a temporary deferral
24  that just required either more information or the action
25  of a donor to do something to get it lifted, then it

Page 68

1  would be lifted.
2      Q.   What actions would the donor need to do?
3      A.   It would depend on what they were deferred for.
4      Q.   What is one example of something that the donor
5  could do to get the temporary deferral lifted?
6      A.   If a donor had a -- if they stated that they
7  had a fracture, they couldn't remember when the fracture
8  was, they would have to go to their doctor and get a
9  letter stating from their doctor that it's okay to
10  donate.
11     Q.   Okay.  What else might a donor need to do to
12  get the temporary deferral lifted?
13     A.   It would depend on the case.  I can't sit here
14  and come up with cases and cases.  I don't know.  There's
15  a lot of different things.  Donors can get more
16  information on to get deferrals lifted.
17     Q.   I'm asking you to think of what you can recall.
18  If there are other examples of something a donor can do
19  to get the temporary deferral lifted, can you recall what
20  that might be?
21     A.   Typically MSAs would ask for letters from
22  doctors for different reasons.
23     Q.   Did you ever give instructions to a potential
24  donor to drink more water?
25     A.   If something came back in their screening that

Page 69

1  indicated that they should probably drink more water,
2  yes, I'm sure we would educate them to drink more water.
3      Q.   Did you give other pieces of education to
4  potential donors about what they could do to get their
5  temporary deferral lifted?
6      A.   Commonly in the new donor process, yes.
7      Q.   What are some of those?
8      A.   Well, they have to eat before they donate.
9  They need to be well hydrated to donate.  I mean, if
10  somebody comes in and their iron and stuff is low in the
11  screening process, we're going to instruct them on foods
12  to eat to boost their iron.
13     Q.   For permanent deferrals, you were also the
14  person that would potentially tell them that they were
15  permanently deferred if it was a medical reason; is that
16  correct?
17     A.   For a medical reason, yes.
18     Q.   And what would you tell them about the
19  permanent deferral?
20     A.   Would depend on what the deferral was for.
21     Q.   Would you tell them why the deferral was -- had
22  occurred?
23     A.   Yes.  If it was a medical deferral that I
24  applied, yes.
25     Q.   And did you explain to them that the deferral

Michelle Mailey
April 11, 2017                                   74 to 77

Page 74

1   nonmedical reasons?
2        A.   We -- I don't -- I never deferred a donor for a
3   nonmedical reason.
4        Q.   Were you authorized to do so?
5        A.   I don't recall.
6        Q.   Aside from your employment at CSL Plasma, have
7   you ever been threatened while at work?
8        A.   Oh, yes.
9        Q.   When was that?
10       A.   Well, how does that pertain to this?  That's
11  personal.
12       Q.   I'm going to ask the question again.  Had you
13  ever been threatened in the workplace?
14       A.   Yes.  I have been threatened in the workplace
15  before other than at the plasma center.
16       Q.   Have you been threatened in the workplace since
17  then?
18       A.   Yes.
19       Q.   Where did that happen?
20       A.   That is personal.
21       Q.   I'm going to ask the question again.  Where did
22  the threats in the workplace --
23       A.   At the Nueces County Jail.
24       Q.   What -- what happened?
25       A.   I am not at liberty -- I'm not discussing that.

Page 75

1        Q.   I'm going to ask the question again.  What
2   happened in the Nueces County Jail?
3        A.   I am not answering.  That has nothing to do
4   with this.  There was a case involved, and I'm not
5   answering that.
6             MS. DAVIS:   Let the record show that the
7   answer was nonresponsive.
8        Q.   (By Ms. Davis)  Setting aside the Nueces County
9   Jail example, were there other threats made to you in the
10  workplace?
11       A.   After CSL?  No.
12       Q.   And what about before CSL --
13       A.   Yes.
14       Q.   -- were there -- and when did those occur?
15       A.   Had a mentally unstable son of a patient in
16  home health that attacked me on the porch.
17       Q.   Did you call the police?
18       A.   I went to the police.
19       Q.   And was a police report made about that?
20       A.   I'm sure there was.  But that was many, many
21  years ago, and I don't remember.
22       Q.   And did you have to tell your supervisor when
23  that happened?
24       A.   I called my supervisor.
25       Q.   And did you have to make any documentations

Page 76

1   about that threat?
2        A.   I don't remember.
3             MS. DAVIS:  I'd like to take just a short
4   break, if that's okay with you.  It will be short.  Thank
5   you.  Off the record.
6        (Break taken from 12:51 p.m. to 12:56 p.m.)
7        Q.   (By Ms. Davis)  Ms. Mailey, do you know that
8   the lawsuit involves a donor named Mark Silguero?
9        A.   That's what it was on the subpoena.
10       Q.   Do you remember Mr. Silguero?
11       A.   A little, not a lot.
12       Q.   What do you remember about him?
13       A.   He got mad because I didn't let him donate that
14  day.
15       Q.   How did you know he was mad?
16       A.   Because he came -- became verbally aggressive
17  and slammed the door and threatened.  I called a manager.
18       Q.   What job duty did you have on the day that you
19  assessed Mr. Silguero?
20       A.   I can't remember who or why.  But I know that
21  there was -- something came up about his -- the way he
22  was walking or the limp or something.  So we brought him
23  in to ask him some questions.  And he hadn't been to the
24  center in a while.
25       Q.   Did you ask him those questions?

Page 77

1        A.   Uh-huh.
2        Q.   What questions did you ask?
3        A.   I don't remember exactly.  I know I asked him
4   about his -- the way he was walking and the cane, because
5   he had a really severe limp.  And he had said something
6   about needing surgery or something.
7             And that's where the conversation kind of
8   went to:  If you're pending surgery, you can't donate
9   plasma.  You need a note from your doctor.
10       Q.   Did you tell him that he needed a note --
11       A.   Yes.
12       Q.   -- from his doctor?
13       A.   Nobody who's pending surgery or had surgery can
14  donate plasma.
15       Q.   If there's no surgery that has been
16  scheduled --
17       A.   We would still need clarification from the
18  patient's doctor, because we don't know how old the
19  injury is, what the injury is, what's going on.  We
20  need -- basically the patient's doctor needs to say it's
21  okay.
22       Q.   And what would the note from the doctor have
23  been required to say?
24       A.   That would have been up to the doctors
25  basically, whether or not the doctor felt it was okay for

Michelle Mailey
April 11, 2017                                    78 to 81

Page 78

1  the donor to donate.
2      Q.   CSL Plasma needed something from his doctor
3  that said he was okay to donate?
4      A.   Yes, because he made a statement about needing
5  surgery.
6      Q.   Did you tell them that once he got the note
7  from his doctor, he would be able to donate plasma?
8      A.   There was no guarantee he would be able.  It
9  would depend on what the note said.  So, no.  It was
10  basically he made his comment about surgery.  I asked.  I
11  don't remember exactly what I asked.
12          He needs a note from the doctor, because
13  we need to know what kind of -- you know, is it an
14  injury?  Is it new?  Is it a fracture?  What is -- I
15  mean, what is it?
16          So when I told him he needed a note from
17  his doctor, he became angry and started cursing.  I
18  called a manager.  Dennis took over.
19      Q.   And Dennis came into the room?
20      A.   We weren't in a room.  We were at the donor --
21  at the end of the donor booths, in a booth.
22      Q.   Dennis came to the booth?
23      A.   Uh-huh.
24      Q.   And did you leave at that point?
25      A.   I stepped off to the new donor area.

Page 79

1      Q.   And you had called Dennis to come to the
2  booth --
3      A.   Yes.  The patient was verbally abusive.  So,
4  yes, I called a manager.
5      Q.   And what was he saying that made you think he
6  was being verbally abusive?
7      A.   He was cursing.
8      Q.   What else?
9      A.   He made a threatening statement at one point.
10  I don't remember exactly what the threat was.  But Dennis
11  took over, so I left.
12      Q.   What else?
13      A.   I don't recall.
14      Q.   You deferred him because he needed a note from
15  his doctor; is that --
16      A.   I don't believe I deferred him.
17      Q.   Who deferred him?
18      A.   I believe Dennis Thomas is the one that
19  deferred the donor.
20      Q.   Did you tell --
21      A.   I told him he couldn't donate that day without
22  a letter from his doctor.  I didn't apply any deferrals,
23  not to my knowledge.
24      Q.   What do you mean you didn't apply any
25  deferrals?

Page 80

1      A.   I didn't apply a deferral in the system on the
2  donor.  Dennis Thomas deferred the donor.
3      Q.   Did you tell the donor that he could not donate
4  that day?
5      A.   That day.
6      Q.   What is that called if you tell a donor --
7      A.   I didn't apply a deferral.  He just needed to
8  bring a note from the doctor.
9      Q.   If someone is not allowed to donate that day,
10  is that not called a deferral?
11      A.   Yes.  It would have been a deferral had it not
12  escalated into a management situation.  It escalated into
13  a management situation.  Therefore, the manager took
14  over, and it was not a medical situation any longer.
15      Q.   Had you deferred him temporarily for a medical
16  reason?
17      A.   I hadn't even gotten to the deferral point.  I
18  told the donor that we needed a note from his doctor, and
19  he immediately became verbally aggressive.  So I called
20  for management, and I stepped away, and Dennis took over.
21          I didn't even get to explain anything else
22  other than we need a note from your doctor.  No donor can
23  say anything surgery and not us want clarification.
24      Q.   Were you sitting down when you had that
25  conversation with him?

Page 81

1      A.   No.  He was standing here.  There's a counter
2  here, and I was standing here.
3      Q.   You were standing on the other side of the
4  counter?
5      A.   Yeah.  The donor comes in the door.  I'm on the
6  little hallway where all of us move around.  And there's
7  a counter, and I'm on this side of the counter.
8      Q.   I -- I haven't been to the CSL Plasma, so I
9  can't imagine it exactly.  So you're on one side of the
10  counter, and he's on the other side.  And you had been
11  called to that booth --
12      A.   I don't remember exactly how it happened.  I
13  know there was -- I think I was called regarding his --
14  the severe limp he had and the cane.  I think one of the
15  screeners had called me.  I don't remember exactly why.  I
16          I don't remember exactly how it went.  I
17  know that when I saw him ambulating down the hallway, it
18  was pretty severe limp.
19      Q.   Did you ask him at all about his limp?
20      A.   That's what triggered the whole surgery.  I
21  can't remember.  I think he said it was something about
22  his knee and that he was needing surgery.
23      Q.   And did you look at his previous history, his
24  previous donor history?
25      A.   No.  We didn't even get to that point.

Michelle Mailey
April 11, 2017                              82 to 85

---

Page 82

1    Q.   Do you remember him before that visit?
2    A.   No.
3    Q.   Did you ask the medical director about the --
4  the upcoming --
5    A.   No, there was no need.
6    Q.   -- surgery?  Did you ask the medical director
7  about the upcoming surgery?
8    A.   No, there was no need.  The clarification
9  needed to come from the patient's doctor.
10   Q.   Did you make the determination that the
11 clarification needed to come from --
12   A.   I told the donor he needed a letter from his
13 doctor.  So, yes, I told the patient he needed a letter
14 from his doctor.
15   Q.   Is there a phone in the booth that you were
16 able to use to call Dennis?
17   A.   I don't remember.
18   Q.   How did you call Dennis?
19   A.   I think I yelled for a manager from one of the
20 girls and they called him.  I don't remember.
21   Q.   So you call --
22   A.   It's been a while.  I don't remember.  I
23 requested a manager.
24   Q.   And do you remember if there was a phone --
25   A.   I don't remember.

---

Page 83

1    Q.   -- that you would have been able to use?  I'm
2  going to --
3    A.   I don't remember.
4    Q.   Let me finish the question, and then you can
5  answer.  Was there a phone in the booth that you can
6  remember?
7    A.   I don't remember.
8    Q.   Your recollection is that you may have yelled
9  for --
10   A.   Not yelled, but there's girls all down there.
11   Q.   Called out?
12   A.   I asked for a manager.  I just don't remember
13 how exactly the manager got to get there.  I know it was
14 Dennis.
15   Q.   And who would have been the -- the other people
16 that would have heard your call?  You said you -- it
17 was -- you called --
18   A.   There was a bunch of donor booths.
19   Q.   -- girls?
20   A.   There's a bunch of donor booths, everybody that
21 was screening.
22   Q.   And what -- what kind of staff were those?
23 Were they also MSAs?
24   A.   No.
25   Q.   No?

---

Page 84

1    A.   They were the screeners in the -- I don't
2  remember what their title was.
3    Q.   Do you remember who was talking to Mr. Silguero
4  before you?
5    A.   No.
6    Q.   Do you remember who called you --
7    A.   No.
8    Q.   -- for additional -- okay.  I --
9    A.   I know.  But it's like I've answered these
10 questions already, and you keep asking the same ones, and
11 it's just --
12   Q.   I do have to finish --
13   A.   Okay.
14   Q.   -- my question.  Do you remember who called you
15 to address Mr. Silguero about his gait?
16   A.   No.
17   Q.   Do you know the job title of that person that
18 would have called you?
19   A.   No.  I don't remember what they were called.
20   Q.   How close were the other booths to the booth
21 that you were in?
22   A.   I don't remember if somebody was right next to
23 me, but the booths are touching.
24   Q.   Are they side by side?
25   A.   Yes.

---

Page 85

1    Q.   Did anybody else hear Mr. Silguero's comments
2  to you?
3    A.   I don't remember.  I don't know.
4    Q.   Did you write down the comments that he made to
5  you?
6    A.   No.  I told my manager.  My manager took over.
7    Q.   Beyond telling your manager, did you have
8  any -- did you make any further documentation of
9  Mr. Silguero's interaction with you?
10   A.   No.  I was very upset.  I walked away.
11   Q.   Did anyone else say that he had threatened
12 them?
13   A.   I don't know.
14   Q.   So the only thing that you are aware of --
15 aware of is the statement that he made to you?
16   A.   He was still yelling at Dennis while I was over
17 in the new donor area.  Could I hear exactly what he was
18 yelling at Dennis about?  No.
19   Q.   Did he say that he had a weapon?
20   A.   No.
21   Q.   And did he make any physical threats?
22   A.   I don't recall.  I just remember him being
23 verbally aggressive and cursing quite a bit.
24   Q.   Did you call the police?
25   A.   No.  The manager took over.

Michelle Mailey
April 11, 2017                                  90 to 93

**Page 90**

1 must speak to this donor prior to his next donation.  MSA
2 MM told donor he would be unable to donate due to using a
3 cane and walking with a limp.  He told her that she would
4 regret this and left, DT, January 1st -- or January 2nd,
5 2015.
6            Are you MSA MM --
7     A.   Yeah.
8     Q.   -- in this note?  The note says that you told
9 the donor he would be unable to donate due to using a
10 cane and walking with a limp.
11     A.   That's not my documentation.  That's Dennis's
12 documentation.
13     Q.   Do you disagree with this documentation that
14 says that he was unable to donate due to using a cane and
15 walking with a limp?
16     A.   Yeah, because he needed a note from the doctor.
17     Q.   Do you know why Dennis would have put the cane
18 and walking with a limp?
19         MS. WILLING:  Objection, speculation.
20 That's not her note.
21     Q.   (By Ms. Davis)  You can go ahead and answer.
22     A.   That's not my documentation.
23     Q.   Do you remember Mr. Silguero saying you would
24 regret this?
25     A.   Oh, yes.

**Page 91**

1     Q.   Did you defer him because he used a cane?
2     A.   No.
3     Q.   Did you defer him because he walked with a
4 limp?
5     A.   No.
6     Q.   Did you defer him because he could not transfer
7 onto the donor bed?
8     A.   No.  That hadn't even been assessed yet.
9     Q.   Would you have had access to Mr. --
10 Mr. Silguero's records while you were talking with him?
11     A.   I don't remember if there was a computer in
12 that booth.
13     Q.   Looking at line 2, it states, 1/3/15, donor
14 PR'd for threatening staff, TMB, 1/3/15.
15         Do you know what TMB is?
16     A.   No.  Looks like somebody's initials.
17     Q.   Do you know who that would be?
18     A.   No.
19     Q.   Do you think it would be somebody named Tammy
20 Brown?
21     A.   Possibly.
22     Q.   Do you remember somebody named Tammy Brown?
23     A.   I remember a Tammy.
24     Q.   The first note that we talked about on --
25 starting on line 3 was made on January 2nd, 2015.  The

**Page 92**

1 second note was made on January 3rd, 2015.  Did you do
2 anything between those two dates in reference to
3 Mr. Silguero?
4     A.   I don't -- no.  There's nothing documented, not
5 that I remember.
6     Q.   Did you talk to Dennis after Mr. Silguero left?
7     A.   I don't remember.
8     Q.   Did you talk to any staff member about
9 Mr. Silguero after he left?
10     A.   I don't remember.
11     Q.   On January 3rd, 2015, did you talk to any staff
12 member about Mr. Silguero?
13     A.   I don't remember.
14     Q.   On the second line, donor PR'd for threatening
15 staff, was his interaction with you the threatening
16 staff --
17     A.   It's possible.  It says you would regret this.
18 So that's a threat, so it's possible.
19     Q.   Are you aware of any other threats that he
20 made?
21     A.   I don't remember the whole conversation.
22     Q.   But are you aware of any other threats that he
23 made?
24     A.   I don't remember the whole interaction with
25 him.

**Page 93**

1     Q.   So you are unaware of any threats that were
2 made?
3     A.   I don't remember.
4     Q.   Who made the decision to PR him?
5     A.   I don't know.  I would assume it would be a
6 manager.
7     Q.   Do you know if it was Dennis Thomas?
8     A.   I would assume.  He was the manager that day.
9     Q.   There was a manager -- you've mentioned a
10 center manager, who it sounds like was above Dennis
11 Thomas.  Would he have been involved in a decision like
12 this?
13     A.   If he was not there that day as acting manager,
14 no.  Dennis Thomas was the acting manager that day.  So I
15 don't know what happened the next day.  I don't remember.
16     Q.   Was it -- the acting manager was whoever was
17 there that day.  And if somebody was not there that day,
18 is it your testimony that they are not involved in the
19 decision?
20     A.   I don't know.
21     Q.   Are you in touch with Dennis Thomas now?
22     A.   No.
23     Q.   Do you know where he lives?
24     A.   No.  Last I heard, he left the state.  I don't
25 know where he went.

John Nelson, M.D., Ph.D.
July 12, 2017                                                    1

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3              CORPUS CHRISTI DIVISION

4    ---------------------------------------------

5    MARK SILGUERO,

6                    Plaintiff,

7    and                    File No. 2:16-CV-00361

8    AMY WOLFE,

9                    Intervening Plaintiff,

10   v.

11   CSL PLASMA INC.,

12                    Defendant.

13   ---------------------------------------------

14                   DEPOSITION OF

15             JOHN NELSON, M.D., Ph.D.

16             Taken on July 12, 2017

17             Commencing at 9:00 a.m.

18

19

20

21

22

23

24     REPORTED BY:  NANCY G. GISCH, RMR, CRR, CLR

25

Page 6

1         P R O C E E D I N G S
2         JOHN NELSON, M.D., Ph.D.,
3  duly sworn, was examined and testified as follows:
4                EXAMINATION
5  BY MR. EAST:
6      Q.  And, Doctor Nelson, would you state your
7  full name for the record.
8      A.  My name is John Edward Nelson,
9  N-E-L-S-O-N.
10     Q.  Thank you.
11         My name is Brian East.  I am a lawyer for
12  the plaintiff -- plaintiffs in this case, Mark
13  Silguero and Amy Wolfe.
14         And we have not spoken before today.  Is
15  that correct?
16     A.  Yes.
17     Q.  All right.  I'm going to be asking you
18  questions here today.  And the court reporter
19  will be transcribing them.  And you have taken
20  the oath.
21         So do you understand that your answers
22  here today are under oath, the same as if you
23  were testifying in court?
24     A.  Yes.
25     Q.  It is important, because we have a court

Page 7

1  reporter, that you wait until I finish my
2  question before you answer.  And that I wait
3  until I -- until you finish your answer before
4  asking you another question.  So I am going to
5  try to do that as best I can.
6         And will you agree to try to do that?
7      A.  Yes.
8      Q.  Also, because we have a court reporter,
9  it's important that you give your answers
10  verbally, as opposed to nodding your head or
11  shaking it.  Also, because I'm on the phone and
12  so I won't be able to see that.
13         And so it's important to give answers
14  verbally and, also, not saying things like uh-huh
15  and huh-uh, so that we make sure that your answer
16  is accurately transcribed.
17         Is that okay?
18     A.  Yes.
19     Q.  If at any time you need to take a break,
20  that's fine.  Just let us know.  Okay?
21     A.  Yes.
22     Q.  And if you don't understand a question
23  that I ask, will you let me know or ask me to
24  repeat it?
25     A.  Yes.

Page 8

1      Q.  And if you don't tell me that you don't
2  understand, I'm going to assume that you do
3  understand the question.
4         Is that all right?
5      A.  Yes.
6      Q.  Tell me about your education after high
7  school.
8      A.  After high school I attended Sauk,
9  S-A-U-K, Valley College near Sterling, Illinois,
10  for two years.
11         I then transferred to the University of
12  Illinois at Chicago Circle.  And there I obtained
13  my bachelor's in chemistry.  I stayed on at the
14  University of Illinois, at Chicago Circle, and
15  obtained a master's in chemistry and eventually a
16  Ph.D. in chemistry.
17         I -- during my Ph.D. I began medical
18  school at Rush Medical College in Chicago,
19  Illinois.  I obtained my M.D.
20         And then for internship and residency -- I
21  did that at Loyola University Medical Center in
22  Maywood, Illinois.
23         Later I did a fellowship in clinical
24  pharmacology at Northwestern University, in
25  Chicago, Illinois.

Page 9

1         That's the extent of my education.
2      Q.  Thank you.
3         Tell me what year you got your medical
4  degree.
5      A.  1983.
6      Q.  And is that an M.D. degree?
7      A.  Yes.
8      Q.  Did you have any work experience prior
9  to -- let's say prior to graduate school or
10  medical school that is relevant to the plasma
11  industry or CSL or the work you do at CSL?
12     A.  No.
13     Q.  All right.  Could you tell me, in
14  chronological order, starting with the oldest,
15  what your work experience has been, either during
16  medical school or after medical school?
17     A.  During medical school I continued as a
18  graduate student assistant at the University of
19  Illinois.
20         After medical school I was an intern and
21  resident at Loyola University Medical Center.
22  Part of that was rotating at Hines VA, in Hines,
23  Illinois, which is next door to Maywood.
24         Following that, I was a fellow in clinical
25  pharmacology at Northwestern University in

John Nelson, M.D., Ph.D.
July 12, 2017                                    10 to 13

Page 10

1  Chicago, Illinois.
2       And then I moved back to Loyola University
3  and Hines VA, where I was an assistant professor.
4       In about 1997 or '98 I moved to Eli Lilly,
5  in Indianapolis.  I worked with them for two
6  years.
7       And then moved back to the Chicago area,
8  where I worked for Evanston Hospital and
9  G.D. Searle.  I did that for about two years.
10       Then I worked in private practice in the
11  western suburbs of LaGrange and Hinsdale,
12  Illinois.  During that time I did some locum
13  tenens work in Wisconsin, Illinois, and Indiana.
14       And in 2000 I began working with a
15  predecessor company of CSL.  At the time it was
16  called Nabi, N-A-B-I.  It later became ZLB.  And
17  then later on was acquired by CSL.
18       I served as a center medical director for
19  several companies, including Nabi, around the
20  Chicago area and northwest Indiana.
21       In about 2005 the position of di --
22  divisional medical director opened up.  At the
23  time the company was ZLB.  And I was appointed to
24  that position.  And I've been a divisional
25  medical director with ZLB and CSL since about

Page 11

1  2005.
2     Q.  Let me ask just a few questions about what
3  you told me.
4       When you were an assistant professor, what
5  was your area?
6     A.  Internal medicine.
7     Q.  Okay.  And then when you worked at
8  Eli Lilly, what did you do for them?
9     A.  I worked on the development of new drugs.
10  My office was on the seventh floor of Wishard
11  Hospital, the county hospital.  And Eli Lilly had
12  a clinical research unit there, where they tested
13  new drugs.
14     Q.  And when you worked at Evanston Hospital,
15  what did you do there?
16     A.  That also was as a clinical
17  pharmacologist.  There was a clinical research
18  unit at Evanston Hospital that was affiliated
19  with G.D. Searle, a pharmaceutical company in
20  Skokie, Illinois.
21     Q.  And you did mention working for
22  G.D. Searle.  Was that the same time and the same
23  work as when you were at Evanston Hospital?
24     A.  Right.  The Evanston Hospital unit was
25  only doing research on Searle's drugs at that

Page 12

1  time.
2     Q.  You said that you were in private practice
3  for a while in the western suburbs.  What was
4  your area of practice?
5     A.  Internal medicine.
6     Q.  And then when you were a visiting
7  physician, was that also serving as an internal
8  medicine doctor?
9     A.  Yes.
10     Q.  And was your first job at Nabi as a center
11  medical director?
12     A.  Yes.  In Beloit, Wisconsin.
13     Q.  And you said now that your title is
14  divisional medical director.  And originally that
15  was at ZLB.  And now that's at CSL.
16       Is that correct?
17     A.  Yes.
18     Q.  How many divisional medical directors does
19  CSL have in the U.S.?
20     A.  We have two divisional medical directors.
21     Q.  And how is -- the responsibilities of
22  those two directors divided between them?
23     A.  We try to divide the centers approximately
24  in half.  CSL currently has a little over 160
25  centers.  I oversee approximately 80 and

Page 13

1  Doctor Chiu, C-H-I-U, oversees the other 80.
2     Q.  Is either of you a supervisor of the
3  other?
4     A.  No, we are not.
5     Q.  Who is your direct supervisor?
6     A.  My direct supervisor is Wyllena
7  Elliott-Brown, who is a divisional operations
8  director for CSL Plasma.
9     Q.  And who is Ms. Brown's immediate
10  supervisor?
11     A.  Her immediate supervisor would be Daniel
12  Ferris.  He is --
13     Q.  And what is Mr. Ferris's job?
14     A.  I believe his title is vice president of
15  CSL Plasma.
16     Q.  Do you know who Mr. Ferris's supervisor
17  is?
18     A.  Give me a second.  The name slips my mind
19  right now.
20     Q.  No problem.
21       If you think of it later during this
22  deposition, just let me know.  Okay?
23     A.  Okay.
24     Q.  And when -- when you are dividing the
25  centers between you and Doctor Chiu, are those

John Nelson, M.D., Ph.D.
July 12, 2017                                    14 to 17

Page 14

1  done geographically, in the sense that one of you
2  does sort of the eastern half or the northern
3  half of the country and the other the opposite?
4      A.  We try to arrange it generally
5  geographically.  It has become difficult, as we
6  open more new centers, to keep the balance.  So
7  that -- Doctor Chiu is responsible for mainly the
8  south and east and I'm responsible, generally,
9  for the north and west.
10         Doctor Chiu has been with the company
11  approximately one year.  And Doctor
12  Haight-Biehler, who was based in Tucson, and I
13  had a similar arrangement.
14      Q.  Are you the divisional medical director
15  who is responsible for the CSL centers in
16  Houston, Texas?
17      A.  Yes.
18      Q.  And is that an example of sort of
19  a -- a -- an assignment that doesn't fit exactly
20  with the geographical division because it's an
21  effort to balance your workload?
22      A.  Yes.
23      Q.  Are you also the divisional medical
24  director over the CSL center or centers in Corpus
25  Christi, Texas?

Page 15

1      A.  I believe that Doctor Chiu is primarily
2  responsible for Corpus Christi.
3      Q.  As the divisional medical director, could
4  you describe for me your job duties.
5      A.  The -- my job duties include working on
6  the Medical Staff Reference, serving as a
7  reference or expert on medical aspects of the
8  plasma collection business.
9         I do a really varied number of things from
10  day to day, but it all pertains to medical
11  aspects of the business.
12      Q.  In your job are you given discretion in
13  exercising your judgment about the areas that you
14  are knowledgeable on or work on?
15      A.  I'm given discretion day to day.  However,
16  all of our policies and procedures are really
17  limited or, I would say, developed in cooperation
18  with the regulatory and the operations side of
19  the business.
20      Q.  If you are being asked a question -- a
21  medical question on which there is a regulation
22  that specifies a certain answer, are you then
23  constrained by that regulation?
24      A.  Yes.  All of our policies, protocols and
25  procedures serve to satisfy the FDA regulations.

Page 16

1      Q.  Are there areas in which the regulations
2  either don't speak or are general and it is up to
3  CSL and its company policies to fill in the --
4  the details?
5      A.  The FDA has general regulations, as well
6  as specific.
7      Q.  And if you are being asked a question that
8  is subject to an FDA regulation that is only
9  general, do you have discretion to interpret it
10  based on the situation you're presented?
11      A.  The Medical Staff Reference -- or it's
12  also referred to as the Medical Conditions
13  Guide -- is our attempt to -- not codify, but to
14  provide guidance to the individual center medical
15  directors, as well as the medical staff
16  associates in doing their day-to-day job.
17         The -- occasionally I do receive questions
18  from the medical staff associates and center
19  medical directors regarding the interpretation of
20  the Medical Staff Reference.  And I am more aware
21  of the FDA regulations, so I try to provide
22  guidance for individual instances or cases so
23  that we meet both our policies and procedures, as
24  well as the FDA regulations.
25      Q.  I take it that it is part of your job to

Page 17

1  look out for CSL's interests -- legal interests
2  and other interests that you -- you deal with in
3  your job, is that correct?
4      A.  My job primarily is to ensure that the
5  donors and employees are safe and that we meet
6  the regulations.
7         As far as legal matters, interaction with
8  the FDA and those sorts of things I defer to our
9  regulatory department.
10      Q.  And if you had a question about an FDA
11  issue, who would you contact in the regulatory
12  department?
13      A.  The director is Jon, J-O-N, Knowles,
14  K-N-O-W-L-E-S.
15      Q.  And is Jon Knowles a -- a medical doctor
16  or a lawyer?
17      A.  I believe his background is science,
18  biology.
19      Q.  Okay.
20         Have you ever given your deposition
21  before, Doctor Nelson?
22      A.  I recall vaguely that when I was an
23  assistant professor at Loyola University I may
24  have been deposed.
25         My first experience was when I was 16

Page 22

1 Indianapolis. And I frequently visit CSL Plasma
2 centers in Indianapolis.
3     Q. Can you give me the address -- your
4 residence address?
5     A. 4419 Edinburgh, E-D-I-N-B-U-R-G-H, Point,
6 Indianapolis, Indiana 46228.
7     Q. As part of your normal job duties, do you
8 have occasion to go to Minneapolis?
9     A. I visited Minneapolis maybe in March or
10 April of this year. And the previous time was
11 sometime in 2016.
12     Q. Did either of those visits relate in any
13 way to this lawsuit or the claims of Mr. Silguero
14 or Ms. Wolfe?
15     A. No.
16     Q. Did either of those visits have anything
17 to do with claims of discrimination in any way?
18     A. No.
19     Q. Did you review any depositions that have
20 previously been given in this case?
21     A. No.
22     Q. We'll -- we'll talk about this some more,
23 but let me ask you a broad question.
24        You said that you had looked at the
25 Medical Staff Reference. It was one of the

Page 23

1 things you looked at. Was there anything in your
2 review of that for preparation today that you
3 thought was erroneous or a problem?
4     A. No.
5     Q. And you also testified that you had looked
6 at medical notes on the two different cases.
7 Would those be the cases involving Mark Silguero
8 and Amy Wolfe?
9     A. Yes. Those were the two.
10     Q. And, in reviewing that material, was there
11 anything in there that you thought was in error?
12     A. No. I did not perceive that there were
13 errors in those medical notes.
14     Q. I take it that you are generally familiar
15 with the kind of plasma collection business that
16 CSL is in.
17        Is that right?
18     A. Yes. I've been with the company 17 years.
19     Q. And so you're generally familiar with what
20 CSL does?
21     A. Yes, I would say I'm familiar.
22     Q. And, because of your job and work
23 experience, you are familiar generally with what
24 goes on in the CSL donation centers, is that
25 correct?

Page 24

1     A. Yes, I frequently visit CSL donation
2 centers.
3     Q. And you are familiar with the policies and
4 procedures that CSL has that apply to the
5 donation process, correct?
6     A. Yes, quite familiar.
7     Q. As I understand it, CSL is in the business
8 of collecting human blood plasma, is that right?
9     A. Yes, that's the primary business of CSL
10 Plasma.
11     Q. And what is plasma?
12     A. Plasma is the clear, straw-colored fluid
13 that separates out, when you let blood sit.
14     Q. And what is the purpose of collecting it?
15 What does CSL use it for?
16     A. The plasma is frozen, shipped to
17 manufacturing centers. And there it is
18 manufactured into pharmaceutical products.
19     Q. And is the manufacturing done by CSL or by
20 different companies?
21     A. CSL plasma has manufacturing facilities in
22 the U.S., Germany and Australia. And those
23 manufacturing facilities produce the
24 pharmaceutical products that are sold by CSL
25 Behring.

Page 25

1     Q. And as part of its work in collecting
2 plasma, CSL operates plasma donation centers
3 around the country, is that correct?
4     A. Yes.
5     Q. People who donate plasma at those CSL
6 centers are paid for the donation, is that
7 correct?
8     A. Yes. We use paid volunteers.
9     Q. And do you know in what form that payment
10 is given?
11     A. Currently that payment is given on a debit
12 card. Formerly it was cash.
13     Q. How much is a donor given for a plasma
14 donation?
15     A. Currently, the plasma donor is given
16 approximately $50 for the first four or five
17 donations. After that it drops down to between
18 20 and 40 dollars, depending on the volume of
19 plasma donated.
20     Q. Does CSL ever run promotions to attract
21 donors by having extra benefits that they offer
22 to donors?
23     A. I really don't pay too much attention to
24 the business side of the plasma centers.
25        I do know that they occasionally give away

Page 26

1  things such as bicycles or TVs in raffles that
2  the donors are eligible for.
3      Q.  Is it fair to say that there is social
4  good that comes from plasma donation?
5      A.  Yes.  One of the mottos is "Good for you,
6  good for life."
7      Q.  And the -- the "good for life" part is a
8  recognition that plasma can be used for making
9  medicines and therapeutic things that help
10 people, correct?
11     A.  Correct.
12     Q.  Some -- would you agree with me that some
13 of the people who donate plasma are motivated by
14 altruistic reasons that we've just been talking
15 about?
16         MS. WILLING:  Objection, lack of
17 foundation.
18         You can still answer.
19     A.  (Continuing)  Donors donate for a variety
20 of reasons.  Some do it strictly for the money.
21 Others are altruistic.  Others know of family
22 members who require plasma products and -- or
23 friends -- and so their altruism is closer to
24 home.
25     Q.  Understood.

Page 27

1          You've mentioned this before, but, as I
2  understand it, CSL is required to follow certain
3  fed -- federal regulations from the U.S. Food and
4  Drug Administration, related to donating plasma
5  or blood products, is that right?
6      A.  Yes.  The FDA has, in the Code of Federal
7  Regulations, specific criteria for collecting
8  human plasma.
9      Q.  And are some of those regulations at least
10 designed to protect the -- the plasma itself or
11 the -- the purity of the plasma?
12     A.  The regulations protect both the purity of
13 the plasma, as well as donor health.
14     Q.  How do the staff at CSL Plasma donation
15 centers know what these regulations require?
16     A.  The -- as part of their training, the
17 medical staff associates are required to read the
18 specific subchapter relating to plasma donation.
19 And they sign a statement that they agree to
20 abide by the Code of Federal Regulations.
21     Q.  Are there other documents that help the
22 medical staff associates and others at the
23 centers to know what the regulations require?
24     A.  Really, all of our -- our policies and
25 procedures are designed to meet the FDA

Page 28

1  regulations.  And all of our policies and
2  procedures require sign-off by the regulatory
3  department before they are implemented or sent
4  out to the centers.
5      Q.  And are those policies and procedures that
6  you're referring to the ones contained in the
7  Medical Staff Reference conditions guideline
8  document?
9      A.  The Medical Staff Reference is one of the
10 hundreds of policies and procedures that we have.
11     Q.  Are there any other policy or procedure
12 documents, besides the Medical Staff Reference,
13 that convey or translate to the staff at the
14 centers what the FDA regulations require?
15     A.  There are -- the FDA regulations and
16 guidelines are published on the Internet, on the
17 FDA website.  Those are available if -- to the
18 general public if they wish to read them.
19         The centers also learn about regulations
20 during FDA audits and audits by other regulatory
21 bodies.
22     Q.  What other regulatory bodies would audit a
23 CSL donation center?
24     A.  There is the German Health Authority,
25 which conducts audits for the European Union.

Page 29

1  There is the PPTA that conducts audits.  And then
2  there are local departments of health and state
3  departments of health that audit.
4      Q.  Other than what may be learned during an
5  audit, is there any other reference document
6  that -- that CSL makes available to the center
7  staff to let them know what the FDA requirements
8  are?
9      A.  I can't think of any, offhand.
10     Q.  Is it accurate to say that CSL is one of
11 the world's largest collectors of human plasma?
12     A.  I believe we might be third in
13 collections.
14     Q.  How many companies are there that do this
15 work, let's say, in the U.S.?
16     A.  There are probably five -- what I would
17 call major.  And there are many smaller companies
18 that might have just two or three centers.
19     Q.  CSL is a private company, correct?
20     A.  CSL Plasma is a division of CSL, which is
21 based in Australia.  And its stock is traded on
22 the Australian stock exchange.
23     Q.  CSL is not any kind of governmental
24 organization, is it?
25     A.  In Australia -- the company may have had a

Page 30

1 close relationship with the Australian government
2 when it was formed a hundred years ago, but now
3 it's a publicly traded corporation.
4    Q.  And the plasma donation centers that CSL
5 operates are open to the public, correct?
6    A.  The front door is open so that people can
7 come into the reception area.  However, the
8 remainder of the building is not open to the
9 public.
10   Q.  Is it fair to say that CSL is open to
11 anyone coming in to make inquiry about donating,
12 even if not everybody gets to donate?
13   A.  Yes, anyone can walk in the door, go to
14 the front desk, and ask about CSL and donating
15 plasma.
16   Q.  As part of the process of donating plasma,
17 the CSL staff administer a donor screening, is
18 that right?
19   A.  Prior to being able to donate, potential
20 donors go through a screening process.  It
21 involves answering health-related questions on a
22 kiosk, a computer data system.  It includes
23 screening of vital signs, hematocrit protein.
24 And if those are acceptable -- even if they are
25 not acceptable, the donor then sees a medical

Page 31

1 staff associate and they have a brief medical
2 history and physical.  And a determination is
3 made whether they will be able to donate or not.
4    Q.  You had mentioned checking hematocrit and
5 protein levels.  Is that the same thing or are
6 those two different tests?
7    A.  It's a -- two tests that are done on a
8 single blood sample.
9    Q.  What does the hematocrit level show?
10   A.  The hematocrit level has to be within a
11 FDA set range in order to donate blood or plasma.
12   Q.  And why does it have to be within that
13 range?  That is, what is the hematocrit
14 telling -- telling you about the person?
15   A.  If the hematocrit is high, they may be
16 dehydrated or have another medical condition.
17       If the hematocrit is low, that would
18 indicate anemia.  And there are literally
19 hundreds of causes of anemia.
20       If someone's hematocrit is low, we would
21 be concerned about taking blood out or possibly
22 not be able to return the blood, leaving the
23 donor with a very low hematocrit, such that it
24 might endanger their health.
25   Q.  And what is the test for protein telling

Page 32

1 you?
2    A.  The test for protein, if it's high, can
3 indicate some specific diseases.  It could
4 indicate dehydration.  If it's low, it may
5 indicate malnutrition, chronic illness, liver
6 problems or kidney problems.
7    Q.  You indicated that the vital signs are
8 taken, in addition to checking the hematocrit and
9 protein.  Are the results of the vital signs,
10 that hematocrit and protein shared with the donor
11 or prospective donor?
12   A.  Yes.  If the donor asks, they will be
13 shared.
14   Q.  And is information given to the donor
15 about -- let me start over.
16       If the hematocrit or protein level is such
17 that the person is not going to be allowed to
18 donate, is that information shared to the -- to
19 the prospective donor?
20   A.  Yes.  We tell the re -- the donor the
21 reason that they are being deferred that day.
22   Q.  And do the staff -- the CSL center explain
23 why the hematocrit or protein level prevents
24 their donation?
25   A.  We have donor information sheets for low

Page 33

1 hematocrit, as well as low protein.
2    Q.  Are the prospective donors given
3 information about what they could do to change
4 their hematocrit or protein in order to allow
5 them to donate in the future?
6    A.  The information sheets provide suggestions
7 or tips to the donors.
8       The protein -- low protein one suggests
9 things such as eating nutritious meals.  We
10 suggest to the donor that they eat before they
11 come in and that they are well hydrated, to try
12 to lessen the chances of the donor having an
13 adverse event.
14   Q.  Is there a blood pressure reading that
15 would prevent someone from donating plasma?
16   A.  Yes.  The FDA has specified ranges for the
17 systolic and diastolic blood pressures.
18   Q.  Is information given to the prospective
19 donor, about how they might change their blood
20 pressure in order to allow them to donate in the
21 future?
22   A.  If the donor has a blood pressure outside
23 the accepted range, our procedures specify that
24 in some cases they have to be seen by the medical
25 staff associate.  The medical staff associate

John Nelson, M.D., Ph.D.
July 12, 2017                                  34 to 37

Page 34

1  would repeat the blood pressure reading.  And,
2  depending on what it is, may suggest that the
3  donor needs to see their primary care physician.
4          And if the blood pressure is quite high,
5  we inform the donor and suggest they need to go
6  to an emergency room or their physician as soon
7  as possible to have that taken care of.
8          We do, for severely high blood pressure,
9  offer to call EMS to have the donor transported.
10     Q.  Is there a -- information sheet regarding
11  blood pressure?
12     A.  I don't believe that we have an
13  information sheet for high blood pressure.  I
14  don't recall at this point.
15     Q.  Am I understanding correctly, that the --
16  that the process that the donation centers use to
17  extract the plasma is called plasma phoresis?
18     A.  Yes, that's the term.
19     Q.  And am I understanding it correctly, that
20  the goal of that is to remove that liquid portion
21  of the blood and to return the nonliquid portion
22  to the donor's body?
23     A.  Right.  The plasma is what is collected.
24  The red blood cells are returned to the donor.
25     Q.  And I'm not asking for a technical

Page 35

1  description of how it works, because I know I
2  wouldn't understand it and we'd be here a long
3  time, but I assume that this process requires
4  fairly sophisticated machinery to accomplish?
5     A.  The machines that CSL uses are called
6  PCS2s.  And yes, they are quite complicated and
7  sophisticated.
8     Q.  If someone wants to donate plasma, either
9  for altruistic reasons or for the money or both,
10  am I right that they have to go to a plasma
11  donation center?
12     A.  There are some blood collection centers
13  that also collect plasma, but most of the
14  collection facilities in the U.S. are commercial
15  concerns.
16     Q.  And CSL is one of those, correct?
17     A.  Yes.
18     Q.  And at the CSL donation centers there are,
19  as I understand it, trained staff who screen or
20  assess the prospective donors, is that right?
21     A.  Yes.  All of our staff have to go through
22  a training process.  We have reception techs who
23  greet the donors and enter basic information,
24  such as demographics, into the computer system.
25  We have screening techs that do the vital sign

Page 36

1  measurement, fingerstick hematocrit and protein.
2  We have medical staff associates who do the
3  history and physical.  And we have phlebotomy
4  technicians that actually operate the machines
5  and collect the plasma.  And we have laboratory
6  technicians that process the plasma and collect
7  samples from it for laboratory analysis.
8     Q.  And all of those things that you just
9  described are done on site at the donation
10  center, is that correct?
11     A.  The -- what I described is done on
12  location at the plasma center with the
13  exception -- with the exception of laboratory
14  testing.  And that is done by a CSL laboratory in
15  Knoxville, Tennessee.
16     Q.  And does that lab in Knoxville do the
17  testing for the plasma collected at all the
18  centers in the U.S.? Excuse me.  All the CSL
19  centers in the U.S.?
20     A.  Yes.
21     Q.  Is it fair to say that good customer
22  service is important to CSL?
23     A.  Good customer service is quite important.
24     Q.  And are there staff awards for good
25  customer service?

Page 37

1     A.  I believe that at some centers they do
2  have an employee reward system.  However, I'm
3  really not familiar with it.
4     Q.  How does the staff at the centers know
5  that customer service is an important commitment
6  by CSL?
7     A.  During their training I believe that all
8  employees have training or information provided
9  to them regarding customer service.
10     Q.  Are the plasma donation centers licensed
11  by anyone?
12     A.  FDA license -- licenses each individual
13  center.  There is a -- initial licensing process
14  that the center undergoes when they first open or
15  change locations.  And then every two to three
16  years after that the FDA audits a center.
17     Q.  So if a person wants to donate plasma,
18  they have to go to a licensed establishment for
19  that purpose, is that correct?
20     A.  For a center to operate and ship the
21  plasma that is collected, they have to be
22  licensed by the FDA.
23     Q.  And the CSL Plasma donation centers in
24  this country are licensed establishments, the way
25  you've been describing them, is that correct?

Page 42

1  Germany.  And plasma from the U.S. is shipped to
2  Germany for manufacturing.  And from there it's
3  distributed throughout the world.
4      Q.  And are you saying for that reason, yes,
5  the CSL Plasma centers in the U.S. do follow EU
6  requirements?
7      A.  Yes.  The -- in order to ship the plasma
8  into Europe, it must meet their requirements.
9      Q.  I can't recall if we've used the term
10  today or not, but my understanding is that the
11  term "defer" means to make a decision that a
12  person will not be allowed to donate plasma at
13  that time.
14      Is that correct?
15      A.  When we say "defer," that means the donor
16  will not be donating that day.  And deferrals can
17  last for varying amounts of time.
18      Q.  Or they may be permanent, correct?
19      A.  Or they may be permanently deferred.
20      Q.  So I -- I used history of cancer as an
21  example.  What about someone who has some sort of
22  heart condition?  Is there an FDA regulation on
23  that?
24      A.  No, I can't think of a specific FDA
25  regulation.  The deferrals for various heart

Page 43

1  conditions.  It depends on the specific
2  condition.  They may be deferred permanently for
3  many heart conditions.
4      Q.  And am I -- am I correct, that the
5  decision with regard to heart conditions is a
6  matter for the company to determine?
7      A.  The -- the corporate medical group has
8  decided that we will have a Medical Staff
9  Reference that lists many commonly seen
10  conditions.  And we have assigned deferral
11  periods for those conditions.
12      Q.  And if -- and with regard to heart
13  conditions, that is not based on a specific
14  regulation, but based on the company's own
15  decision about what's appropriate, is that
16  correct?
17      A.  The FDA says that a donor must be
18  generally healthy.  And we want to ensure that
19  the donation process will be safe for a donor.
20  And so we have put together the Medical Staff
21  Reference with our -- CSL's requirements.
22      Q.  I just want to make sure I understand your
23  testimony.
24      If I understand what you're saying, the
25  FDA requirement is a healthy donor.  The details

Page 44

1  of that in some instances are left to the company
2  to determine.  And with regard to heart
3  conditions, that's one in which it's left to the
4  company to determine.
5      Is that right?
6      A.  The FDA does mandate that the donation
7  process is safe.  And they do review our adverse
8  events when they come and audit us, such that we
9  want to ensure that the donation process is safe
10  for the donor.  And that's why we have developed
11  the Medical Staff Reference that provides
12  guidelines.
13      Q.  Is it possible for different plasma
14  donation companies in the U.S. to have different
15  standards or judgments about what kind of heart
16  condition leads to what kind of deferral?
17      A.  I believe some companies leave it more to
18  the local center -- center medical director's
19  discretion.
20      CSL -- because we have a large number of
21  centers, we've decided that we will have a
22  Medical Staff Reference.  Certainly other
23  companies -- their specific Medical Staff
24  Reference is going to be different.  We -- each
25  company develops their own policies and

Page 45

1  procedures in isolation.  We really don't share
2  our policies and procedures with other companies.
3      Q.  You've mentioned -- we've both mentioned a
4  few times a document called a Medical Staff
5  Reference.
6      MR. EAST:  So at this time I wanted
7  to ask the court reporter to mark, if it isn't,
8  and to put in front of you Exhibit 4.
9      And if you could just let me know when you
10  have it.
11      (Brief discussion held off the record.)
12      MS. WILLING:  If you want to let him
13  know that you have it.
14      A.  (Continuing) Yes, I have Exhibit 4.
15      Q.  Thank you.
16      This particular version, at the upper
17  right it shows an effective date of 27
18  October 2014, correct?
19      A.  Yes.
20      Q.  And above that it says "Page 1 of 71."
21      And I'm going to be asking you to turn to
22  some pages here in a minute.  And when I do,
23  that's the page numbering that I'll be referring
24  to, that -- that page 1 of 71 or page whatever of
25  71.

Page 46

1       Is that all right?
2       A.   Yes.
3       Q.   On the -- in the -- in the second
4  paragraph of this document there is a reference
5  to certain of the items in here being labeled
6  "Regulatory Requirement."  And those two words
7  are in bold.
8       Do you see that?
9       A.   Yes.
10      Q.   And then the fourth paragraph, two down
11  from there.  It says, "In those cases where
12  regulatory requirements exist these are noted in
13  bold type.  These requirements may not be altered
14  and deviations are not permitted."
15      Do you see that?
16      A.   Yes.
17      Q.   And is that accurate in terms of the way
18  CSL does its business practice and procedures?
19      A.   There are some requirements that are
20  specific to the Code of Federal Regulations, or
21  CFR.  And the requirements must be followed to
22  the letter.
23      Q.   Let me ask you to turn to page 18 of 71.
24  And on the bottom half of that page, in the right
25  column, there are a couple of boxes that say, in

Page 47

1  bold, "Regulatory Requirement."  The first one
2  says "Regulatory Requirement.  If received since
3  1980, permanent deferral."
4       So I take it that when we see those words,
5  "regulatory requirement," that is something from
6  the FDA and it cannot be deviated from, correct?
7       A.   Those are regulatory requirements.  And
8  it's mandated or expected by the FDA that we
9  would not deviate from it.
10      Q.   And, likewise, if, in the right-hand
11  column, it doesn't say "regulatory requirement,"
12  that reflects that the requirement is a company
13  policy, is that correct?
14      A.   The -- these are the common medical
15  conditions that an MSA might encounter during
16  their evaluation of a donor.  And these are
17  expected to be adhered to for -- if you note, on
18  page 18 of 71, in the first subheading, labeled
19  "Plasma," "Acceptable if:  At least two days
20  between donation, no more than two donations in a
21  seven-day period."
22      Now, that is a very specific regulatory
23  requirement.  It's not bolded, but it is commonly
24  understood by all the staff that it -- that that
25  is determined by regulation.

Page 48

1       The notation of regulatory requirement
2  really developed out of the need for us to make
3  the Medical Staff Reference interdigitate with
4  other documents that we have in the center, such
5  as in the screening booth there are lists of
6  medications, there are geographic travel areas.
7  And there's other information.
8       So the Medical Staff Reference really is
9  designed as part of -- all of our documents are
10  to interface or interdigitate with -- with all of
11  the other documents in the center.  So that
12  something may be listed as a regulatory
13  requirement.  It might -- something else might
14  not be bolded, but, in fact, when you trace it
15  back, the reason that we have it, eventually you
16  reach a regulatory requirement.
17      Q.   And just to -- to clarify, based on your
18  comments, I note that in that box that you were
19  talking about, where it says, "Plasma.
20  Acceptable if at least two donations" -- at -- at
21  the top of that section on blood product
22  donation, on that page, it does actually say, in
23  bold, "Regulatory Requirement," sort of outside
24  the if-then boxes.
25      So can we presume that that section on

Page 49

1  blood process -- plasma product donation is based
2  on regulatory requirements?
3       A.   Yes.
4       Q.   If you would, turn to page 28 of 71.  And
5  there their entry, for example, on depression,
6  slash, bipolar disorder.  And there is no
7  reference, on the right-hand side of the column
8  there, to regulatory requirement, nor is there a
9  reference sort of at the top of that section to
10  regulatory requirement.
11      So can we presume that the re --
12  restrictions described there are company policies
13  designed to interpret the general requirement of
14  safety and health?
15      A.   The depression/bipolar disorder is what
16  corporate medical operations has determined that
17  the deferral period be for these particular
18  conditions or issues.
19      Q.   And can I assume, then, that because it
20  doesn't mention regulatory requirement anywhere
21  here, that this is more of a company
22  determination, rather than an FDA determination?
23      MS. WILLING:   Objection, it
24  mischaracterizes the evidence.
25      You can answer.

Page 50

1    A.   (Continuing) Corporate medical operations
2  has developed the Medical Staff Reference to
3  provide guidelines to the medical staff
4  associates.
5         The -- and in writing the Medical Staff
6  Reference, after many years and attempts, we
7  decided that this if-then format would be easiest
8  for the MSAs to understand and base their
9  decisions on.
10   Q.   Not everything in this document is a
11 specific regulatory requirement, correct?
12   A.   Much of the medical staff reference is --
13 has been developed over the years by the medical
14 operations group to reflect CSL's emphasis on
15 meeting the FDA regulations and making the
16 donation process safe for our donors.
17   Q.   Do the FDA regulations mention the word
18 "depression"?
19   A.   No.  I don't think the FDA regulations
20 mention depression.
21   Q.   Do they mention -- well, I'll start over.
22        If a matter is not listed on this document
23 as a regulatory requirement, the medical staff
24 associates in the centers are supposed to use
25 their judgment and can call on medical backup in

Page 51

1  exercising that judgment, is that correct?
2    A.   We list a lot of common medical
3  conditions.  It's impossible to list everything.
4  And new drugs, treatments are developed and
5  introduced into practice every day.
6         I think we -- we capture maybe 90 percent
7  of what an MSA would encounter day to day.
8         The -- the "then" requirements for
9  deferral that we expect the MSAs to adhere to --
10 if it says, "defer for at least four months,"
11 then we expect the MSA to defer the donor for at
12 least four months.
13        They are not given the liberty of
14 decreasing the deferral period.
15        If they feel the deferral period needs to
16 be increased for a specific donor, then they can
17 discuss that with their center -- center medical
18 director.  And, if they wish to, they can contact
19 medical operations and discuss the -- the
20 particular issue.
21        So these are general.  We do set out
22 minimum markups that corporate medical operation
23 expect -- expects the MSA to adhere to, but, you
24 know, we can't cover everything.
25        And we do provide a call line staffed by

Page 52

1  myself, Doctor Chiu, or two medical support
2  specialists that the MSA in the field can call to
3  ask for help in making an individual
4  determination.
5    Q.   Are there times that the MSA will contact
6  the center medical director or physician about
7  an -- about an item that is listed in here,
8  seeking more information?
9    A.   Yes.  The medical staff associate may not
10 have dealt with a particular condition before.
11 And so they would contact the center physician or
12 center -- center medical director to help them
13 evaluate the specific individual and, you know,
14 apply the medical condition guideline.
15   Q.   Are there occasions when the medical call
16 line person or medical operations person -- so
17 you or Doctor Chiu, let's say -- disagrees with
18 the center medical director or center physician?
19   A.   The center medical director has not
20 written the Medical Staff Reference.  It's been
21 written by medical operations.  And so the center
22 medical director or the MSA's interpretation
23 might differ.
24        The medical operations is the final
25 arbiter of the interpretation.  It's not uncommon

Page 53

1  for a center director or MSA to call for
2  clarification.  Sometimes that clarification can
3  be done by a medical support specialist, who is
4  an RN.  Other times it is given to the divisional
5  medical director to make a determination.
6    Q.   Is there anyone else who would make that
7  determination, besides the divisional medical
8  director or the -- the -- the medical support
9  specialist?
10   A.   I may consult regulatory if it's a
11 question that I feel might have a regulatory
12 impact, but -- and I would defer to the
13 regulatory department if they say that it's a
14 regulatory requirement.  But usually the
15 divisional medical director can make that
16 determination.
17        Very often Doctor Chiu and I will discuss
18 it.  Sometimes questions point out that the
19 Medical Staff Reference needs further
20 clarification or revision.  And we meet at least
21 once a year in person to revise the Medical Staff
22 Reference.
23   Q.   Let me ask you to turn back to page 1 of
24 71 in this Exhibit 4.  And, in particular, the
25 last section on this page, entitled "Open-Ended

John Nelson, M.D., Ph.D.
July 12, 2017                                    54 to 57

Page 54

1  Questions."
2        And it gives a couple of examples of how
3  the donor interview might be handled, is that
4  correct?
5     A.  Yes, there are scenarios within -- within
6  those paragraphs.
7     Q.  On the second example where the MSA is
8  asking about epilepsy, one of the suggested
9  questions is, "What was the cause?"
10        Why would that be helpful to know in the
11  donor screening process?
12     A.  The -- reason that we ask about
13  convulsions or epilepsy is that as part of the
14  process, when the blood is drawn, it is mixed
15  with sodium citrate.  Sodium citrate complex is
16  calcium, which -- calcium is needed for the blood
17  coagulation process.  If we don't add sodium
18  citrate to the blood, it clots in the lines and
19  in the separation bowl.  And that's the end of
20  the plasma phoresis procedure, once the blood
21  clots.
22        A side effect is that some of that sodium
23  citrate is given back to the donor when the red
24  cells are returned.  And that lowers the
25  concentration of calcium in the donor's blood.

Page 55

1  That lowering of calcium can induce or cause
2  seizures in a susceptible person.  So if a donor
3  has had convulsions, seizures, epilepsy, the
4  plasma phoresis process may induce seizures.
5     Q.  I -- I think I follow what you're saying
6  and understand, in light of that, why questions
7  would be asked about those conditions.
8        I guess what I'm wondering, though, is,
9  why would knowing the cause of those conditions
10  be helpful?
11     A.  Seizures or convulsions can be caused by a
12  number of conditions.  It's not uncommon for
13  children, when they have a high fever, to have
14  seizures.  In adults, when benzodiazepines, such
15  as Valium or Xanax, are withdrawn, a person can
16  have seizures.  During alcohol withdrawal a
17  person can have seizures.  Or a -- a donor may
18  have epilepsy.
19        So there are lots and lots of reasons,
20  medical conditions, that can predispose a donor
21  to seizures.  And it's important for us to know
22  about it.
23     Q.  Are there times when getting input from
24  the prospective donor's own physician is
25  requested or required?

Page 56

1     A.  Excuse me.  I have to clear my throat.
2        It is not uncommon that we request
3  information from a donor's physician or pharmacy,
4  to determine what conditions a donor might have
5  or what medications they are taking.
6        The -- most donors don't carry around a
7  list of their medications.  Donors might not be
8  fully cognizant of what their medical conditions
9  are.
10        The -- someone may know that they have
11  high blood pressure.  The side effects, the
12  dosage, the actual name of the medication they
13  might not recall.
14        The complications associated with their
15  high blood pressure, such as cardiac hypertrophy,
16  atherosclerosis, et cetera, they might not be
17  aware of.  They just know they have high blood
18  pressure.
19     Q.  Are there times when the treating
20  physician's input about whether donation would be
21  safe is helpful in CSL making determination about
22  allowing the donation to go forward?
23     A.  If the physician takes the time to list
24  all of the conditions, medications, et cetera, it
25  can be helpful.

Page 57

1        Unfortunately, not all physicians are
2  aware of what plasma phoresis is or how it's
3  done.  And they might not spend a lot of time
4  completing the health care provider form.
5        So yes, sometimes it's helpful.  Sometimes
6  it opens more questions than it answers.
7     Q.  Let me ask you to turn to page 3 of 71 in
8  this Exhibit 4.
9        And the heading to the left of the main
10  box -- subject box on this page states,
11  "Disabilities -- see SOP for specific guidance."
12        Do you see that?
13     A.  Yes.
14     Q.  And at the -- at the top of the page, sort
15  of in the center, there's a reference to this
16  being SOP No. MA02016.
17        Do you see that?
18     A.  Yes.
19     Q.  And does "SOP" stand for "standard
20  operating procedure"?
21     A.  Yes.
22     Q.  So below, when it says, "see SOP for
23  specific guidance," is it pointing out that there
24  may be specific conditions at play that are
25  elsewhere in this document that may give

John Nelson, M.D., Ph.D.
July 12, 2017                                   62 to 65

Page 62

1 that to be an SOP. Whether it's actually stated
2 SOP or not, I don't remember.
3     Q. All right. And those documents that
4 you've referenced -- the training document on the
5 health assessment, the video, MA 7011 and then
6 the associated form designation letter -- do any
7 of those explain more fully what the assessment
8 of gait should be looking for, what observations
9 might lead to a deferral, or any other detail
10 about gait?
11     A. My recollection is that in the video and
12 perhaps in the written procedure for performing a
13 health assessment, the gait is stated as being an
14 indicator of impairment or other medical
15 condition that might determine donor suitability.
16     Q. Would the fact that somebody -- excuse me.
17        Would the fact that a prospective donor
18 uses a cane when walking automatically mean that
19 they cannot donate?
20     A. A donor having a cane does not
21 automatically determine whether a donor can
22 donate. However, it is an indication that the
23 MSA should evaluate the donor and determine the
24 reason a cane is being used and if there are
25 medical conditions that might prevent a donor

Page 63

1 from donating.
2     Q. The -- let me ask you the same question
3 about a limp. Does the fact that somebody walks
4 with a limp always mean that they will not be
5 allowed to donate?
6     A. No. It means that there may be a
7 condition that needs to be investigated.
8     Q. Is there any SOP outside of the MSR that
9 relates to the use of a cane?
10     A. I don't believe that there is. In the
11 procedure for obtaining a donor's weight, it may
12 say that the donor has to be able to stand on the
13 scale unaided. And a cane could come into play
14 there, but I don't recall it specifically
15 mentioning a cane.
16     Q. Other than the document that you described
17 related to gait, is there any other SOP outside
18 of this MSR that relates to limping?
19     A. No. I believe that the -- any mention of
20 gait or limping is in the documents that I
21 described.
22        However, the reception staff -- screening
23 staff would -- if they observed a donor to be
24 limping, might alert the MSA that a donor should
25 be evaluated by the MSA.

Page 64

1     Q. There is an entry on this MSR regarding
2 osteoarthritis, which I want to talk to you about
3 in a few minutes. But do you recall any other
4 SOP that CSL has related to donors or prospective
5 donors with osteoarthritis?
6     A. No, I don't recall others.
7     Q. Can you recall any SOP outside of this MSR
8 document that relates to donors or prospective
9 donors with anxiety disorders?
10     A. I don't recall any other documents listing
11 anxiety. I believe that in the information for
12 new donors there may be mention of -- of anxiety,
13 but I can't recall specifically that that term is
14 used.
15     Q. And, again, other than what is in this MSR
16 document or other -- or other versions of it, are
17 there any SOPs that relate to the use of a
18 service animal?
19     A. I can't recall an SOP that mentions
20 service animals. I think it's only in MA02016.
21     Q. There, at the bottom of this page 3 -- not
22 at the bottom, but the last entry in the text
23 boxes -- relates to transfer to the donor bed.
24 And, if I understand it correctly, describes a
25 requirement that the person wanting to donate has

Page 65

1 to be able to safely transfer to and from without
2 assistance, is that correct?
3     A. That's the statement.
4     Q. Are you aware of any SOP outside of this
5 document, or other editions of it, that refer to
6 that issue, describe that issue, explain that
7 issue, or anything else related to that?
8     A. I don't recall any other documents that
9 mention it.
10     Q. In the -- under the column "if" on this
11 page, the second entry is "mental or behavioral."
12 So if a donor has a mental or behavioral
13 condition. And then, under the "then" column it
14 says, "Acceptable if: Able to give informed
15 consent" and "Does not violate center standards."
16        Correct?
17     A. That is the if-then statement.
18     Q. What does, "Does not violate center
19 standards" mean or refer to?
20     A. The -- each center has general standards,
21 as regards donor behavior. The donors are not
22 permitted to use foul language. If a donor that
23 has had -- if a donor has -- potential donor has
24 an objectionable tattoo, they might be
25 permanently deferred from donating. If the donor

John Nelson, M.D., Ph.D.
July 12, 2017                              66 to 69

Page 66

1  behaves in a way -- does not follow directions,
2  then they may be deferred.  They may be given a
3  warning.  They may be deferred temporarily or
4  they may be deferred permanently.
5          I don't believe that we have a list of
6  behaviors that would result in an automatic
7  deferral or sequence of events that have to be
8  followed.
9          The center is expected to maintain a
10 professional, calm environment.  Someone who is
11 argumentative or disruptive would likely be
12 warned or deferred.
13         So there is no specific list.  However, I
14 think we all agree on behavior that would be
15 unacceptable in a medical or quasi medical
16 setting.
17     Q.  I notice that on this page 3 there is no
18 reference to regulatory requirements.  And so,
19 just to use it as an example -- the last thing we
20 were talking about.  Am I correct that there is
21 no FDA regulation regarding donor behavior?
22     A.  No, there are no FDA written regulations.
23         However, when the FDA comes to audit, if
24 they observe something that they feel violates
25 general decorum, they would certainly raise that

Page 67

1  with the center manager and ask them, "Why is
2  that donor here?"
3      Q.  My understanding, from looking at this
4  page, is that the entry -- and I think it's the
5  fifth box down -- on "Unsteady gait, falling or
6  dizziness" -- that is not a regulatory
7  requirement, but a CSL policy, correct?
8      A.  It is a CSL policy designed to ensure the
9  safety of our donors and employees.
10     Q.  Is there any regulation, either U.S. or
11 otherwise, that CSL follows that mentions
12 unsteady gait from -- unsteady gait?
13     A.  No.  There is no specific regulation or
14 guideline that I recall, from the FDA.
15     Q.  Is there any -- I'm sorry.  I'm sorry.  Go
16 ahead.
17     A.  No.
18         From the FDA or any of the other bodies
19 that audit -- audit centers.
20     Q.  And is there any regulation, from the FDA
21 or one of those other bodies, that relates to the
22 use of a cane?
23     A.  No.  I do not recall any regulations.
24     Q.  Any regulations by the FDA or the other
25 governing bodies that relate to limping?

Page 68

1      A.  No, there are none.
2      Q.  Any regulations that relate to
3  osteoarthritis?
4      A.  No.
5      Q.  Any regulations that relate to anxiety
6  disorders?
7      A.  I don't believe there are any regulations
8  relating to anxiety disorders.
9      Q.  Any regulations relating to the use of
10 service animals?
11     A.  No.  I do not believe that the FDA, GHA or
12 PPTA describe the use of service animals.
13     Q.  Let me ask you to turn to page 4 of 71.
14         And the top half of this page -- if I
15 understand it -- is referencing a case in which
16 input from the treating physician might be
17 appropriate and how to handle that, is that
18 correct?
19     A.  This is a general statement regarding
20 health care provider letters and how to manage
21 that process.
22     Q.  The bottom half of this page has a general
23 heading of "Procedures and Surgeries."  And then
24 it has some if-then boxes underneath it.  And
25 they actually go onto the following page, I

Page 69

1  think, page 5.  So there's one entry there.
2          And, if I am reading this correctly, it
3  looks like the last entry on this page 4, about
4  "procedures using flexible scopes," is actually a
5  regulatory requirement, is that correct?
6      A.  The FDA has specific guidelines regarding
7  the use of flexible scopes during medical
8  procedures.  And the reason for that is, flexible
9  scopes cannot be adequately sterilized.  They can
10 be disinfected.  However, they can be a source of
11 transmission of hepatitis and HIV.
12     Q.  Some of these entries under "Procedures
13 and Surgeries" don't reflect regulatory
14 requirement.  So am I correct in understanding
15 that those are based on CSL policy?
16     A.  The -- well, for an example, procedures
17 using flexible scopes.  We might mention a
18 procedure and say it's a four-month deferral.  It
19 may trace back to the fact that flexible scopes
20 are commonly used to -- during that procedure or
21 it may be because we feel that four months
22 are required to recover from a given procedure.
23     Q.  Under "Procedures and Surgeries," on page
24 4 and 5, there is no entry regarding future
25 surgeries, is that correct?

Page 70

1    A.  It is correct that in this section we
2  don't discuss future surgeries.  However, it's
3  not infrequent that a regular donor will discuss,
4  prior to having surgery, how long they will be
5  deferred for.
6        The other things is that if a donor
7  mentions they may be having surgery in the
8  future, that will be a clue to the MSA that they
9  need to spend some time investigating why it is
10  that the donor believes they are going to have
11  surgery.
12    Q.  And the reason for that is, the
13  explanation for why might reveal a condition that
14  the MSR speaks to, is that right?
15    A.  It may disclose a condition that the MSR
16  speaks to.  It may disclose other medical
17  conditions.  It's not unusual for donors to not
18  fully understand what their medical condition is
19  and its implications for plasma phoresis.
20    Q.  The MSAs do not routinely ask about
21  upcoming or future surgeries, correct?
22    A.  The MSAs are instructed to ask open-ended
23  questions to try to illicit information from the
24  donors.
25        They might not ask specifically, "Do you

Page 71

1  have any surgeries planned?"
2        However, if a donor is limping or is in
3  pain, the MSA, as part of their conversation, may
4  ask about recent surgeries or planned surgeries.
5    Q.  If the -- if planned surgery is disclosed
6  by the prospective donor, you testified that
7  that's a signal to the MSA to ask further
8  questions to find out what that's about, is that
9  correct?
10    A.  Yes.  The MSAs really are trained to
11  follow up on information revealed by a donor;
12  again, asking open-ended questions and eliciting
13  further information.
14    Q.  If the MSA doing that is told what the
15  surgery relates to and that is a condition that
16  this document says does not result in a deferral,
17  would the person normally be allowed to donate,
18  assuming no other conditions that trigger
19  deferral?
20    A.  It really depends on why the surgery is
21  being contemplated.  For example, if someone says
22  they need knee surgery, the surgery might be done
23  for a variety of reasons.  It may be done simply
24  as pain relief.  It may be done if there is a
25  torn ligament or a loose bit of cartilage in the

Page 72

1  joint.  A torn ligament may contribute to
2  instability.  A loose body can cause the knee to
3  suddenly lock, causing a person to fall.  The
4  pain may be intermittent and severe,
5  cause -- causing the donor to -- to stumble.
6        So it is important to fully elucidate what
7  the issue is.  And very often that requires a
8  health care provider note.  If a person is going
9  to have surgery, obviously they've consulted a
10  surgeon.  And getting the information that that
11  surgeon can provide would be important to the
12  donor's suitability determination.
13    Q.  There's nothing in the FDA or other
14  regulatory requirements that mentions future
15  surgery, is that correct?
16    A.  No, but, again, it is important, to donor
17  safety and product safety, to have a full
18  understanding of a donor's medical conditions.
19    Q.  If a person indicates that they intend to
20  have surgery on their knee because of arthritis,
21  would that result in deferral?
22    A.  It depends on what conditions are
23  associated.
24    Q.  So it wouldn't be an automatic deferral,
25  but, depending on the information, it could

Page 73

1  uncover something that would lead to a deferral,
2  is that right?
3    A.  If the MSA feels they require further
4  information and a health care provider note, the
5  issuance of that health care provider note
6  implies that a donor is going to be deferred
7  until that health care provider note is received
8  and reviewed by the MSA and probably by the
9  center medical director.
10    Q.  What if the donor discloses that they
11  would like to have the surgery, but that's as far
12  as they've gotten with it?  What should the MSA
13  do at that point?
14    A.  Again, the MSA would investigate, question
15  the donor, review what medications the donor is
16  on.  Perhaps ask for a clarification of what
17  medications the doctor -- the donor is on.
18        It really is an individualized process.
19  Each donor is an individual with a specific
20  condition.  Not all arthritis or osteoarthritis
21  is -- is the same.  So it's an individual
22  assessment.
23    Q.  Let me ask you to turn to page 11 of 71 in
24  this document.
25        And the top category on that page says

Page 74

1  "Anxiety Disorders," correct?
2      A.  Yes.
3      Q.  The third "if" statement under that
4  category says, "If it requires more than two
5  medications daily for control of symptoms or
6  service animal required."
7          Is that correct?
8      A.  Yes, that's the statement.
9      Q.  And then the "then" statement says, "Defer
10 until the need for medications or animal
11 decrease" --
12     A.  That is --
13     Q.  -- correct?
14     A.  That is the Zen -- the "then" statement.
15     Q.  Is there anything in the FDA or regulatory
16 requirements that mentions this "two medication"
17 or "service animal" screen?
18     A.  This is a CSL medical operations
19 requirement or guideline.
20     Q.  What is the basis for the CSL guideline
21 that an anxiety disorder requiring the use of a
22 service animal results in deferral?
23     A.  The use of multiple medications or the
24 need for service animal indicates the severity of
25 the anxiety.  And so that is the -- the "then"

Page 75

1  statement.
2      Q.  Is this viewed as a safety issue by CSL?
3      A.  It is a safety issue.  It is also a plasma
4  center decorum issue.
5      Q.  How is it a decorum issue?
6      A.  The plasma center typically has 30 to 60
7  beds.  And the accompanying machines that are
8  quite close together -- when a donor is having
9  problems with their donation, it impacts the
10 technician who is performing the procedure and it
11 impacts other donors around the donor that's
12 having an issue.
13     Q.  And how does the use of a service animal
14 impact problems with the donation, or reflect
15 problems?
16     A.  The presence of a service animal really is
17 not an issue.  At many of our centers we have
18 visually impaired donors who will always have
19 their service animal with them.  So the presence
20 of the service animal is usually not an issue.
21         It's a question of the donor's medical
22 suitability for donation.
23     Q.  And what is it about using more than two
24 medications, for example, that tells you about
25 their suitability for donation?

Page 76

1      A.  Use of more than two medications would
2  indicate that the level of anxiety is fairly
3  severe.  And so we would require that the donor
4  be on fewer medications.
5      Q.  Would you agree with me that someone who
6  uses more than two medications to control the
7  symptoms of their anxiety disorder may have good
8  results with them and may, in effect -- and may,
9  in fact, control those symptoms with those meds?
10     A.  The donor may have good control of their
11 symptoms.
12         Another issue comes into play.  And that
13 is removal of the medication during the plasma
14 phoresis procedure.  A lot of medications are
15 bound to the plasma proteins.  And removal of
16 those medications certainly might make titration
17 of those medicines more difficult for the donor
18 or their physician.
19     Q.  And does that difficulty depend on the
20 kind of medication?
21     A.  It would depend on the kind of medication.
22 It would depend on, really, multiple factors.
23         For example, lithium -- we prohibit donors
24 on lithium from donating.  And the reason being
25 is that the margin between a therapeutic dose and

Page 77

1  a toxic dose is very thin.  And we simply don't
2  want to be disturbing those donor's medication
3  regimen.  And it's for the safety of the donor.
4      Q.  In a case involving -- or start over.
5          In a situation involving a prospective
6  donor with an anxiety disorder taking more than
7  two meds, would a letter from the donor's treater
8  indicating approval with the donation affect
9  CSL's judgment on whether to defer that person?
10     A.  The health care provider letter would
11 provide more information, but really the decision
12 as to whether to accept the donor is not made by
13 the donor's health care provider.  That decision
14 is made by the MSA, the CMD and medical
15 operations.
16     Q.  If the concern with medications is that it
17 may affect titration and dosage, wouldn't that be
18 something that the treating physician might be in
19 a better position to answer than the CSL staff?
20     A.  The -- again, the treating physician may
21 have an opinion.  However, the decision to accept
22 the donor is -- it's our decision.
23     Q.  Is there any flexibility in that decision?
24 In other words, might there be times when someone
25 has an anxiety disorder for which they take more

Page 78

1  than two meds and CSL decides they are okay to
2  donate?
3      A.  We would really have to look at it on a
4  case-by-case basis.
5          When we get the health care provider note
6  back, we may find that the donor is on other
7  medications or the use of a medication is for
8  another indication than what the donor believes
9  that it is for.
10         So I would say that if they are on more
11 than two medications for anxiety, we would stick
12 with the Medical Staff Reference guideline.  But
13 we would have to see what the health care
14 provider note is, what else is going on, before
15 we make a final decision.
16     Q.  And with regard to an anxiety disorder
17 that requires the use of a service animal, would
18 you agree that there are times when the use of a
19 service animal is effective in reducing the
20 symptoms of the anxiety disorder?
21     A.  I believe that people use service animals
22 because it does provide them relief.
23     Q.  Does the effectiveness of the service --
24 use of a service animal impact CSL's decision on
25 whether that person can donate?

Page 79

1      A.  The need for a service animal suggests
2  that the anxiety is severe.  And the -- I don't
3  think that we can quantify the level of benefit
4  that the donor -- potential donor receives.  I
5  think that use of a service animal, the need for
6  a service animal, really, indicates, to me, as a
7  medical professional, that the level of anxiety
8  is severe.
9      Q.  And what do you base your judgment on,
10 that the use of a service animal for an anxiety
11 disorder indicates that it's severe?
12     A.  The -- my medical experience of the past
13 30 years -- 30-plus years indicates to me that
14 the need for a service animal classifies the
15 anxiety as being severe.
16         The -- in terms of quantifying it, I
17 really have no way to objectively measure that.
18     Q.  What experience have you had, in the last
19 30 years, that informs your opinion about anxiety
20 disorders and the use of a service animal?
21     A.  My practice of medicine was general
22 internal medicine.  And anxiety -- the treatment
23 of anxiety -- my 10 or 11 years at the VA, where
24 anxiety and PTSD are very common conditions,
25 informs my opinion regarding anxiety and service

Page 80

1  animals.
2      Q.  Did you ever have a patient with an
3  anxiety disorder who did get benefit from the use
4  of a service animal?
5      A.  Certainly many of the veterans ascribe the
6  use of a service animal as being beneficial.
7      Q.  Do you have reason to doubt their
8  description?
9      A.  It's not that I doubt their opinion.  It's
10 that I have no way of objectively quantifying the
11 benefit that they receive.
12     Q.  Did you ever have a patient whose
13 functioning in the world improved because of the
14 use of a service animal?  Say, for example, was
15 able to go out more places or be less fearful
16 among -- among other people?
17     A.  You know, I don't recall.  And I've really
18 never studied how many people respond, what the
19 frequency of their anxiety or panic attacks are.
20         Perhaps there's information in the
21 literature.  I'm not aware of it.
22     Q.  Did you ever suggest to a patient with an
23 anxiety disorder that they consider the use of a
24 service animal?
25     A.  I can't recall an instance where I have

Page 81

1  suggested de novo that someone get a dog.
2          The -- I have suggested to people that
3  they need to take a vacation, they need to go to
4  the beach and, you know, enjoy life.
5          But in terms of specifically suggesting to
6  a patient without them asking about the benefit
7  of a service animal?  No, I don't think I've ever
8  encountered that situation.
9      Q.  Did you have medical colleagues at the VA
10 or elsewhere who suggested the use of a service
11 animal for an individual with an anxiety
12 disorder?
13     A.  I really don't know.
14         I know there are veterans organizations
15 that train animals and provide animals to vets.
16         As far as a medical professional
17 suggesting a -- the use of a service animal, I
18 really have no information on that.
19     Q.  Did you ever have a patient who asked you
20 directly about the possibility of using a service
21 animal to help with an anxiety disorder?
22     A.  No.  Again, the situations I recall -- the
23 donors -- I'm sorry -- I'm sorry -- rather, the
24 patients took it upon themselves to investigate
25 obtaining a service animal.  So it's something

Page 82

1  that is well known in the veteran community.  And
2  there are organizations that make that their
3  mission.  But in terms of patients seeking
4  specific medical guidance, no, I've not had that
5  experience.
6        Q.  Did you ever counsel a patient not to use
7  a service animal for an anxiety disorder?
8        A.  No, I don't recall ever counseling them
9  not to use their service animal.
10       Q.  Are you aware of any studies that describe
11 the actual risks of someone with an anxiety
12 disorder for which they use a service animal?
13       A.  I don't think I understand the question.
14       Q.  Are you aware of any studies regarding
15 the -- the actual risk of having -- let me start
16 over.
17       If I understood your testimony earlier,
18 you said that, in your view, someone with an
19 anxiety disorder that requires the use of a
20 service animal has a serious anxiety disorder.
21       Is that what you said?
22       A.  The -- I would say qualitatively that the
23 person has severe anxiety.
24       As far as quantitating that, I really
25 don't know of any studies on how to quantitate

Page 83

1  that.
2        Q.  Do you know of any studies that describe
3  the risk of incidents that would be inappropriate
4  in the plasma donation situation in terms of
5  decorum for someone with an anxiety disorder that
6  uses a service animal?
7        A.  I have no information regarding the
8  incidence of panic attacks or anxiety while in
9  the plasma center.
10       What I do know is that donors with visual
11 disability -- I find their service animals to be
12 very well-trained.  They present really no
13 problems to the donor or staff.
14       And my experience with service animals, I
15 would say, has generally been very good.
16       Q.  In assessing whether an individual who
17 uses a service animal as a result of an anxiety
18 disorder can donate, would it make a difference
19 to you if the dog were a -- well-trained and
20 well-behaved?
21       A.  If an animal is present in the plasma
22 center, certainly the animal has to be
23 well-trained and behaved.  I don't think there's
24 any question about that.
25       Q.  Right.  But my question is a little

Page 84

1  different.
2        My question is, in assessing whether the
3  person will be allowed to donate, does the fact
4  that the dog is well-trained and well-behaved
5  weigh in favor of allowing -- allowing the
6  donation?
7        A.  We assess the donor and it's a medical
8  assessment.  The requirement for a service animal
9  indicates to me that the anxiety is of a severe
10 nature.  And so really we never get to the
11 question of whether the service animal is
12 well-trained or well-behaved.
13       I would simply say that, in my experience
14 with service animals, I have generally enjoyed
15 having them around, because I find them to be
16 some of the best-trained and -behaved dogs there
17 are.
18       Q.  You said when you're assessing the donor.
19 Is that -- with regard to anxiety disorders and
20 the use of a service animal.
21       Is that an individualized assessment that
22 is done?
23       A.  All of our health assessments are
24 individualized.
25       Q.  In making a decision about whether to

Page 85

1  allow a donation by someone with an anxiety
2  disorder using a service animal, would it make a
3  difference if the person presented as calm?
4        A.  I am confused.  Can you restate the
5  question?
6        Q.  Well, my understanding is that you are
7  assessing a person with an anxiety disorder to
8  see if they are appropriate to donate.  And in
9  this example the person uses a service animal.
10       And what I'm wondering is, does the fact
11 that the person appears to CSL staff as calm
12 weigh in favor of allowing the donation?
13       A.  The -- what I would say is that we are
14 performing the health assessment one time a year
15 if the donor is a regular donor.  So it is a
16 snapshot.
17       The -- a donor may be calm one day and be
18 having severe behavioral issues the next.
19       So I think that we make our best efforts
20 to see if a donor is acceptable.  Certainly CSL
21 is in the business of collecting plasma.  We want
22 to have as many donors as possible.
23       But, in assessing the donors, we want
24 donors that are going to be happy and healthy and
25 donate the most plasma they can and derive the

Page 86

1  most financial benefit that they can.

2      Q.  So, to use your example, if, on the day in
3  question, someone comes in with a service animal,
4  discloses they have an anxiety disorder, but the
5  dog is well-behaved and they are well-behaved and
6  calm, might they be allowed to donate?

7      A.  The guideline that we have is that if the
8  donor needs a service animal for anxiety, that
9  indicates severe anxiety.  And they are deferred
10  until they no longer need the service animal.
11  That may occur --

12      Q.  Is there any -- I'm sorry.  Go ahead.

13      A.  That may occur with time, with future
14  counseling.  Whatever.

15          But when a donor requires a service
16  animal, we have a -- define that as being severe
17  anxiety.  And the guidelines are as written.

18      Q.  Is there any flexibility in this
19  particular guideline, such that there are
20  circumstances in which someone with an anxiety
21  disorder requiring the use of a service animal
22  will be allowed to donate?

23      A.  Again, I have -- I can qualitatively say
24  that, you know, this person has severe anxiety.
25  I really cannot objectively quantify.  And so I

Page 87

1  would say that we will stick with this guideline.

2          And when MSAs call me, the answer I always
3  give is that use of the service animal indicates
4  severe anxiety.  And we do not accept the donor
5  until they no longer need the service animal.

6      Q.  When you say that the use of a service
7  animal indicates severe anxiety, would you agree
8  with me that it's possible that that was severe
9  anxiety prior to the use of a service animal and
10  there -- may not have severe anxiety with the use
11  of a service animal?

12      A.  The person may experience relief of their
13  symptoms.

14          The -- however, to objectively quantify
15  that, I find that impossible.  So, you know, a
16  donor may tell us a lot of things, but I really
17  have no way to objectively assess it.

18      Q.  Except that the MSA who is meeting with
19  the donor has a way to objectively assess the
20  presentation of the person that day, correct?

21      A.  I would draw the correlation with more
22  than two medications.  The -- I -- if someone
23  comes in with five medications and would I say
24  "Oh, they look calm today, go ahead and let them
25  donate?"

Page 88

1      No.  I would say that they need to be on
2  two or fewer medications and calm before they are
3  permitted to donate.

4      Q.  And that's true even if the five
5  medications actually work in managing their
6  symptoms, because you're thinking about their
7  condition without the medications and how severe
8  it must be to require five meds, is that right?

9      A.  The -- it's an assessment of their degree
10  of anxiety.  It's also assessing potential for
11  adverse events.

12          The use of multiple medications -- we have
13  limits in hypertension.  Yes, someone's blood
14  pressure may be well controlled, but if they are
15  on five medications, I think that presents an
16  issue of safety.  And I'm not going to permit the
17  donor to donate.

18      Q.  Are you aware of any studies regarding the
19  potential for adverse events in someone with an
20  anxiety disorder requiring the use of a service
21  animal?

22      A.  I don't believe there is any information
23  in the literature.

24      Q.  Do you have any observations yourself
25  about the potential for adverse events with

Page 89

1  someone who uses a service animal for anxiety
2  disorders?

3      A.  Well, we don't permit donors with service
4  animals to donate, so we're not going to have
5  that information.

6      Q.  How about before you worked at CSL, at the
7  VA or elsewhere, did you make any observations
8  about the potential for adverse events in
9  patients with anxiety disorder using service
10  animals?

11      A.  Certainly people like to have their
12  service animals with them.

13          In terms of adverse events in a hospital
14  or clinic, between donors that have their service
15  animal with them and donors that don't, I don't
16  think there's any information.  I really have no
17  personal information that would allow me to make
18  a definitive statement.

19      Q.  Who was it that wrote this particular
20  limitation on more than two meds or use of the
21  service animal?

22      A.  The Medical Staff Reference was first put
23  together in 2005 or 2006, in that date range --
24  maybe a little bit later, 2007 -- by
25  Doctor Haight-Biehler, who was a divisional

John Nelson, M.D., Ph.D.
July 12, 2017                                      90 to 93

Page 90

1  medical director; myself; and at the time I think
2  it may have been Jan Hamilton, the corporate
3  medical director.  Certainly, for later
4  revisions, it was Doctor Toby Simon.  And since
5  that time we have made several revisions to this
6  document, over the years.
7       We meet yearly to review the document and
8  make changes.  The -- I don't recall whether it
9  was my suggestion that we add this or
10  Doctor Biehler's, but it was one of us.
11      Q.  And who is Toby Simon?
12      A.  Toby Simon was the corporate medical
13  director for CSL Plasma for about the past --
14  well, about five years ago -- four or five years
15  ago.  He moved to CSL Behring.  So he's not the
16  CSL Plasma corporate medical director at this
17  point, but he does interface with us because of
18  his experience and knowledge.
19      Q.  And remind me.  What is the relationship
20  between your position and the corporate medical
21  director?
22      A.  Previously, when I was first hired, I
23  reported to the corporate medical director, who
24  was Jan Hamilton.  And then Jan left and
25  Doctor Simon joined as the corporate medical

Page 91

1  director.
2       Since Doctor Simon left we have -- I have
3  not reported to the corporate medical director,
4  because there is not a corporate medical
5  director.
6       My assessments, my day-to-day HR needs are
7  handled by Ms. Elliott-Brown, who is the
8  divisional operations director.
9       For a time I did report to Michelle Myers,
10  who was the corporate quality director.
11      And I have reported at times to Scott
12  Newkirk, who was -- who is a divisional
13  operations director.
14      But for the last year and a half I've been
15  reporting to Ms. Elliott-Brown.
16      Q.  I had asked you earlier about your
17  awareness of studies of risk or observations
18  you've made about the risk of adverse events.
19      Let me just ask the same question, but
20  broaden it, so that I'm not just asking about
21  your own personal knowledge.
22      But are you aware of any information that
23  CSL has to indicate the potential -- the --
24  the -- yeah, the potential for adverse events in
25  allowing someone with an anxiety disorder who

Page 92

1  uses a service animal to donate?
2       A.  No, I don't believe anyone has that
3  information.  Medical operations is responsible
4  for monitoring adverse event data company-wide.
5  And I have -- I don't believe I have the
6  information that would permit me to study that
7  question.
8       MR. EAST:  Stephanie, let me go off
9  the record and ask you about taking a break, if
10  we could?
11      MS. WILLING:  Yeah, let's do it.
12      (Recess from 12:24 p.m. to 1:16 p.m.)
13      MR. EAST:  Okay.  Let's go back on
14  the record.
15      Q.  (By Mr. East, continuing) Doctor Nelson,
16  we're back on the record after a lunch break.
17  And I was asking you about some of the entries
18  regarding anxiety disorder on page 11 of
19  the -- of the MSR that's been labeled 4 here.
20      Was -- were these policies regarding
21  anxiety disorder drafted in response to
22  something?
23      A.  CSL -- at the time it was Nabi -- was
24  maybe 12 locations, 12 centers.  Then it merged
25  with Aventis to become ZLB, which bumped the

Page 93

1  number up to about 60 centers.  And there were
2  three physicians at the time that could answer
3  questions and be on call.
4       CSL has expanded greatly.  We're over 160
5  centers now.  Even back then, to keep up with
6  phone calls, we decided that we would have a
7  Medical Staff Reference or conditions guide for
8  MSAs to work from.  And so we put together the
9  conditions guideline.  I believe we have always
10  had a -- a -- item about anxiety.  And the
11  if-then statements have evolved over the years.
12  And that evolution has been in response to
13  questions from the MSAs and the center, as well
14  as our experience in what sort of questions we
15  were most frequently called about, areas where
16  clarification was needed.
17      So the Medical Staff Reference has always
18  been 60 or 70 pages, but over the years the
19  format and -- has evolved and we have refined our
20  if-then statements.
21      Q.  Do you recall when the if-then statement
22  was changed to add -- or -- start over.
23      Do you recall when the if-then statement
24  first referenced the use of a service animal for
25  anxiety disorder?

John Nelson, M.D., Ph.D.
July 12, 2017                                         94 to 97

Page 94

1    A.  I really don't recall that, which revision
2   it was.
3       Q.  Would that have been near the beginning of
4   the MSR and its evolution?
5       A.  It -- it has been -- service animal has
6   been in the MSR for a very long time.  At one
7   point it was in -- on page 1 or 2, regarding
8   disabilities.  And later on it was moved to the
9   anxiety disorder subheading.
10      Q.  And was the addition of the service animal
11  piece regarding anxiety disorder the result of
12  some incident or incidents that had occurred at
13  donation centers?
14      A.  I -- I really don't recall.  It's been
15  probably eight or nine years ago.  And I don't
16  recall if it was in response to questions from
17  center medical staff or whether it was in
18  response to events that occurred.  So I can't --
19  I can't provide you with an answer there.
20      Q.  Do you know of anybody who would know more
21  about the response to that question?
22      A.  Doctor Haight-Biehler, who was based in
23  Tucson, but she left the company a couple of
24  years ago.
25      Q.  Anybody else?

Page 95

1       A.  No.
2           Jan Hamilton --
3       Q.  Can you think of --
4       A.  Jan Hamilton --
5       Q.  I'm sorry?
6       A.  Yeah.  Jan Hamilton --
7       Q.  Uh-huh.
8       A.  -- was --
9       Q.  Yes?
10      A.  -- our corporate medical director at the
11  time we were -- first put the Medical Staff
12  Reference together.  But she is deceased now.
13      Q.  Can you think of any documentation that
14  would help to answer the question of why this was
15  added?
16      A.  No.  There really is no documentation.
17  When we revise the Medical Staff Reference, that
18  is done as a group, sitting around a conference
19  table.  And one person has the current Medical
20  Staff Reference pulled up on their computer.  And
21  it's a realtime revision that goes on.  So there
22  is no other documentation of the revisions.
23      Q.  Has CSL ever received input from an FDA
24  audit about incidents related to anxiety
25  disorders and the way they might have been

Page 96

1   handled?
2       A.  I have no information about that.
3       Q.  Who would know that?
4       A.  I don't believe anyone would have that
5   information available.  The -- certainly the
6   regulatory department keeps records of when
7   audits were done.  Over the last 17 years that
8   I've been with the company, we're talking about
9   hundreds, if not over a thousand audits.
10      Q.  In your clinical practice before CSL, what
11  kinds of things would you look at to determine if
12  a patient's anxiety disorder was controlled or
13  not?
14      A.  Anxiety would be something that would be
15  self-reported by the donor or by a patient.  So
16  it would be something that the patient would
17  bring to my attention.
18          In terms of assessing, you know, whether
19  the donor requires medications or they need their
20  medication regimen adjusted, that would be an
21  interaction that would be initiated by the
22  patient.  They would say, you know, "Last week I
23  had two panic attacks.  I don't feel that things
24  are under control."
25      Q.  Does the severity of an untreated anxiety

Page 97

1   disorder tell you anything about the likelihood
2   of there being problems on the donor floor if
3   they were being treated?
4       A.  I really don't know how to answer that
5   question.  I -- a donor may be having anxiety.
6   If it's severe anxiety, they would not be
7   permitted to donate.  They may come back later,
8   on medication, and be improved and no longer
9   having anxiety symptoms or panic attacks.  And at
10  that time they may be acceptable.  But
11  determining how medication influences risk for
12  DAE, an adverse event, I don't know that I have
13  any --
14      Q.  What did --
15      A.  -- that I have any information on that.
16      Q.  I'm sorry.  Go ahead.  You don't know that
17  you have any ...?
18      A.  Information.
19      Q.  What does "DAE" stand for?
20      A.  Donor adverse event.
21      Q.  And in the context of anxiety, can you
22  give me some examples of DAEs --
23      A.  Most --
24      Q.  -- that -- that you've seen or that staff
25  have seen?

Page 98

1    A.   In answering this, I have to describe our
2 adverse event monitoring and management system.
3         There are nonreportable adverse events,
4 where something occurs and it's managed without
5 the intervention of a medical staff associate.
6 The phlebotomist is able to do something, change
7 something that relieves the donor's symptoms.
8         There are also reportable adverse events.
9 And those are codified by the PPTA, which
10 monitors a company's adverse event rate.
11        There are specific criteria that
12 determine -- determine whether an adverse event
13 is reportable.  If it falls into that reportable
14 category, then we complete a form describing
15 symptoms, signs, treatment, response.  The MSAs
16 manage most adverse events.  The -- part of the
17 form includes a call back to the donor the next
18 day, to make sure they are okay.
19        And then the third part of the form is a
20 review by the center medical director, to
21 determine whether the donor is suitable to
22 continue to donate.
23        The -- I do not believe that we break it
24 out by previous medical diagnoses or we don't
25 have information about previous reported anxiety

Page 99

1 and the development of adverse events, so there
2 is no data.  There is no way for me to look at
3 the donor adverse event data and break it out by
4 people with a history of anxiety versus not.
5    Q.   Would you agree, treated -- a treated
6 anxiety disorder -- I'm going to start over.
7         Would you agree that someone who is
8 getting treatment for an anxiety disorder will
9 have a reduced likelihood of an incident that
10 would interfere with the safety of -- of the
11 donation process?
12   A.   The -- that is our hope.
13        As far as giving you statistics, no, I
14 don't have any statistics.  But it would be our
15 hope that the donor would be less likely to have
16 an adverse event.
17        The adverse event can be anything from the
18 donor not being able to continue and complete the
19 donation.  We have had donors pull the needle out
20 and run out of the center.  We've had donors that
21 have anxiety and have to stand up.  You know,
22 they are really compelled to -- to do that.
23 Difficulty breathing.
24        The -- one of the not uncommon adverse
25 events is a citrate reaction, which we describe

Page 100

1 in our informed consent -- in both the written
2 and the video information about informed consent.
3         Citrate that's mixed with the blood to
4 prevent coagulation works by lowering calcium.  A
5 small amount of that citrate is reinfused into
6 the donor, along with the red cells.  That can
7 cause anxiety.  As we talked about earlier,
8 seizures, muscle cramps, tingling of the face and
9 lips, a feeling of not being able to breathe or
10 catch their breath.  And it can be quite
11 fear-inducing.  It can be -- most of those are --
12 are managed in the center, but we have had donors
13 requiring transport due to those symptoms.
14        So the -- it can be quite ang -- cause a
15 lot of anxiety and fear.
16        The -- it also -- the citrate can cause a
17 metallic taste in the mouth, nausea, vomiting.
18        And I used to donate.  And that was
19 the -- one of the more disturbing parts of my
20 donation, was the metallic taste and nausea.
21        The -- when donors discontinue the
22 donation early, they don't get their saline,
23 which is given at the end of the procedure.  They
24 are definitely at increased risk for fainting and
25 falling.

Page 101

1         The part of the reaction that we commonly
2 see is an intense urge to go to the bathroom.
3 And if a donor has to run to the bathroom in the
4 middle of the procedure, that usually heralds a
5 fall -- fainting and a fall.
6         And the injuries that I've seen over the
7 years -- some have been quite severe.  Donors
8 losing teeth, suffering a concussion.  Falls
9 often result in a call to EMS and the transport
10 of the donor.
11        So it's -- it's also -- can impact
12 employee safety and safety of other donors.
13        I've had instances where donors start
14 flailing about and the needle becomes dislodged
15 and an employee ends up with a -- a needlestick
16 injury.  Or other donors get sprayed with blood.
17 And so it's really not something to be taken
18 lightly.
19        It -- donors going home happy on -- donors
20 go home unhappy, but to protect the safety of the
21 donors, employees, other donors, we have
22 developed our guidelines.  I think they are
23 fairly encompassing.  We cover a lot of
24 conditions, but I feel really quite confident
25 that -- that they are a good set of guidelines.

Page 102

1  And we will continue to use them and -- and
2  refine them.
3      Q.  Some of the adverse anxiety events that
4  have happened at CSL donation centers have
5  involved people with no known or diagnosed
6  anxiety disorder, correct?
7      A.  It's not uncommon, for people who have
8  adverse events, to later on reveal that they have
9  a medical condition or have anxiety problems or
10 are taking medications that they did not tell us
11 about.  It -- it's always difficult to figure
12 out.
13         If they require transport, that is often a
14 come-to-Jesus moment, when people do reveal their
15 medical history.
16         I am not saying that either of these
17 donors was not completely truthful with us, but,
18 in my experience over the years, I've seen that
19 quite commonly.
20     Q.  Are there times when there's an adverse
21 event related to anxiety in people who do not
22 have a diagnosis or treatment?
23     A.  Yes.  People do come in and realize that
24 they are afraid of needles.  It's not unheard of
25 for a six-foot-four, 260-pound male to faint when

Page 103

1  they get their finger stuck.  So, you know,
2  it's -- we're dealing with the general population
3  and so we see all of these things.
4      Q.  I -- I apologize if I asked you this
5  already, but is there anyone at CSL who you
6  believe has more information than you about
7  anxiety disorders or anxiety disorders requiring
8  the use of a service animal?
9      A.  No.  I believe I have the most experience.
10 And we have individual center medical directors
11 that have been in the business longer than I
12 have, but, on a corporate level, I have the most
13 seniority.
14     Q.  Is it -- is it possible that a donor who
15 has a severity anxiety disorder could donate
16 safe -- safely and without an issue?
17     A.  I'm sure that there are donors that have
18 responded to treatment and donate quite
19 successfully.
20     Q.  Let me ask you to look again at page 11
21 of -- regarding anxiety disorders.  And the first
22 entry under "if."  It says "severe" and
23 "frequent" and resulting in a permanent deferral.
24         What does "severe, frequent" mean there?
25     A.  It really has to be elicited in the

Page 104

1  interview with the donor.
2      Q.  And how is that determined, as how is
3  "severe" or "frequent" determined?  I know you
4  said it's listed in the interview, but what are
5  you asking?  What are you looking for?
6      A.  If the donor is on a medication that's
7  used to treat anxiety, we would ask them, "Why
8  are you on this medication?"
9         If they respond, "It's my anxiety
10 disorder," or PTSD, then we would delve into that
11 further.
12         Again, trying to use open-ended questions.
13 And let the donor tell us in their own words.
14     Q.  What kinds of questions would you expect
15 would be asked to delve into that further?
16     A.  The questioning really is in response to
17 specific things that the donor might say.  We may
18 ask if it's situational, how severe is it.  We
19 would try to get a -- a clearer picture of the
20 donor.
21     Q.  And under the last if-then statement under
22 "Anxiety Disorders," it says, "If currently with
23 symptoms, temporary deferral."
24         What does "symptoms" mean there?
25     A.  Any symptoms of anxiety:  sweating,

Page 105

1  nervousness, palpitations, the feeling of fear,
2  wanting to get out of the center.  There are
3  really a wide variety of -- of symptoms that a
4  person might -- might develop.
5      Q.  I asked you earlier about what the safety
6  issues implicated here are.  And you were talking
7  about decorum issues.  And, if I understood you
8  correctly, you were not talking about the decorum
9  of the animal, but the decor -- decorum of the
10 donor.
11         Have I understood your testimony
12 correctly?
13     A.  Yes.  The -- we don't allow donors with
14 severe anxiety to donate, so it's not a question
15 of the animal.  What we're talking about would be
16 the environment in the center.
17     Q.  Are you familiar with the diagnosis
18 "generalized anxiety disorder"?
19     A.  I have not looked -- that sounds like
20 something from the DSM.  I have not reviewed that
21 in a couple of years.
22     Q.  Would you agree with me that the DSM is
23 sort of the authoritative handbook on mental
24 disorders?
25     A.  It describes the symptoms and things that

Page 106

1  you observe.  And it categorizes those into
2  diagnoses.  Often it's a checklist type of thing.
3  And so it's useful for psychiatrists.  It's
4  useful for billing purposes when physicians seek
5  reimbursement for their services.
6        In terms of general utility outside of
7  those settings, I'm not sure that that's the
8  intended use.
9     Q.  Would it be fair to say that it's written
10 primarily for professionals?
11    A.  Yes.  That's -- it's written primarily for
12 mental health professionals.
13    Q.  And is it updated from time to time to
14 correct or -- or coincide with current thinking
15 and research?
16    A.  It is updated.  When it is updated, you
17 frequently see it in the popular press.  And it's
18 not always without controversy that it is
19 updated.
20    Q.  Is it something that, for professionals,
21 is considered authoritative?
22    A.  I think that in any professional
23 discussion, conferences, literature, it is the --
24 it supplies the basic definitions that people
25 use.

Page 107

1     Q.  And by "people," you mean professionals?
2     A.  Professionals, yes.
3     Q.  Do you use it at -- in your work at CSL?
4     A.  I have looked at it in the past.  I really
5  can't point to a specific instance where I said,
6  "Let's refer to the diagnostic and statistics
7  manual to refine our if-then formatted
8  questions."
9     Q.  In your clinical practice have you used
10 the DSM?
11    A.  Yes.  In my training and -- and clinical
12 practice I have reviewed it.  The -- in terms of
13 using it, I do not use it on -- on a day-to-day
14 basis, but if I have a question, I -- I will look
15 at a topic.
16    Q.  Are you familiar with the diagnosis "panic
17 disorder"?
18    A.  Yes, I am familiar, but it's been a long
19 time since I've looked at it.
20    Q.  What is your understanding of what that
21 diagnosis means for an individual?
22    A.  I would really have to have a copy of the
23 DSM in front of me to -- to discuss it.
24    Q.  And what about the diagnosis of
25 "post-traumatic stress disorder"?  Are you

Page 108

1  familiar with that?
2     A.  Yes.
3     Q.  Do you know the symptoms or manifestations
4  or criteria for that?
5     A.  There again, I would need the DSM in front
6  of me to -- to discuss it.
7     Q.  Let me ask you to turn to page 13 of 71 in
8  the exhibit in front of you.  And the top entry
9  there is for arthritis.  And under the "if"
10 column it says, "If ... All others, including
11 osteoarthritis," then Acceptable if:  No
12 disqualifying medications."
13        Did I read that accurately?
14    A.  Yes, that's what it says.
15    Q.  And so am I understanding it correctly,
16 that osteoarthritis, the diagnosis, is not
17 grounds for deferral, although someone could be
18 taking in medicine for it, that would be grounds
19 for deferral?
20    A.  They may be deferred due to medications.
21 They may be deferred due to other symptoms.  If
22 they have difficulty getting on and off the bed,
23 if they have difficulty standing on the scale, if
24 they are unsteady on their feet, it -- those may
25 also cause deferral.  It's not simply in

Page 109

1  disqualifying medications.
2     Q.  Also on that page there's an entry for
3  "Asperger's Syndrome, slash, Disorder,"
4  indicating that that is not grounds for deferral,
5  correct?
6     A.  Yes.
7     Q.  And at the bottom of the page there's an
8  entry for asthma.  And on -- on the following
9  page, page 14, it has the if-then statements.
10 And they indicate that certain things will result
11 in deferral and other things won't.
12        Is that a fair characterization?
13    A.  Yes.  We have multiple if-then statements.
14    Q.  And some situations regarding asthma do
15 not result in a deferral, correct?
16    A.  Some situations do not, according to the
17 if-then statements, but, there again, you need to
18 look at the whole patient -- or donor.  And there
19 may be issues regarding the number of medications
20 that are required.
21        There can also be -- if you observe the
22 donor walking into the center or walking into the
23 MSA office and they are huffing and puffing and
24 short of breath, that would indicate that the
25 asthma is severe and that the donor is going to

Page 110

1  be deferred or we're going to require a health
2  care provider note or it's not simply asthma.
3  There may be COPD, as well.
4      So yes, these are the general if-then
5  statements, but there may be other things going
6  on. You may observe other things that would
7  result in the donor's deferral or result in a
8  health care provider note being requested.
9      Q. Let me ask you to turn to page 43 of this
10 document. And on that page there is a -- a --
11 three -- for joint replacement. And the if-then
12 statements suggest that a person with joint
13 replacement is not deferred if it's been a
14 sufficient time since -- since the surgery. And
15 I believe it says eight weeks for small joints
16 and four months for large.
17      Did I characterize that correctly?
18     A. Those are the if-then statements.
19     Q. Is there anything else to add to the
20 deferral decision regarding joint replacements?
21     A. This is assuming that the surgery went
22 well, there was no problem healing. If there was
23 infection, complications, such as a deep-vein
24 thrombosis, other medications that the donor
25 might now be on.

Page 111

1      So this is sort of the minimum. And there
2  are other questions that need to be answered
3  before we would accept the donor.
4      Q. And how do the staff know what those
5  questions are?
6      A. The staff are paramedics, RNs and LPNs, so
7  they have experience in the medical field. They
8  have training and experience. And if they have
9  any questions, they can call their CMD or they
10 can call MedOps.
11     It -- the questions are, again,
12 open-ended. Let the donor tell their story.
13     If something doesn't seem right, call the
14 CMD, call MedOps, ask for a health care provider
15 note.
16     Q. And am I right that there is nothing in
17 the FDA or other regulations that specifically
18 references joint replacement?
19     A. No, there is nothing that addresses joint
20 replacement. However, there are requirements
21 regarding blood transfusions or cadaver cartilage
22 or those sorts of questions that might -- might
23 be involved.
24     Certainly any time someone goes under, has
25 a major surgery, if it's nonemergent, and are

Page 112

1  older, they would probably end up with a -- a
2  cardiac evaluation preop. And those would all be
3  things that we would be interested in hearing
4  from the donor.
5      Q. There's nothing in this entry or elsewhere
6  in the MSR about upcoming or future joint
7  replacement surgery, correct?
8      A. We do not have a -- if-then statement
9  about future surgery. However, again, it would
10 be of interest to know why the person is having
11 the surgery, what other medical problems might be
12 accompanying, and the general health of the
13 person.
14     Q. Let me ask you to turn to page 53 of this
15 document, if you would.
16     And towards the bottom of the page there
17 is an entry for "Post-Traumatic Stress Disorder."
18 And it reflects that someone with PTSD is
19 acceptable to donate if the condition and
20 medications are stable, is that correct?
21     A. Yes. Also part of that statement is, "See
22 Anxiety Disorders."
23     Q. And that's the entry that we've already
24 looked at before, on page 11, is that right?
25     A. Right.

Page 113

1      Q. Okay. Let me ask you, if you would, to
2  look at something that either has been or will be
3  marked as Exhibit No. 6.
4      (Brief discussion held off the record.)
5      (Deposition Exhibit No. 6 marked.)
6      A. (Continuing) I have number 6.
7      Q. All right. And let me point out that at
8  the top right corner it reflects the effective
9  date of 23 May 2016. And Exhibit 4 that we were
10 looking at had an effective date of 27 October
11 2014.
12     So this is a more recent version of the
13 MSR, is that correct?
14     A. Yes.
15     Q. There may be one or two changes that I
16 wanted to ask you about. Most of this seems very
17 similar to me.
18     But if you look at page 3 of Exhibit 6, 3
19 of 73. Again, that's the disabilities section.
20 And it has similar language in some ways to what
21 we looked at before, but this one under
22 "Disabilities" says, "See CTR02121, Impaired
23 Donors for specific guidance."
24     Do you see that?
25     A. Yes.

John Nelson, M.D., Ph.D.

July 12, 2017                                          118 to 121

Page 118

1 came out, did it make any changes with regard to
2 assessing the donor's gait?
3      A.  There are no changes to assessing the
4 donor's gait.
5      Q.  Are there any changes that would impact a
6 donor's use of a cane?
7      A.  No.
8      Q.  Are there any changes to that that relate
9 to a donor's limp?
10      A.  No.
11      Q.  Any changes to the entry on
12 osteoarthritis?
13      A.  No.
14      Q.  Any changes to the entry on anxiety
15 disorders?
16      A.  No.
17      Q.  And any changes to the entries on service
18 animals or assistance animals?
19      A.  No.
20      Q.  You -- I think when you were describing
21 the -- the screening process that goes on at a
22 CSL Plasma donation center, you referenced that
23 one of the facts that they do is weigh the donor
24 or prospective donor.  And you also referenced
25 the ability to get on the scale, et cetera.

Page 119

1      Is there an FDA regulation regarding the
2 weight of the donor?
3      A.  The donor's weight determines the volume
4 of plasma that they can donate.  I believe that a
5 donor can be no less than 110 pounds to donate.
6      The -- I don't think the FDA proscribes an
7 upper limit to the donor's weight.  However, we
8 do have limitations as regards our scales and our
9 donor beds, on upper weight.
10      Q.  What are those limitations?
11      A.  I would have to look it up.  I can't
12 remember offhand what the upper limit is.
13      Q.  Is the upper limit the same in all the CSL
14 donation centers?
15      A.  All of the centers use the same beds.  I
16 think there is some variation in terms of the
17 scales, depending on when they were bought and
18 what their upper certified limit is.  I don't
19 have that information, offhand.
20      Q.  If a donor is deferred and is not
21 satisfied with that decision, what, if anything,
22 can they do?
23      A.  The donor can ask center management
24 to -- or the MSA to check with their CMD and see
25 if they agree with their decision.

Page 120

1      Sometimes donors complain to the corporate
2 office.  And there is a process by which donor
3 complaints are managed.  I don't have the details
4 on that.
5      Q.  The CMD is the center medical director, is
6 that right?
7      A.  Right.
8      Q.  And who do the complaints go to at
9 corporate, if it makes it that far?
10      A.  It -- it goes to a -- it goes to an office
11 that handles donor relations.  And I sometimes
12 see a message from them that a donor has called
13 and complained.  But, for the most part, those
14 complaints go back to the center manager to
15 address.
16      And the center manager handles those
17 complaints and then reports to what's called the
18 ADOQ, assistant director for operations and
19 quality.  And the ADOQs report to what are called
20 RDs, regional directors.  Those RDs then report
21 to the divisional operations director.
22      Q.  If I understood what you were saying,
23 occasionally a complaint that ends up at
24 corporate might get -- if not routed to
25 you -- sent to you for your input, perhaps,

Page 121

1 although mostly that's not the case.
2      Is that -- did I understand you correctly?
3      A.  Yes.
4      Q.  Okay.  Is there -- if the -- start over.
5      If the donor is dissatisfied with the
6 deferral, makes it up to corporate, and is still
7 dissatisfied with the CSL decision, is there
8 somewhere else there they can go or some other
9 entity they can appeal to?
10      A.  I don't know of any.
11      Simply that.  I don't know of any.
12      Q.  Are you aware of any process of -- for
13 considering similar matters that the FDA might
14 have?
15      A.  If a donor complains to the FDA, I don't
16 know what their response is.  If it's a question
17 of safety, the FDA may assign an investigator to
18 come visit the center.  If a donor complains to a
19 state or local health department, I have, on
20 occasion, seen the health departments
21 investigate.
22      I have heard of donors complaining to OSHA
23 and OSHA comes and investigates.  The state and
24 local health departments and OSHA usually go
25 directly to the center for their investigation.

John Nelson, M.D., Ph.D.
July 12, 2017                        122 to 125

Page 122

1    Q.  Can you think of any specific occasions
2    when the FDA responded to a complaint involving
3    CSL's donation center?
4    A.  I don't know of any specific complaint
5    that the FDA responded to.  I would probably not
6    hear about it.  All of the interaction with the
7    FDA goes through regulatory.
8    Q.  If the -- if the person were complaining
9    about a deferral for health re -- reasons and
10   they felt like it was not fair or not accurate
11   assessment of their health or safety issues,
12   could they take that to the FDA?
13   A.  Yes.  And I assume the FDA would have some
14   process in place to respond.
15   Q.  How do you know that they could take that
16   to the FDA?
17   A.  The FDA's mandate is ensuring the safety
18   and effectiveness of medications, medical
19   instruments and so on.  So my simple assumption
20   is that the FDA would have some process in place
21   to hear complaints and respond.
22   Q.  Who at CSL would know more about that
23   mechanism?
24   A.  I really don't know.  If -- if there was a
25   question by the FDA, it would probably be

Page 123

1    directed to the regulatory department.
2    Q.  Let me ask you to take a look at what has
3    been marked as Exhibit No. 2.
4    A.  I have 2 in front of me.
5    Q.  Thank you.
6    And is this one of the documents that you
7    looked at in preparation for your deposition here
8    today?
9    A.  Yes.  Ms. Willing presented it to me.
10   Q.  And is your understanding that these are
11   various donor medical notes related to the
12   plaintiff, Mark Silguero?
13   A.  That's what it says in the lower
14   right-hand corner.
15   Q.  Okay.  And are -- when you say "the lower
16   right-hand corner," are you referring to either
17   the Exhibit No. 2 label or the -- the number
18   stamped below that?
19   A.  They are both there.  The first column is
20   the donor ID, but I have not looked back to
21   confirm that this donor ID corresponds to that
22   donor.
23   Q.  Okay.  Let me -- let me point out, in the
24   second column there are -- a numerical sequence,
25   beginning at the top of the page.  The first

Page 124

1    line, 0001 and, down at the bottom, 0016.
2    Do you see that?
3    A.  Yes.
4    Q.  And, if you will, look at the line 003.
5    And it goes on to 004.
6    And I'm reading the -- there it says,
7    "MGMT must speak to the donor prior to his next
8    donation.  MSA MN told donor he would be unable
9    to donate due to using a cane and walking with a
10   limp."
11   Did I read that correctly?
12   A.  Yes, that's read correctly.
13   Q.  And, if I understand your testimony, the
14   use of a cane by itself would not result in a
15   deferral, is that correct?
16   A.  The use of a cane and walking with a limp
17   do not result in an automatic deferral.
18   The -- and I don't know if -- when the MSA
19   observed this, whether she told him that a health
20   care provider note would be needed prior to his
21   coming in to donate again.
22   So it says that he's using a cane and
23   walking with a limp.  That -- I don't know if
24   that was written by the MSA or whether that is
25   what the donor told someone else and this was

Page 125

1    being written third person.  That's what it
2    actually looks like, is a third person, DT, made
3    this entry.
4    Q.  It doesn't reflect that the reporter here
5    was the donor, correct?
6    A.  The only person -- the only people that
7    have access to the computer, to make the notes,
8    are CSL employees.  And it appears that the
9    employee who made this entry had the initials DT.
10   Now, where DT got the information from,
11   whether he got it from the MSA or whether he got
12   it from -- this information from the donor, it's
13   not clear to me.
14   Q.  So, looking at line three, the first part,
15   "MGMT."  Does that -- does that stand for
16   "management"?
17   A.  Yes.
18   Q.  So it says, "Management must speak to this
19   donor prior to his next donation."
20   That's unlikely to have come from a donor,
21   correct?
22   A.  That -- well, I can't tell.  It sort of
23   implies that DT made that entry, that management
24   must speak to the donor.
25   The second part of the line -- I don't

Page 154

1    What factual basis does CSL have for
2 claiming that either of the plaintiffs in this
3 case suffered no recoverable damages?
4    A.   That seems to be a legal question.  The
5 donors were not permitted to donate.  As far as I
6 know, that -- for the one person was temporary
7 and then, because of his behavior, it became
8 permanent.
9    For the other donor, she is temporarily
10 deferred.
11    We do pay donors for their donation.
12 However, we don't guaranty that everyone will be
13 able to donate.  So, in terms of damages, I would
14 have to leave that up to an attorney to determine
15 if there are recoverable damages.
16    Q.   So, just to clarify, I'm -- I'm not asking
17 at this point for information about why CSL
18 disputes these claims.
19    I guess what I want to know is, does CSL
20 have any information regarding the extent of the
21 harm or the claimed harm that the plaintiffs
22 suffered when they were deferred?
23    A.   The only information I have is what's in
24 the medical notes.  And I really --
25    Q.   Okay.

Page 155

1    A.   -- can't say anything beyond that.
2    Q.   Okay.  So you don't know anything about
3 what mental anguish they may have suffered or how
4 bad it was or anything like that --
5    A.   No.  I do not --
6    Q.   -- is that correct?
7    A.   -- any information.
8    Q.   And, as far as you know, CSL does not have
9 information about that, either, other than what
10 might be in the testimony in this case, is that
11 correct?
12    A.   That's correct.  I know of no other
13 information.
14    Q.   If you will turn to page 4 of this
15 document, Exhibit 8.  And I'm looking now at the
16 subheading (1) on that page.
17    Does CSL have any facts to support its
18 claim that the plaintiff claims in this case are
19 preempted by federal law?
20    A.   CSL operates under a license granted by
21 the FDA.  And that is a federal regulatory body.
22    As a layman, in terms of law, it seems
23 that that is a federal issue.  That's all I can
24 say about it.
25    Q.   All right.  What facts does CSL have to

Page 156

1 support the contention that plaintiff claims are
2 within the primary jurisdiction of the FDA?
3    A.   Again, each center is licensed by the Food
4 and Drug Administration.  They have guidelines
5 and requirements that we must follow.  And all of
6 our policies and procedures dovetail into those
7 requirements and guidelines so that the Food and
8 Drug Administration is the final arbiter of
9 whether we can operate plasma centers or not.
10    Q.   You understand, though, that the
11 plaintiffs are not contending that CSL cannot
12 operate a plasma center.  Instead, they are
13 alleging that they were discriminated against by
14 CSL staff.
15    Do you see that?
16    A.   Yes.  I understand that.
17    My response would be that we do not
18 discriminate against any class or category.  Each
19 person is assessed individually and a medical
20 determination is made, whether they can donate or
21 not.
22    Q.   And, as I understand it, there are no
23 written policies or training materials that say
24 that, is that correct?
25    A.   That say what I say?

Page 157

1    Q.   Yes.  There are no -- that CSL has no
2 written policies or training components that say
3 staff are not supposed to discriminate against a
4 group of people?
5    A.   I don't know.  There may be a policy
6 somewhere that actually states that.
7    Our -- my training, as a supervisor or
8 manager, was -- has been focused primarily on
9 employees.  Perhaps there is a general statement
10 somewhere in CSL's overall code of conduct that
11 says we do not discriminate against donors, but I
12 could not point you to that.
13    Q.   What facts does CSL rely on in claiming
14 that the plaintiffs' claims are waived in this
15 case?
16    A.   That is subitem 9 -- or (n).
17    Q.   It -- yeah.  N, as in Nancy, the first
18 part of that.
19    A.   I really have to -- these are legal terms,
20 waiver, estoppel and unclean hands.  I would have
21 to rely on the CSL's attorney to back that
22 statement up, but -- that's really --
23    Q.   You're not a -- I'm sorry.  Go ahead.
24    A.   Yeah.  I'm not an attorney, so I
25 can't -- I don't know how to interpret that or

Juliana Sanchez
July 07, 2017                                              1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK SILGUERO,                )
    Plaintiff,            )
                        )
and                           )
                        )
AMY WOLFE,                    )
    Intervening Plaintiff,   )
                        )
v.                            )   CIVIL ACTION NO.
                        )   2:16-CV-00361
CSL PLASMA INC.,              )
    DEFENDANT.               )

*****************************************

ORAL DEPOSITION OF

JULIANA SANCHEZ

JULY 7, 2017

*****************************************

    ORAL DEPOSITION of JULIANA SANCHEZ, produced
as a witness at the instance of the PLAINTIFFS, and
duly sworn, was taken in the above-styled and numbered
cause on JULY 7, 2017, from 9:02 a.m. to 9:55 a.m.,
before Stephanie M. Harper, RPR, CSR in and for the
State of Texas, recorded by machine shorthand, at the
offices of DISABILITY RIGHT TEXAS, 1500 McGowen, SUITE
100, Houston, Texas, pursuant to the Federal Rules of
Civil Procedure 30 and the provisions stated on the
record or attached hereto; that the deposition shall be
read and signed before any notary public.

JOB NO. 244702

Juliana Sanchez
July 07, 2017                                          6 to 9

Page 6

1  that you will let me know; is that okay?
2      A.   Yes.
3      Q.   And if at any point you need to take a break
4  and you need a break from the deposition, will you let
5  me know?
6      A.   Yes, ma'am.
7      Q.   Okay.  Where -- you said you're from
8  California.  What kind of background or educational
9  certification do you have that is pertinent to your
10  experience at CSL Plasma?
11      A.   I'm an LVN, so a licensed vocational nurse.
12  That is what I'm -- my position is, so it's called a
13  medical staff associate for CSL purposes, but my
14  license is an LVN.
15      Q.   Is there any other certification or license
16  that you hold that's pertinent to your work?
17      A.   No, ma'am.
18      Q.   And have you ever given a deposition before?
19      A.   No, ma'am.
20      Q.   What did you do to prepare for today's
21  deposition?
22      A.   I met with Ms. Stephanie.  We just went over
23  the MSR, and --
24      Q.   I don't need you to explain anything that you
25  talked to her about.  But did you look at any

Page 7

1  documents --
2      A.   Yes.
3      Q.   -- to prepare?
4      A.   The MSR and the medical communication form.
5      Q.   And what is the "MSR"?
6      A.   It's basically the reference guidelines that
7  the company goes by for any medical conditions or
8  medications.  That's so -- any kind of medicine or any
9  kind of diagnosis, it has to be in there.  If it's not
10  in there, then basically they're not able to donate or
11  we would have to refer to our physician.
12      Q.   And does the "MSR" stand for medical staff
13  reference?
14      A.   Yes, ma'am.
15      Q.   Did you listen to anything to prepare for
16  today's deposition?
17      A.   Yes, a video of -- like, a call recording.
18      Q.   And was it a call recording regarding what?
19      A.   When I talked to Ms. Wolfe.
20      Q.   And do you have any reason to believe that the
21  call recording was inaccurate or not a truthful
22  rendition of what occurred?
23      A.   It was a conversation we had between each
24  other.
25      Q.   And did it sound like an accurate

Page 8

1  conversation?
2      A.   Yes, ma'am.
3      Q.   Aside from talking with Ms. Willing, did you
4  speak with anybody else to prepare for today's
5  deposition?
6      A.   No, ma'am.
7      Q.   Did you speak to anybody else about
8  Ms. Wolfe's case?
9      A.   No, ma'am.
10      Q.   And are you currently employed at CSL Plasma?
11      A.   Yes.
12      Q.   And you're a medical staff associate there; is
13  that right?
14      A.   Yes.
15      Q.   What are your job duties as a medical staff
16  associate?
17      A.   Well, we basically look at donor candidates.
18  We see basically if they qualify to be donors.  So we
19  look at their medical history, their physical
20  background.  We do a physical to make sure everything
21  is acceptable for health history-wise.  I also take
22  care of reactions, donor reactions, on the donor floor.
23  So if donors do have reactions, our medical staff does
24  take care of it.
25           We speak with the physicians regarding

Page 9

1  any other questions we have.  I also help screen.  So
2  whenever the donors get screened, I help if they need
3  help.  That's about it.
4      Q.   And when you say you go over the donor
5  history, what does that entail?
6      A.   So we ask about any surgeries, medical
7  conditions, diagnosis.  When we do the physical, we do
8  look for any scars for surgery.  We look over tattoos,
9  see if there's any fresh tattoos, any needle marks,
10  anything that will basically disqualify or not make the
11  plasma quality as efficient as it should be.
12      Q.   Do you ask about past surgeries?
13      A.   Past surgeries, yes, ma'am.
14      Q.   Do you ask about future surgeries?
15      A.   Yes.
16      Q.   What kind of future surgeries do you ask
17  about?
18      A.   Well, sometimes future surgeries, they usually
19  voluntarily tell us.  We don't usually just ask, "Oh,
20  are you going to have a surgery next month?"  If they
21  have like a gastric surgery coming up that they know,
22  they will let us know that they're going to have a
23  gastric bypass.  Or if they have a tooth extraction and
24  they know they're going to be on antibiotics, they
25  usually let us know ahead of time.

Juliana Sanchez
July 07, 2017                          14 to 17

Page 14

1  you read over SOPs.  You read over CTRs.  You're
2  questioned on what you read to see if you are
3  knowledgeable to the information, and then you do
4  hands-on training.
5      Q.   And do you have access to Rocio and William as
6  part of your day-to-day job --
7      A.   If they're on the schedule, yes.
8      Q.   Who are you supposed to go to with questions
9  on a day to day?
10     A.   It's usually more than one MSA.  The only time
11 there would be one MSA is on the weekends.  If they're
12 not there to help me out, I would contact Dr. Shafi.
13     Q.   Did you ever receive any training about donors
14 with disabilities?
15     A.   Not directly.  We do have CTRs that we read
16 over for the training purposes for vision and hearing
17 disability, yes.
18     Q.   And do you -- on those CTRs, did it cover
19 other disabilities, other than vision and hearing?
20     A.   No.
21     Q.   Did you ever learn anything about disability
22 discrimination in your trainings?
23     A.   No.
24     Q.   Do you have any knowledge of disability
25 discrimination?

Page 15

1      A.   No, ma'am.
2      Q.   Have you ever had any training on something
3  called the "Americans with Diabilities Act" or "ADA"?
4      A.   No.
5               (Exhibit No. 6 was marked.)
6      Q.   (BY MS. DAVIS)  I'm going to look at what has
7  been marked now as Exhibit 6.
8      A.   Okay.
9      Q.   Can you tell me what this is?
10     A.   The MSR that we go by.
11     Q.   Is this the MSR that you were referencing
12 earlier?
13     A.   Yes, ma'am.
14     Q.   And what is the effective date on this MSR?
15     A.   May 23rd of 2016.
16     Q.   And do you see on the top right-hand, it says
17 "Page 1 of 73"?
18     A.   Yes, ma'am.
19     Q.   I'm going to be going through those pages and
20 referring to pages on that using those numbers.
21     A.   Okay.
22     Q.   On Page 1 of 73, you see in the second
23 paragraph, it talks about a regulatory requirement?
24     A.   Yes.
25     Q.   What does that mean, "regulatory requirement"?

Page 16

1      A.   So a regulatory requirement -- we do have
2  certain requirements that I guess are general.  Some of
3  them are -- I would say, like, if somebody has a baby,
4  it's a six-month deferral.  If anybody has IV drugs --
5  it's just something basically that's an overall general
6  statement for some of the regulations that they have.
7      Q.   Do you know what regulations those are
8  referring to?
9      A.   No, ma'am.
10     Q.   And if something is not a regulatory
11 requirement, what is that considered?
12     A.   So basically if it's not a broad -- if it's
13 something specific, like a certain medical condition,
14 we go by the MSR.
15     Q.   Do you use the MSR in your job every day?
16     A.   Yes, ma'am.
17     Q.   And how are you able to access the MSR in your
18 job?
19     A.   It's in our office, our medical office.
20     Q.   And is it on in the computer or is it in
21 paper?
22     A.   We have it in paper.
23     Q.   And do you use it on paper?
24     A.   Yes.
25     Q.   Do you use it with every donor that you

Page 17

1  screen?
2      A.   Yes, ma'am.
3      Q.   Do you know who wrote those guidelines?
4      A.   No.
5      Q.   Am I right to say this Rocio and William
6  trained you on them?
7      A.   Yes.
8      Q.   Are you supposed to use your own judgment when
9  following the guidelines?
10     A.   We go off of what is stated in the --
11 basically, for each condition, whatever's written,
12 whatever's acceptable, that's what we go by.
13     Q.   If it is unclear, what are you supposed to do?
14     A.   Call Dr. Shafi or MedOps.
15     Q.   If it is unclear, is it ever appropriate for
16 you to make your own decision about what it means, what
17 the guidelines mean?
18     A.   No.
19     Q.   If you can turn to Page 3 of 73 --
20          MS. WILLING:  You can unclip it.
21     Q.   (BY MS. DAVIS)  Oh, yeah.  Sorry.
22          Do you see on this page, where there on
23 the "If" column --
24     A.   Yes.
25     Q.   -- about one, two, three, four, five -- six

Juliana Sanchez
July 07, 2017                          18 to 21

Page 18

1  down, it says: "Unsteady gait, falling, or dizziness"?
2      A.  Yes.
3      Q.  What is an "unsteady gait"?
4      A.  So a limp.  I would just say "limp."
5      Q.  Somebody with a limp would not be allowed to
6  donate?
7      A.  Not necessarily.  We would evaluate what the
8  limp is for.  If it's for a fracture, if it's for any
9  vision impairment, just to see exactly what is causing
10  the limp.
11      Q.  What kind of things would cause a limp that
12  would prohibit donation?
13      A.  Being under the influence, substance abuse,
14  anything like that.  If there's a fracture, it just
15  depends on other conditions, as well, other
16  qualifications.
17      Q.  What kind of conditions would cause an
18  unsteady gait that would not prohibit?
19      A.  If there's a sprain, it's not necessarily
20  disqualifying you.  As long as there's no bruising,
21  it's considered okay.
22      Q.  What about bad knees from obesity, if that was
23  causing an unsteady gait, would that prohibit donation?
24      A.  That would be acceptable.
25      Q.  What would using a cane be considered; if

Page 19

1  somebody -- if a donor used a cane, would they be
2  allowed to donate?
3      A.  Yes.
4      Q.  Can you look at the last one:  "Transfer to
5  donor bed"?
6      A.  Yes, ma'am.
7      Q.  If I'm reading that correctly, does that mean
8  that a person is acceptable if they can transfer to and
9  from the donor bed without assistance --
10      A.  Yes.
11      Q.  -- if they meet all other criteria?
12          So a donor who is able to transfer safely
13  to and from the donor bed without assistance is
14  eligible to donate; is that right?
15      A.  Yes, as long as they don't have a problem
16  transferring to the donor bed.  Yeah.
17      Q.  Have you ever had a donor that used a cane?
18      A.  Yes.
19      Q.  And were they able to donate?
20      A.  Yes.
21      Q.  Have you ever had a donor that walked with a
22  limp?
23      A.  Yes.
24      Q.  And were they able to donate?
25      A.  Yes.

Page 20

1      Q.  If you can turn to Page -- what is marked as
2  11 of 73 on the same exhibit, do you see where it says
3  "Anxiety Disorders"?
4      A.  Yes, ma'am.
5      Q.  What does it say about people with anxiety
6  disorders?
7      A.  Which column would you like?
8      Q.  I want to understand what you would -- what
9  you would look at if you were assessing a donor.  What
10  does it say about people with anxiety disorders?
11          How would you assess, given the information
12  here?
13      A.  Okay.  So before I would look at the MSR, I
14  would already have the information of basically how far
15  their anxiety goes, how long they were diagnosed, and
16  what medications they're on.  So depending on which
17  category would apply to them, then I would look at
18  basically the qualification for it.  So depending on if
19  they're more -- on more than two medications, if how --
20  how often they have anxiety attacks and how long
21  they've been diagnosed.
22      Q.  Let's start with more than two medications.
23  How would you know if somebody was on more than two
24  medications?
25      A.  We would have asked prior when we ask medical

Page 21

1  conditions.  And then we ask if they're on any
2  medications.
3      Q.  That would have already been asked prior to
4  getting to this point?
5      A.  Prior.  Yes, ma'am.
6      Q.  Is there a specific question on the -- on the
7  donation form that asks about anxiety disorders?
8      A.  Not anxiety specifically.  When we do the
9  physical process, we do ask about medications,
10  diagnoses, and surgeries prior to doing any physical.
11      Q.  So if they hadn't disclosed any medications
12  related to anxiety, would there be any way for you to
13  know that they had anxiety?
14      A.  No.
15      Q.  And if you don't know that they have anxiety,
16  they would still be allowed to donate because you don't
17  have that knowledge; is that correct?
18      A.  Yes.  If they didn't tell us they had the
19  diagnosis, we would not know.
20      Q.  And what about a service animal; what does it
21  say about a service animal?
22      A.  Relating to anxiety disorders, it just says
23  for service animal guidelines, if unclear, contact
24  MedOps.  So it says to refer to a separate CTR number.
25      Q.  And so if you were to get -- if you were to

Juliana Sanchez
July 07, 2017                                        22 to 25

Page 22

1   look at this with somebody who had a service animal,
2   what would you do?
3           What would be your typical course of action?
4       A.  So first, I would look at the CTR02121 and see
5   what that stated.  And then if that did not answer my
6   question, I would call MedOps, just as stated.
7       Q.  And would you do that while the person was
8   there -- while the donor was there with you?
9       A.  Yes.
10      Q.  Walk me through what that looks like.  If the
11  donor's sitting there with you, and you had to go
12  through this process, what would you do?
13      A.  So usually I -- I look at this in front of
14  them.  I explain to them what it says, and then I would
15  tell them to wait a second so I could pull up the other
16  CTR number.  I would read over that CTR.  If that's
17  unclear, I would tell them, "This doesn't really
18  explain specifically what I should do, so my other
19  option is to call Ops."
20          MedOps sometimes does not always answer.
21  So in that case instead of having them wait because it
22  could take a couple of hours, we are allowed to let
23  them leave the facility, enter their information, and
24  then recontact them.
25      Q.  And would you look up the CTR while the donor

Page 23

1   was sitting there with you --
2       A.  Yes.
3       Q.  -- or would you leave the room?
4       A.  No, while they're sitting there waiting for --
5   with me in the room.
6       Q.  Okay.  So that information is accessible to
7   you there in the room with the donor?
8       A.  Yes.
9       Q.  And if someone didn't have a service animal
10  but had anxiety, would you have any way of knowing that
11  they had anxiety?
12      A.  If they did not disclose it, no.
13      Q.  Have you ever had a donor who had anxiety that
14  they did not disclose?
15      A.  If they didn't disclose it, I wouldn't know.
16      Q.  So have you ever found out after the fact?
17      A.  After the fact, yes.  When we do vitals, some
18  people with anxiety, their vitals do tend to be a
19  little higher.  Pulses usually -- usually do tend to be
20  a little higher, and that's just medically.
21      Q.  And were they still allowed to donate?
22      A.  Once we ask sometimes why their pulse -- they
23  usually come out and disclose, "Well, I have" -- "I
24  think I have anxiety."  And when something like that --
25  we usually send them to see a physician so we can get a

Page 24

1   diagnosis.
2       Q.  So even if they say they think they have
3   anxiety --
4       A.  When it's a possibility, we still send them
5   with the HCP letter, just so we can have a
6   confirmation.
7       Q.  What is the "HCP letter"?
8       A.  It's basically a letter we give out anytime
9   that we need additional information to any diagnosis,
10  if people have high blood pressure continuously but are
11  not on any medications, and we want them to seek
12  further evaluation before continuing donating.
13      Q.  What does "HCP" stand for?
14      A.  Health consent form.
15      Q.  So even if a person is just saying "I think I
16  have anxiety," that's the end of their donation; is
17  that correct?
18      A.  If they say they think they have anxiety, we
19  usually tell them that they should be evaluated before
20  continuing.  So it -- it's not necessarily they stop
21  donating completely, but before they can continue, they
22  would need to seek medical care.
23      Q.  The donation that day --
24      A.  Yes, ma'am.
25      Q.  -- will end?

Page 25

1       A.  Um-hmm.
2       Q.  How -- in what other circumstances do you give
3   out the HCP letters?
4       A.  So for vitals like high blood pressure, high
5   pulse continuously.  If people have low hematocrit
6   levels.  If we think they're anemic.  If they say that
7   they have a medical condition, but they're not sure
8   what medications they're on, we usually send an HCP
9   letter so their physician can tell us exactly what
10  medications they are taking.
11      Q.  Do you give out information to donors about
12  their vitals?
13      A.  Yes.
14      Q.  Do you tell them their vitals?
15      A.  Yes.
16      Q.  Do you tell them their hematocrit?
17      A.  Yes.
18      Q.  Do you explain to them why those may be what
19  they are?
20      A.  Yes.
21      Q.  And maybe how they can improve those levels?
22      A.  Yes.
23      Q.  You provide that health information to --
24      A.  Every donor.
25      Q.  Every donor.

Juliana Sanchez
July 07, 2017                                    26 to 29

Page 26

1        Are you also the person that tells potential
2   donors that they would be deferred?
3        Does that information come from you?
4   A.    Not always.
5   Q.    Who else would it come from?
6   A.    There are other receptionists that screen
7   donors.  The only time -- if I'm the one putting the
8   donor in the system, then I would be the person telling
9   them they are deferred.  But it is a different set of
10  group of people all the time.
11  Q.    So if you're doing the screenings, does that
12  mean that you would be the person to tell them that
13  they are deferred?
14  A.    For that -- for each donor, yes.
15  Q.    The person that does the screening is the
16  person that typically does the deferral; is that how
17  I'm understanding it?
18  A.    Yes.
19  Q.    Okay.  Would you tell donors why they were
20  being deferred?
21  A.    Yes.
22  Q.    What happens after someone gets deferred from
23  your side of the job?
24  A.    Can you rephrase that?
25  Q.    Do you put that in the computer?

Page 27

1        After someone gets deferred, what do you do
2   with that information?
3   A.    Yes, we document it in their file.
4   Q.    Do you document in the file why there was a
5   deferral?
6   A.    Yes.
7   Q.    And do you document in the file what could be
8   done to change the deferral's decision?
9   A.    Not necessarily.  We don't put what could be
10  done to change deferral.  We can -- we usually put --
11  say, if there's a tattoo, for example, they just had a
12  tattoo, we put when the deferral would be lifted, yes.
13  Q.    Can donors disagree with the reason for being
14  deferred?
15  A.    As in...
16  Q.    If a donor disagrees with the reason for the
17  deferral, can they tell you that they disagree?
18  A.    They can tell us they disagree.  If it's our
19  corporate policy, we just go by the policy.  We explain
20  them -- to, like, the best of our ability.  Try to have
21  them understand and be aware of why we're deciding.
22  But if it's medically in writing, we don't go against
23  it.
24  Q.    Do donors ever get angry about being deferred?
25  A.    All the time.  Most of the time.

Page 28

1   Q.    Do -- do they threaten to talk with your
2   supervisor ever?
3   A.    Yes.
4   Q.    Do they get to talk with your supervisor?
5   A.    Yeah.
6   Q.    Is that your job to refer them to your
7   supervisor?
8   A.    Yes.
9   Q.    Does the supervisor ever overturn the reason
10  for deferral?
11  A.    No.
12  Q.    What if the person being deferred can prove
13  that the reason for deferral was incorrect?
14  A.    It just depends on the situation.  Every
15  situation is different.  Some people say they had --
16  they were incarcerated for a certain amount of time,
17  and then once they realize the deferral period is so
18  long, they go back and say, "Okay, well, I wasn't
19  incarcerated for that long."  So when something like
20  that happens, we ask them to bring court documentation
21  proving the days, and then it can be overturned.  So it
22  just depends on each situation.
23  Q.    There is an opportunity potentially for them
24  to bring documentation in to prove the reason is
25  incorrect?

Page 29

1   A.    Yes.
2   Q.    Do you remember Ms. Wolfe?
3   A.    Yes.
4   Q.    What do you remember about her?
5   A.    I remember when she had walked in, we were
6   really busy that day.  She was trying to be a potential
7   donor.  And I was the MSA that had took care of her.
8   Q.    What else do you remember about her?
9   A.    She did have her service animal with her.
10  Q.    Is there anything else that you remember about
11  her?
12  A.    No.
13  Q.    She was pretty unremarkable?
14  A.    She was quiet.
15  Q.    Had you ever seen a service animal before?
16  A.    Yes.
17  Q.    At CSL Plasma?
18  A.    No, not at CSL.
19  Q.    Have you had any donors before that had a
20  service animal?
21  A.    No.
22  Q.    So this was an issue that you had never dealt
23  with before?
24  A.    No.
25  Q.    A donor with a service animal?

Juliana Sanchez
July 07, 2017                                    30 to 33

Page 30

1    A.   Yeah, I had never had a donor with a service
2  animal.
3    Q.   Did you talk to anybody that day about Miss --
4  Ms. Wolfe and her service animal?
5    A.   I -- I don't remember who was at the front
6  counter, but I -- they did tell me to take care of her.
7  So I took her into the medical office just so she
8  wouldn't be waiting because I didn't know exactly what
9  the guidelines were.  So that's why I went and checked
10 myself, other than MedOps, which was Dr. Nelson, no.
11   Q.   And you took her into the front office?
12   A.   Into the medical office.
13   Q.   Into the medical office, which was in the
14 front?
15   A.   It's MSA 1.  It's kind of in a hallway.
16   Q.   Okay.  And then what happened?
17   A.   I sat her down.  I created her profile, just
18 so I could have everything in documentation, just so I
19 can contact Dr. Nelson and I can put everything in her
20 notes.  I did look at the MSR.  I asked her what her
21 diagnosis was.  She did say her diagnosis was for
22 anxiety and PTSD, and she stated she wasn't on any
23 medications.  And then from there, I just looked at the
24 guidelines.
25   Q.   When you first saw the service animal, did you

Page 31

1  already know what the guidelines said?
2    A.   No.
3    Q.   You looked them up that day?
4    A.   Yes.
5    Q.   What did Ms. Wolfe say to you that day?
6    A.   I don't remember.
7    Q.   Did she ask you if she seemed anxious?
8    A.   I don't remember.
9    Q.   Do you remember if she seemed anxious that
10 day?
11   A.   She was calm.
12   Q.   If she hadn't had her service animal with her,
13 was there anything about what she was doing that would
14 have alerted you to her anxiety?
15   A.   No.
16   Q.   So the service animal was the only thing that
17 made you know that she was anxious --
18   A.   No, her verbally --
19   Q.   -- or that she had anxiety?
20   A.   Her verbally telling me that she had anxiety.
21   Q.   But otherwise, was there anything else that
22 she did that made you think she had anxiety?
23   A.   No.
24   Q.   Did she tell you how the service dog helped
25 her?

Page 32

1    A.   Not that I remember.
2    Q.   Other than the guidelines that you located,
3  does CSL Plasma have any other guidelines about service
4  dogs?
5    A.   They allow service dogs for vision and hearing
6  impairment.
7    Q.   Do you know why they allow service dogs for a
8  visual or hearing impairment, but not for anxiety
9  disorder?
10   A.   Because it's not necessarily the service dog
11 that is the disqualifying.  It is the disorder.
12 Because the service dog is needed.  It's visualized as
13 a severe or frequent reaction.
14   Q.   Have you ever had a donor have a reaction on
15 the don- -- donation floor?
16   A.   Yes.
17   Q.   What happened?
18   A.   They can have seizures, lose consciousness,
19 get dizzy, vomit, nausea.
20   Q.   Have you ever had a donor have an anxiety
21 reaction on the donor floor?
22   A.   Some of the reactions start from anxiety,
23 anxiety to the needles, which will cause them to have
24 those symptoms.
25   Q.   After you -- after the donor had that

Page 33

1  reaction, did you then ask them about an anxiety
2  disorder?
3    A.   No.
4    Q.   Were they allowed to donate in the future?
5    A.   That is up to Dr. Shafi.  Any kind of reaction
6  is put in the notes.  It's documented as a donor
7  adverse event, and Dr. Shafi goes over everything.  If
8  she feels the need to speak to the donor, she would
9  speak to the donor, reevaluate, and assess if they're
10 allowed to donate or not.
11   Q.   So there have been donors who had an adverse
12 event and later donated again --
13   A.   Yes.
14   Q.   -- is that right?
15        Did Ms. Wolfe offer to leave her service
16 dog outside during the donation?
17   A.   Not -- not outside.  In the building, I
18 believe in the waiting room, she had said.
19   Q.   In the waiting room?
20   A.   We have like a little waiting area, yes,
21 ma'am.
22   Q.   If Ms. Wolfe had not had her service dog with
23 her that day, would she have been able to donate,
24 assuming she met all other criteria?
25   A.   If she met all the other criteria.

Juliana Sanchez
July 07, 2017                           34 to 37

Page 34

1    Q.   Did she do anything that made you concerned
2  about her ability to donate?
3    A.   From the little time I spoke to her, no.
4    Q.   Did you talk to any other staff members aside
5  from Dr. Nelson about Ms. Wolfe and her service dog
6  after she left that day?
7    A.   No.
8    Q.   Did it seem unusual for you to see a service
9  dog?
10        Was that something that you wanted to share
11  with other people at the -- at the office?
12    A.   No.  We have some stuff that always happens.
13  It's always something new every day.
14    Q.   Do you know why there was a recommendation to
15  defer Ms. Wolfe?
16    A.   Just due -- because they figured that her
17  anxiety because of the service dog was severe.  She
18  wasn't on any medications, so that was Dr. Nelson's
19  choice.
20    Q.   Could you tell if it was anybody else's
21  decision, other than Dr. Nelson's?
22    A.   No.
23    Q.   Did Dr. Nelson ask you anything about
24  Ms. Wolfe?
25    A.   Just asked me how long she had anxiety, what

Page 35

1  other diagnosis she had, and if she was on any
2  medications.
3    Q.   How did you answer those questions?
4    A.   I told him that she had anxiety since
5  childhood.  She recently had -- P-- -- PTSD.  I don't
6  remember for how many years I said exactly due to a
7  trauma she had, and she said she was currently on no
8  medications.
9    Q.   Did he ask anything about how the service
10  animal helped her?
11    A.   No.
12    Q.   Did he ask any follow-up questions about the
13  PTSD?
14    A.   Not that I remember.
15    Q.   Any follow-up questions about the anxiety?
16    A.   Not that I remember.
17    Q.   Approximately, probably, how long was your
18  phone call with Dr. Nelson?
19    A.   I had to leave a voicemail.  He returned my
20  call.
21    Q.   And how long was the call that he returned?
22    A.   Maybe less than five minutes.
23    Q.   And you've never had someone who has a guide
24  dog or who's blind donate plasma, is that right,
25  with -- with a service dog?

Page 36

1    A.   Not from my experience, no.
2    Q.   Have you ever had a donor appear anxious?
3    A.   Yes.
4    Q.   How did you know they were anxious?
5    A.   They usually fidget.  They get sweaty.  Vitals
6  are usually not in the range.  It's usually just --
7  you -- you can see it physically.  Signs that you
8  observe.
9    Q.   And are you supposed to ask about that when
10  you observe it?
11    A.   Yes.
12    Q.   What do you ask?
13    A.   We ask them if everything is okay.  If
14  anything is making them stressed.  We can have the
15  ability to take them in our medical office and examine
16  and go into further detail and ask what is making them
17  stress.  If they're on any kind of substance abuse
18  because sometimes that could be the reason why they're
19  fidgeting.  We are allowed to check pupillary reaction
20  to see if they are on any substance because that
21  usually will show us some kind of sign.
22    Q.   And then depending on what you discovered
23  because of what you observed, would you then make a
24  decision about whether or not that donor could donate
25  that day?

Page 37

1    A.   Yes.
2    Q.   Did you ask Ms. Wolfe any sym- -- about her
3  symptoms of anxiety?
4    A.   I don't remember.
5    Q.   Were you supposed to ask about her symptoms of
6  anxiety?
7    A.   We usually do.  She said she had anxiety since
8  childhood, so I don't really remember if I asked or
9  not.  I usually do ask what their symptoms are, how
10  frequent, if they've had any kind of reactions or any
11  anxiety attacks.
12    Q.   And do you remember if she answered any of
13  those questions?
14    A.   I don't remember because I don't remember if I
15  had asked or not.
16    Q.   How did you describe Ms. Wolfe to Dr. Nelson?
17    A.   As a donor that was trying to donate.  That
18  she had an anxiety disorder, anxiety diagnosis, PTSD
19  diagnosis.  Basically just information she told me.
20  Other than that, there was nothing else.
21    Q.   Do you have any reason to believe that
22  Ms. Wolfe does not have a disability?
23    A.   No.
24    Q.   Do you have any reason to believe that her
25  service dog is not a service dog?

Juliana Sanchez
July 07, 2017                                    42 to 45

Page 42

1   This is what's actually on her comments on her file.
2       Q.   And if you were accessing her file, would you
3   be able to get the medical communication form, too?
4       A.   Yes.
5       Q.   But they're considered separate documents, the
6   medical communication form and these medical notes?
7       A.   Yes.
8       Q.   And are the notes that are here on Houston
9   Center 0143, on both -- both lines, do they look like
10  an accurate description of what happened with your
11  communication with Dr. Nelson?
12      A.   Yes.
13      Q.   Okay.  On the next page, -000328, at the
14  bottom right, what is this?
15      A.   This is a screenshot from the computer of what
16  the medical notes looks like on the Web site.
17      Q.   So essentially, one is what the printout looks
18  like, and the other is what it would look like on the
19  computer screen?
20      A.   Um-hmm.  Yes, ma'am.
21      Q.   Dr. Nelson, per your notes, had said that if
22  service dog is no longer necessary, then she would be
23  eligible to donate.  Who would decide if the service
24  dog was no longer necessary?
25      A.   We would send an HCP letter for her to get

Page 43

1   filled out from her psychiatrist --
2       Q.   And it --
3       A.   -- or her therapist.
4       Q.   It would require that she have a letter from
5   her phys- -- physician or -- or counselor or therapist
6   to state that the service animal was no longer
7   necessary?
8       A.   Yes, ma'am.
9       Q.   Okay.
10           MS. DAVIS:  I'd like to take a brief
11  break and go off the record.
12           (Break from 9:44 a.m. to 9:52 a.m.)
13      Q.   (BY MS. DAVIS)  You mentioned the medical ops
14  earlier.  What is the "medical ops"?
15      A.   It's a hotline -- not necessarily a hotline,
16  but a list of numbers that you could call.  So it's the
17  different physicians that they have just in case we're
18  not able the reach our center physician.
19      Q.   And did I understand that -- that William went
20  to medical ops?
21      A.   He's a medical ops supervisor.  So it's
22  medical operations supervisor, is what it stands for.
23  It's just kind of like he's over all the MSAs now.
24      Q.   Okay.  So explain this a little bit more.
25  There's the medical ops and then the medical operations

Page 44

1   supervisor?
2       A.   Yes.
3       Q.   Are those different departments?
4       A.   Yes.
5       Q.   And so what does the medical operations
6   supervisor do?
7       A.   He's kind of head over all the MSAs.  He recently
8   got promoted, so I'm not sure if at the time he was
9   MOS.  Before it was Rocio, but she had just had a baby.
10  She was on maternity leave.  So I don't remember if she
11  was out on maternity leave at the time that all this
12  happened.
13      Q.   Please look at what has been titled Exhibit 6.
14           And do you see on Page 3 of 73, at the
15  bottom, do you see the transfer to the donor bed?
16      A.   Yes.
17      Q.   I believe you said earlier that if someone
18  transfers to the donor bed doesn't have a problem doing
19  so, they'd be able to donate, assuming that they met
20  all other criteria.  What do you mean, "doesn't have a
21  problem"?  What would be a problem transferring to a
22  donor bed?
23      A.   So over here, it's transferring to the donor
24  bed, and it has to do with the disability.  So say if
25  there's a vision disability and they need somebody to

Page 45

1   put them physically on the donor bed and take them
2   physically off, that would be something that would
3   disqualify them.  They have to be able to sit down by
4   themselves independently and get up independently.
5   There is a small space in between the beds, so it's
6   just a safety risk.
7       Q.   And if they used a -- a cane to assist them
8   getting on and off the donor bed, would that mean that
9   they were still acceptable if they met all other
10  criteria?
11      A.   By experience, we do have donors that use
12  canes, so I would say yes.
13      Q.   When you left Dr. Nelson a voicemail regarding
14  Ms. Wolfe, what did you say on the voicemail?
15      A.   I don't remember exactly.
16      Q.   What type of information generally would you
17  have included in the voicemail about Ms. Wolfe?
18      A.   We usually state who's calling, where we're
19  calling from, what our question is.  So I'm sure I
20  would say what the donor is calling for or what they're
21  coming in for and the reason we need extra information.
22  So we usually we'll explain the situation.
23      Q.   In this case, what would you -- what did you
24  tell Mr. Nelson, to the best of your recollection?
25      A.   I don't remember what I said.

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      CORPUS CHRISTI DIVISION

 3    MARK SILGUERO,                §
           Plaintiff,               §
 4                                  §
      and                           §
 5                                  §
      AMY WOLFE,                     §          CIVIL ACTION
 6         Intervening Plaintiff,    §          NO. 2:16-CV-00361
                                    §
 7    v.                            §
                                    §
 8    CSL PLASMA INC.,              §
           Defendant.               §
 9

10

      ********************************************************
11
                          ORAL DEPOSITION OF
12
                            SAM SCHULTZ
13
                           April 10, 2017
14
      ********************************************************
15

16

17            ORAL DEPOSITION OF SAM SCHULTZ, produced as a

18    witness at the instance of the Plaintiff, and duly sworn,

19    was taken in the above-styled and numbered cause on the

20    10th of April 2017, from 2:25 p.m. to 4:12 p.m., before

21    Isabel Connor, CSR in and for the State of Texas,

22    reported by machine shorthand, at the offices of U.S.

23    Legal Support, 802 North Carancahua Street, Suite 2280,

24    Corpus Christi, Texas, pursuant to the Federal Rules of

25    Civil Procedure.
```

Sam Schultz
April 10, 2017                                    10 to 13

Page 10

1      A.    -- Paramedic.
2      Q.    How long did that -- I'm sorry.
3      A.    That's okay.  I was trying to think of the rest
4  of the name.
5      Q.    How long did that course of study take?
6      A.    I believe it was about eight months, maybe
7  nine.
8      Q.    Have you ever had a job as a paramedic?
9      A.    Yes, sir.
10     Q.    For whom?
11     A.    Gold Cross Ambulance.
12     Q.    Any other position as a paramedic?
13     A.    No, sir.
14     Q.    And how long did you have the Gold Cross job?
15     A.    I worked at Gold Cross for almost seven years.
16     Q.    Was that in Utah or here --
17     A.    Yes, sir.
18     Q.    -- in Texas?
19     A.    In Utah.
20     Q.    And what brought you to Texas?
21     A.    CSL.
22     Q.    How did you find out about the job?
23     A.    I don't recall.
24     Q.    And I apologize if I asked you before.  What
25  was your -- the date that you started at CSL?

Page 11

1      A.    Believe it was in June of 2014.
2      Q.    I did ask you before.  Sorry.  All right.
3  Other than what you've already told us, do you have any
4  education or other training after high school?
5      A.    After high school?
6      Q.    Yes.
7      A.    I was in the Marines for four years.
8      Q.    All right.
9      A.    -- take leadership courses in the Marines.
10     Q.    Did you specialize in any particular area in
11  the Marines that is sort of transferable to civilian
12  life?
13     A.    Not -- not directly.  And my MOS was -- was
14  artillery.  But I was a manager, if you will.  I was a
15  platoon sergeant, so similar role.
16     Q.    Have you had any other work experience that you
17  believe is relevant to your current job at CSL that
18  you -- besides what you've already told us?
19     A.    Not that I can think of right now.
20     Q.    We have seen reference in this case to an
21  individual named Tammy Brown, who I -- if I understand
22  correctly, was some kind of trainer.  Do you know
23  Ms. Brown?
24     A.    I do.
25     Q.    Was she working for CSL when you were there?

Page 12

1      A.    Yes.
2      Q.    And am I correct that she no longer works for
3  CSL?
4      A.    Correct.
5      Q.    And what was her job when she was last there?
6      A.    She was training coordinator.
7      Q.    What does that mean?
8      A.    Essentially they would be in charge of
9  training, assigning, documenting, or learning initial
10  part of the training, new hire, orientation, etc.
11     Q.    All right.  Do you know why she left CSL?
12     A.    I don't.
13     Q.    Was she terminated by CSL?
14     A.    No.  It was voluntary.
15     Q.    Are you in contact with her now?
16     A.    No, sir.
17     Q.    Do you know where she is?
18     A.    I do not, sir.
19     Q.    We also saw reference to an individual named, I
20  believe, Dennis Thomas.  And I think he was reflected as
21  perhaps an assistant manager.  Is that right?
22     A.    Yes, sir.
23     Q.    And am I right that he no longer works for CSL?
24     A.    Correct.
25     Q.    Do you know why he left CSL?

Page 13

1      A.    I do not.
2      Q.    Was he terminated?
3      A.    I don't know.
4      Q.    Okay.
5      A.    He transferred from my center.
6      Q.    And where did he go to?
7      A.    I don't know that either.
8      Q.    So if I understand you correctly, he moved
9  from -- he stayed at CSL but moved to another location,
10  and then you lost track of him?
11     A.    Yes, sir.
12     Q.    All right.  Could you describe for me the
13  plasma donation process from the point of view of the
14  customer.  So if they've never donated before and they
15  walk in the door, sort of what happens?
16     A.    They have to go through a new donor process,
17  which is different than a return donor process.  That
18  involves some additional information, reading, watching a
19  video.  They get entered into our database.
20          Then they go through the normal
21  prescreening process that every donor, every time they
22  come in, will go through.  Then they have a health
23  assessment.  And then they get taken to the floor where
24  they go through the plasmapheresis procedure.
25     Q.    And you indicated that the prescreening is

Sam Schultz
April 10, 2017                                    46 to 49

Page 46

1  date of the event that is described on the note.  Is
2  that -- am I right about that?
3      A.    That looks to be correct.
4      Q.    And am I also right that this doesn't
5  necessarily reflect every donation this person made, but
6  instead reflects the donations for which there were
7  medical notes?
8      A.    Yes.
9      Q.    So there might be donations this person made,
10 and there were no medical notes, and it wouldn't be on
11 this list?
12     A.    Correct.  This -- this is not a list of
13 donations.
14     Q.    All right.  All right.  So if I can call your
15 attention to the third and fourth and fifth lines on this
16 page.  So there is a column -- the second column says
17 donor medical SEQ.
18           And those are sort of -- we'll use those
19 because they're sequential.  We'll use those as line
20 numbers, all right?
21     A.    Yes, sir.
22     Q.    So I'm talking about lines 3, 4, and 5.  And
23 those all seem to relate to an event that happened on
24 January 2nd, 2015, according to the next to last column;
25 is that right?

Page 47

1      A.    Yes.
2      Q.    What is your understanding from these notes of
3  what that reflects?
4      A.    The notes look like it was initially requested
5  to speak to a manager prior to further donations, based
6  on the comment that was made.
7      Q.    And so on the third line, it says, management
8  must speak to this donor prior to his next donation.
9  Correct?
10     A.    Yes.
11     Q.    And then it says MSA MM told donor he would be
12 unable to donate due to using a cane and walking with a
13 limp.
14           Stop there.  There's a period.  MSA is the
15 position title you've described generally.  Do you know
16 who the MSA MM was or is?
17     A.    The -- the name Michelle Mailey, yes.
18     Q.    Okay.  So let's just -- just talking about that
19 information there, that statement there beginning with
20 MSA MM and ending with walking with a limp, do you know
21 anything more about what happened on that event or what
22 she observed on that event other than what's listed
23 there?
24     A.    No, sir.
25     Q.    Okay.  Have you ever talked to her about that?

Page 48

1      A.    No, sir.
2      Q.    And if I am recalling correctly, you were not
3  at the Ayers facility when this happened?
4      A.    That is correct.
5      Q.    And then reading on at the end of where we left
6  off -- so this is beginning on the fourth line, yes -- he
7  told her that she, quote, would regret this, and left.
8  And then initials DT, 1/2/2015.
9           Do you know anything more about what is
10 described there other than what's in the words?
11     A.    No.
12     Q.    Do you know who DT is?
13     A.    Dennis Thomas.
14     Q.    Have you ever had occasion to talk to Dennis
15 Thomas about what might have happened with regard to
16 Mr. Silguero?
17     A.    No.
18     Q.    Ever had occasion to talk to Michelle Mailey
19 about what might have happened with regard to
20 Mr. Silguero?
21     A.    No.
22     Q.    All right.  Let me ask you to look at the
23 second line.  And tell me what that says and what you
24 understand that means.
25     A.    It has a date, and then it says donor is

Page 49

1  permanently rejected for threatening staff.  And then
2  initials and date.
3      Q.    And do you know who TMB is?
4      A.    I believe that is Tammy Brown.
5      Q.    Can you -- well, do you know anything more
6  about the incident described here other than what's
7  written down here?
8      A.    No.
9      Q.    Have you ever talked to Tammy Brown about this
10 incident?
11     A.    No.
12     Q.    Can you tell if the -- threatening the staff is
13 referring to the -- she-would-regret-this note a few
14 lines below?  Can you tell if that's the same thing or
15 something different?
16     A.    It's reasonable to assume that the next
17 sequential one that would be there would be for the most
18 recent one.  But, no, I don't know specifically that
19 that's related to that.
20     Q.    All right.  And -- and I guess from your
21 answer, that also means that when that second line refers
22 to January 3rd, 2015, you don't know if that meant there
23 was a threat on that date or if that's the documentation
24 of some earlier comment from the day before?
25     A.    Correct.

Sam Schultz
April 10, 2017                                    50 to 53

Page 50

1     Q.   All right.  And then the first entry, so on the
2  first line of this page, the date is 4/7 of '15.  What
3  does that say, and what does that mean to you?
4     A.   Said, called donor and left a message and the
5  initials and date.
6     Q.   Do you know what that means?
7     A.   That they called and left a message.
8     Q.   Do you know who called?
9     A.   It looks like Nola Baker.
10    Q.   And what was -- at that point what was
11 Mr. Baker's position?
12    A.   She's my assistant manager.
13    Q.   I'm sorry.  Is it Nola?
14    A.   Nola, yes.
15    Q.   How do you spell that?
16    A.   N-o-l-a.
17    Q.   All right.  Apologize.  So at that time in
18 April of 2015, she was also an assistant manager, to --
19    A.   Yes.
20    Q.   -- your understanding?  All right.  Do you know
21 anything more about what's referenced on that first line
22 other than what's on the page?
23    A.   No, sir.
24    Q.   Have you ever had occasion to talk to Ms. Baker
25 about Mr. Silguero or anything related on this page?

Page 51

1     A.   No, sir.
2     Q.   Do you know if CSL is currently prohibiting
3  Mr. Silguero from donating?
4     A.   Do I know?
5     Q.   Yes.
6     A.   There is a deferral on his account, yes.
7     Q.   All right.  So if he were to come in at this
8  point and try to donate, he would be told not -- not to?
9     A.   Currently, yes.
10    Q.   And when you were reading that exhibit -- and
11 it was on line -- the second line, it said, donor PR'd
12 for threatening staff.  And I think you said something
13 like permanently denied.
14         And so I'm just -- I want to make sure I
15 understand, is PR, apostrophe D -- is that permanently
16 denied or permanently deferred or --
17    A.   Permanently deferred.  Stands for permanently
18 rejected.
19    Q.   Okay.  The lawsuit that we're here about today
20 stems from the incident that happened on or about
21 January 2nd, 2015.  That is partly referenced in those
22 notes you were looking at.
23         Do you know anything else about that
24 incident other than what you've told us or what you've
25 read?

Page 52

1     A.   No, sir.
2     Q.   Okay.  Have you ever talked to anybody else --
3  start over.  Aside from lawyers, legal representatives
4  for CSL, have you ever talked to anybody else about that
5  incident?
6     A.   No, sir.
7     Q.   Have -- during your tenure, either as assistant
8  manager in Fort Worth or as the manager in Corpus, has
9  anybody ever been rejected or refused or deferred for
10 threatening staff?
11    A.   Yes, sir.
12    Q.   Give me an example of the kind of threats that
13 you've been aware of.
14    A.   Had a bomb threat.  Had an individual threaten
15 to have a shootout in the parking lot with the police
16 officers.  I've had people make sexual advances on
17 employees, both males and females, excessive profanity,
18 yelling, cursing, threats -- threats of violence.  Better
19 not meet me in the parking lot, things like that.
20    Q.   How frequently does that happen?
21    A.   Several times a month probably, at my locations
22 anyway.
23    Q.   When that happens, other than noting the
24 deferral in your -- in your recordkeeping, does your
25 office or does CSL take any other action?

Page 53

1     A.   Not to my knowledge.
2     Q.   Do you ever contact law enforcement about those
3  matters?
4     A.   I have, yes.
5     Q.   When would you do that?
6     A.   The gentleman that threatened to have a
7  shootout in the parking lot, if they're threatening
8  violence or have attempted violence.  I've had people
9  take a swing at me before.  If they're causing a scene
10 and -- and are refusing to leave the building, yes, we
11 have.
12    Q.   Is -- when law enforcement is contacted by CSL,
13 is that always done by you or might it be done by other
14 staff?
15    A.   It could be done by other staff.
16    Q.   Referring to Exhibit No. 2 that's in front of
17 you, do -- is that similar to the printout that I might
18 see for a -- for the current records on a donor who's
19 currently donating, in the sense -- what I mean is, do
20 you still keep medical notes that can be printed out on a
21 sheet like that?
22    A.   I'm trying to understand the question, I guess.
23 Are you asking, can I print this out for any donor --
24    Q.   Yes.
25    A.   -- medical notes?  Yes.

Sam Schultz
April 10, 2017                    58 to 61

Page 58

1    A.   They should not be in the production areas.
2    Q.   And if -- is the production area where the
3   actual plasma is withdrawn?
4    A.   It's the processing areas.
5    Q.   So does that mean the plasma has already been
6   withdrawn and it is taken to the production area?
7    A.   That would be in like the screening booth where
8   they ask the questions or -- yes, on the donor floor as
9   well.
10   Q.   Okay.  All that would be considered the --
11   A.   Production area.
12   Q.   -- production?  All right.  Are there occasions
13  where you or other CSL staff will ask for a doctor's note
14  from the donor about something to confirm whether the
15  donation can go forward?
16   A.   Yes.
17   Q.   Give me an example of when that might happen.
18   A.   If they come in and say they have conditions,
19  but they can't remember what they are or what the
20  medications are.  Or I know I take five medications, but
21  I don't know what they are, things like that, that we
22  need additional follow-up to -- to reference.
23   Q.   All right.  I think you -- if -- if I'm
24  remembering correctly, you told me about two sort of
25  nationwide databases that you have access to.  One is a

Page 59

1   list of donations that the person might have made.
2              And the other is whether they're on a
3   deferral list for some viral marker.  Is that -- am I
4   remembering right?
5    A.   Somewhat.  It's not necessarily a list.  I
6   don't get to see donations.  I don't get to see -- other
7   than the donation that would affect the suitability for
8   today, meaning the two days in a row or the two in seven.
9              It -- it pops up.  That's all it's going
10  to be.  It might be one or two.  I don't know where it
11  was made, what company.  It just says there's two in the
12  last seven days.  They're not acceptable.  I don't have
13  any other information on that --
14   Q.   Under--
15   A.   -- on the ND.  I don't -- they're either a
16  match or not a match.
17   Q.   Understood.  Is there any national database for
18  people who are deferred for reasons other than a viral
19  marker, that you're aware of?
20   A.   No.
21   Q.   Is there any other way in which you could
22  determine whether someone has a deferral somewhere else?
23   A.   You can ask them.
24   Q.   Anything else?
25   A.   Not generally, no.

Page 60

1    Q.   Are there any SOPs that relate to misconduct or
2   threats by donors?
3    A.   I believe so, yes.
4    Q.   Do you recall generally what they say or what
5   the point of them is?
6    A.   I do not.
7    Q.   Are there any SOPs that relate to the physical
8   ability of a donor in the sense of their ability to walk,
9   transfer, get on the scale, etc.?  Any SOPs that relate
10  to that?
11   A.   Aside from this one that we reviewed?
12   Q.   Right, aside from Exhibit No. 4 that we looked
13  at.
14   A.   There is another one regarding impaired donors.
15   Q.   Okay.  So just for the record, you were looking
16  at Exhibit No. 4, which the title is given, Medical Staff
17  Reference -- Conditions Guideline.  We've already talked
18  about this.  And you were looking on page 255 of it.
19              And in the right-hand column, you were
20  pointing out the bold type there reflecting impaired
21  donors and some other things.  But that's what you were
22  talking about?
23   A.   Yes.
24   Q.   And you also were looking at -- in the top left
25  corner, it says disabilities, dash, see SOP for specific

Page 61

1   guidance.  Do you understand that reference to an SOP to
2   be talking about these same things that are in bold?
3    A.   Yes.
4    Q.   Might there be other SOPs that give specific
5   guidance other than those ones listed there, or would
6   that be it?
7    A.   There might be.
8    Q.   How would you find them?
9    A.   Occasionally they're listed as you go through
10  some of the other SOPs that are cross-referenced.
11   Q.   If -- if you are wondering whether there's an
12  SOP on specific guidance related to one of the things
13  listed here and it -- you're worried that perhaps these
14  bolded items may not address what you're talking about in
15  particular, how do you go about looking for something?
16   A.   I can search on my computer.
17   Q.   And how do you do that?  Like, what do you
18  search?
19   A.   The list of our SOPs.
20   Q.   And do you do a word search, or do you read
21  down the page, or how would you do that?
22   A.   Both.
23   Q.   And is the -- if you're doing a word search, is
24  the search being made of the SOP title or is it also
25  searching the text of the SOP?

Mark Silguero
April 10, 2017                                                    1

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION

3    MARK SILGUERO,                §
                                   §
4           Plaintiff,             §
                                   §        CIVIL ACTION
5    v.                            §        NO. 2:16-CV-00361
                                   §
6    CSL PLASMA INC.,              §
                                   §
7           Defendant.             §

8

9

10   ********************************************************

11                    ORAL DEPOSITION OF

12                    MARK SILGUERO

13                    April 10, 2017

14   ********************************************************

15

16

17           ORAL DEPOSITION OF MARK SILGUERO, produced as a

18   witness at the instance of the Defendant, and duly sworn,

19   was taken in the above-styled and numbered cause on the

20   10th of April 2017, from 8:25 a.m. to 10:15 a.m., before

21   Isabel Connor, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of U.S.

23   Legal Support, 802 North Carancahua Street, Suite 2280,

24   Corpus Christi, Texas, pursuant to the Federal Rules of

25   Civil Procedure.

Mark Silguero
April 10, 2017                                10 to 13

Page 10

1    A.   All kinds.  I mean, all kinds.  Literally all
2  kinds.  Construction, retail, selling funeral property,
3  little bit of everything.
4    Q.   So when did you get your RN license?
5    A.   Began the RN program in 2007 and ended 2009 --
6  I finished.
7    Q.   Have you ever served in the military?
8    A.   No, ma'am.
9    Q.   Are you currently employed?
10   A.   No, ma'am.
11   Q.   When was your last job?
12   A.   August of 2014.
13   Q.   And what were you doing at that time?
14   A.   I was the director of nurses at a detention
15 center.
16   Q.   Do you consider yourself retired, or are you
17 still looking for work?
18   A.   Disabled.
19   Q.   So do you get some kind of income from the
20 government or state?
21   A.   Yes, disability.
22   Q.   And how long have you gotten disability?
23   A.   It began in February of 2015, I believe.
24   Q.   When did you first donate plasma, if you
25 remember?

Page 11

1    A.   I don't remember.  Back in my 20s.
2    Q.   And how did you hear about donating plasma?
3    A.   Friend at the time.
4    Q.   Where -- do you remember where you went back in
5  your 20s to donate?
6    A.   The name of the company was -- the initials are
7  NABI.  That's all I remember.
8    Q.   Do you know how often you went back then?
9    A.   Probably like, off and on, a good two years.
10 Was during college, some classes.
11   Q.   And why did you donate back then?
12   A.   Just supplement.  Was going to school.
13   Q.   And why did you stop donating at that time?
14   A.   I received employment.  I would go
15 occasionally, you know, just still --
16   Q.   So after your 20s, when was the next time that
17 you donated plasma?
18   A.   I've been going off and on right -- since my
19 20s up until -- well, you know, till I -- I had surgery,
20 so that disqualified me from donating for a while.  So,
21 you know, it's, like I said, off and on since my 20s.
22   Q.   And what was the reason for donating plasma off
23 and on?
24   A.   Just, you know, the money to -- you know, from
25 the donation, of course, was helpful.  You know, just --

Page 12

1  you know, just kind of felt like it was helping out
2  somehow.
3    Q.   So since you've donated at CLS, you said you've
4  donated more recently.  Where are you donating in the
5  past couple of years?
6    A.   Well, I was donating at CSL.  After that --
7  there's a nearby donation place called Trifolos
8  (phonetic) or something like that.  That's the name of
9  the company, Trifolos, Trifol, something like that.
10   Q.   And how often did you donate there?
11   A.   Pretty routinely, every -- you know, twice a
12 week is what you're allowed to do, so -- probably year
13 and a half, two years, I think, something like that.
14   Q.   Did you start going there immediately after you
15 stopped going to CSL?
16   A.   Not -- yeah, not too soon after.  Not too soon
17 after.
18   Q.   And when was your most recent donation?
19   A.   It would have been in January prior to my
20 surgery.
21   Q.   And you said you're disqualified now because of
22 the surgery.  Is that right?
23   A.   Yeah.  Right.  There's, you know, certain
24 requirements and -- due to my surgery, I have to wait, I
25 think, a year before I'm able to donate again.

Page 13

1    Q.   Do you know why that is?
2    A.   Not sure.  I imagine has to do with the
3  hardware, new hardware in my body, or my knee, you know,
4  just something foreign in there.
5    Q.   Okay.  So let's talk about your knees.  When
6  did they start hurting you, bothering you?  Did you have
7  an injury?  What kind of caused all this to start?
8    A.   Yeah.  Well, back in '87, '88, I had a total
9  new reconstruction of my left knee.  Consequently
10 throughout the years -- I'm 50 now.  This was when I was
11 about 20.  I've had to compensate with my right leg,
12 which put a lot of wear and tear on it.
13           Degenerative joint disease is like one of
14 the things going on with both knees.  Had this one scoped
15 out in 2006, my right one, because of the fact that I
16 worked at a magazine route company.  And due to an injury
17 there, they had to scope out my knee.
18           It just kind of weakened it.  Again, the
19 compensation -- because of the weakness of the -- of the
20 other one, just wore it out -- to the point I had to
21 have it replaced January 2017.
22   Q.   So were there any other surgeries besides the
23 one in 1987 and then the one in 2017?
24   A.   Yes, in 2006.  They -- arthroscopic surgery of
25 my right knee.

Mark Silguero
April 10, 2017                                    14 to 17

Page 14

1    Q.   Any other surgeries on your knees besides those
2  three?
3    A.   I had a reconstruction, arthroscopic.  I think
4  that's -- surgeries -- as far as surgeries, yeah, that's
5  it.  That's enough.
6    Q.   That is plenty.  So how has the issues with
7  your knees impacted your walking over the years?
8    A.   Initially, not too -- too much.  I was younger
9  and stronger.  As I got a little older and after my
10  injury in 2006, I could handle -- it limit me somewhat.
11  It did limit me somewhat, but still carried on my jobs
12  and stuff, you know, pretty much.
13               2000 -- after I had it scoped out in 2006,
14  it -- well, went through the nursing program in 2007.
15  Generally, it's just -- made it a little -- my right knee
16  and my left knee is just weaker throughout the years.  I
17  guess say that.
18    Q.   Why did you stop working at the detention
19  center?
20    A.   Due to my -- my knees.  It just -- it was too
21  painful.  Part of the requirements working there is to
22  respond to an emergency within four minutes, and I was no
23  longer able to meet that time limit.
24    Q.   And when in 2014 did you stop working?  Do you
25  remember --

Page 15

1    A.   August.
2    Q.   -- what month?
3    A.   August.
4    Q.   So is it fair to say that up until August 2014,
5  your knees were bad but not bad enough to prevent you
6  from working, and then after that, they did prevent you
7  from working?
8    A.   Say that again.  I'm sorry.
9    Q.   I guess what made you decide in August 2014 to
10  stop working?  Did they get worse that month?  Was it
11  just kind of a buildup?  What happened?
12    A.   It -- because of not being able to meet my job
13  requirements.  You know, it just kind of led to, you
14  know, limited options where I could work.  So, yeah, I
15  had to stop work.
16    Q.   Were your knees worse in August of 2014 than
17  they were in August of 2013?
18    A.   Oh, yeah.  Right.
19    Q.   Okay.  Did anything happen to make them worse
20  around the August 2014 time or -- that you remember?
21    A.   Just, I mean, years of wear and tear just
22  caught up with it, August --
23    Q.   How long have you used a cane to walk?
24    A.   Started around Houston, I believe.  Probably
25  around 2013, as far -- probably -- I don't know.  I don't

Page 16

1  know.  Maybe August, September, somewhere around there,
2  that time, of 2013.  I was working in Houston at another
3  detention center in -- yeah, more or less that time.
4    Q.   Was there anything specific between, say,
5  August '13 and August 2014 that made your knees worse or
6  just the general deterioration.
7    A.   I imagine the general deterioration.
8    Q.   I believe we have records that say around
9  July 2013 you visited a doctor to start talking about a
10  knee replacement.  Does that sound right?
11    A.   Uh-huh.  Yes, ma'am.
12    Q.   But you didn't get a knee replacement at that
13  point, correct?
14    A.   Right.  Right.
15    Q.   Why did you not get one at that point?
16    A.   My surgeon felt I needed to lose weight and,
17  you know, be safer.
18    Q.   Okay.  So what did you do for a treatment plan
19  for your knees between 2013 and then 2017 when you
20  finally did get the replacement?
21    A.   Diet and exercise.
22    Q.   Did your knees continue to get worse during
23  that time?
24    A.   I guess they were pretty much the same.  I
25  mean, just -- they were real bad already.  So imagine it

Page 17

1  just -- just kind of the same.  I mean, I already needed
2  the replacement.  So I imagine they were just pretty
3  much, you know, getting worse as time progressed.
4    Q.   So why did you eventually get the surgery in
5  2017?
6    A.   I mean, obviously, I was in pain and needed
7  that done.  I mean, also just, you know, future -- hoping
8  to improve my health.
9    Q.   Would it be fair to say from 2013, when you
10  went to talk to your doctor, that you were always
11  planning on having the surgery?
12    A.   Having -- replacement?
13    Q.   Yes.
14    A.   I was hoping it wouldn't be.  But, yeah, I
15  mean, I kind of knew already, as a nurse, that was my
16  next option probably.
17    Q.   Did you think maybe with diet and exercise,
18  your knee would be okay enough that you wouldn't have to
19  have surgery?
20    A.   I would -- I did hope there would be some
21  improvement, yeah.  I mean, surgery is not like my most
22  favorite thing to do.
23    Q.   So what exactly prompted the surgery in 2017?
24  Were you finally at the weight you needed to be at?
25    A.   Right.

Mark Silguero
April 10, 2017                          18 to 21

Page 18

1      Q.   Did it hurt too much or --
2      A.   Right.  I lost significant amount of weight to
3   qualify.
4      Q.   And you have another surgery scheduled; is that
5   right?
6      A.   Yes, ma'am.
7      Q.   And when is that?
8      A.   April 17th.
9      Q.   Coming up.
10     A.   Yes, ma'am.
11     Q.   So what knee did you have surgery on in
12  January?
13     A.   The right knee.
14     Q.   And then you're having surgery on the left
15  knee next?
16     A.   Yes, ma'am.
17     Q.   And then, hopefully, no more surgeries after
18  that?
19     A.   Hopefully.
20     Q.   So you understand you're bringing a disability
21  discrimination claim, right?
22     A.   Yes, ma'am.
23     Q.   So is the problems with your knee?  Is that
24  what you consider to be your disability, then?
25     A.   Right.  Yes, ma'am.

Page 19

1      Q.   Anything else that you consider to be a
2   disability for this lawsuit?
3      A.   No, ma'am.
4      Q.   So this lawsuit is based on an event in 2000 --
5   early 2015.  Do you remember the condition of your knees
6   around that time?
7      A.   They were in bad shape.  Needed to be replaced.
8      Q.   Were you in any physical therapy on your knees
9   between the 2013, 2017 time period?
10     A.   Just occasional swimming, things like that.
11     Q.   Do you remember when you first went to CSL
12  Plasma?
13     A.   I don't remember when I first went, no, ma'am.
14          (Silguero Exhibit No. 1 marked.)
15     Q.   (By Ms. Willing)  So I'm handing you what's
16  been marked as Exhibit No. 1.
17     A.   I look better with hair on me, my face.
18     Q.   I'm not sure exactly when this picture is from.
19  But I doubt it's the most flattering camera that they
20  use.  Kind of like driver's license pictures,
21  unfortunately.
22     A.   Uh-huh.
23     Q.   So this is a printout of your donor file from
24  CSL.  If you look at the bottom left corner where the
25  printing is, it indicates you came in at least once in

Page 20

1   December 16, 2011.  Do you remember that?
2      A.   I don't remember that, but I imagine it's true.
3      Q.   You don't have any reason to believe it's not
4   true?
5      A.   Right.
6      Q.   And then if you look, it shows the next time --
7   it has you coming in as January 12, 2014.  Do you see
8   that?
9      A.   Uh-huh.  Yes, ma'am.
10     Q.   Do you have any recollection of why you would
11  have waited three -- I guess really two years to --
12  between visits?
13     A.   I was living in Houston.
14     Q.   Oh, okay.  So you were donating in Houston
15  during the 2012, 2013 --
16     A.   I was employed also as an RN.
17     Q.   So when did you come back to Corpus Christi?
18     A.   2014.
19          THE WITNESS:  Was it January 2014?
20     A.   I believe it was January 2014.
21     Q.   (By Ms. Willing)  Okay.  And so what years did
22  you live in Houston?
23     A.   Believe it's like December, November of 2011.
24          THE WITNESS:  Right?
25     A.   And then came back around, oh, gosh, May of --

Page 21

1          THE WITNESS:  2013?
2      A.   2013, I think.  Yeah, 2013.  Yeah, I'm actually
3   right.
4      Q.   (By Ms. Willing)  So did you donate plasma
5   while you were in Houston?
6      A.   No, ma'am.  I was employed.  I did try.  It was
7   just the -- I did at one time attempt to.  It's just I
8   hadn't moved my -- changed my driver's license and all
9   that and didn't want to deal with it.  Their driver's
10  license office is over there.
11     Q.   So do you remember why you started donating in
12  January of 2014?
13     A.   I imagine probably needed some cash.
14     Q.   You were still working at that time, right?
15     A.   No, ma'am.  I had just moved back from Houston.
16  2014?
17     Q.   Believe you were --
18     A.   I was --
19     Q.   -- you said earlier you worked in 2014?
20     A.   I'm not exactly sure.  January 2014, right?
21  That's what you're looking at?
22     Q.   Yeah.
23     A.   Oh, yeah.  Yeah, yeah.  I'm sorry.  I guess I
24  wasn't working at the time.  I imagine that's why.
25     Q.   So you said your last job was at the detention

Mark Silguero
April 10, 2017                                    22 to 25

Page 22

1  center; is that right?
2       A.   Yeah.  Yes, ma'am.
3       Q.   And so --
4            THE WITNESS:  Was it 2014?  Right?  2013?
5       A.   Oh, I'm sorry.  It was August 2013, I stopped
6  working at the detention center.  I'm terrible with dates
7  and stuff.
8       Q.   (By Ms. Willing)  That's okay.  It's been a few
9  years.  It's hard to remember.  I'm trying to get a
10  sense, given what we know.
11      A.   I understand.
12      Q.   Okay.  And so these dates on Exhibit 1 show
13  that you came in a few times between January 2014 and
14  April 2014.  You see that?
15      A.   Yes.  Yes, ma'am.
16      Q.   Do you remember coming in that time or those
17  times?
18      A.   Sure.  Sure, sure, sure.  I do -- yeah.  I
19  mean, I do remember donating there, yes.  Uh-huh.
20           (Silguero Exhibit No. 2 marked.)
21      Q.   (By Ms. Willing)  Handing you what's been
22  marked as Exhibit 2.  So these are medical notes from CSL
23  Plasma's file.
24      A.   Sure.
25      Q.   So all -- they go reverse chronological, I

Page 23

1  guess.  So the ones on the bottom are from 2014, and they
2  go back up to 2015.
3       A.   Oh, these are notes.  Okay.
4       Q.   Yeah.  So it's a little bit more explanation.
5       A.   As far as dates is what I'm looking at.
6       Q.   Yeah.  The dates on the right side are -- the
7  date stamp is not correct, but there's dates within the
8  notes.  So if you look at -- on the column that says
9  donor medical SEQ.  And then there's numbers under that.
10      A.   Yes, ma'am.
11      Q.   Those are basically line numbers.  That's
12  probably the easiest way to refer to these notes.  If you
13  look at line 12, it says review of MQ medical approvals
14  complete.
15           And then line 13 says donor uses cane for
16  support.  So do you remember having to get approval to
17  donate back in January 2014?
18      A.   No.
19      Q.   That's just fine.  And then starting line 10,
20  it says donor has less than three-inch bruise --
21      A.   Yes.
22      Q.   -- not okay to donate --
23      A.   Yeah.
24      Q.   -- until resolved.  Do you remember that?
25      A.   Yes.  Yes.  Yes.  They had, I guess -- when

Page 24

1  they went to draw -- or stick me, they kind of, you know,
2  went through the vein.  Caused real bad bruising.
3       Q.   And so did they tell you that you couldn't
4  donate at that time?
5       A.   Right, till it healed up.
6       Q.   So they told you not to come back until the
7  bruised had healed; is that correct?
8       A.   Right.  But this was not on 1/20 -- oh, wait.
9  '14, yeah.  Okay.  Never mind.  Yeah.  The dates are
10  what -- all right.
11      Q.   So that was on January 12th.  And then it looks
12  like you came back January -- or no.  That was --
13  sorry -- January 15th.  Then you came back January 20th,
14  and you still had bruising.
15      A.   Uh-huh.
16      Q.   And so you couldn't donate; is that right?
17      A.   Correct.
18      Q.   And then, finally, on January 22nd, the bruise
19  had healed, and you could donate.  You see that?
20      A.   Yes.  Yes.  Yes.  I see.
21      Q.   So do you remember if this was something that
22  happened often that you would go in and they would tell
23  you --
24      A.   No.  It was just, I believe, onetime incident
25  that I remember.  You know, they just, you know, stuck me

Page 25

1  wrong and caused bruising.  And had to wait till that
2  cleared up.  Yeah, I remember.
3       Q.   Do you remember any other times that you went
4  in and you didn't get to donate for any reason?  Not the
5  one -- the main one that we're talking about in January
6  2015, but at CSL or other places where you couldn't
7  donate for a few days, something like this?
8       A.   Yeah.  Yeah.
9       Q.   What kind of things were those?
10      A.   Well, I mean, it wasn't necessarily where my
11  blood -- but I did get to donate.  My blood pressure was
12  a little high.  Told me to go sit down for a minute and,
13  you know, went back, checked it.  Everything was fine.
14      Q.   Do you remember any other times like this where
15  you had to come back, say, a couple days later?
16      A.   Well, where I currently donate, yeah, because
17  my plasma, I guess, was a little too -- hyperlipidemia,
18  which, you know, I had to drink water and just resolve it
19  in a day.  It was just -- but, yeah.
20      Q.   So they told you couldn't donate that day,
21  but to come back, say, the next day and see if you could
22  donate again?
23      A.   Yeah.  That's normal.  It happens all the time,
24  not just myself.
25      Q.   Do you remember why you stopped donating in

Mark Silguero
April 10, 2017                    26 to 29

Page 26

1 April 2014?
2     A.  April.  I don't remember, no.
3     Q.  You said at one point you had high blood
4 pressure when you went in to donate.  Did you get to
5 donate that day, or did you --
6     A.  Yes.
7     Q.  -- have to come back another day?
8     A.  No.  I got to donate that day.
9     Q.  So why don't you walk us through a little bit
10 about how the donation generally goes when you go to a
11 plasma center.  What happens when you first walk in the
12 door?
13    A.  Well, if it's a routine donation, what you do
14 is sign in.  And where I -- where I donate, you just sit
15 down -- sit down till you're called, go into a kiosk,
16 answer the questions, get a little band stating you did
17 that.
18            Wait for your name to be called, which
19 leads you to the screening room where they take your
20 blood pressure, temperature, get a little blood sample,
21 weigh you, and evaluate your blood as far as
22 hyperlipidemia or your medical levels.
23    Q.  So is that every time that they do that
24 evaluation?
25    A.  That's in a routine donation.  And after -- if

Page 27

1 you're accepted, you wait a few hours -- I'm sorry.
2 Wait -- seems like a few hours.  You wait a little while.
3 They call you to a back room where they'll, you know,
4 hook you up to a plasma machine, basically, and you give
5 your donation.
6     Q.  And the first time you go somewhere new, is
7 there additional screening?
8     A.  Right.  Yes, ma'am.
9     Q.  What kind of -- do you know -- remember what
10 kind of questions they asked?
11    A.  There's paperwork proving your residency and
12 who you are.  There's also paperwork for the facility,
13 physical.  And other than screening, of course, an
14 explanation of the whole process also.
15    Q.  So do you have friends and -- or relatives that
16 currently donate plasma?
17    A.  Currently, no.
18    Q.  But you said you first heard from a friend.  So
19 at one point you knew people that were donating; is that
20 right?
21    A.  Yeah.  Yes.  Yes.
22    Q.  You mentioned that short deferrals for little
23 things were normal.  Did you have friends that got
24 deferred for a couple days for little things here and
25 there?

Page 28

1     A.  No.  But you -- it's pretty much given.  You go
2 into be screened.  If you don't wait and -- sit down and
3 be called to the back, you leave right away.  And that's
4 just a clear indication you weren't accepted, yeah, for
5 whatever reason, you know.
6     Q.  So within your experience at plasma centers,
7 you know that people walk in, and sometimes they get
8 deferred, and they don't get to donate?
9     A.  Right.  Yeah.
10    Q.  And if I use the word deferred, have you heard
11 that before?
12    A.  Yes.
13    Q.  Okay.  And that means that you don't get to
14 donate plasma?
15    A.  There's two types.  There's permanent and
16 temporary deferral.
17    Q.  And what's the difference?
18    A.  Pretty much one is on a temporary basis.  The
19 other one is permanent.
20    Q.  So you know that not everyone who wants to
21 donate plasma gets to donate plasma, right?
22    A.  Yes, I understand that.
23    Q.  And do you know some of the reasons that those
24 people get deferred?
25    A.  Yes.  Diseases, stuff like that, I imagine.

Page 29

1     Q.  And even people that are generally qualified to
2 donate plasma, there may be days where they can't donate
3 and get temporarily deferred; is that right?
4     A.  Sure.
5     Q.  You said that's normal?
6     A.  From what I've seen, yeah.
7     Q.  When you go for a routine donation, about how
8 long are you at the plasma center?
9     A.  Routine -- probably around two hours, two and a
10 half.
11    Q.  Do you know how many places there are to donate
12 plasma in Corpus Christi?
13    A.  I think there's two.
14    Q.  You said two?
15    A.  I believe there's two.  I'm not a hundred
16 percent on that.
17    Q.  So would that be CSL and then the place that
18 you're donating now?
19    A.  Yeah.  Those are the only two I'm aware of.
20    Q.  So when you go to CSL to donate plasma, it was
21 just the screening and the donation, and then you left;
22 is that correct?
23    A.  Screening, on a routine donation, yeah.
24    Q.  Did you ever buy anything when you were there?
25    A.  Buy anything?  Coke.

Mark Silguero
April 10, 2017                                    34 to 37

Page 34

1  they told you that you were temporarily -- temporarily
2  deferred for the bruising?
3      A.   No, ma'am.
4      Q.   And then you mentioned a time that you couldn't
5  donate for a short period, not a whole day, but for a
6  couple hours, because you had high blood pressure?
7      A.   Right.
8      Q.   Do you know why you couldn't donate when you
9  have high blood pressure?
10     A.   Imagine it's unsafe for the patient or the
11  client or whatever.
12     Q.   And by the client you mean you?
13     A.   Right.
14     Q.   So it's your understanding that sometimes you
15  can't donate because it's unsafe for you to donate; is
16  that right?
17     A.   If you don't fall within their parameters.
18     Q.   And so some of those parameters are to make
19  sure that the patient -- the person that's donating is
20  safe, correct?
21     A.   I imagine so, yes.
22     Q.   So as a nurse does it make sense to you that
23  someone who had an injury, who needed their plasma to
24  heal, would not be able to donate?
25     A.   You're asking me to think for them.  You know,

Page 35

1  I don't know how their job is -- what their job
2  requirements are, what they're trained.  I don't know.
3      Q.   Well, you told me that plasma is used for
4  healing; is that correct?
5      A.   Right.  Right.
6      Q.   So given your understanding of that, would it
7  make sense to you that someone who was injured and so
8  needed to heal would then need their plasma and could not
9  donate?
10     A.   I don't -- I don't know all their parameters.
11  I don't know all their medical requirements.  I don't
12  know their policies and procedures.  I don't know.
13     Q.   I'm not asking about the policies.  I'm just
14  asking if it makes --
15     A.   Right.
16     Q.   -- sense to you or not.
17     A.   But, I mean, their training -- I don't know.
18  The answer is I don't know.
19     Q.   When they told you you couldn't donate because
20  of high blood pressure, did you think that was
21  discriminatory?
22     A.   No, ma'am.
23     Q.   Have you ever been temporarily deferred by any
24  plasma center for any other reason?
25     A.   Yes.

Page 36

1      Q.   What were those?
2      A.   Hyperlipidemia.
3      Q.   And what is hyperlipidemia?
4      A.   It's when your cholesterol is too high and
5  interferes with the plasma, therefore contaminating it.
6  It's not useful to the plasma center.
7      Q.   And was that at CSL, or was that somewhere
8  else?
9      A.   Somewhere else.
10     Q.   Did you think it was discriminatory when you
11  were temporarily -- temporarily deferred for
12  hyperlipidemia?
13     A.   No, ma'am.
14     Q.   So would you agree that CSL has the right to
15  defer people if their plasma is going to contaminate the
16  plasma supply?
17     A.   Sure.
18     Q.   Would you agree that CSL has the right to defer
19  someone if donating plasma is going to be unsafe for that
20  person?
21     A.   Yes.
22     Q.   Okay.  Let's talk about your visit to CSL on
23  January -- I believe it was January 2nd, 2015.
24     A.   Uh-huh.
25     Q.   Does that date sound right to you?

Page 37

1      A.   Yes.  Well, yeah.
2      Q.   Did anyone come with you that day?
3      A.   Yes.
4      Q.   Who?
5      A.   Would have been my wife and my stepdaughter.
6      Q.   Were they also donating plasma?
7      A.   Yes, ma'am.
8      Q.   Do you remember if they did donate plasma that
9  day?
10     A.   They -- they both did.
11     Q.   And what's your stepdaughter's name?
12     A.   Ashley.
13     Q.   Were Lisa and Ashley regular donors?
14     A.   Lisa had been.
15     Q.   What about Ashley?
16     A.   I don't believe so.
17     Q.   Was that her first time?
18     A.   Yes.
19     Q.   So it looks like, from our records, that you
20  had not been to CSL since April.  So that would have been
21  like eight months or so before?
22     A.   Right.
23     Q.   So did you have to do -- go through the whole
24  new donor process when you got there in 2015?
25     A.   Right.

Mark Silguero
April 10, 2017                                          38 to 41

Page 38

1    Q.   So do you remember what happened when you
2    initially got to CSL in 2015?
3    A.   Signed in, showed the person at the desk my
4    paperwork. I received a booklet to read through. Saw a
5    video, if I'm not mistaken, and was waiting to either get
6    screened or do my physical.
7    Q.   Do you remember what was in the booklet that
8    you read through?
9    A.   Some.
10   Q.   Sorry. What was that?
11   A.   Some. I remember some of what's in the book.
12   Q.   Oh. What do you remember?
13   A.   Some of the reasons why you couldn't donate,
14   things like that, how to, you know, prepare for your
15   donation as far as healthwise, things of that nature.
16   Q.   And do you remember what was in the -- on the
17   video?
18   A.   Yes.
19   Q.   What was that?
20   A.   Also as -- how plasma is used and, you know,
21   what they do with your donation.
22   Q.   Okay. So after you got the booklet and saw the
23   video, then what happened?
24   A.   I was asked to sit in the back till it was my
25   turn to either, again, be given a physical or screen.

Page 39

1    Q.   So you were sitting in like the lobby area or
2    somewhere else?
3    A.   I guess it would be lobby area in the back area
4    of where they do all that stuff.
5    Q.   Okay. And then what happened?
6    A.   I was called into the screening room. I walked
7    in, put my cane down, stepped up to the chair. She told
8    me I couldn't donate because I couldn't transfer, because
9    of my gait and because of my cane, I believe.
10   Q.   So because of your gait. What did she say
11   about that?
12   A.   Basically -- I know it was something concerning
13   my cane, you know, because I use a cane. I couldn't
14   transfer, you know, which, you know, I hadn't even been
15   given the opportunity to show her I could or couldn't,
16   you know.
17   Q.   Do you remember if you were walking with a limp
18   that day?
19   A.   Not with my cane, if I had my cane.
20   Q.   Did she tell you anything else?
21   A.   That was pretty much it.
22   Q.   And what did you say in response?
23   A.   You know, obviously upset me. I just -- you
24   know, I knew I was being discriminated against and, you
25   know, told her -- you know, shook my finger and said, you

Page 40

1    know, you're going to be sorry.
2    Q.   So you shook your finger and told her she would
3    be sorry?
4    A.   Yes.
5    Q.   What did you mean by that?
6    A.   Meant I was going to call her supervisor or --
7    or corporate, take, you know, some kind of correction
8    action, you know, or legal action.
9    Q.   Did you say anything else?
10   A.   No, ma'am.
11   Q.   Did you raise your voice?
12   A.   Probably no louder than I'm speaking right now.
13   Q.   Did she explain any more about why she was
14   deferring you?
15   A.   No.
16   Q.   Did she say how long the deferral would be?
17   A.   No.
18   Q.   How long did you understand it would be?
19   A.   Permanent, because, I mean, I was -- she's
20   basing it on my gait and my transfer. I mean, that's --
21   that wasn't going to change overnight.
22   Q.   Did she tell you it was going to be permanent?
23   A.   And I'd been there prior plenty times before.
24   Q.   Did she say it was going to be a permanent
25   deferral?

Page 41

1    A.   I understood it to be.
2    Q.   But did she say it was going to be a permanent
3    deferral?
4    A.   I don't remember. She just said, you're
5    deferred. You know, going to defer you. Can't transfer.
6    Q.   So at that time you were planning to get knee
7    replacement surgery, right?
8    A.   No. I was in the process of losing weight. I
9    had already -- you know, they told me, you need to lose
10   weight and diet before we do that.
11   Q.   But you were losing weight so that you could
12   get the knee replacement surgery, right?
13   A.   Trying to, yeah.
14   Q.   So did you think that once you got the knee
15   replacement surgery, then you could go back and donate?
16   A.   Sure. That or work, something.
17   Q.   So, then, it wouldn't be a permanent deferral,
18   right?
19   A.   Say that again.
20   Q.   So you said you understood it to be a permanent
21   deferral because your gait was not going to improve. Is
22   that correct?
23   A.   I mean, she just said you're deferred, okay?
24   You're asking me to guess what she meant. You know, I
25   imagine she meant permanent because I'm using a cane.

Mark Silguero
April 10, 2017                          46 to 49

Page 46

1    Q.   So did -- have you -- since that time have you
2  ever gone back to any CSL plasma center?
3    A.   No, ma'am.
4    Q.   So did anyone at CSL Plasma ever talk to you
5  about being deferred because of behavior?
6    A.   No, ma'am.
7    Q.   So it was the first time you learned that your
8  file says you're permanently deferred because of behavior
9  when you saw the notes here?
10   A.   Pretty much.  I mean, I did learn of that
11 earlier.  But, I mean, you know, it's just ridiculous.
12 It's ridiculous, behavior.
13   Q.   Because your behavior was not bad?  Is that
14 what you're saying?
15   A.   Because that -- what behavior?  What did I do
16 wrong?
17   Q.   You told me you shook your finger and said,
18 you'll be sorry?
19   A.   Yeah.  But that wasn't a threat as far as
20 violence or physical or anything like that.  No, I
21 mean --
22   Q.   Do you think she could understood -- have
23 understood it to be a threat of that?
24   A.   You know, I mean, when somebody is wrong and
25 you want to correct them, sometimes you do use hand

Page 47

1  gestures, you know, like with a child.
2    Q.   What about saying, you will be sorry?  Do you
3  think she could have understood that to mean that you
4  were threatening her physically?
5    A.   She shouldn't have.
6    Q.   Why not?
7    A.   I mean, I didn't mean it like that, for sure.
8  You know, I'm not a violent person, to start off with.
9    Q.   But do you think threatening someone is a
10 reason to get deferred?
11   A.   You know, I needed to talk to the supervisor.
12 I needed to talk to somebody above her, because I wasn't
13 going to get anywhere with her, obviously.
14   Q.   Did you ask her if you could talk to a
15 supervisor?
16   A.   No.  No, I called instead.  I didn't want to
17 talk to her.  I called.  That's why -- decided I would
18 go -- I'm going to call somebody to talk to somebody.
19   Q.   Did anyone laugh at you when you were at the
20 center?
21   A.   I hope not.
22   Q.   But not that you remember?
23   A.   That I remember.
24   Q.   Did anyone say anything that belittled you when
25 you were at the center?

Page 48

1    A.   Not to my recollection.
2    Q.   Do you believe that businesses have the right
3  to ban someone from their location if they're
4  threatening?
5    A.   Yeah.  In what way, though?  Violent way?  Is
6  that what you're asking me?
7    Q.   Just any sort of threat in general.
8    A.   You know, there's a process.  You know, people
9  have rights, you know.  And when you're not given that
10 right -- you know, I had a right to speak to a
11 supervisor.  I should have been given that right.
12   Q.   But when you were there, you didn't ask to
13 speak to a supervisor --
14   A.   No, but I called.  Minutes later I called.  I
15 wasn't going to tell her that.
16   Q.   Why not?
17   A.   Come on.
18   Q.   You think she wouldn't have let you?
19   A.   You know what, lady?  That -- you know, her
20 ignorance was that thick.  I was not going to talk to
21 her.
22   Q.   Why do you say she was ignorant?
23   A.   The fact that she was discriminating against me
24 without even -- you know, made up her mind already, I
25 couldn't do something without even allowing me or asking

Page 49

1  me to do it, you know.
2         That's somebody that -- you know, in the
3  profession that they're in -- you know, being a nurse,
4  too, myself, you know, I understand you don't -- you
5  know, you can't make assumptions like that, you know.
6         How does she know I couldn't transfer?
7  She didn't give me an opportunity to.  I'd done it
8  before.  And according to these notes, said I can do it,
9  too.
10   Q.   Did you tell her you transferred before?
11   A.   Probably not.  Probably not.  Like I said, she
12 sounded like she had made up her mind already, you know.
13 I don't know why she picked on -- didn't like me that
14 day.  I don't know.  Because of my cane, I guess.
15   Q.   So she said you -- she said she was deferring
16 you, and then you basically just walked out; is that
17 right?
18   A.   Well, I mean, what else -- what other option
19 did I have at the time?  She told me, you're deferred for
20 these reasons.  And it's like, okay, you know.  I'm being
21 humble and accepting what you're telling me because
22 you're in charge.  But I know there's another -- somebody
23 above you.  So I decided to go call as soon as I left.
24   Q.   How long did you have to sit in the car and
25 wait for your wife?

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION

 3   MARK SILGUERO,                §
          Plaintiff,               §
 4                                 §
     and                           §
 5                                 §
     AMY WOLFE,                     §        CIVIL ACTION
 6        Intervening Plaintiff,   §        NO. 2:16-CV-00361
                                   §
 7   v.                            §
                                   §
 8   CSL PLASMA INC.,              §
          Defendant.               §
 9

10   ********************************************************

11                  ORAL DEPOSITION OF

12                   REYNALDO VARGAS

13                    June 26, 2017

14   ********************************************************

15

16

17        ORAL DEPOSITION OF REYNALDO VARGAS, produced as

18   a witness at the instance of the Plaintiff, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on the 26th of June 2017, from 9:04 a.m. to 10:18 a.m.,

21   before Isabel Connor, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of

23   U.S. Legal Support, Inc., 802 North Carancahua Street,

24   Suite 2280, Corpus Christi, Texas, pursuant to the

25   Federal Rules of Civil Procedure.
```

Reynaldo Vargas
June 26, 2017                                    10 to 13

Page 10

1    A.   We've talked about the conditions guideline.
2  That's one of those things.  Health assessment, that's
3  another.
4    Q.   And what is the health assessment?
5    A.   The health assessment is a hands-on head-to-toe
6  assessment that is provided to new donors and for annual
7  donors.
8    Q.   And how does the health assessment differ from
9  the conditions guidelines?  Help me understand the
10  difference between the two.
11    A.   Sure.  Absolutely.  The health assessment is
12  actually a hands-on portion, head-to-toe assessment,
13  where we're looking at our donor and evaluating what's in
14  front of us.  The conditions guideline is a guideline
15  that we use to reference certain medical conditions when
16  they come about.
17    Q.   And is the health assessment guideline written
18  anywhere?
19    A.   The health assessment is written, correct.
20  Yes, it is.
21    Q.   And are the protocols for taking the health
22  assessment written anywhere?
23    A.   Yes.
24    Q.   And do you provide a written copy of those
25  protocols to the individuals that you are training?

Page 11

1    A.   It is something that they read, and it is
2  available to them at any time.
3    Q.   And do you train the medical staff associates?
4    A.   Yes, I do.
5    Q.   Did you train Michelle Mailey?
6    A.   I had some part in her training, not a hundred
7  percent.
8    Q.   What type of written documentation do you
9  provide individuals that you are training?
10    A.   The written documentation that's provided to
11  our trainees is -- is a document that addresses every
12  specific area of whatever part of the training is -- is
13  occurring.
14    Q.   How many days does it take to train someone to
15  be an MSA?
16    A.   It's based on the individual receiving the
17  training.
18    Q.   Are there any tests or exams that you provide
19  to the MSA in training?
20    A.   There is two assessments that are provided.
21  And they also have knowledge questions that have to be
22  addressed with the trainee, and they have to be
23  proficient on it.
24    Q.   And do they shadow people as part of their
25  training?

Page 12

1    A.   Yes.  They're not left alone till they're
2  completely signed off and ready to be on their own.  And
3  that's with physician approval.
4    Q.   And if you had to estimate an average amount of
5  time it takes someone to be trained, what would that
6  average be as an estimate?
7    A.   Three weeks at an estimate.  That's -- and
8  that's -- like I said, it's based on the individual.
9    Q.   And are staff supposed to refer to the written
10  health assessment protocols as necessary?
11    A.   They are available as necessary.
12    Q.   And are staff supposed to refer to the
13  conditions guidelines as necessary?
14    A.   They are available as necessary.
15    Q.   Mr. Vargas, have you ever participated in any
16  Americans with Disabilities Act or ADA training?
17    A.   No formal training.
18    Q.   Have you ever had any training about avoiding
19  disability discrimination?
20    A.   Not -- no formal training regarding that.
21    Q.   And did you know that you are not supposed to
22  discriminate against people with disabilities?
23        MS. WILLING:  Objection.  Calls for a
24  legal conclusion.
25        You can still answer.

Page 13

1    A.   I'm aware of that.
2    Q.   (By Ms. Davis)  And how did you know that you
3  weren't supposed to discriminate against people with
4  disabilities?
5    A.   It's -- it's posted everywhere you go.
6    Q.   Is it posted inside the center?
7    A.   I don't recall at this moment.
8    Q.   And so you say that it's posted everywhere you
9  go.  Where do you go that you may see it?
10    A.   It -- I'm not going to get into specifics as to
11  where.  But, I mean, it seems like everywhere you walk to
12  nowadays, there's a sign regarding disabilities.
13    Q.   Do you mean outside the center when you're in
14  public?
15    A.   Absolutely.
16    Q.   Recall any place in the center that something
17  like that is posted?
18    A.   I do not recall at this moment.
19    Q.   And did you ever receive any training on how to
20  interact with prospective donors with disabilities?
21    A.   In regards to our medical training, that's
22  something that's -- that's in there.
23    Q.   And where is that?
24    A.   I'm -- I'm not exactly sure where it's at.
25  It's something that it -- it's mentioned in the

Reynaldo Vargas
June 26, 2017                                    26 to 29

**Page 26**

1    A.   Yes, they have.
2    Q.   And were they allowed to speak with your
3  supervisor with corporate?
4    A.   Absolutely.
5    Q.   What happens when someone says that they want
6  to speak to someone above you?
7    A.   Then at that point I ask them to wait where
8  we're at, and I go get my superiors and have them come
9  speak to the donor.
10   Q.   Is that common protocol, to allow dissatisfied
11 donors to talk to supervisors?
12   A.   If they request it, yes.
13   Q.   -- donors ever get angry?
14   A.   Yes, ma'am.
15   Q.   And how would you know that they were angry?
16   A.   When they raise their voice, start using
17 profane language on occasion, that would indicate that
18 they're angry.
19   Q.   What would you do if that happened?
20   A.   I maintain as calm as possible and allow the
21 donor to have their say.  And if they want to speak to a
22 superior, by all means, give them that opportunity.
23   Q.   Did you have to report that behavior to a
24 supervisor?
25   A.   I would document it in their donor data file.

**Page 27**

1    Q.   If a donor just calls CSL Plasma directly on
2  the phone and asks to speak to a supervisor, who would
3  that call typically be directed to?
4    A.   Based on who they're speaking with and if they
5  want to speak to somebody superior than myself, then one
6  of the assistant center managers or the center manager.
7    Q.   When donors were referred, would you tell them
8  or would an MSA tell them the reason why they were being
9  deferred?
10   A.   Absolutely.
11   Q.   -- donors ever try to prove that the reason for
12 the deferral was wrong?
13   A.   I'm not sure how to answer that question.  I
14 mean, do people argue?  Yes.
15   Q.   And what happens when a person argues?
16   A.   If the deferral is set in place for a reason,
17 it does not change the end result.  If a donor is
18 deferred, a donor is deferred because of the condition or
19 the reason why the donor is deferred.
20   Q.   What if the reason for the deferral was wrong?
21   A.   Then at that point it's not my determination to
22 make.
23   Q.   Whose determination to make is it?
24   A.   If it's a medical condition, then it doesn't go
25 above medical staff.

**Page 28**

1    Q.   Explain that to me.  If it's a medical
2  condition, you are the last person that they can complain
3  to?  Is that --
4    A.   They can complain to -- I'm sorry.  I'll let
5  you finish.
6    Q.   Is that what I'm understanding?
7    A.   What I'm saying is, at the center level, if
8  it's a medical condition and I defer a donor because of a
9  medical condition, then they would have to take it to
10 maybe corporate at that point to be able to see if that
11 determination could be made.  How corporate would handle
12 that, I cannot answer.
13   Q.   Are you or MSAs authorized to defer someone
14 from donating for a reason that's not listed on the
15 medical staff reference - conditions guidelines?
16   A.   I would have to see what the reason was.
17   Q.   Can you think of any examples that would -- you
18 would be authorized to defer someone for a condition
19 that's not listed on the medical staff reference -
20 conditions guidelines?
21   A.   I can't think of anything off the top of my
22 head.
23   Q.   Ever been threatened while at work?
24   A.   Yes, ma'am.
25   Q.   When was that?

**Page 29**

1    A.   I can't recall specifically.  Approximately six
2  months ago.
3    Q.   It was at CSL Plasma?
4    A.   Yes, ma'am.
5    Q.   What happened?
6    A.   Donor was upset because he couldn't donate.
7  Balled up his fists and attempted to -- attempted to have
8  a piece of paper in his hand and make like he was going
9  to strike me, but then he changed his mind.
10   Q.   What happened after that?
11   A.   I allowed him to walk out and go about his way.
12   Q.   Was that a physical threat?
13   A.   It never made it to that point.
14   Q.   When you say he had his fist balled up, did it
15 look like he was going to try to strike you?
16   A.   It appeared that way.
17   Q.   Did you call the police?
18   A.   We did.
19   Q.   And was there a police report made?
20   A.   I -- not sure if the police were able to
21 contact that donor once he left the facility.
22   Q.   Did you make note of it in his files?
23   A.   Yes, ma'am.
24   Q.   And did you tell a supervisor?
25   A.   Yes, ma'am.

Reynaldo Vargas
June 26, 2017                                    42 to 45

Page 42

1   Q.   Can you think of another example of a time you
2   deferred someone for something not listed in the
3   conditions guidelines?
4       A.   Not specifically.
5       Q.   Can you think of something generally?
6       A.   Out-of-range values, like total protein.
7       Q.   How did you know to defer somebody for
8   out-of-range values?
9       A.   Because our SOP gives us a minimum and a
10  maximum value.  And if they fall outside that range, then
11  they are deferred for the day.
12      Q.   Which SOP is that?
13      A.   Number-wise, I cannot give you, but it talks
14  about total protein and hematocrit.
15      Q.   Is it a SOP about vital signs?
16      A.   I think it's specifically reading protein and
17  hematocrit.
18      Q.   Is there an SOP about the temperature?
19      A.   Yes, there is.
20      Q.   Donor you described earlier, balled up his
21  fist, did he get permanently deferred?
22      A.   Yes, he did.
23      Q.   Who permanently deferred him?
24      Q.   Who permanently deferred him?
25      Q.   Yes.

Page 43

1       A.   I did.
2       Q.   -- tell him that he was permanently deferred?
3       A.   One more time with that question, please.
4       Q.   Did you tell him that he was permanently
5   deferred?
6       A.   At that point when he walked out, I did not.
7   When he returned, somebody else advised him he was
8   permanently deferred.
9       Q.   Did he return to donate?
10      A.   He attempted.
11      Q.   Had you ever had a donor that uses a service
12  animal?
13      A.   Have I ever?  No, not specifically.
14      Q.   Do you know CSL Plasma's guidelines on service
15  animals?
16      A.   I wouldn't be able to give it to you word for
17  word.
18      Q.   What -- what does the guideline say, generally?
19      A.   It just says service animals for -- I believe
20  seeing eye dogs are acceptable.  Everything else has to
21  be based on condition.
22      Q.   And why service animals are based on
23  condition -- let me rephrase that.  Do you know why
24  service animals are accepted for individuals who need
25  them as a seeing eye dog and are not accepted for

Page 44

1   individuals that need them for some other condition?
2       A.   It's based on the condition and what aggravates
3   that condition.
4       Q.   And does having a service animal aggravate a
5   condition that would prevent them from donating?
6       A.   Again, each specific condition would have to be
7   looked at individually for me to be able to answer that
8   question.
9       Q.   -- a person has an anxiety disorder and uses a
10  service animal, are they allowed to donate?
11      A.   That's based on interviewing the donor.
12      Q.   What -- what would you look for in that
13  interview?
14      A.   Donor response, what aggravates -- what sets
15  off the anxiety.
16      Q.   Ask the donor questions about what sets off
17  their anxiety?
18      A.   Absolutely.
19      Q.   What type of answers would you be looking for
20  that would allow them to donate?
21      A.   It's -- it's not just the answer.  I would have
22  to see donor response as well.
23      Q.   If the donor was called, would that be a good
24  indicator that the donor would be able to donate if they
25  met all other conditions?

Page 45

1       A.   Again, my interpretation of calm would be
2   different than anybody else's, yours or mine.
3       Q.   If your interpretations of calm were met, would
4   that donor be able to donate if they met all other
5   conditions?
6       A.   Again, I would have to have that donor in front
7   of me to make that determination.
8       Q.   -- agree that companies should not discriminate
9   against people with disabilities?
10      A.   One more time with the question.
11      Q.   Do you agree that companies should not
12  discriminate against people with disabilities?
13      A.   I agree.
14      Q.   Why do you believe that?
15      A.   Because I believe everybody needs to get a fair
16  shot at the opportunity that's in front of them.
17      Q.   Is there an SOP about service animals?
18      A.   There's not a specific SOP about service
19  animals.
20      Q.   What are you looking for when you interview
21  somebody regarding anxiety?
22      A.   The first thing I would have to have is a donor
23  in front of me to even attempt to look at what I'm
24  looking for.
25      Q.   Are there questions you're supposed to ask?

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK SILGUERO,           )
    Plaintiff,           )
                    )
                    )
and                      )
                    )
AMY WOLFE,               )
    Intervening Plaintiff,   )
                    )
v.                       )   CIVIL ACTION NO.
                    )   2:16-CV-00361
CSL PLASMA INC.,         )
    DEFENDANT.               )

************************************\*

ORAL DEPOSITION OF

AMY WOLFE

JULY 7, 2017

************************************\*

    ORAL DEPOSITION of AMY WOLFE, produced as a
witness at the instance of the DEFENDANT, and duly
sworn, was taken in the above-styled and numbered cause
on JULY 7, 2017, from 10:06 a.m. to 11:54 a.m., before
Stephanie M. Harper, RPR, CSR in and for the State of
Texas, recorded by machine shorthand, at the offices of
DISABILITY RIGHTS TEXAS, 1500 McGowen, SUITE 100,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto; that the deposition shall be read and
signed before any notary public.

JOB NO. 244923

Amy Wolfe
July 07, 2017                                    10 to 13

Page 10

1    Q.   And what year did you graduate high school?
2    A.   2014.
3    Q.   And immediately after that, you came to
4    Houston for college?
5    A.   Yes, ma'am.
6    Q.   Now, are you still taking classes at the
7    University of Houston?
8    A.   Yes, ma'am.
9    Q.   What are you studying?
10   A.   Psychology, with a minor in biology.
11   Q.   Do you have an expected date of graduation?
12   A.   August of this year.
13   Q.   Close.  Exciting.
14   A.   Yeah.
15   Q.   So are you finishing up summer classes, then?
16   A.   Yes, ma'am.  Two more to go, and I will be
17   done.
18   Q.   Congratulations.
19            Do you know what you're doing after you
20   graduate?
21   A.   I'm hoping to get into the forensics field.
22   Houston has the Institute of Forensics, and I'd really
23   like an internship there if I can manage to snag one.
24   Q.   So that would be like lab work?
25   A.   Lab work, autopsy assistant, crime scene.

Page 11

1    Q.   That sounds exciting.
2    A.   Yeah.
3    Q.   Other than your classes at the University of
4    Houston, have you ever received any other vocational
5    training or post high school training?
6    A.   No, ma'am.
7    Q.   Have you ever served in the military?
8    A.   No, ma'am.
9    Q.   Are you currently employed?
10   A.   Yes, ma'am.
11   Q.   And where do you work?
12   A.   I work at Urban Tails.
13   Q.   And what is Urban Tails?
14   A.   We're a dog boarding and daycare facility, and
15   we also do training.
16   Q.   And what do you do there?
17   A.   I'm the head trainer, and I am a daycare
18   assistant and a pet attendant.
19   Q.   Is that a fun job?
20   A.   It -- yes, it is.
21   Q.   We take our dog to daycare every day, so it
22   seems like you guys have fun.  I'm always a little
23   jealous.
24   A.   It really is.
25   Q.   And how long have you worked there?

Page 12

1    A.   For about a month now.
2    Q.   And where did you work before that?
3    A.   Before that, I had a brief stint at the Mad
4    Potter.
5    Q.   And what is that?
6    A.   It's a paint your own pottery place.
7    Q.   And where did you work before that?
8    A.   Before that, I worked for the University of
9    Houston.
10   Q.   What were you doing for them?
11   A.   I was a student worker at printing and postal.
12   Q.   Since you graduated high school, have you
13   pretty much always been taking college classes and then
14   just doing the jobs on the side?
15   A.   Yes, ma'am.
16   Q.   Do you receive any sort of student loans,
17   government aid to pay for your college?
18   A.   Yes, ma'am.  I receive loans and grants
19   through FASFA and also the Texas Workforce Commission.
20   Q.   What is the Texas Workforce Commission?
21   A.   They were previously known as DARS, or the
22   disability advocates.  I cannot remember for the life
23   of me the anagram [verbatim].
24   Q.   So it's some sort of program that gives money
25   to students with disabilities?

Page 13

1    A.   Yes, ma'am, and places them in jobs and...
2    Q.   So did they place you in jobs?
3    A.   Not yet.  But they do help with tuition.
4    Q.   And how did you hear about that program?
5    A.   A friend of mine suffers from a disability.
6    He was born completely deaf, and they helped him.
7    Q.   And you have a service dog; that's correct?
8    A.   Yes, ma'am.
9    Q.   And what's his name?
10   A.   Harley.
11   Q.   Is this your first service dog?
12   A.   Yes, ma'am.
13   Q.   And when did you get Harley?
14   A.   In May of 2015.
15   Q.   And what made you decide to get a service dog?
16   A.   My mother's a psychiatric nurse.  And we
17   discussed it because I had tried many other means of
18   treatments, and they were all falling short.
19   Q.   So what's the process for going about getting
20   a service dog?
21            Did you have to apply or ask someone, or how
22   does that work?
23   A.   It depends whether you go through a program or
24   owner training.  There aren't many programs available
25   for people suffering civilian PTSD.  And since I'm also

Amy Wolfe
July 07, 2017                                    14 to 17

Page 14

1  on the spectrum, it was considered better for me to
2  train my own or go through training with him so he
3  would be more personalized.  So he is owner trained.
4          The basics for a service dog is that they
5  know at least one task that mitigates the disability
6  and the handler is disabled.  And they are trained in
7  public access, which is a general good behavior
8  guideline.
9      Q.  So where did you get Harley?
10     A.  He was adopted.  I specifically decided I
11  needed a -- a service dog.  And normally some people go
12  through breeders, but I wanted to try the adoption
13  route.
14     Q.  So you went and found him at like an adoption
15  center where there were other dogs and...
16     A.  Yes, ma'am.
17     Q.  So the decision to get a service dog was you
18  talking to your mom, and then you decided to go out and
19  pick him up at the center?
20     A.  I also discussed it with my doctor, who
21  supported it.
22     Q.  And what doctor was that, or what was the
23  doctor's name?
24     A.  Russell Phillips.
25     Q.  And did you have any help in training Harley?

Page 15

1      A.  Not directly.
2      Q.  What do you mean by that?
3      A.  I'm in several disabled communities with a lot
4  of individuals who have service dogs and who have
5  trained service dogs, and I did a lot of research on
6  different methodologies, and basically I came from -- I
7  worked at a training program based on what he responded
8  to and was happy doing.
9      Q.  Had you owned dogs before growing up?
10     A.  Yes, ma'am, all the time.
11     Q.  Had you trained a dog before Harley?
12     A.  I had worked with my mother on basic obedience
13  and manners for ex-racing greyhounds.  We fostered for
14  multiple years in Lubbock.  Them behaving better upped
15  their chances of adoption, so...
16     Q.  So you trained the racing greyhounds and then
17  had -- helped them get placed in other homes?
18     A.  Yes, ma'am.
19     Q.  So what is Harley trained to do for you?
20     A.  His biggest tasks I call "medical alert" as an
21  umbrella.  He alerts me to cortisol spikes, which
22  accompany my migraines, many pain attacks and panic
23  attacks and disassociation.
24     Q.  So a spike in cortisol could indicate a number
25  of things, which you said include migraines and anxiety

Page 16

1  attacks?
2      A.  Yes, ma'am.
3      Q.  And what were the others?
4      A.  Migraines, panic attacks, disassociations, or
5  I suffer from chronic pain.  So I will have random
6  chronic pain fits almost.  I'm just -- where I'll be in
7  a lot of pain.  And Harley's -- Harley will alert me a
8  minute or so before those hit so I can sit down.
9      Q.  So he knows you're going to be in pain a
10  couple minutes before you do?
11     A.  Yes, ma'am.
12     Q.  And what does he do when he senses that?
13     A.  He stands up, and he'll lean into my legs, if
14  it's not going to be too severe.  It gives me a moment
15  to brace.  Or if it's going to be more severe, if -- I
16  believe how we shaped it was if there was more a chance
17  of it being severe, he'll hop in my lap, and he'll
18  start performing deep pressure therapy.
19     Q.  And how does he perform deep pressure therapy?
20     A.  He puts his weight into my lap, and he'll
21  either focus it in his paws or he'll lean against my
22  chest.
23     Q.  And other than just kind of giving you a
24  heads-up that this is coming, does he do anything to
25  help mitigate?

Page 17

1      A.  The deep pressure therapy.  And he also is
2  trained to -- in case of a panic attack, if I start
3  scratching at myself or pulling my hair, he will
4  redirect my hand to his head, so I pet him instead.
5      Q.  Does he also sense the panic attacks about a
6  minute or so before?
7      A.  Yes, ma'am.  Those are also indicated with the
8  cortisol spikes.  And he will actually let me know if I
9  need to leave a room.  Say I'm in a large class, and
10  I'm going to have a really severe panic attack.  I'm
11  not currently on medication, but when I was, he was
12  trained to settle down after I had taken my medication
13  if I was at a certain level.  But if the medication
14  didn't work, he would not settle down until I left the
15  classroom physically.  And that was how he let me know
16  you need to leave this situation to be safe.
17     Q.  And you said that was when you were on
18  medication?
19     A.  Yes, ma'am.
20     Q.  Does he still do that -- sorry, does he still
21  indicate if you need to leave a room now?
22     A.  Yes, ma'am.
23     Q.  How often do you get panic attacks?
24     A.  It can be very situational.  Before I got
25  Harley, it was multiple times a day.  With Harley, it's

Amy Wolfe
July 07, 2017                                    18 to 21

Page 18

1   once, twice a week, maybe.  If it's a harder month, I
2   might have two or three a week.  If it's an easier
3   month, I might have none for a couple of weeks.
4        Q.   And you said they're situational?
5        A.   Yeah.
6        Q.   What kinds of things tend to trigger a panic
7   attack?
8        A.   Being in large crowds.
9        Q.   Anything else?
10       A.   Public speaking and that sort of thing.  Like
11  I'm walking out and it -- dark after night -- or
12  walking outside after dark, it can happen.  And then
13  sometimes they're random, but those are rarer.
14       Q.   So anything other than large crowds, public
15  speaking, or being outside after dark that kind of tend
16  to trigger panic attacks?
17       A.   If I get overwhelmed sensationally.  So at
18  music concerts or something like that.
19       Q.   Anything else?
20       A.   Not that I can think of.
21       Q.   And when you say "large crowds," does that
22  tend to be -- like, I'm thinking like a ballpark type
23  large crowds, or is that more of like even a large
24  classroom type large crowd?
25       A.   Large classrooms would be -- yeah, in the

Page 19

1   hundreds or in large retail stores like Sam's Club at
2   rush hour.
3        Q.   And do you always have Harley with you?
4        A.   Yes, ma'am.  There are times I will leave him
5   at home if his health is -- like, if he's had like a
6   sick day or something.  But that's very rare.  And most
7   of those days I don't leave the house without him.  If
8   he's in the same building with me, say I'm going to the
9   doctor for a CT or something, he can be in a different
10  room, and I'm all right.
11       Q.   I imagine if he's in a different room, he
12  wouldn't be able to tell if your cortisol is spiking;
13  is that right?
14       A.   Yeah.  He was with my boyfriend the other day,
15  and he did alert when I was out of the room.  But I'm
16  not sure if that was towards me.  But as soon as I got
17  back, he performed deep pressure therapy.
18       Q.   So having him close by, say, in the next room
19  is helpful to you to help not have panic attacks, but
20  he can't alert to the cortisol?
21       A.   Yes, ma'am.
22       Q.   And you understand you're bringing a
23  disability discrimination claim; is that correct?
24       A.   Yes, ma'am.
25       Q.   And for the purposes of this claim, the

Page 20

1   disability is anxiety disorder?
2        A.   Yes, ma'am.
3        Q.   And when were you first diagnosed with anxiety
4   disorder?
5        A.   It's been a while.  I believe it was the first
6   couple of years of high school.  But it became really
7   disabling the first year of college.
8        Q.   And were you diagnosed by a doctor?
9        A.   Yes, ma'am.
10       Q.   And what doctor was that?
11       A.   Dr. Phillips.
12       Q.   And was this a doctor back at your home or at
13  college or --
14       A.   At home.
15       Q.   And what -- what are your symptoms?
16            Is it just the attacks, or is it anything
17  else?
18       A.   Panic attacks.  Sometimes I'll feel a
19  tightness in my chest, but it's mostly just the panic
20  and the anxious thoughts.
21       Q.   And what -- you -- you said you started
22  college in 2014?
23       A.   Yes, ma'am.
24       Q.   And you got Harley -- would -- would that have
25  been the end of your first year of college or --

Page 21

1        A.   Yes, I believe so.  May of 2015.
2        Q.   And when you were first diagnosed with anxiety
3   disorder, were you on any medications?
4        A.   I was on -- yes.  I'm -- I'm trying to
5   remember the name.  I can't for the life of me remember
6   the name.  Sorry.
7        Q.   It's okay.  They're all very complicated and
8   hard to pronounce.
9        A.   Yeah.
10       Q.   And then you said at some point, you stopped
11  taking medication, and you got Harley.  Did you stop
12  taking medication before you got Harley?
13       A.   After.
14       Q.   After.
15            So would you say having Harley meant that you
16  didn't need the medication?
17       A.   It meant I needed it less.  And then I was
18  able to come fully off of it.
19       Q.   Did you start taking medication in high school
20  when you were first diagnosed?
21       A.   Yes, ma'am.
22       Q.   Do you take -- I know you don't remember which
23  one.  Did you take the same one all the way through, or
24  did you kind of bounce around to different ones?
25       A.   I took one pretty steadily through high

Amy Wolfe
July 07, 2017                    22 to 25

Page 22

1   school, but when I went to college and things, i.e.,
2   got worse.  I did move to Klonopin, which is a higher
3   strength.
4        Q.   And are you currently taking any medications?
5        A.   Yes.
6        Q.   And what are you currently taking?
7        A.   Prozac.
8        Q.   Is that the only thing you're taking?
9        A.   Yes, ma'am.
10       Q.   And when did you start that up?
11       A.   I want to say September of 2016.
12       Q.   And you've also been diagnosed with PTSD; is
13  that correct?
14       A.   Yes, ma'am.
15       Q.   And when were you diagnosed with that?
16       A.   20-- -- I believe really early 2015, like
17  January.  Maybe a little earlier.
18       Q.   And did you take any medications for your PTSD
19  specifically?
20       A.   Just the ones for my anxiety.
21       Q.   And do you see a -- a psychologist and/or a
22  psychiatrist?
23       A.   I see the school psychiatrist.
24       Q.   How long have you been seeing the school
25  psychiatrist?

Page 23

1        A.   Since September.
2        Q.   Of 2016?
3        A.   Yes.  Sorry.
4        Q.   That's okay.  Were you seeing another
5   psychiatrist before that?
6        A.   I've seen a few, but I think the last one
7   before that was also at the university, their
8   counseling center.  But I cannot remember his name.
9        Q.   And what's the name of the one you're seeing
10  currently?
11       A.   Dr. Stern.
12       Q.   Have you seen a psychiatrist maybe on and off
13  since you were first diagnosed with anxiety?
14       A.   Dr. Phillips was the main treatment.
15       Q.   And he is a psychiatrist?
16       A.   He's a general care practitioner, or he was my
17  primary care.
18       Q.   Do you have a current -- I don't want to
19  use -- misuse medical terms.  Is there a sense that
20  your anxiety will get better in the future, or is that
21  not something that you talk about?
22       A.   There's the possibility.  I have improved with
23  Harley.  But if I were to take away Harley, I don't
24  know if I would get worse again or stay where I'm at.
25  But I have seen an improvement with the service dog.

Page 24

1        Q.   And I believe in this lawsuit, you've said
2   that your anxiety substantially limits major life
3   activities; does that sound right?
4        A.   Yes, ma'am.
5        Q.   What activities does it limit?
6        A.   It limits most of them:  leaving the house,
7   eating, interacting with people.  It was interacting
8   with work in a negative way, and school.
9        Q.   Are you going to graduate early from college?
10       A.   Yes, ma'am.
11       Q.   Took you, what, three years to get through?
12       A.   Yeah.
13       Q.   Impressive.
14       A.   Thank you.
15       Q.   Did you take summer school all the way
16  through, then?
17       A.   Yeah, and I graduated with a semester already
18  done almost or a little over a semester done during
19  high school.
20       Q.   Nice.  Did you ever have to take any time off
21  school because of your anxiety or PTSD?
22       A.   No, ma'am.  I probably should have, but...
23       Q.   When was the last time you had an anxiety
24  attack?
25       A.   A couple of days ago.

Page 25

1        Q.   And what triggered that one?
2        A.   One of the dogs at work, one of our puppies,
3   nipped at my neck, which is one of my triggers.  Just
4   out of nowhere.  He was trying to play.  I don't blame
5   the little one, but Harley was there and brought me
6   down from it quickly.
7        Q.   So he comes to work with you?
8        A.   Yes.
9        Q.   And how are you generally in hospitals; is
10  there anything in a hospital or medical facility that
11  would trigger a panic attack?
12       A.   No, ma'am.  I actually spent seven hours in
13  one a few days ago with no anxiety.
14       Q.   And have you talked to Dr. Stern about your
15  service animal, I assume?
16       A.   Yes, ma'am.
17       Q.   And he -- does he approve of it; does he
18  disapprove, any --
19       A.   He approves.  He sees the benefit.
20       Q.   And has he prescribed anything other than the
21  Prozac?
22       A.   We did try a couple of antianxiety
23  medications -- one for antianxiety and one that's meant
24  to stop nightmares -- but they did not work for me.
25       Q.   And around what time were you trying those

Amy Wolfe
July 07, 2017                                    26 to 29

Page 26

1  medications?
2      A.  Actually that was during summer.  So I saw
3  Dr. Stern earlier than September.  I apologize.
4      Q.  That's fine.
5      A.  That's right.  He had me on them last summer
6  of 2016.
7          I believe I went to another doctor around
8  September, and that's why I was thinking...
9      Q.  Do you think by October of 2016, you were not
10  on any medications; does that sound right?
11      A.  Yes, ma'am.
12      Q.  Because by that time you were off of the ones
13  you had started in the summer?
14      A.  Yes.  And then I started Prozac a few weeks
15  after.
16      Q.  Why the gap?
17          Why not start Prozac right away?
18      A.  It took some time to get in to see my
19  psychiatrist.  Beginning of school, everyone rushes in.
20      Q.  So you went to CSL in the Houston location in
21  about October 2016; does that sound right?
22      A.  Yes, ma'am.
23      Q.  Had you ever donated plasma before?
24      A.  No, ma'am.
25      Q.  How did you hear about CSL?

Page 27

1      A.  Through Google.
2      Q.  And how did you know that you could do -- how
3  did you know that you could donate plasma?
4      A.  I have some friends who are in my disability
5  groups who use plasma and were discussing donations or
6  whose conditions require that they use plasma.
7      Q.  And what kind of conditions require the use of
8  plasma?
9      A.  I cannot remember off the top of my head right
10  now.
11      Q.  And so you knew that people used plasma.  How
12  did you know that you could donate plasma?
13      A.  I believe I heard of it donating blood.
14      Q.  And what did you know about the process before
15  you decided to go that day?
16      A.  Not much, other than they take the plasma out
17  and put the blood back in, basically.  That it took
18  about 30 minutes to an hour.
19      Q.  Did you know anyone who had donated plasma?
20      A.  I'm not sure.  I'm pretty sure within my group
21  of friends, there had been a few people.  Because they
22  used to run a big blood donation at my high school,
23  blood and plasma.  But I cannot think of names.
24      Q.  Did you talk to anyone about what the process
25  would be like before you went in?

Page 28

1      A.  Not really.  I looked -- I Googled a couple of
2  things and read other people's experience.
3      Q.  So what made you decide to go in that day?
4      A.  I think it was just convenient.
5      Q.  Was it a weekend, a school day, if you
6  remember?
7      A.  I can't remember.  I think it was a school day
8  for some people, but I didn't have class that day.
9      Q.  And why did you go to CSL, as opposed to
10  another donation center?
11      A.  They were close and had some good reviews.
12      Q.  Did you know that people get paid to donate
13  plasma before you went?
14      A.  Yes, ma'am.
15      Q.  And were you aware that CSL defers a lot of
16  people that want to donate?
17      A.  No, I was not.
18      Q.  Have you donated plasma anywhere since you
19  went to CSL that day?
20      A.  No, ma'am.
21      Q.  Why not?
22      A.  I've been anxious about complication and
23  worried that I would be turned down.  I didn't want to
24  go through using all that energy just to be turned down
25  again, and -- though I would still like to donate.

Page 29

1      Q.  And why would you still like to donate?
2      A.  Well, firstly, because I'm a broke college
3  student.  But because I've seen the good it does, and
4  I'd really like to -- I like to give back any way I
5  can, and this is one of the ways I could.
6          MS. WILLING:  Let's take a quick break
7  before we go on to other questions.
8          (Break from 10:44 a.m. to 10:48 a.m.)
9      Q.  (BY MS. WILLING)  Okay.  Ms. Wolfe, let's talk
10  about the day that you went into CSL.  Like I said, I
11  believe it was October 9, 2016; does that sound right?
12      A.  Yes.
13      Q.  Did you go in the morning, the afternoon?
14      A.  Early morning.
15      Q.  How early?
16      A.  Probably around 8:00 a.m.  I had read you
17  should get there when they open because lines got long.
18      Q.  So was 8:00 o'clock when they opened?
19      A.  I believe so, yeah.
20      Q.  And did anyone come with you?
21      A.  No, it was just me.
22      Q.  And Harley was there, as well?
23      A.  Yeah.
24      Q.  Do you drive, walk; how did you get there?
25      A.  I drive.

Amy Wolfe
July 07, 2017                    30 to 33

Page 30

1  Q.  So what happened when you first got there?
2  A.  I walked in and hopped in line.
3  Q.  Was the line pretty long already?
4  A.  There were about six people in there, yeah.
5  And there were already a lot of people in the waiting
6  area too and being taken back in another line.
7  Q.  Do you remember about how many people were in
8  the waiting room?
9  A.  Probably between five and ten.
10  Q.  And so what happened after you got in line?
11  A.  I waited in line until I got to the front, and
12  then I gave her my -- my Social Security card.  I think
13  I gave her my lease because they needed to know where
14  you lived.  And my ID.  And then I also -- I did have
15  my letter from my doctor regarding Harley, just in
16  case.
17  Q.  And what does that letter say?
18  A.  That I am a disabled individual under the ADA
19  and require the use of a service dog to mitigate my
20  disability.
21  Q.  Do --
22  A.  I --
23  Q.  Go ahead.
24  A.  I keep it on me for police and such.
25  Q.  Did the person at the front ask to see a

Page 31

1  letter?
2  A.  Yeah.  Yeah.  And I -- it seemed like a gray
3  area to me.  I didn't know if she was allowed to ask
4  for it, but I presented it because she asked for it.
5  And I wasn't sure if she was not allowed to ask for it
6  in this case.
7  Q.  And what happened after you talked to the
8  front desk person?
9  A.  She had me step to the side so she could call
10  someone and then started working with the person behind
11  me in line.  About -- when she handled I think a couple
12  other people, maybe ten minutes, she came -- she asked
13  me to come back to a -- you know those rooms where one
14  door enters to one side and one door enters to the
15  other and you have the medical desk in between?
16  Q.  Um-hmm.
17  A.  Back into one of those to wait for about five,
18  six minutes to talk to someone.  And I think she asked
19  my name.  Looked at my driver's license maybe.  Then I
20  had to wait five more minutes.  And then she asked me
21  to meet her outside in the hallway to go back into an
22  examination room.
23  Q.  So by this point, had you just dealt with the
24  same one individual, or were there two individuals?
25  A.  There were two, the front desk lady and then I

Page 32

1  think the woman who came back to the small room was
2  Ms. Juliana.  And then asked me to step out and go talk
3  to her in the other room.
4  Q.  So you think Juliana is the one that talked to
5  you for a second and then brought you back to an exam
6  room?
7  A.  Yeah.  And then I'm -- she was the one I did
8  have that discussion with in the exam room.
9  Q.  And so what was the discussion in the exam
10  room?
11  A.  She asked why I had a service dog, why I
12  needed him, what he did.  And then she had -- I believe
13  the MSR, she called it.  And she was looking up
14  guidelines regarding service animals.  But she wasn't
15  really able to find much of anything.  So she looked up
16  anxiety and went to the -- got on the computer and did
17  an online thing.
18  Q.  So to you, it looked like she was trying to
19  figure out what to do --
20  A.  Yes, ma'am.
21  Q.  -- about your situation?
22  And did she ever come to a conclusion?
23  A.  Not while I was in the exam room.  She tried
24  to call their physician, who did not answer after
25  several times.  And then she attempted to call the

Page 33

1  hotline they had and left a message for a doctor and
2  told -- asked me or told me she would go ahead and let
3  me go home, and then she'd give me a call later.
4  Q.  And so at that point, how long do you think
5  you had been at the center?
6  A.  Maybe an hour.  We did sit back in the exam
7  room for a good bit.
8  Q.  By "good bit," was that maybe half of the
9  time, or what do you think?
10  A.  Probably a little more than half.  Probably 45
11  minutes, because she was trying to get ahold of someone
12  to answer her questions.
13  Q.  And what else do you remember from the time
14  where you were sitting in the exam room talking to
15  Juliana?
16  A.  Just general questions about -- she did ask
17  whether I was on two medications, which I was not at
18  the time.  We discussed -- we talked about the anxiety
19  a little.  And she stated I didn't seem anxious.
20  Because I asked her, "Do I seem really anxious?"
21  And she said, "No, you seem really calm."
22  And I had asked -- I asked if she thought
23  I would be able to donate, and she said she wasn't
24  sure, but she thought I might because my anxiety seemed
25  under control.

Amy Wolfe
July 07, 2017                          34 to 37

Page 34

1    Q.   Anything else from when you were at the
2  center?
3    A.   Not that I can think of.
4    Q.   So you said then she said that you could go
5  home?
6    A.   Yeah.
7    Q.   And so did you leave pretty much immediately
8  after that?
9    A.   Yeah.  I made sure she had my number and asked
10  her to go ahead and give me a call and told her if she
11  wouldn't mind having the doctor call me.  But the
12  doctor never called me, but Ms. Juliana did later that
13  day.
14    Q.   About how much later did Juliana call you?
15    A.   It was a few hours.  Yeah.
16    Q.   And what do you remember from that
17  conversation?
18    A.   That I was told I was being deferred and would
19  not be allowed to donate because my anxiety required
20  the use of a service animal.  And I confirmed it was
21  because of the type of service animal, that they did
22  allow other service animals back for hearing impaired
23  or vision impaired.  And just in general, I was being
24  deferred because I required a service animal for my
25  anxiety.  And that if I did not require a service

Page 35

1  animal anymore for my anxiety, I would be allowed to
2  donate.
3    Q.   So she told you that if you ever got to the
4  point where your anxiety lessened to where you did not
5  need a service animal that you could come back and
6  donate?
7    A.   Yes, ma'am.
8    Q.   Did she tell you anything else?
9    A.   Not that I can recall.
10    Q.   So did you talk to anyone other than the front
11  desk person and Juliana when you were at CSL?
12    A.   No, ma'am.
13    Q.   Was Juliana rude to you at all?
14    A.   No, ma'am.
15    Q.   Did she mention -- did Juliana mention that
16  your anxiety might be a safety issue?
17    A.   Not that I recall.
18    Q.   Did she tell you that they were concerned that
19  you might have an anxiety attack on the donor floor?
20    A.   Not that I recall.  She didn't -- it -- she
21  didn't seem to think my anxiety was very bad, I think,
22  from her impression of me.
23    Q.   So as you understand it, she didn't think the
24  anxiety was bad, but when she called the doctor, that's
25  who said that you could not donate; is that right?

Page 36

1    A.   Yes, ma'am.
2    Q.   Was Juliana apologetic?
3    A.   I guess like she would be to any other donor
4  who was rejected.
5    Q.   Did they give you any other reason other than
6  just that you had the anxiety?
7    A.   No, ma'am.  Just that my anxiety required a
8  service dog.
9    Q.   And did they explain why they don't let people
10  with severe anxiety donate?
11    A.   No, ma'am, not that I recall.
12    Q.   And you said that after Juliana called you, no
13  one else called you back; is that right?
14    A.   Yes, ma'am.  I was expecting the doctor to
15  call me maybe that Monday, but they never followed up.
16  It was just Juliana.
17    Q.   And did you ever follow up with CSL?
18    A.   No, I did not.  I was quite anxious on the
19  whole issue, so...
20    Q.   Were you afraid you'd have an attack if you
21  called or if you followed up with them?
22    A.   I wasn't afraid of an anxiety attack, but
23  phone calls tend to make me a bit nervous.  They're
24  more uncomfortable than anything.
25    Q.   Were you nervous when you were at CSL?

Page 37

1    A.   Not until I was pulled back and they started
2  asking about my disability.  But I figured that would
3  make anyone a little nervous.
4    Q.   Do you get anxious if someone's asking you a
5  lot of questions about yourself?
6    A.   It depends on the situation.  It wasn't really
7  that they were asking me so many questions.  But it's
8  that they singled me out and pulled me back.
9    Q.   Were you aware that all donors get --
10  eventually get pulled into an exam room for a physical
11  exam and a medical history questionnaire?
12    A.   Yes.  It was just that they did it because I
13  had a service dog.  So it's like, "Okay, you have
14  glasses.  Come back and talk to us."  I just feel very
15  singled out at times.
16    Q.   Did she tell you that she pulled you out of
17  line because she wanted to figure out what the answer
18  was before you had to wait?
19    A.   Yeah, I believe so.  But by that point, I had
20  already waited through the line, so...
21    Q.   So what you said, you had already waited
22  through the line, but then she pulled you out of line?
23    A.   When I got to the front of the line, she
24  pulled me to the side.
25    Q.   So do you know what the step -- next step

Amy Wolfe
July 07, 2017                              38 to 41

Page 38

1  would have been if you had gone through the process?
2      A.  I'm not sure.
3      Q.  But you think that the process that as it
4  happened to you was different than as it happened to
5  other people?
6      A.  Yes, ma'am.
7      Q.  And how do you think it was -- other than the
8  fact that you got deferred, how do you think the
9  process of finding out if you were going to be deferred
10 or not was different?
11     A.  No one else was pulled out to the side and
12 then asked immediately to go back.  I believe others
13 were given paperwork first, maybe questionnaires or
14 something.  I know they were not immediately pulled
15 back into either of the rooms.
16     Q.  So other people had to go through a few more
17 steps first?
18     A.  I believe so, yeah.
19     Q.  And what did you do once you got home from
20 CSL?
21     A.  I talked with my boyfriend about what had
22 happened, and then I talked to a couple of my groups.
23     Q.  Was that just to tell them what happened or to
24 get advice, or what were you talking to them about?
25     A.  I was wondering if anyone else had had the

Page 39

1  experience.  I felt very -- I don't want to say
2  "rejected," but in a way, and ostracized.  And I wanted
3  to know if anyone else had had the same experience.  If
4  they thought I should report it or something or just in
5  general if -- what other people had done when faced
6  with this.
7      Q.  And did you talk to them before you heard back
8  from Juliana or after?
9      A.  I think it was after.
10     Q.  Would that be because before you heard back,
11 you thought you still might be able to donate?
12     A.  Yeah.
13     Q.  You said you had had previously filed
14 complaints with the DOJ.  Did you do that in this case?
15     A.  Yes, ma'am.  As far as I remember, yes.
16     Q.  Did you talk to any other people that had been
17 deferred from the plasma donation process?
18     A.  No, ma'am.
19     Q.  Did you talk to anyone else who was not
20 allowed to donate plasma?
21     A.  I believe a couple of the people who responded
22 on my post had been told they couldn't donate.  But I
23 don't know if it was at CSL or not.  I didn't directly
24 talk to anyone at CSL or from CSL who had been
25 deferred.

Page 40

1      Q.  And you said you've been too anxious to donate
2  anywhere else, other than CSL; is that right?
3      A.  Yeah.  It's -- I would have liked to have
4  tried, but the energy to donate, just getting up the
5  energy to go and to attempt to donate, gathering the
6  documentation just to be turned away there is kind of
7  not worth the energy at times as a full-time student
8  and a full-time worker.
9      Q.  After you were deferred, did you learn
10 anything more about the plasma donation process?
11     A.  Not really.
12     Q.  Do you understand that the plasma donation
13 centers defer a lot of different people for a variety
14 of medical reasons?
15     A.  Yeah.
16     Q.  Do you think it's fair that the plasma
17 donation centers can decide who is able to donate and
18 who is not able to donate?
19     A.  I'm not sure.  I think to a certain degree, of
20 course, the FDA regulations must be followed and in the
21 interest of safety of others, yes.  But I think they
22 might be too broad with it or use old standards
23 possibly.
24     Q.  If the doctors who work at CSL knew that
25 donating plasma would hurt the person who was donating,

Page 41

1  for example, if someone was pregnant and so donating
2  plasma would harm them, do you think it's fair that
3  they can turn away someone who's pregnant?
4      A.  Yes, ma'am.
5      Q.  So to some level, you think it's okay that CSL
6  turns away people because donating could harm the
7  donor?
8      A.  Yes, in certain cases.
9      Q.  But you think that you should be able to
10 donate?
11     A.  Yes, ma'am.
12     Q.  Do you think you're qualified to donate?
13     A.  I believe so.  I don't believe I would clearly
14 be harmed by donating.  I don't think there's a clear
15 danger to me, enough to defer me.  Because my anxiety
16 is controlled.  Even if Harley is in the lobby room, I
17 could still donate in the back with no problem.
18     Q.  Do you know all of the different medical
19 parameters for donating plasma?
20     A.  I know the generals.
21     Q.  But you never went through the whole medical
22 exam, so you don't know, say, if your blood pressure
23 was too high or your hematocrit was too low or --
24     A.  No, ma'am.  Sorry.
25     Q.  It's okay.  It happens.

Amy Wolfe
July 07, 2017                           42 to 45

Page 42

1    Could you see the donor floor from where you
2    were at the center?
3    A.   Yes, ma'am, I believe so.
4    Q.   Could you see how many beds there were?
5    A.   I believe so.  In the little open area, and it
6    was set up.  You came in the front door.  There's a
7    waiting room.  The exam room's back this way
8    (indicating).  The desk is here.  And then there was a
9    long line.  Then you could see the donor floor.  And it
10   looked like -- I'm not sure how many, but I know I saw
11   some.
12   Q.   Was there a chance that you would have an
13   anxiety attack when you were on a donor bed?
14   A.   There's a slight possibility, but I don't
15   believe in that circumstance, as I'm comfortable in
16   medical areas.  And I believe in medical areas, people
17   are more focused on themselves.  And when you have a
18   giant needle in your arm, you're going to be a little
19   more internally focused than outwardly focused.
20   Q.   Even if there's a lot of people walking
21   around?
22   A.   Yeah.  I've given blood before, and I've
23   always been comfortable with it.  And I am -- I'm more
24   focused inward when I'm -- when in a medical setting.
25   Q.   Do your migraines have any specific triggers

Page 43

1    or do -- do those happen randomly?
2    A.   They're random.
3    Q.   And what about -- you said the chronic pain,
4    is that random or triggered?
5    A.   It's random, but mostly triggered by stress.
6    Q.   And how often do you get migraines?
7    A.   It used to be a few times a week.  But now
8    it's maybe once a month or twice a month.  But
9    recently, it's been even less.  So I've been reducing
10   my stress, working out more, and eating healthy.
11   Drinking a lot more water, too, so...
12   Q.   So you were able to see in the donor room.
13   And the beds are a little bit elevated; could you see
14   that?
15   A.   Yeah.
16   Q.   If you had brought Harley back and you had had
17   a cortisol spike while you were donating, what do you
18   think he would have done?
19   A.   He would have stood up and nosed me with his
20   nose.
21   Q.   If he thought you were going to have a bad
22   panic attack, you said he will try to get you out of
23   the room.  And you said he gets restless.  What does he
24   do when he gets restless?
25   A.   He basically just stands up and won't lie back

Page 44

1    down when I ask him to.  He doesn't really move around
2    much.  He just stands up and stares at me and bumps me
3    with his nose occasionally.
4    Q.   What happens if you get a panic attack
5    somewhere that you can't leave?
6    A.   Then he'll do deep pressure therapy, and I can
7    sit through it.  If I can leave during a bad one, I'd
8    prefer to because it does help me get through it
9    faster.  But I can sit through them if they do occur.
10   Q.   Can you sit through them even without the deep
11   pressure therapy?
12   A.   If needed, yes.  I will be exhausted the rest
13   of the day, however, but...
14   Q.   So if you had a panic attack when you were
15   donating and you were on the bed, so he probably
16   couldn't get on top of you, you could just sit through
17   it?
18   A.   Yes.  If he were with me, I would also be able
19   to stim, feeling his fur.  He's taught to keep my hand
20   on him if I'm panicky because my touch sensation is
21   heightened.  So sometimes just repetitive petting
22   helps.  So I trained him, if he's not up on me, he'll
23   keep my hand on him as a sort of distraction and
24   grounding mechanism.
25   Q.   Is your pain sensation heightened when you

Page 45

1    have panic attacks?
2    A.   Not really.
3    Q.   So if you have a panic attack, say, in a
4    classroom, and you don't leave, do you just sit there
5    and get very nervous and fidgety, or what else happens?
6    A.   I get very nervous and fidgety.  I tend to
7    tune out a little.  So I'll miss what the professor is
8    saying sometimes.  If I do sit through them, they last
9    longer.
10   Q.   About how long?
11   A.   Anywhere from 30 minutes to an hour.  But as
12   soon as Harley starts helping, it reduces them to maybe
13   10 to 15 minutes, even less sometimes.
14   Q.   So any other symptoms of an anxiety attack,
15   other than nervous fidgeting and tuning out?
16   A.   My thoughts race sometimes.  Sometimes, I'll
17   have a tightness in my chest.
18   Q.   Anything else?
19   A.   No, I think that's the gist.
20   Q.   You said in your complaint that CSL's deferral
21   of you was not based on any valid reasons.  Do you
22   still believe that?
23   A.   I believe that, yes.
24   Q.   And why do you believe that?
25   A.   Because I believe my anxiety is controlled and

Amy Wolfe
July 07, 2017                                        50 to 53

Page 50

1            THE WITNESS:  Sorry.
2      Q.    (BY MS. WILLING)  So what are you hoping to
3  get out of this lawsuit?
4      A.    I would like CSL to change their
5  discriminatory policy so that others are not excluded
6  from donating if they are -- if it is safe for them.
7  And compensation -- com- -- sorry -- compensation for
8  the mental -- I think, anguish is what it was called,
9  that the interactions caused.  And that's the simplest
10 way I could put it.
11     Q.    So you experienced mental anguish from being
12 deferred; is that right?
13     A.    Yeah.
14     Q.    Would you say the mental anguish was just from
15 the deferral, or was it from also being asked questions
16 about your anxiety?
17     A.    It was from both.  It was from being deferred
18 because of my service animal directly, and the --
19 the -- yeah, the kind of out-of-nowhere personal
20 questions about the disability and what he did and
21 everything.  She also asked how I got the disability,
22 which was very sensitive at the time.
23     Q.    So did you think your medical history was not
24 relevant to your ability to donate plasma?
25     A.    I thought it was relevant, but I don't think

Page 51

1  the anxiety was -- I think the anxiety was controlled
2  well enough where it would not have been an issue.  But
3  that was never brought into question.  It was just all
4  or nothing, which I don't think was exactly
5  appropriate.
6      Q.    So it's your position that the nurses at CSL
7  should not be able to decide who can donate, that it's
8  the donors that could -- should get to decide; is that
9  right?
10     A.    I think it should be based, of course, on FDA
11 standards.  But they should be looked at more on a
12 case by case than a broad overall.  And I think they
13 should focus on -- how do I say this?  Sorry.  I think
14 it should be based on a case-by-case basis rather than
15 stereotypical umbrella terms.
16     Q.    So you said you experienced mental anguish
17 from the deferral; is that right?
18     A.    Yeah.
19     Q.    Can you describe or give me an example of that
20 mental anguish?
21     A.    Yeah.  I had been -- I had had access issues
22 in the past before this, but they had always been
23 resolved.  Even if I had been yelled at by a manager,
24 they apologized, and I had been able to finish what I
25 had come to do.

Page 52

1            With Kroger, I was taken over to the
2  manager and -- by the security personnel who asked a
3  bunch of questions and went to talk to the manager
4  alone.  But I was still allowed to finish shopping and
5  everything once it was cleared up.
6            This was the first instance of it
7  actually -- basically, me being told I would not be
8  served because I needed a service animal, and it
9  definitely was not a fun experience.  I had -- I did
10 end up becoming quite depressed over it.
11           Because the easiest way to describe it is
12 like you have a birthmark, and -- and you go into a
13 store, and they say, "Well, I can't serve you because
14 you have a birthmark.  Because it's so noticeable, I
15 noticed it."
16           It's -- how do I say that?  It's an
17 overarching con- -- consequence, if that makes sense.
18 Basically, you start to question, am I going to be able
19 to go anywhere without someone calling attention to my
20 disability.  I just want to be treated normally.
21           Am I going to have to deal with being
22 turned away constantly.  How is this going to affect
23 personal relationships, business relationships.  How is
24 this going to affect school.  That might seem a bit
25 dramatic, but when this is your daily reality, it's a

Page 53

1  constant.
2            And in the past, I have debated having a
3  service dog because of this.  But that instance really
4  made me question, though the pros did outweighs the
5  cons.  He's done so much to change my life, so much to
6  help me.  I wouldn't be able to leave my house without
7  him most days.
8            On my worst days, I wouldn't be able to
9  get out of bed or eat or take care of myself.  On my
10 good days, I can leave him at home for a little bit and
11 I'm okay.  But I need other supports, and that's still
12 barely getting by.  It's -- it's MacGyvering it just
13 enough to get by, but not enough to escape the harm
14 that comes from it.
15           I really did start to question was it
16 worth -- like I just want to be a functioning member of
17 society.  I'm physically -- I was doing really great at
18 the time.  I was healthy.  The mental disabilities were
19 the main thing I was dealing with.
20           And it just really hit home, someone
21 could turn me away and just say no and kick me out and
22 be like, I don't want to hear what you say.  Like I
23 don't care what the law says.  I don't -- I see this,
24 and I don't approve of it or something like that,
25 and -- or I see this, and I don't believe you need it.

| KEY_DONOR | DONOR_MEDICAL_SEQ | DONOR_MEDICAL_NOTE | DONOR_COMML_DATE | DATE_STMP |
|---|---|---|---|---|
| 00D32AX | 0001 | Called donor and left message. nb 4/7/2015 | 20150407 | 04/07/2015 13:34:21 |
| 00D32AX | 0002 | 1/3/15-DONOR PR'D FOR THREATENING STAFF-TMB 1/3/15. | 20150103 | 04/07/2015 13:34:21 |
| 00D32AX | 0003 | MGMT must speak to this donor prior to his next donation.MSA MM told donor he wo | 20150102 | 04/07/2015 13:34:21 |
| 00D32AX | 0004 | uld be unable to donate due to using a cane and walking with a limp.He told her | 20150102 | 04/07/2015 13:34:21 |
| 00D32AX | 0005 | that she "would regret this" and left.DT 01/02/2015 | 20150102 | 04/07/2015 13:34:21 |
| 00D32AX | 0006 | slight disloration to left vp ok to donate mg 2/5/14 | 20140205 | 04/07/2015 13:34:21 |
| 00D32AX | 0007 | Donor bruise has healed, ok to donate. VU 1/22/14 | 20140122 | 04/07/2015 13:34:21 |
| 00D32AX | 0008 | DONOR RETURNED AND STILL HAS SOME BRUISING. TOLD HIM TO RETURN WHEN IT HAS | 20140120 | 04/07/2015 13:34:21 |
| 00D32AX | 0009 | HEALED COMPLETELY. DONOR UNDERSTOOD. ET 1.20.14 | 20140120 | 04/07/2015 13:34:21 |
| 00D32AX | 0010 | donor has less 3in bruise to left vp. only uses left vp. not ok to donate | 20140115 | 04/07/2015 13:34:21 |
| 00D32AX | 0011 | until resolved mg 1/15/14 | 20140115 | 04/07/2015 13:34:21 |
| 00D32AX | 0012 | Review of MQ medical approvals complete, overdue PE granted mg 1/12/14 | 20140112 | 04/07/2015 13:34:21 |
| 00D32AX | 0013 | donor uses cane for support. donor states sometimes knees ache d/t body | 20140112 | 04/07/2015 13:34:21 |
| 00D32AX | 0014 | weight. mg 1/12/14 | 20140112 | 04/07/2015 13:34:21 |
| 00D32AX | 0015 | donor is able to transfer on and off exam table and donation bed ok to | 20140112 | 04/07/2015 13:34:21 |
| 00D32AX | 0016 | donate mg 1/12/14 | 20140112 | 04/07/2015 13:34:21 |

SIGUERO
EXHIBIT NO. 7
4-10-17
Isabel Connor, CSR

CONFIDENTIAL

CSL-SIIguero000252

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 1 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

**Instructions for Use**

The following items are guidelines only. Individual cases must be evaluated on a case-by-case basis. Medical staff associates are to use their clinical judgment and discuss cases with the Center Medical Director/Center Physician when needed. The Medical Call Line is also available if the CMD/CP cannot be reached. The outcome of these discussions may warrant alternative decisions than those listed.

Additionally, when a donor relates a history of an otherwise disqualifying disorder that was present and resolved in the distant past, the donor may be acceptable after discussion with the CMD/CP or corporate MedOps. This does not apply to those labeled *Regulatory Requirement.*

Interpretation of guidelines: When a guideline reads "Acceptable if:" followed by one or more listed items, the recommendation is that (unless otherwise noted – e.g. "OR") all of the items must be met for the donor to be considered acceptable. If all conditions are not met, the recommendation is that the donor is not acceptable.

In those cases where regulatory requirements exist, these are noted in *Bold Type.* These requirements may not be altered and deviations are not permitted.

**Medications**

When donors admit to the use of medications that are unfamiliar to the Medical Staff, an internet search (e.g., Medline) must be conducted to determine category of medication and typical uses. Determine if the medication and reason for use are acceptable for donation. If uncertain contact your CMD/CP or the MedOps call line for assistance.

**Open-Ended Questions**

When interviewing a donor, it is imperative to ask open-ended questions to elicit the maximum amount of information.

Example: Do not say "Oh, you've got a bug bite". Instead ask "What is this? How did you get it? When did you get it?"

Example: MSA: "I see you marked yes to convulsions or epilepsy. Tell me about that. Were you diagnosed with epilepsy? What was the cause? When was your last convulsion? What medications were you on? Are you still taking medications? If not, when did you stop taking medications? Did you stop taking the medications at your doctor's direction?"

SCHULTZ
EXHIBIT NO. 4
4-10-17
Isabel Connor, CSR

CONFIDENTIAL

CSL-Silguero000253

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 2 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

**Documentation**

When a donor provides a history of a medical diagnosis, that specific diagnosis (not symptoms of the disease process) must be documented in the DRF, as well as any approvals needed for that specific diagnosis (if applicable).  For example:  donor admits to history of epilepsy and meets all criteria listed for acceptability to donate; sample documentation: "history of epilepsy, last seizure 20 years ago, no seizure medications for 15 years, ok to donate".

**Search the Document**

This document may be searched online for specific topics.  To accomplish this, go to iNet -> Controlled Documents, open this document, click on the binoculars or click in the Search box (or go to Edit, Find).  Type-in the word or phrase for which you are looking and click on Enter or the "Find Next" arrow, located next to the Search box.  Click the "Find Next" arrow until all entries in the document with this word or phrase have been found (a message telling you that no more matches are found will appear).

**Basis of Conditions Guidelines**

The Conditions Guidelines have been developed to meet FDA and European Union regulatory requirements and to assure donor and plasma safety, as determined by corporate Medical Operations.  A donor whose medical condition, disability or behavior conflicts with FDA, GHA or EU Regulations for the production of source plasma is to be deferred.

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 3 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

**Disabilities - *See SOP for specific guidance***

| If ... | Then ... |
|---|---|
| Reasonable and safe accommodation can be made without disruption of center operations or contravention of manufacturing environment | Acceptable |
| Mental or behavioral | Acceptable if: <br> • Able to give informed consent <br> • Does not violate center standards |
| Resulting from unacceptable medical conditions | Permanent deferral |
| On unacceptable medications | Permanent deferral |
| Unsteady gait, falling, dizziness | Defer |
| Scale access | Acceptable if: <br> Able to stand on scale without assistance <br> Exception:  Donors in wheelchairs may alternately provide a doctor's note stating the weight as specified in ***CTR02121, Impaired Donors*** and ***CTR04021W-ah, Initiating Medical Screening and Donor Weight*** |
| Transfer to donor bed | Acceptable if: <br> Able to safely transfer to and from donor bed without assistance |

CSL-Silguero000255

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 4 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

**Health Care Provider (HCP) Letters**

| If ... | Then ... |
|---|---|
| After interviewing the donor, additional information is required | • Defer donor until HCP letter is received and reviewed for donor's suitability OR<br>• Schedule the donor to return when the CMD/CP is available to meet with the donor OR<br>• Contact the CMD/CP to inquire whether a HCP letter is required |
| Previously requested HCP letter | Donor acceptable without HCP letter if:<br>Request for letter is no longer applicable (ie, surgery as a small child, condition no longer present) |
| Conditions applied by HCP (e.g., may donate once a week) | Defer donor until conditions do not need to be applied |
| Question regarding medication(s) | Pharmacy printout is acceptable, in lieu of a HCP letter |
| Repeat HCP letters | If a donor has provided an HCP letter for a specific reason, it is not mandatory to repeat the HCP letter request for the same condition, if recurrent. May consider time-based deferral. |

**Procedures and Surgeries**

The following are general surgical guidelines. More information is found under specific procedures

| If ... | Then ... |
|---|---|
| Major surgery (e.g., laparotomy, thoracotomy, large joint replacements) | Acceptable if:<br>At least 4 months since procedure |
| Minor surgery (e.g., laparoscopic surgeries, small joint surgeries) | Acceptable if:<br>At least 4 weeks since procedure |
| Biopsy | See *Biopsy* |
| Tooth extraction | See *Dental Procedures* |
| Procedures using flexible scopes | *Regulatory Requirement*<br>4 month deferral due to method of instrument sterilization |

CONFIDENTIAL

CSL-Silguero000256

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 5 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| Procedures using rigid scopes | Due to method of sterilization used, deferral beyond procedure deferral is not required |
|---|---|

**Whole Blood Criteria**  When different from Normal Source Plasma (NSP) criteria, whole blood criteria can be found at the end of this document.

## Medical Topics, Alphabetical Listing

| Abscess Drainage | | |
|---|---|---|
| | **If ...** | **Then ...** |
| | Closed | Acceptable if:<br>• Antibiotic criteria are met<br>• Redness and warmth resolved |

| Accutane® (isotretinoin) | *Regulatory Requirement*<br><br>Defer 30 days after last dose |
|---|---|
| Acne | Acceptable. Antibiotics to treat acne are not cause for deferral |
| Acne Rosacea | Acceptable. Antibiotics to treat acne are not cause for deferral |
| Acoustic Neuroma | Acceptable if at least 4 weeks since surgery or gamma knife treatment |

| Actinic Keratosis | | |
|---|---|---|
| | **If ...** | **Then ...** |
| | Recently removed | Defer until healed |
| | All others | Acceptable |

| Acupuncture | | |
|---|---|---|
| | **If performed by...** | **Then ...** |
| | Licensed (to perform acupuncture) practitioner | Acceptable |
| | Non-licensed practitioner | Defer at least 12 months since treatment |

| Addison's Disease | Permanent deferral |
|---|---|
| Adenoidectomy | See *ENT Surgeries* |

| Adrenal | | |
|---|---|---|
| | **If ...** | **Then ...** |
| | Cyst, Benign | Acceptable |
| | Hyperplasia, Congenital | Permanent deferral |
| | Insufficiency | Permanent deferral |

| Allergies | | |
|---|---|---|
| | **If ...** | **Then ...** |
| | Allergic to adhesives (e.g., Band-Aid®, tape) | Acceptable if:<br>• Alternative wrap is used in center |

CONFIDENTIAL

CSL-Silguero000257

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 6 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| | | Not acceptable to leave center with the following in place:<br>• Scotch tape<br>• Masking tape<br>• Other types of non-medical tape | |
|---|---|---|---|
| | Anaphylaxis | **If . . .** | **Then . . .** |
| | | Known source, substance not used in center (e.g., seafood) | Acceptable if not to substance used in center |
| | | Known source, substance used in center (e.g., Betadine®) | Permanent deferral |
| | | Unknown source | |
| | Allergic to Betadine®, shellfish, iodine | Acceptable BUT always use alternate scrub | |
| | Allergic to Citrus fruits | Acceptable | |
| | Contact dermatitis | See *Contact Dermatitis* | |
| | Allergic to Contrast agent (X-rays, etc), iodine | Acceptable BUT always use alternate scrub | |
| | Allergic to Foods | Generally acceptable. If allergic to seafood, always use alternate scrub | |
| | Allergic to Latex | **If ...** | **Then ...** |
| | | Anaphylaxis | Permanent deferral |
| | | Respiratory symptoms | |
| | | Mild symptoms | Acceptable |
| | Allergic to Nickel | Permanent deferral if:<br>• Severe OR<br>• Repeatedly develops rash at VP site | |
| **Allergic Rhinitis** | Acceptable, w/ or w/o nasal sprays (including steroid sprays) if symptoms controlled | | |

CSL-Silguero000258

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 7 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| Allergy Treatments | If ... | Then ... | | |
|---|---|---|---|---|
| | Shots | Acceptable if at least 1 day since last injection | | |
| | Allergy testing | | | |

For Allergy testing:

| If . . . | Then . . . |
|---|---|
| Skin testing | Acceptable if: <br> • At least 1 day since testing <br> • Wheals resolved |
| Blood testing | Acceptable |

| Alzheimer's Disease | Permanent deferral |
|---|---|

| Amnesia | See also **Head Trauma** |
|---|---|

| If ... | Then ... |
|---|---|
| Short term following trauma | Defer at least 7 days after injury; assess for resolution |
| All others | Assess case-by-case, including the donor's ability to understand and recall the risks and other information in the informed consent |

| Amoebic Dysentery | Acceptable if: <br> • At least 7 days since medication complete <br> • Donor well |
|---|---|
| Amputation | Acceptable if: <br> • No disqualifying underlying condition <br> • Surgical conditions met - See **Procedures and Surgeries** <br> • Able to safely transfer to and from donor bed |
| Amyotrophic Lateral Sclerosis (ALS / Lou Gehrig's Disease | Permanent deferral |

| Anabolic Steroids | If ... | Then ... |
|---|---|---|
| | Injected and not prescribed by physician (e.g., body building) | Permanent deferral |
| | Prescribed by physician to stimulate growth | Acceptable |

| Anemia | If ... | Then ... |
|---|---|---|
| | Iron deficiency | Acceptable if all acceptance criteria are met |
| | Recurrent low hematocrit | May need: <br> • HCP letter and/or |

CSL-Silguero000259

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 8 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| | | |
|---|---|---|
| | | • Temporary deferral |
| | Pernicious anemia | Acceptable if successfully treated |
| | B12 injections | Acceptable if prescribed by HCP |
| | Oral iron supplements | Acceptable |
| | Iron injections | Defer<br>• At least 8 weeks since last injection AND<br>• HCP letter is required |
| **Aneurysm Repair** | See *Vascular Surgery* | |
| **Angina Pectoris** | Permanent deferral | |
| **Angioplasty** | | |
| | **If ...** | **Then ...** |
| | Cardiac | Permanent deferral |
| | Peripheral | See *Vascular Surgery* |
| **Anisocoria** | Acceptable if:<br>• Congenital or<br>• Related to trauma or surgery | |
| **Ankylosing spondylitis** | Acceptable:<br>• If able to transfer safely<br>• Not on disqualifying medications, such as TNF inhibitors (e.g., Enbrel®) | |
| **Anorexia** | See *Eating Disorders* | |
| **Antecubital Area** | | |
| | **If ...** | **Then ...** |
| | Bruising | Acceptable when resolving.<br>*Note*: Donors with extensive bruising on one arm may not donate from the other arm until bruising is resolving (fading to yellow). |
| | Foreign body | Acceptable if not within 3 inches of venipuncture site |
| | Scarring | <table><tr><td>**If . . .**</td><td>**Then . . .**</td></tr><tr><td>Surgical due to vascular repair or nerve release</td><td>Unacceptable to use affected arm – other arm may be acceptable</td></tr><tr><td>Tattoo removal<br>Cigarette burns along a vein</td><td>Permanent deferral</td></tr></table> |
| **Antibiotics** | Always assess reason for use | |
| | **If ...** | **Then ...** |
| | | Acceptable if: |

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 9 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference – Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| | IV or IM | • At least 4 weeks since last dose AND<br>• Donor well |
|---|---|---|
| | Oral, for acne or UTI prophylaxis | Acceptable |
| | Oral, for illness or infection | Acceptable if:<br>• At least 1 day since last dose AND<br>• Donor well |
| | Topical, for minor skin lesions | Acceptable |
| | Topical, including drops, active infection | Acceptable if<br>• At least 1 day since last dose AND<br>• Donor well |
| | Topical, including drops, prophylaxis | Acceptable |

| | If … | Then … | |
|---|---|---|---|
| | | And . . . | Then . . . |
| **Anti-Coagulation Therapies** | Any oral anticoagulants alone or in combination with Heparin or tPA<br><br>See **Pulmonary Embolism** | • Used for single episode DVT AND<br>• 12 months or more since last dose | Acceptable |
| | | • Low dose and used as surgical prophylaxis | Acceptable if at least 14 days since last dose |
| | | • Used as chronic prophylaxis OR<br>• DVT occurred while on medication | Permanent deferral |
| | Heparin | Acceptable if:<br>• Surgical prophylaxis AND<br>• Medication stopped AND<br>• Asymptomatic AND<br>• Deferral period from surgery has expired<br><br>Permanent deferral if:<br>• Chronic medical condition<br>• Ongoing use | |

CONFIDENTIAL

CSL-Silguero000261

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 10 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

| | Low molecular weight heparin | See *Heparin* |
|---|---|---|
| | Plavix®, Ticlid®and similar anti-platelet medications | Minimum of 14 day deferral from cessation of medication.  Assess condition. Permanent deferral for atherosclerotic vascular disease |

| Anti-Diuretic Medications (e.g., DDAVP®) | | |
|---|---|---|
| | **If Used For...** | **Then ...** |
| | Nocturnal eneuresis (bedwetting) | Acceptable when medication discontinued |
| | Diabetes insipidus | Permanent deferral |
| | Hemophilia | |
| | von Willebrand's disease | |

| Anti-Emetic | Acceptable when: • Medication discontinued AND • Donor well |
|---|---|

| Anti-Fungal | | |
|---|---|---|
| | **If ...** | **Then ...** |
| | Oral or topical for skin, nail, or vaginal infections | Acceptable |
| | Systemic infection | • IV – defer until 4 months after completion of treatment • Oral – defer until 2 weeks after completion of treatment |

| Antihistamine / Decongestant | | |
|---|---|---|
| | **If Used For...** | **Then ...** |
| | Allergy symptoms | Acceptable if symptoms controlled |
| | Motion sickness | |
| | Itching | Acceptable if no open skin lesions |

| Anti-Phospholipid Syndrome | | |
|---|---|---|
| | **If...** | **Then...** |
| | Identified in association with pregnancy complication, now resolved | Acceptable |
| | Identified with other systemic disease | Permanent deferral |

| Anti-Spasmodic Medication | Acceptable if no disqualifying underlying condition |
|---|---|

| Anti-Viral | | |
|---|---|---|
| | **If Used For...** | **Then ...** |
| | Flu | See *Influenza* |
| | Herpes, genital or oral | See *Herpes* |

CSL-Silguero000262

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 11 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference – Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

|  | All others | Assess carefully, including HCP letter stating reason for use |
|---|---|---|

| Anxiety Disorders | If ... | Then ... |
|---|---|---|
| | Severe, frequent | Permanent deferral |
| | Induced by plasma center environment | Permanent deferral |
| | Requires more than 2 medications daily for control of symptoms or service animal required | Defer until need for medications (or animal) decreased |
| | Currently with symptoms | Temporary deferral until resolved |

| Aortic valve, bicuspid or stenotic | Permanent deferral |
|---|---|

| Aplastic anemia | Permanent deferral |
|---|---|

| Appendectomy | If ... | Then ... |
|---|---|---|
| | Laparoscopic | Defer at least 4 weeks since procedure |
| | Laparotomy (open) | Defer at least 8 weeks since procedure |

| Arnold-Chiari Malformation | Acceptable if:<br>• At least 5 years since uncomplicated surgical correction<br>• No disqualifying grafts |
|---|---|

| Arrhythmia | If disqualifying underlying cardiac disease, permanent deferral.<br><br>Use the following table if no disqualifying underlying cardiac disease: |
|---|---|

| | If ... | Then ... |
|---|---|---|
| | Ablation | Acceptable, if:<br>• 2 years or more since ablation and<br>• On no more than 2 medications to control rhythm |
| | Atrial, chronic (Examples: recurrent paroxysmal atrial tachycardia, atrial fibrillation) | Permanent deferral |
| | Atrial tachycardia, isolated (e.g., pregnancy related) | Defer at least 1 year since episode |
| | Bradycardia | Refer to *CTR04021W-aj* |
| | Bundle branch block | Acceptable if pulse within acceptable range and PVC criteria met and no history of myocardial infarction (heart attack) |
| | On medications other than calcium channel blockers or beta blockers to control/prevent arrhythmia | Permanent deferral |

CSL-Silguero000263

| CSL Plasma | SOP No.: MA02016 | Rev.: 05 | Page 12 of 71 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 27 OCT 2014 |

|  | Pacemaker | Permanent deferral |
|---|---|---|
|  | Premature atrial/ventricular contractions (PACs/PVCs) -- known history | Acceptable if 5 or fewer per minute Temporary deferral if 6-7 per minute (apply medical deferral until 5 or fewer) Permanent deferral if 8 or more per minute |
|  | Skipped/extra beats | If no known history, consider HCP letter. If known history, see appropriate section |
|  | Supraventricular tachycardia (SVT) | Acceptable if: • No occurrence in past year and • On no more than 2 medications to control rhythm |
|  | Tachycardia, recurrent (not ventricular) | Consider time-based deferral |
|  | Ventricular fibrillation Ventricular tachycardia | Permanent deferral |
|  | Wolff-Parkinson-White (WPW) Syndrome, treated successfully | See *Arrhythmia, Ablation* |
|  | Wolff-Parkinson-White (WPW) Syndrome, untreated or treated with medication | Permanent deferral |
| Arteriosclerosis | Permanent deferral | |
| Arteriovenous Malformation | See *Cerebral Aneurysm / AVM* | |

CSL-Silguero000001

CONFIDENTIAL

## Medical Questionnaire by Date

Visit Date Range: 11/30/2011 12:00:00 AM - 4/12/2014 12:00:00 AM

eProgesa Direct

| Donor Number | 00D32AX |
| Donor Name | SILGUERO, MARK |

| Visit Date | Center Name | Center Code or Incomplete Donation | Question Order | Question Code | Question | Answer | Employee Name |
|---|---|---|---|---|---|---|---|
| 11/30/2011 | CORPUS CHRISTI 603 ZCTX | 603 | 01 | JL | (REVISED) In the past 7 days, have you donated plasma or tried to donate plasma at a center other than a CSL center?: | No | Chavez, Jana |
| 11/30/2011 | CORPUS CHRISTI 603 ZCTX | 603 | 02 | 1A | Are you feeling well and healthy today?: | Yes | Chavez, Jana |
| 11/30/2011 | CORPUS CHRISTI 603 ZCTX | 603 | 03 | 1B | Have you read the High Risk Poster?: | Yes | Chavez, Jana |
| 11/30/2011 | CORPUS CHRISTI 603 ZCTX | 603 | 04 | 1C | Are you in any of the INCREASED Risk groups described in the High Risk Poster?: | No | Chavez, Jana |

VERIFIED FOR BUSINESS USE ONLY
CONFIDENTIAL
CSL-Silguero000002
1/250

113

## Medical Questionnaire by Date

Visit Date Range: 11/30/2011 12:00:00 AM - 4/12/2014 12:00:00 AM

eProgesa Direct

| Visit Date | Center Name | Center Code or Incomplete Donation | Question Order | Question Code | Question | Answer | Employee Name |
|---|---|---|---|---|---|---|---|
| 04/11/2014 | CORPUS CHRISTI 603 ZCTX | Incomplete Donation | 34 | VA | Donor may continue the screening process?: | Yes | Maldonado, Sandra |
| 04/11/2014 | CORPUS CHRISTI 603 ZCTX | Incomplete Donation | 35 | R4 | Defer donor for presence of fingernail dye?: | No | Maldonado, Sandra |
| 04/11/2014 | CORPUS CHRISTI 603 ZCTX | Incomplete Donation | 36 | R2 | Was fingernail dye applied per SOP (if applicable)?: | Yes | Maldonado, Sandra |
| 04/11/2014 | CORPUS CHRISTI 603 ZCTX | Incomplete Donation | 37 | 3B | Weight: | 369 | Maldonado, Sandra |

VERIFIED FOR BUSINESS USE ONLY
CONFIDENTIAL

CSL-Siiguero000247

| **CSL Plasma** | SOP No.: MA02016 | Rev.: 08 | Page 1 of 73 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 23 MAY 2016 |

**Instructions for Use**

The following items are guidelines only. Individual cases must be evaluated on a case-by-case basis. Medical staff associates are to use their clinical judgment and discuss cases with the Center Medical Director/Center Physician when needed. The Medical Call Line is also available if the CMD/CP cannot be reached. The outcome of these discussions may warrant alternative decisions than those listed.

Additionally, when a donor relates a history of an otherwise disqualifying disorder that was present and resolved in the distant past, the donor may be acceptable after discussion with the CMD/CP or corporate MedOps. This does not apply to those labeled *Regulatory Requirement.*

Interpretation of guidelines: When a guideline reads "Acceptable if:" followed by one or more listed items, the recommendation is that (unless otherwise noted – e.g. "OR") all of the items must be met for the donor to be considered acceptable. If all conditions are not met, the recommendation is that the donor is not acceptable.

In those cases where regulatory requirements exist, these are noted in *Bold Type*. These requirements may not be altered and deviations are not permitted.

**Medications**

When donors admit to the use of medications that are unfamiliar to the Medical Staff, an internet search (e.g., Medline) must be conducted to determine category of medication and typical uses. Determine if the medication and reason for use are acceptable for donation. If uncertain contact your CMD/CP or the MedOps call line for assistance.

**Medication List** entries – follow the deferral listed on the form

**Open-Ended Questions**

When interviewing a donor, it is imperative to ask open-ended questions to elicit the maximum amount of information.

Example: Do not say "Oh, you've got a bug bite". Instead ask "What is this? How did you get it?  When did you get it?"

Example: MSA: "I see you marked yes to convulsions or epilepsy. Tell me about that.  Were you diagnosed with epilepsy?  What was the cause? When was your last convulsion? What medications were you on? Are you still taking medications?  If not, when did you stop taking medications? Did you stop taking the medications at your doctor's direction?"



EXHIBIT
6

CSL-Silguero000347

| CSL Plasma | SOP No.: MA02016 | Rev.: 08 | Page 3 of 73 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 23 MAY 2016 |

**Disabilities -**
*See CTR02121, Impaired Donors for specific guidance*

| If ... | Then ... |
|---|---|
| Reasonable and safe accommodation can be made without disruption of center operations or contravention of manufacturing environment | Acceptable |
| Mental or behavioral | Acceptable if: <br> • Able to give informed consent <br> • Does not violate center standards |
| Service animals | If particular situation is not addressed in *CTR02121*, contact your MedOps resource |
| Resulting from unacceptable medical conditions | Permanent deferral |
| On unacceptable medications | Permanent deferral |
| Unsteady gait, falling, dizziness | Defer |
| Scale access | Acceptable if: <br> Able to stand on scale without assistance <br> *Exception:* Donors in wheelchairs may alternately provide a doctor's note stating the weight as specified in *CTR02121, Impaired Donors* and *CTR04021W-ah, Initiating Medical Screening and Donor Weight* |
| Transfer to donor bed | Acceptable if: <br> Able to safely transfer to and from donor bed without assistance |

CONFIDENTIAL

CSL-Silguero000349

| CSL Plasma | SOP No.: MA02016 | Rev.: 08 | Page 5 of 73 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 23 MAY 2016 |

| | | instrument disinfection |
|---|---|---|
| | Procedures using rigid scopes (e.g., arthroscopy) | Deferral beyond procedure deferral is not required due to sterilization methods |

**Whole Blood Criteria**   When different from Normal Source Plasma (NSP) criteria, whole blood criteria can be found at the end of this document.

## Medical Topics, Alphabetical Listing

| Abscess Drainage | If ... | Then ... |
|---|---|---|
| | Closed | Acceptable if: <br>• Antibiotic criteria are met <br>• Redness and warmth resolved |

| Acne | Acceptable. Antibiotics to treat acne are not cause for deferral |
|---|---|
| Acne Rosacea | Acceptable. Antibiotics to treat acne are not cause for deferral |
| Acoustic Neuroma | Acceptable if at least 4 weeks since surgery or gamma knife treatment |

| Actinic Keratosis | If ... | Then ... |
|---|---|---|
| | Recently removed | Defer until healed |
| | All others | Acceptable |

| Acupuncture | If performed by... | Then ... |
|---|---|---|
| | Licensed (to perform acupuncture) practitioner | Acceptable |
| | Non-licensed practitioner | Defer at least 12 months since treatment |

| Addison's Disease | Permanent deferral |
|---|---|
| Adenoidectomy | See *ENT Surgeries* |

| Adrenal | If ... | Then ... |
|---|---|---|
| | Cyst, Benign | Acceptable |
| | Hyperplasia, Congenital | Permanent deferral |
| | Insufficiency | Permanent deferral |

| Allergies | If ... | Then ... |
|---|---|---|
| | Allergic to adhesives (e.g., Band-Aid®, tape) | Acceptable if: <br>• Alternative dressing is used in center <br><br>Not acceptable to leave center with |

CSL-Silguero000351

| CSL Plasma | SOP No.: MA02016 | Rev.: 08 | Page 7 of 73 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 23 MAY 2016 |

| Allergy Treatments | If … | Then … |
|---|---|---|
| | | Acceptable if at least 1 day since last injection |
| | Shots | |
| | Allergy testing | |

| | If … | Then … |
|---|---|---|
| | Skin testing | Acceptable if: <br> • At least 1 day since testing <br> • No open sores |
| | Blood testing | Acceptable |

| Alzheimer's Disease | Permanent deferral | |
|---|---|---|

| Amnesia | See also *Head Trauma* | |
|---|---|---|

| | If … | Then … |
|---|---|---|
| | Due to trauma | Defer at least 7 days after injury; assess for resolution |
| | All others | Assess case-by-case, including the donor's ability to understand and recall the risks and other information in the informed consent |

| Amoebic Dysentery | Acceptable if: <br> • At least 7 days since medication complete <br> • Donor well |
|---|---|

| Amputation | Acceptable if: <br> • No disqualifying underlying condition <br> • Surgical conditions met – See *Procedures and Surgeries* <br> • Able to safely transfer to and from donor bed |
|---|---|

| Amyotrophic Lateral Sclerosis (ALS / Lou Gehrig's Disease | Permanent deferral |
|---|---|

| Anabolic Steroids | If … | Then … |
|---|---|---|
| | Injected and not prescribed by physician (e.g., body building) | Permanent deferral |
| | Prescribed by physician to stimulate growth | Acceptable |

| Anemia | If … | Then … |
|---|---|---|
| | Iron deficiency | Acceptable if all screening criteria are met |
| | Recurrent low hematocrit | May need: <br> • HCP letter and/or |

CSL-Silguero000353

| CSL Plasma | SOP No.: MA02016 | Rev.: 08 | Page 9 of 73 |
|---|---|---|---|
| Title: Medical Staff Reference - Conditions Guidelines | | | Effective Date: 23 MAY 2016 |

| Antibiotics | Always assess reason for use | | |
|---|---|---|---|
| | **If …** | **Then …** | |
| | IV or IM | Acceptable if: <br> • At least 4 weeks since last dose AND <br> • Donor well | |
| | Oral, for acne or UTI prophylaxis | Acceptable | |
| | Oral, for illness or infection | Acceptable if: <br> • At least 1 day since last dose AND <br> • Donor well | |
| | Topical, for minor skin lesions | Acceptable | |
| | Topical, including drops, active infection | Acceptable if <br> • At least 1 day since last dose AND <br> • Donor well | |
| | Topical, including drops, prophylaxis | Acceptable | |

| Anti-Coagulation Therapies | **If …** | **Then …** | |
|---|---|---|---|
| | | **And . . .** | **Then . . .** |
| | Any oral anticoagulants alone or in combination with Heparin or tPA <br><br> See **Pulmonary Embolism** | • Used for single episode DVT AND <br> • 12 months or more since last dose | Acceptable |
| | | • Low dose and used as surgical prophylaxis | Acceptable if at least 14 days since last dose |
| | | • Used as chronic prophylaxis | Permanent deferral |
| | Heparin | Acceptable if: <br> • Surgical prophylaxis AND <br> • Medication stopped AND <br> • Asymptomatic AND <br> • Deferral period from surgery has expired | |

CSL-Silguero000355



CSL-Siguero000324

CONFIDENTIAL



**Medical Communication Form**
**Detail Report**
**Reference: 1531069**
**Form: 01431496268**

## General Part

| | |
|---|---|
| Center Code | 0143 |
| Creation User ID | C155174A |
| Creation User Name | JULIANA SANCHEZ |
| Creation Date | 10/09/2016 |

### Donor Information

| | |
|---|---|
| Donor Number | 00G2K0U |
| Donor Name | AMY WOLFE |

### Detail Information

### Medical Communication

| | |
|---|---|
| Purpose of Communication | * Other |
| Purpose of Communication Comments | DONOR CAME IN WITH SERVICE DOG. DONOR HAD HISTORY OF SEVER ANXIETY AND PTSD NOT ON ANY PRESCRIBED MEDICATIONS. |
| Name of Person Contacted | DR. NELSON |
| Discussion Outcome | Defer Donor - Temporary |
| Discussion Comments | DR.NELSON ADVISED THAT DONOR IS NOT ALLOWED TO DONATE UNTIL SERVICE DOG IS NO LONGER REQUIRED OR IS ON LESS THAN 2 MEDICATIONS. |

**e-Signature for Detail Information:**
JULIANA SANCHEZ 11/10/2016 01:36 PM

### Physician Information

Has the communication been reviewed?                    Yes
**e-Signature for Physician Information:**
RABIA SHAFI 11/16/2016 11:40 AM

### Quality Assurance Review

QA Review Comments                    NA
**e-Signature for Quality Assurance Review:**
SHAWNTRALA STEPHENS 11/16/2016 09:11 PM

CONFIDENTIAL
CSL-Silguero000325

## Medical Notes

eProgesa Data

| Center Name | Donor Number | Donor Name | Medical Note Timestamp Date | Donor Medical Note | Employee Name |
|---|---|---|---|---|---|
| HOUSTON CENTER 0143 | 00G2K0U | WOLFE, AMY | 10/09/2016 | DONOR STATED SHE HAS ANXIETY AND PTSD. TAKES NO MEDICATION CURENTLY FOR EITHER DIAGNOSIS. DONOR HAS HAD PTSD FOR 3 YEARS AND ANXIETY SINCE CHILHOOD . DONOR REQUIRES SERVICE DOG FOR ANXIETY. CONTACTED DR.NELSON AND DR.SHAFI ON CLEARANCE BEHALF. WAITING FOR RESPONSE. | SANCHEZ, JULIANA |
| HOUSTON CENTER 0143 | 00G2K0U | WOLFE, AMY | 10/09/2016 | SPOKE TO MED OPS. DONOR IS NOT SUTABLE FOR DONATION DUE TO SEVER ANXIETY REQUIRING SERVICE DOG. DONOR IS ELGIBLE TO DONATE PER PHYSICIAN GUIDELINES IF SERVICE DOG IS NO LONGER NECESARRY OR ON LESS THAN 2 MEDICATIONS FOR ANXIETY/PTSD. | SANCHEZ, JULIANA |

Last Report Refresh Date:  January 19, 2017

VERIFIED FOR BUSINESS USE ONLY

CONFIDENTIAL

CSL-Silguero000327

122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK SILGUERO, | § | |
| Plaintiff, | § | |
| | § | |
| AMY WOLFE, | § | |
| Intervenor Plaintiff, | § | CIVIL ACTION NO. 2:16-CV-00361 |
| | § | |
| v. | § | |
| | § | |
| CSL PLASMA INC., | § | |
| Defendant. | § | |

## DECLARATION OF JOHN NELSON, M.D., PH.D.

I, John Nelson, declare the following under penalty of perjury pursuant to 28 U.S.C.

§ 1746:

1.     I am a Divisional Medical Director with CSL Plasma.

2.     Donors who have fallen at CSL centers have fractured their arms and legs,

suffered head trauma with lacerations and concussions, as well as fractured or lost teeth.

3.     A donor with an unsteady gait presents a risk of falling after donation.

4.     A significantly overweight donor with an unsteady gait presents a higher risk of

injuring CSL staff if the donor was to fall and the staff attempted to catch the donor, or attempted

to help the donor up after falling.

Executed on August 10, 2017 at Las Vegas, Nevada.

_____   8/10/17
John Nelson, M.D., Ph.D.

30836875.1

123