IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK SILGUERO, | § | |
|     *Plaintiff,* | § | |
| | § | |
| and | § | |
| | § | |
| AMY WOLFE, | § | |
|     *Intervening Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-00361 |
| | § | |
| CSL PLASMA INC., | § | |
|     *Defendant.* | § | |

**PLAINTIFF MARK SILGUERO'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

BRIAN EAST
ATTORNEY-IN-CHARGE
State Bar No. 06360800
Southern District Bar No. 453108
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2718 (direct line)
(512) 454-3999 (fax)
beast@drtx,org

LIA S. DAVIS
State Bar No. 06360800
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2763 (direct line)
(512) 454-3999 (fax)
ldavis@drtx.org

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES .............................................................................. iii

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 1

SHORT STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ......................................................................................... 2

SUMMARY OF THE ARGUMENT ................................................................... 3

ARGUMENT ........................................................................................................ 4

    I.    Mr. Silguero is a Person with a Disability Under the ADA ........................... 4

        A.    ADA as amended and Rules of Construction ......................................... 4

            1.   Broad coverage required ................................................................ 4

            2.   Disability assessed without regard to mitigating measures ............... 5

            3.   Episodic conditions are assessed in their active state ....................... 5

            4.   Disability is now easier to prove ..................................................... 5

        B.    Impairments ......................................................................................... 6

        C.    Major Life Activities ............................................................................ 8

        D.    Substantial Limitations ........................................................................ 8

    II.   Mr. Silguero has a Disability Under the Texas Human Resources Code ...................... 12

    III.  Defendant's Plasma Donation Centers Are "Public Accommodations" Covered by Title III of The ADA ................................................................. 13

        A.    Excluding Plasma Donation Centers from Title III Coverage Would Conflict With Congress's Broad Purpose in Enacting the ADA .......................... 13

        B.    Plasma Donation Centers Easily Fall Under the Plain Meaning of "Service Establishment" ........................................................................ 16

        C.    This Court Should Reject Defendant's Arguments ............................... 18

IV.   State Anti-Discrimination Law Covers CSL's Plasma-Donation Centers .....................20

V.   The FDA Does Not Have Primary Jurisdiction ..............................................................21

CONCLUSION...................................................................................................................25

CERTIFICATE OF SERVICE ..........................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Andrews v. Blick Art Materials, LLC*,
  No. 17-CV-767, 2017 WL 3278898 (E.D.N.Y. Aug. 1, 2017)................................................24

*Amsel v. Texas Water Development Bd.*,
  2012 WL 913676 (5th Cir. Mar. 19, 2012)................................................................................6

*Arizona ex rel. Goddard v. Harkins Admin. Servs., Inc.*,
  No. CV-07-00703-PHX-ROS, 2011 WL 13202686 (D. Ariz. Feb. 8, 2011) .........................22

*Astiana v. Hain Celestial Grp., Inc.*,
  783 F.3d 753 (9th Cir. 2015) ..................................................................................................24

*Avery v. Colvin*,
  605 F. App'x 278 (5th Cir. 2015) ..............................................................................................7

*Berkowitz v. Oppenheimer Precision Products, Inc.*,
  2014 WL 5461515 (E.D. Pa. Oct. 28, 2014)..............................................................................8

*Bonzani v. Shinseki*,
  No. 2:11-CV-0007-EFB, 2013 WL 5486808 (E.D. Cal. Sept. 30, 2013)..................................8

*Burch v. City of San Antonio*,
  518 S.W.2d 540 (Tex. 1975)....................................................................................................12

*Buser v. Eckerd Corp.*,
  2015 WL 418172 (E.D.N.C. Feb. 2, 2015)................................................................................8

*Carmona v. Southwest Airlines Co.*,
  604 F.3d 848 (5th Cir. 2010) ....................................................................................................5

*Conn. Nat'l. Bank v. Germain*,
  503 U.S. 249 (1992)................................................................................................................16

*de la Torres v. Bolger*,
  781 F.2d 1134 (5th Cir. 1986) ...............................................................................................7, 8

*Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*,
  239 F.R.D. 9 (D.D.C. 2006)....................................................................................................23

*Eddie Yaklin Ford Lincoln Mercury Nissan Inc. v. Am. Rd. Ins. Co.*,
  No. 2:15-CV-399, 2017 WL 3387186 (S.D. Tex. Aug. 4, 2017) ..............................................2

*E.E.O.C. v. Chevron Phillips Chemical Co., LP*,
  570 F.3d 606 (5th Cir. 2009) ............................................... 10

*Elstner v. Sw. Bell Tel. Co.*,
  659 F. Supp. 1328 (S.D. Tex. 1987) ...................................... 12

*Feist v. Louisiana*,
  No. CV 09-7060, 2012 WL 12884815 (E.D. La. Sept. 24, 2012) ........................................... 11

*Frame v. City of Arlington*,
  657 F.3d 215 (5th Cir. 2011) ............................................... 17

*Giusti v. Coleman*,
  986 F.2d 1419 (5th Cir. 1993) ............................................... 7

*Gordon v. D.C.*,
  480 F. Supp. 2d 112 (D.D.C. 2007) ...................................... 8

*Gorecki v. Hobby Lobby Stores, Inc.*,
  No. CV 17-1131-JFW (SKX), 2017 WL 2957736 (C.D. Cal. June 15, 2017) ...................... 23

*Hanby v. Colvin*,
No. 4:13-CV-03473, 2015 WL 12551080 (S.D. Tex. Mar. 30, 2015) ....................................... 6, 7

*Harris v. P.A.M. Transp., Inc.*,
  339 F.3d 635 (8th Cir. 2003) ............................................... 22

*Heightened Indep. & Progress v. Port Auth. of New York & New Jersey*,
  No. CIV A 07-2982(JAG), 2008 WL 5427891 (D.N.J. Dec. 30, 2008) ................................. 23

*Hodges v. Delta Airlines, Inc.*,
  44 F.3d 334 (5th Cir. 1995) ............................................... 17

*Holland v. Methodist Hosps.*,
  2016 WL 5724355 (N.D. Ind. Sept. 30, 2016) ......................................... 8

*Jacobs v. N.C. Admin. Office of the Courts*,
  780 F.3d 562 (4th Cir. 2015) ............................................... 5

*Kaiser v. CSL Plasma Inc.*,
  No. C15-0842RSM, 2017 WL 840198 (W.D. Wash. Mar. 2, 2017) ................................. 23, 24

*Kelly v. Boeing Petroleum Servs., Inc.*,
  61 F.3d 350 (5th Cir. 1995) ............................................... 16

iv

*Lee v. Harrah's New Orleans*,
   2013 WL 3899895 (E.D. La. July 29, 2013) ........................................................................11

*Levorsen v. Octapharma Plasma, Inc.*,
   828 F.3d 1227 (10th Cir. 2016) ........................................................13, 14, 15, 16, 18, 19

*Luedecke v. Tenet Healthcare Corp.*,
   2015 WL 3867793 (N.D. Tex. June 23, 2015) ....................................................................11

*MacClymonds v. IMI Investments, Inc.*,
   No. CIV.A. H-05-2595, 2007 WL 1306803 (S.D. Tex. Apr. 5, 2007)....................................2

*Magee v. Coca–Cola Refreshments USA, Inc.*,
   833 F.3d 530 (5th Cir. 2016) ........................................................................................18, 19

*Maley v. Octapharma Plasma, Inc.*,
   No. 12-13892, 2013 WL 3814248 (E.D. Mich. July 22, 2013) ............................................18

*Mileski v. Gulf Health Hosps., Inc.*,
   No. CA 14-0514-C, 2016 WL 1295026 (S.D. Ala. Mar. 31, 2016) ........................................8

*Mississippi Power & Light Co. v. United Gas Pipeline Co.*,
   532 F.2d 412 (5th Cir.1976) ..............................................................................................21

*Moates v. Hamilton County*,
   976 F. Supp. 2d 984 (E.D. Tenn. 2013)................................................................................8

*Molina v. DSI Renal, Inc.*,
   840 F. Supp. 2d 984 (W.D. Tex. 2012)................................................................................11

*Moore v. Barnhart*,
   405 F.3d 1208 (11th Cir. 2005) ............................................................................................7

*Mulet-Rivera v. Barnhart*,
   437 F. Supp. 2d 616 (S.D. Tex. 2006) ..................................................................................6

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
   No. CV 15-30023-MGM, 2016 WL 6540446 (D. Mass. Nov. 3, 2016) ................................24

*National Ass'n of the Deaf v. Netflix, Inc.*,
   869 F. Supp 2d 196 (D. Mass. 2012)..................................................................................15

*NME Hospitals, Inc. v. Rennels*,
   994 S.W.2d 142 (Tex. 1999)..............................................................................................12

*Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n*,
    810 F.3d 299 (5th Cir. 2016) ........................................................................21

*Pennsylvania Dept. of Corrections v. Yeskey*,
    524 U.S. 206 (1998) .............................................................................17, 20

*Penny v. Sw. Bell Tel. Co.*,
    906 F.2d 183 (5th Cir. 1990) ........................................................................21

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ..............................................................13, 14, 15, 19, 20

*Prince v. Claussen*,
    173 F.3d 864 (10th Cir. 1999) ........................................................................8

*Rosado v. Wyman*,
    397 U.S. 397 (1970) ......................................................................................22

*United States v. W. Pac. R. Co.*,
    352 U.S. 59 (1956) ...................................................................................21, 23

*United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp., Inc.*,
    842 F.3d 1333 (11th Cir. 2016) ......................................................................11

*Socoloski v. Sears Holding Corp.*,
    2012 WL 3155523 (E.D. Pa. Aug. 3, 2012) .....................................................8

*Summers v. Altarum Institute, Corp.*,
    740 F.3d 325 (4th Cir. 2014) ........................................................................5, 6

*Wagner & Brown v. ANR Pipeline Co.*,
    837 F.2d 199 (5th Cir. 1988) ........................................................................22

## STATUTES AND REGULATIONS

42 U.S.C. § 12101(a) .........................................................................................15

42 U.S.C. § 12101(a)(5) .....................................................................................13

42 U.S.C. § 12101(b)(1) .....................................................................................13

42 U.S.C. § 12102(1)(A) ......................................................................................4

42 U.S.C. § 12102(2)(A) ......................................................................................8

42 U.S.C. § 12102(2)(B) ...........................................................................................8

42 U.S.C. § 12102(4)(A) ...........................................................................................4

42 U.S.C. § 12102(4)(D) ...........................................................................................5

42 U.S.C. § 12102(4)(E)(i) ........................................................................................5

42 U.S.C. § 12181(7) ...............................................................................................14

42 U.S.C. § 12181(7)(F) ..........................................................................................16

42 U.S.C. § 12181(7)(K) ..........................................................................................14

42 U.S.C. § 12182(a) ............................................................................................2, 14

Pub. L. 110–325, § 2(b)(5), 122 Stat. 3553 (Sept. 25, 2008) ....................................5

21 C.F.R. § 640.30(b)(1) ..........................................................................................16

21 C.F.R. § 640.30(b)(2) ..........................................................................................16

28 C.F.R. § 35.108(d)(1)(vi) ......................................................................................6

28 C.F.R. § 36.104 (2015) .........................................................................................6

28 C.F.R. § 36.105(b)(1)(i) ........................................................................................6

28 C.F.R. § 36.105(b)(2) ............................................................................................6

28 C.F.R. § 36.105(c)(1)(ii) .......................................................................................8

28 C.F.R. § 36.105(d)(1)(vi) ......................................................................................6

28 C.F.R. § 36.105(d)(3)(i) ......................................................................................10

28 C.F.R. § 36.105(d)(3)(ii) .....................................................................................10

28 C.F.R. Pt. 35, App. C, § 35.108(b) (2016) ...........................................................7

28 C.F.R. Pt. 35, App. C, § 36.105(b) (2016) ...........................................................7

28 C.F.R. Pt. 36, App. C, § 35.108(d)(1)(vi) ............................................................6

28 C.F.R. Pt. 36, App. C, § 36.104 ..........................................................................14

28 C.F.R. Pt. 36, App. C, § 36.105(d)(1)(vi) ...................................................................6

29 C.F.R. § 1630.2(i)(1)(ii) ..............................................................................................8

29 C.F.R. Pt. 1630, App., § 1630.2(j)(4) .......................................................................11

TEX. HUM. RES. CODE § 121.001 ....................................................................................12

TEX. HUM. RES. CODE § 121.002(4)(A) .....................................................................12, 13

TEX. HUM. RES. CODE § 121.002(4)(H) ...........................................................................12

TEX. HUM. RES. CODE § 121.002(5) .................................................................................20

TEX. HUM. RES. CODE § 121.003(a) .................................................................................20

TEX. HUM. RES. CODE § 121.003(c) .................................................................................20

TEX. HUM. RES. CODE § 121.003(e) .................................................................................20

## LEGISLATIVE HISTORY AND OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (10th ed. 2014 Westlaw BLACKS....................................16

*Brief for the United States as Amicus Curiae Supporting Appellant and Urging Reversal*
(May 4, 2015),
https://www.justice.gov/sites/default/files/crt/legacy/2015/05/06/levorsenoctapharmabrief.pdf
.........................................................................................................................................13

*Contact Us*, https://www.cslplasma.com/contact-us/donation-experience
(last visited August 13, 2017) ........................................................................................17

*Donation Steps*, https://www.cslplasma.com/become-a-donor/donation-steps
(last visited August 13, 2017) ........................................................................................17

*Frequently Asked Questions*
("How will I be compensated or paid for my plasma donation?"),
https://www.cslplasma.com/frequently-asked-questions (last visited on August 13, 2017) .........18

*Frequently Asked Questions*
("What are the hours of operation?"),
https://www.cslplasma.com/frequently-asked-questions (last visited on August 13, 2017) .........17

*Frequently Asked Questions* ("Who do I contact about medical questions?"),
 https://www.cslplasma.com/frequently-asked-questions (last visited on August 13, 2017) ........17

H.R. Rep. 101-485(II) at 35 (May 15, 1990), 101st Cong., 2nd Sess. 1990,
1990 U.S.C.C.A.N. 303, 317, 1990 WL 125563 ...................................................................15

H.R. Rep. 101-485(III) (May 15, 1990), 101st Cong., 2nd Sess. 1990,
1990 U.S.C.C.A.N 445, 1990 WL 121680 .........................................................................15

H.R. Rep. 110-730, Pt. I, 110th Cong., 2d Sess. (June 23, 2008)......................................5

*iGive Rewards FAQs* ("What is the E Rewards survey?"),
https://www.cslplasma.com/current-donor-rewards/iGive-rewards-faq
(last visited August 13, 2017) .....................................................................................17, 18

Merck Manual (16th ed. 1992) .....................................................................................6, 7

*Promotions*, https://www.cslplasma.com/media-center/promotions
(last visited August 13, 2017) ...........................................................................................18

*Stedman's Medical Dictionary* (26th ed.)...........................................................................7

U.S. Department of Justice, *ADA Title III Technical Assistance*
    *Manual Covering Public Accommodations and Commercial Facilities*,
    available at http://www.ada.gov/taman3.html .............................................................14

*Webster's Third New International Dictionary* (1986) ...............................................7, 21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK SILGUERO,                              §
      *Plaintiff,*                           §
                                            §
and                                         §
                                            §
AMY WOLFE,                                  §
      *Intervening Plaintiff,*              §
                                            §
v.                                          §      CIVIL ACTION NO. 2:16-CV-00361
                                            §
CSL PLASMA INC.,                            §
      *Defendant.*                          §

## PLAINTIFF MARK SILGUERO'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The Defendant prohibited Plaintiff Mark Silguero from "donating" (selling) blood plasma because of his disability, and then retaliated against him when he asserted his right to be free from discrimination.  Plaintiff brings suit against Defendants for violations of Title III of the Americans with Disabilities Act (ADA), and for violations of the analogous state law.

To make for a more efficient trial, and pursuant to Fed. R. Civ. Proc. 56, Mr. Silguero moves the Court to enter partial summary judgment determining, as a matter of law, that:

(1)    at the relevant time Mr. Silguero was a person with a disability under the ADA;
(2)    at the relevant time Mr. Silguero was a person with a disability under state law;
(3)    Title III of the ADA applies to Defendant's plasma centers;
(4)    Texas Human Resources Code Chapter 121 applies to Defendant's plasma centers;
(5)    the affirmative defense of "primary jurisdiction" is inapplicable.

In an ADA Title III case, "[t]he elements of a prima facie case, derived directly from the statutory language, are: 1) the plaintiff has a disability; 2) the place that the defendant owns, leases, or operates is a place of public accommodation; and 3) the plaintiff was denied full and equal

1

enjoyment because of his disability." *MacClymonds v. IMI Investments, Inc*., No. CIV.A. H-05-2595, 2007 WL 1306803, at *3 (S.D. Tex. Apr. 5, 2007), *citing* 42 U.S.C. § 12182(a).

The legal standards for summary judgment were recently set out by this Court in *Eddie Yaklin Ford Lincoln Mercury Nissan Inc. v. Am. Rd. Ins. Co*., No. 2:15-CV-399, 2017 WL 3387186 (S.D. Tex. Aug. 4, 2017):

> When considering a motion for summary judgment the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  In making this inquiry, a court considers the record and other documents that could be admissible as evidence under Fed. R. Civ. P. 56(c).  The court must view all evidence in the light most favorable to the non-moving party.  Factual controversies must be resolved in favor of the non-movant, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  When assessing whether a dispute to any material fact exists, [courts] consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence.  Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial.

*Id*. at *3–4 (internal quotes, brackets, footnote, paragraph break, and citations omitted).

## SHORT STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case was originally filed by Plaintiff Mark Silguero on August 24, 2016.  On March 28, 2017 the Court granted the Motion to Intervene by Plaintiff Amy Wolfe.  The parties engaged in discovery, and the discovery deadline passed on July 28, 2017.  Order of May 16, 2017.  This Motion for Partial Summary Judgment is timely, as the deadline for filing dispositive motions is August 14, 2017.  *Id*.  Pursuant to the Scheduling Order dated December 7, 2016, the Final Pretrial Conference is set for October 19, 2017, with the date for bench trial to be determined at that time.

## SUMMARY OF THE ARGUMENT

*Mr. Silguero is a person with a disability under the amended ADA*.   Under the ADA Amendments Act, (1) "disability" is to be interpreted as broadly as the terms allows; (2) disability must be assessed without regard to mitigating measures; (3) episodic conditions must be assessed in their active states; and (4) disability is now easier to prove than it was under pre-ADAAA law. Mr. Silguero's arthritis and degenerative joint disease, and the conditions associated with it, are physical impairments that (at the time in question) substantially limited a variety of major life activities.   This is particularly true in light of the pain he suffered, and when considered without the use of his cane (which he required for mobility).   For example, he could not walk or stand without extreme pain, could not stand for more than ten minutes, and could not lift anything heavier than a gallon of milk.   He could not work, and received Social Security disability benefits.

*Mr. Silguero has a disability under state law*.   Chapter 121 of the Texas Human Resources Code must be broadly construed, and it defines disability to include any health impairment that requires an ambulatory device.   In addition to the evidence above, Mr. Silguero used a cane and a knee brace, and thus has a disability under state law.

*CSL plasma centers are places of public accommodations under ADA Title III*.   Title III must be broadly construed, and as the Tenth Circuit and the DOJ have found, plasma centers meet the plain language of Title III's definition of a service establishment.   This is also supported by the facts in this case and by the Defendant's own self-descriptions.

*CSL plasma centers are public facilities under state law*.   Chapter 121 applies to any "public facility," which it defines to include a retail business, commercial establishment, or office building to which the general public is invited.   CSL plasma centers meet the plain language of that provision.   Chapter 121 also applies to any other place of public accommodation to which the

general public is normally invited.  This is even broader than ADA Title's coverage because it is not limited to the twelve categories of businesses listed in Title III.

*The FDA does not have "primary jurisdiction."*  This Court should not abstain from resolving this case under the "primary jurisdiction" doctrine because the FDA has expressed no opinion on the relevant and has no mechanism for resolving them.  This is a discrimination case on which the court, not the FDA, has the relevant expertise.  Abstention will also unnecessarily delay the resolution of this case, and is contrary to the relevant case law.

## ARGUMENT

## I.    Mr. Silguero is a Person with a Disability Under the ADA

### A.    ADA as amended and Rules of Construction

The medical evidence and unrebutted testimony show that Mr. Silguero is an individual with a disability under the ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA").

An actual disability under the ADA means a physical or mental impairment that substantially limits a major life activity.  42 U.S.C. § 12102(1)(A).  But effective January 1, 2009, the ADAAA made fundamental changes to how the term "disability" is interpreted.  The ADAAA has Rules of Construction, four of which are relevant here: (1) "disability" is to be interpreted as broadly as the terms allows; (2) disability must be assessed without regard to mitigating measures; (3) episodic conditions must be assessed in their active states; and (4) disability is now easier to prove than it was under pre-ADAAA law.

#### 1.    Broad coverage required.

Under the ADAAA the definition of disability "shall be construed … in favor of broad coverage of individuals … to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A).  Thus, Congress "mandated that the ADA, as amended, be interpreted as broadly

as its text permits." *Summers v. Altarum Institute, Corp*., 740 F.3d 325, 330 (4th Cir. 2014). Under the ADAAA the primary subject in ADA cases "should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub. L. 110–325, § 2(b)(5), 122 Stat. 3553 (Sept. 25, 2008).

> 2.    *Disability assessed without regard to mitigating measures.*

Disability must now be assessed without regard to the ameliorative effects of mitigating measures. 42 U.S.C. § 12102(4)(E)(i). Such measures include canes, medication, and service animals. *Id.* ("medication," "equipment," "mobility devices," "reasonable accommodations"); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 573 (4th Cir. 2015) (mitigating measures include exposure therapy to overcome anxiety); H.R. Rep. 110-730, Pt. I, 110th Cong., 2d Sess., at p. 15 (June 23, 2008) ("use of a . . . service animal, surgical intervention, or compensatory strategy that might mitigate, or even allow an individual to otherwise avoid performing particular major life activities.").

> 3.    *Episodic conditions are assessed in their active state.*

A condition that is episodic or in remission is a disability if it would substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D). This provision "make[s] it easier for a plaintiff with an episodic condition like . . . [plaintiff's psoriatic arthritis] to establish that he is an 'individual with a disability.'" *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010).

> 4.    *Disability is now easier to prove.*

Because of the ADAAA's changes, "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially

limits applied prior to the ADA Amendments Act." 28 C.F.R. §§ 35.108(d)(1)(vi) and 36.105(d)(1)(vi).[1]

### B.    Impairments

A physical impairment includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as . . . musculoskeletal . . .." 28 C.F.R. § 36.105(b)(1)(i).   The term includes orthopedic conditions.   28 C.F.R. § 36.105(b)(2).[2]

It is undisputed that Mr. Silguero has been diagnosed with various severe knee problems, including:

- Arthritis[3] and degenerative joint disease,[4] which are alternate names for a disorder of cartilage, bone and other tissues surrounding affected joints. Merck Manual at 1338 (16th ed. 1992).   In this form of arthritis, "one or more joints undergo degenerative changes, including subchondral bony sclerosis, loss of articular cartilage, and proliferation of bone spurs (osteophytes) and cartilage in the joint." *Hanby v. Colvin*, No. 4:13-CV-03473, 2015 WL 12551080, at *4 n.9 (S.D. Tex. Mar. 30, 2015) (quotation omitted).   *See also Mulet-Rivera v. Barnhart*, 437 F. Supp. 2d 616, 626 n.4 (S.D. Tex. 2006) ("'Osteoarthritis' is a noninflammatory degenerative joint disease seen mainly in older persons, characterized by

---

[1] As a further result of these changes, pre-ADAAA cases on the issue of disability are now suspect.  28 C.F.R. Part 36 App. C, §§ 35.108(d)(1)(vi) and 36.105(d)(1)(vi) ("These rules of construction reflect Congress's concern that prior to the adoption of the ADA Amendments Act, courts were using too high a standard to determine whether an impairment substantially limited a major life activity."); *Summers v. Altarum Institute, Corp.*, 740 F.3d 325, 330, 331 (4th Cir. 2014) (district court erred in relying on pre-ADAAA cases); *Amsel v. Texas Water Development Bd.*, 2012 WL 913676, at *3 n.2 (5th Cir. Mar. 19, 2012) (unpublished) (observing that "[m]any of the cases cited in this discussion will be superseded in whole or in part as applied to cases arising under the new law").

[2] The prior ADA Title III regulations contained the same language.  28 C.F.R. § 36.104 (2015).

[3] Ex. E, pp. 14/22, 22/22; Ex. F, p. 6 ("bone on bone arthritis both knees"); *id.* at p. 2 ("Right knee end-stage bone-on-bone varus arthritis").

[4] Ex. C, p.2.

degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.").

- Osteophytes,[5] which are bone spurs that form as arthritis progresses. *Hanby*, *supra*, at *4 n.9; *Stedman's Medical Dictionary* (26th ed.) (bony outgrowth); Merck Manual at 1340.

- Varus deformity,[6] a deformity of the bone in which it is bent or twisted inward. *Moore v. Barnhart*, 405 F.3d 1208, 1210 n.1 (11th Cir. 2005); *Stedman's Medical Dictionary* (26th Ed.).

- Chondromalacia,[7] softening of the cartilage in the knee, *Giusti v. Coleman*, 986 F.2d 1419 (5th Cir. 1993), resulting in pain. *Avery v. Colvin*, 605 F. App'x 278, 280 (5th Cir. 2015).

- Capsulosynovitis,[8] which is inflammation or swelling of the joint. *Stedman's Medical Dictionary* (26th Ed.).

- Obliteration of joint space,[9] or "bone-on-bone" arthritis.[10]

Each of these conditions is documented in the medical records, and each is a physical condition that affects the musculoskeletal system. Therefore, these are physical impairments under the ADA's implementing regulations cited above.

This is further supported by current DOJ guidance, 28 C.F.R. Pt. 35, App. C, §§ 35.108(b) and 36.105(b) (2016) (referring to arthritis as an impairment), and by the dictionary definition of "impair"—to make worse, or diminish in quantity, value, excellence, or strength. *Webster's Third New International Dictionary* 1131 (1986); *de la Torres v. Bolger*, 781 F.2d 1134, 1138 (5th Cir. 1986) (agreeing with district court that under the Rehabilitation Act, the term "impairment . . .

---

[5] Ex. C, p.2.
[6] Ex. C, p.2; Ex. F, p. 6.
[7] Ex. G, p. 2; Ex. H, p. 1.
[8] Ex. H, p. 1.
[9] Ex. C, p.2.
[10] Ex. F, p. 6; *id.* at 2.

cannot be divorced from its dictionary and common sense connotation of a diminution in quality, value, excellence or strength.").  Moreover, arthritis was recognized as an impairment even before the ADAAA expanded the rules of construction.  *See, e.g., de la Torres*, *supra*, 781 F.2d at 1137; *Gordon v. D.C.*, 480 F. Supp. 2d 112, 116 (D.D.C. 2007) ("Arthritis certainly qualifies as an impairment under the statutes.").  And after the ADAAA, several courts have found sufficient evidence that arthritis is not just an impairment, but a substantially limiting one.  *See* n.11 below.

### C.    Major Life Activities

Under the ADAAA, the term major life activities "includes the operation of a major bodily function." 42 U.S.C. § 12102(2)(B).  Such functions include musculoskeletal functions. 28 C.F.R. § 36.105(c)(1)(ii); *see also* 29 C.F.R. § 1630.2(i)(1)(ii).  Major life activities also include walking, lifting, standing, caring for oneself, and working, 42 U.S.C. § 12102(2)(A), squatting, *Prince v. Claussen*, 173 F.3d 864 (10th Cir. 1999) (Table) (unreported decision); *Bonzani v. Shinseki*, No. 2:11-CV-0007-EFB, 2013 WL 5486808, at *7 (E.D. Cal. Sept. 30, 2013), and running.  *Prince*, *supra*; *Mileski v. Gulf Health Hosps., Inc*., No. CA 14-0514-C, 2016 WL 1295026, at *15 (S.D. Ala. Mar. 31, 2016); *Bonzani*, *supra*, 2013 WL 5486808, at *7.

### D.    Substantial Limitations

Several courts have found sufficient evidence of disability in arthritis cases,[11] but more importantly, the specific and uncontested facts in this case are enough to establish disability.

Mr. Silguero has had knee problems since as far back as about 1987, when he had a total surgical reconstruction of his left knee.  Ex. A, ¶ 2 (Silguero Declaration); Ex. B at 13:5–9 (Silguero Deposition); Ex. C, p. 1 (medical report of Dr. Clark); Ex. D, p. 1 (7/30/13 medical

---

[11] *See, e.g., Holland v. Methodist Hosps*., 2016 WL 5724355, at *14 (N.D. Ind. Sept. 30, 2016); *Buser v. Eckerd Corp*., 2015 WL 418172, at *7 (E.D.N.C. Feb. 2, 2015); *Berkowitz v. Oppenheimer Precision Products, Inc*., 2014 WL 5461515, at *4–5 (E.D. Pa. Oct. 28, 2014); *Moates v. Hamilton County*, 976 F. Supp. 2d 984, 992–93 (E.D. Tenn. 2013); *Socoloski v. Sears Holding Corp*., 2012 WL 3155523, at *4 (E.D. Pa. Aug. 3, 2012).

records of Dr. Klimisch).  He had to compensate for that knee, which created a lot of wear and tear on his other, right knee.  Ex. A, ¶ 2; Ex. B at 13:8–12.  He also had gradually increasing pain in his left knee beginning in approximately the late 90s.  Ex. A, ¶ 2; Ex. C, p. 1.  Around 2003 the pain in Mr. Silguero's knees significantly increased, and he had frequent episodes of locking and popping.  Ex. A, ¶ 3; Ex. C, p. 1.  The pain was worse upon movement, when using the stairs, walking, kneeling, squatting, getting up from a seated position, or weight-bearing.  *Id*.; Ex. E, pp. 5/22 and 21/22 (medical records of Dr. Covarubias; page numbering on lower right).  He had degenerative joint disease in both knees, and in 2006 had to have arthroscopic surgery on his right knee, with persistent pain in it thereafter, gradually increasing in intensity.  Ex. A, ¶ 4; Ex. B at 13:13–17; Ex. C, p. 1; Ex. D, p. 1.  Over the years both knees got worse.  Ex. A, ¶ 5; Ex. B at 14:15–17, 15:16–22, 16:4–17:3; Ex. D, p. 1.

By 2013 Mr. Silguero's knees were "really bad."  Ex. A, ¶ 5; Ex. B at 16:18–25.  He was diagnosed with "severe degenerative changes" in both knees, Ex. D, p. 2, and was prescribed a knee brace, *id*., which he wore.  Ex. A, ¶ 5.  He also began walking with a cane.  Ex. A, ¶ 5; Ex. B at 15:23–25.  In July of 2013 he began talking with his doctors about knee-replacement surgery.  Ex. A, ¶ 5; Ex. B at 16:8–11; Ex. D, p. 2.

By late 2014, shortly before the incidents at issue in this case, Mr. Silguero, a trained nurse, had to stop working as a nurse because his knees were too painful to walk and stand, and he was moving too slow.  Ex. A, ¶¶ 6, 7; Ex. B at 14:13–15:15.  He could no longer do nursing jobs because they required standing, walking, and lifting; he could not provide direct care at all.  Ex. A, ¶ 7.  He also could not do any heavy labor jobs, or jobs requiring lifting, and he qualified for Social Security disability benefits.  *Id*.

Without the use of a cane, Mr. Silguero could not stand for more than about 10 minutes, and standing would cause him severe pain. Ex. A, ¶ 6. He could not walk without severe pain, and would sit as quickly as possible. *Id*. Even with a cane, he had constant pain when he stood or walked (no matter the distance), although it would get worse the longer he did it. *Id*. Although he had upper-body strength, he could not lift anything heavier than a gallon of milk because it added to his knee pain, and would throw his balance off; for example, his wife had to carry the groceries in from the car. *Id*. He was unable to do activities of daily living. Ex. E, p. 5/22. He could not run, squat, or kneel at all. Ex. A, ¶ 6.

By early 2015, when the incidents the basis of this suit occurred, his knees were in bad shape, and had to be replaced. Ex. B at 19:4–7. He had bilateral degenerative arthritis and was referred to a surgeon. Ex. E, p. 6/22. His right knee was replaced in January of 2017, Ex. A, ¶ 8; Ex. B at 13:18–21; Ex. F, p. 2 (medical records of Dr. Manjarris), and his left knee replaced in April of 2017. Ex. A, ¶ 8. He still has to use a cane, and the doctor predicted that his rehab would last a year. *Id*.

In an ADA case, disability is assessed at the time of the discriminatory action or failure to accommodate. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 618 (5th Cir. 2009). Mr. Silguero's testimony regarding his condition is uncontradicted in this case. He used various mitigating measures including pain medication, knee brace, cane, and various surgeries (arthroscopic, reconstructive, and, ultimately, replacement). But the ADAAA requires that his disability be assessed as it would be had he not used any of those measures.

In determining if an impairment is substantially limiting, considerations include the condition and manner by which the individual performs the activity, the difficulty in performing it, how long he can perform it, and the pain he suffers. 28 C.F.R. § 36.105(d)(3)(i) and (ii). "For

10

example, an individual whose impairment causes pain or fatigue that most people would not experience when performing that major life activity may be substantially limited." 29 C.F.R. Part 1630 App., § 1630.2(j)(4). Thus, in affirming partial summary judgment for the plaintiff, the Eleventh Circuit relied on the fact that the plaintiff "suffered pain and more." *United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp., Inc*., 842 F.3d 1333, 1344 (11th Cir. 2016). Courts in this Circuit have also relied on pain in finding sufficient evidence or allegations of a substantially limiting impairment under the ADAAA. *See, e.g., Luedecke v. Tenet Healthcare Corp*., 2015 WL 3867793, at *4 (N.D. Tex. June 23, 2015); *Lee v. Harrah's New Orleans*, 2013 WL 3899895, at *5 (E.D. La. July 29, 2013); *Molina v. DSI Renal, Inc*., 840 F. Supp. 2d 984, 994–995 (W.D. Tex. 2012).

In *Feist v. Louisiana*, No. CV 09-7060, 2012 WL 12884815 (E.D. La. Sept. 24, 2012), the plaintiff developed a chronic knee condition[12] that limited her ability to walk, *id*. at *1, causing her pain when walking a couple of blocks. Id. at *4. The court held that she had demonstrated a disability. *Id*. at *3. The Fifth Circuit affirmed in relevant part, vacated in part, and remanded. 730 F.3d 450 (5th Cir. 2013). On remand the defendant again challenged disability, and the court stated: "This court has already found, and the United States Court of Appeals for the Fifth Circuit has affirmed, that plaintiff was a qualified individual with a disability . . .." 2014 WL 2979623, at *2 (E.D. La. July 1, 2014).

Defendant's own physician and 30(b)(6) witness admitted that Defendant had no reason to believe that Mr. Silguero's physical condition was not a disability. Ex. I at 150:18-23. He also admitted that someone who uses a cane cannot walk as well as other people, may be substantially

---

[12] According to the briefing on PACER, Ms. Feist had a deformity and arthritis in her right knee.

limited in walking, and one factor in determining substantial limitation is pain on walking.  *Id*. at 150:24–152:3.

Given the undisputed facts in this case, the broadened definition of disability, and the policy underlying the ADAAA, this Court should grant the Plaintiffs' motion for partial summary judgment as to disability under the ADA.

## II.   Mr. Silguero has a Disability Under the Texas Human Resources Code

The purpose of Chapter 121 is to enable persons with disabilities to participate fully in social and economic life, to achieve maximum personal independence, and to otherwise fully enjoy and use all public facilities available within the state.  TEX. HUM. RES. CODE § 121.001.  "If a statute is curative or remedial in its nature the rule is generally applied that it be given the most comprehensive and liberal construction possible."  *Burch v. City of San Antonio*, 518 S.W.2d 540, 544 (Tex. 1975).  *See also NME Hospitals, Inc. v. Rennels*, 994 S.W.2d 142, 146 (Tex. 1999) (according broad construction to civil rights statutes).

Chapter 121 of the Texas Human Resources Code defines "[p]erson with a disability" as a person who has "a mental or physical disability," § 121.002(4)(A), or "any health impairment that requires special ambulatory devices or services."  § 121.002(4)(H).

It is obvious that Mr. Silguero meets the definition in § 121.002(4)(H)—he had to use a cane beginning in 2013, Ex. A, ¶ 5, and a cane is within the plain meaning of an "ambulatory device."  He was also prescribed, and used, a knee brace, *id*., which likewise "constitutes an ambulatory device."  *Elstner v. Sw. Bell Tel. Co*., 659 F. Supp. 1328, 1345 (S.D. Tex. 1987) (interpreting substantially similar language in Texas employment-discrimination law), *aff'd without decision*, 863 F.2d 881 (5th Cir. 1988) (Table).

As to the language regarding "a mental or physical disability" in § 121.002(4)(A), there is no reason to believe that this is more restrictive than the ADA's definition, which Mr. Silguero satisfies as shown above.

## III.   Defendant's Plasma Donation Centers Are "Public Accommodations" Covered by Title III of The ADA

This precise issue has already been decided by the Tenth Circuit, which held that plasma-donation centers are places of public accommodations covered by Title III of the ADA.  *Levorsen v. Octapharma Plasma, Inc*., 828 F.3d 1227 (10th Cir. 2016).  In addition, the U.S. Department of Justice, which is charged with issuing regulations and enforcing Title III of the ADA, agreed.  *Brief for the United States as Amicus Curiae Supporting Appellant and Urging Reversal* (May 4, 2015), https://www.justice.gov/sites/default/files/crt/legacy/2015/05/06/levorsenoctapharmabrief.pdf. This Court should reach the same conclusion, and for the same reasons.

### A.   Excluding Plasma Donation Centers from Title III Coverage Would Conflict With Congress's Broad Purpose in Enacting the ADA

Congress's purpose in enacting the ADA was to respond to the "outright intentional exclusion" of individuals with disabilities.   42 U.S.C. § 12101(a)(5).   Nowhere is this discrimination more obvious than in the exclusion of individuals with disabilities from establishments that are open to all other members of the public.  That is precisely what CSL Plasma hopes to achieve by arguing that Title III does not apply to plasma donation centers.

Through the ADA, Congress sought to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The ADA is that "broad mandate" to eliminate discrimination against people with disabilities, and to integrate them "into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (holding that golf tournament was a place of

13

public accommodation and fit comfortably within Title III's coverage) (hereafter "*PGA Tour*"). One of the ADA's "most impressive strengths" is its "comprehensive character."  *Id.*

Congress provided protections from discrimination in three broad categories, including employment (Title I), public services or programs (Title II), and public accommodations (Title III).  Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by an person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Thus, coverage under Title III depends on whether or not an entity is considered a "public accommodation."  Places of public accommodations include private entities with operations that affect commerce and fall into one of twelve categories. 42 U.S.C. § 12181(7).  One such category is "a service establishment," § 12181(7)(K), and the examples given include:

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.

The final, catch-all phrase "other service establishment" applies here.  The statutory examples of service establishments are illustrative, not exhaustive.  *Levorsen*, *supra*, 828 F.3d at 1230; 28 C.F.R. Part 36 App. C, § 36.104 ("Place of public accommodation") ("While the list of categories is exhaustive, the representative examples of facilities within each category are not. Within each category only a few examples are given."); *Title III Technical Assistance Manual* (DOJ) ("Within each category the examples given are just illustrations.").[13]

---

[13] U.S. Department of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities*, available at http://www.ada.gov/taman3.html.

14

Title III is to be broadly construed. *PGA Tour*, 532 U.S. at 680 (stating that the law's "expansive purpose" prevents reading Title III's coverage less broadly); *id*. at 662 (ADA was created to ensure individuals with disabilities have "equal access to the wide variety of establishments available to the nondisabled."); *id*. at 689 n.51 (noting that Congress "drafted the ADA's coverage broadly").

Moreover, the categories of public accommodations "should be construed liberally" to afford people with disabilities "equal access" to the wide variety of establishments available to the people without disabilities. *Id*. at 676–77 (quoting legislative history); *Levorsen*, *supra*, 828 F.3d at 1230. The legislative history shows that Congress intended that the ADA's twelve categories of public accommodations be construed broadly. H.R. Rep. 101-485(III) at 54 (May 15, 1990), 101st Cong., 2nd Sess. 1990, 1990 U.S.C.C.A.N. 445, 477, 1990 WL 121680 (Leg. History). It was not just important, but "critical" that Title III "include all places open to the public, not simply restaurants, hotels, and places of entertainment . . .." H.R. Rep. 101-485(II) at 35 (May 15, 1990), 101st Cong., 2nd Sess. 1990, 1990 U.S.C.C.A.N. 303, 317, 1990 WL 125563 (Leg. History). "Second, and more importantly, Congress did not intend to limit the ADA to the specific examples listed in each category of public accommodations. Plaintiffs must show only that the web site falls within a general category listed under the ADA." *National Ass'n of the Deaf v. Netflix, Inc*., 869 F. Supp  2d 196, 201 (D. Mass. 2012), *citing* H.R. Rep. 101-485(III), *supra*, at 54, 1990 U.S.C.C.A.N. at 477 ("A person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples listed in the definition. Rather, the person must show that the entity falls within the overall category.").

Perhaps most importantly, the statutory "Findings and purpose" provides that people with disabilities have a "right to fully participate in all aspects of society." 42 U.S.C. § 12101(a).

15

### B.   Plasma Donation Centers Easily Fall Under the Plain Meaning of "Service Establishment."

As noted above, a "service establishment" is one of the categories of public accommodation.  42 U.S.C. § 12181(7)(F).  The Tenth Circuit has held that a plasma donation center (like the ones operated by CSL) is a service establishments "for two exceedingly simple reasons: It's an establishment. And it provides a service."  *Levorsen v. Octapharma Plasma, Inc*., 828 F.3d 1227, 1229 (10th Cir. 2016).

The primary tool for statutory interpretation is the plain language of the statute. *Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (". . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Levorsen*, *supra*, 828 F.3d at 1231.  Only if the "literal interpretation [would] ... thwart manifest purpose" should a court go beyond the plain language of statute.  *Kelly v. Boeing Petroleum Servs., Inc*., 61 F.3d 350, 363 (5th Cir. 1995).

Black's Law Dictionary defines service as "the performance of some useful act or series of acts for the benefit of another."  BLACK'S LAW DICTIONARY (10th ed. 2014) Westlaw BLACKS. The Merriam Webster Dictionary defines "service" to include "a helpful act" or "a facility supplying some public demand."  https://www.merriam-webster.com/dictionary/service, (last visited August 13, 2017).  The extraction of plasma itself is a service.  Plasma donation centers extract plasma from donors by separating it from the blood source by a process called plasmapheresis.  21 C.F.R. § 640.30(b)(1); Ex. I at 34:15–35:17 (Dr. Nelson deposition).  Only licensed establishments may perform this service, 21 C.F.R. § 640.30(b)(2); Ex. I at 37:10–38:1, so anyone who wishes to donate plasma must use the services provided by plasma donation centers like those run by CSL Plasma.  Plasma centers meet the dictionary definition of service establishment.  *Levorsen*, *supra*, 828 F.3d at 1231–32.

16

Similar to the dictionary definitions, the Fifth Circuit has defined "service" to "generally represent a bargained-for or anticipated provision of labor from one party to another." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc). ADA case law has defined "service" broadly to include, for example, prison libraries and public sidewalks. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998); *Frame v. City of Arlington*, 657 F.3d 215, 227 (5th Cir. 2011) (en banc). Thus, the term "service" under the ADA encompasses a wide variety meanings.

CSL operates its plasma donation centers in the community. According to CSL, it is "open Monday through Sunday in order to better serve [its customers]." *Frequently Asked Questions* ("What are the hours of operation?"), https://www.cslplasma.com/frequently-asked-questions (last visited on August 13, 2017). Before customers can make a donation, they must go through a screening process. CSL administers a detailed donor screening consisting of various tests and questionnaires, taking a medical history, and performing a physical examination. *Donation Steps*, https://www.cslplasma.com/become-a-donor/donation-steps (last visited August 13, 2017); Ex. I at 35:18–36:15.

CSL's website confirms that it provides a service to its customers, stating that it is "committed to providing the best in customer service to [its] loyal plasma donors." *Contact Us*, https://www.cslplasma.com/contact-us/donation-experience, (last visited August 13, 2017). Customers may contact CSL medical staff or a center's manager with medical questions about donating plasma or about a recent donation. *Frequently Asked Questions* ("Who do I contact about medical questions?"), https://www.cslplasma.com/frequently-asked-questions (last visited on August 13, 2017). Customers may even nominate CSL employees who provide excellent customer service for a reward. *iGive Rewards FAQs* ("What is the E Rewards survey?"),

https://www.cslplasma.com/current-donor-rewards/iGive-rewards-faq, (last visited August 13, 2017).

In return for making donations, CSL compensates donors up to $400.00 per month. *Frequently Asked Questions*, *supra* ("How will I be compensated or paid for my plasma donation?"); *Promotions*, https://www.cslplasma.com/media-center/promotions (last visited August 13, 2017). In addition, they earn points that can be redeemed for extra cash deposited (loaded) onto a prepaid Visa card. *Frequently Asked Questions*, *supra* ("How will I be compensated or paid for my plasma donation?"). CSL Plasma donation center also have other, special promotions. *Id*.

CSL Plasma also provides health information to every donor. Ex. J at 25:2–25. The health information includes advice about how to improve hematocrit and protein levels. *Id.*; Ex. I at 32:6–33:13. CSL Plasma also provides information and referrals about donors' blood pressure. Ex. I at 33:18–34:9.

CSL provides a benefit to its customer by its extraction services, answering customer questions regarding the donation process, and helping customers set up accounts within its system. While the ADA would apply when an establishment performs just one these services, here CSL provides several. Thus, it provides a service. *Levorsen*, *supra*, 828 F.3d at 1234.[14]

### C.  This Court Should Reject Defendant's Arguments.

Any reliance on *Magee v. Coca–Cola Refreshments USA, Inc*., 833 F.3d 530 (5th Cir. 2016), would stretch that decision far beyond its bounds. In *Magee*, the Fifth Circuit held that a *vending machine* is not a place of public accommodation under Title III. The court reached this (very different, and very unremarkable) result because it found that a Coke machine was not an

---

[14] There is a contrary result in *Maley v. Octapharma Plasma, Inc*., No. 12-13892, 2013 WL 3814248 (E.D. Mich. July 22, 2013), but it predates *Levorsen*, and it involved a pro se plaintiff who submitted no briefing. *Id*. at *1.

"establishment" (commonly defined as a business or physical space), the term used in the statute. *Id*. at 534–35.  But it also confirmed that Title III *would* cover the establishments—e.g., hospital or bus station—in which such a machine was *located*.  *Id*. at 536.  And more relevant here, it confirmed the legislative history that the categories of public accommodations "should be construed liberally."  *Id*. at 535.  Although *Magee* found that a Coke machine does not meet the plain meaning of a "sales establishment," that is irrelevant here.  As shown above, a plasma donation center fits within the plain meaning of a "service establishment."

Plasma donation centers, such as CSL, provide a "service" to its customers as part of a "bargained-for" exchange of goods (source plasma), services (the extraction of the plasma), and money (or cards with monetary value).  Potential donors have a commodity—source plasma—that has monetary and commercial value.  But this commodity has no monetary and commercial value without the services, equipment, and market access provided by the plasma donation center. Plasma donation centers serve the public by screening an individual's blood to determine eligibility for plasma donation, by using the center's technology and staff to extract and process the plasma, and by making plasma available to the public and for medical processing and research.  These are services offered by plasma donation centers.

Nor does it matter for Title III coverage that CSL pays its customers rather than the customers paying CSL.  The direction of the payment appears nowhere in the text or congressional history of the ADA, and the Tenth Circuit found "this superficial distinction irrelevant."  *Levorsen*, *supra*, 828 F.3d at 1229.  It should also be rejected because it is a limitation not found in the statute. *Id*. at 1232–33.  The relationship between CSL Plasma and its customers is similar to any other commercial relationship.  In *PGA Tour*, the Supreme Court rejected parsing out the nature of the financial transaction.  The defendant in that case had argued that Title III only protected the rights

19

of "clients or customers," and not tournament participants.  The Supreme Court observed that Title III contained no express "clients or customers" limitation.  *PGA Tour*, *supra*, 532 U.S. at 679.  It also determined that a tournament participant was just as integral to the event as a spectator, and as such, was just as much a "client or customer."  *PGA Tour*, *supra*, 532 U.S. at 678–79.  Here, plasma donors are just as integral to the plasma donation center as the entity that eventually purchases the plasma from the center.

Even if it were unclear whether Title III encompassed plasma donation centers, any ambiguity should be interpreted broadly rather than narrowly.  *PGA Tour Inc.,* 532 U.S. at 676–77.  And even if that result is unexpected, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth." *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (internal quotation marks omitted).  *See also PGA Tour*, *supra*, 532 U.S. at 689 n.51 (complaints about coverage are "more properly directed to Congress, which drafted the ADA's coverage broadly," than to courts).

## IV.     State Anti-Discrimination Law Covers CSL's Plasma-Donation Centers

Chapter 121 of the Texas Human Resources Code prohibits discrimination against person with a disability by "public facilities."  *See, e.g.,* TEX. HUM. RES. CODE § 121.003(a), (c), and (e). That law also defines "public facility" to include "a retail business, commercial establishment, or office building to which the general public is invited."  TEX. HUM. RES. CODE § 121.002(5).  It also includes "any other place of public accommodation . . . to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." *Id*.

CSL's plasma-donation centers clearly satisfy the first of those definitions—they are retail business and commercial establishments to which the public is invited.  Even under the latter,

20

catch-all provision, state law is broader than the ADA because Chapter 121 does not limit "public facilities" to the twelve categories listed in Title III.  Instead, the plain-language definition of accommodation includes something supplied for convenience or to satisfy a need, *Webster's Third New International Dictionary* (1986), and that is met here.

## V.      The FDA Does Not Have Primary Jurisdiction

When appropriate, a court may stay its proceedings and refer the determination of a complex issue to an administrative agency who has a special expertise.  *Penny v. Sw. Bell Tel. Co.*, 906 F.2d 183, 187 (5th Cir. 1990).  The name is misleading because this "is a doctrine of judicial abstention whereby a court which has jurisdiction over a matter, nonetheless defers to an administrative agency for an initial decision on questions of fact or law within the peculiar competence of the agency."  *Occidental Chem. Corp. v. Louisiana Pub. Serv. Comm'n*, 810 F.3d 299, 309 (5th Cir. 2016).  This is a matter of judicial discretion, *id.*, though "courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate."  *Id.*, *quoting Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 419 (5th Cir.1976).

"No fixed formula exists for applying the doctrine of primary jurisdiction."  *Occidental Chem. Corp.*, *supra*, 810 F.3d at 309.  But its purpose is to promote uniformity and allow the court to invoke the expertise of an agency in resolving complex and technical questions.  *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956).  "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  *Occidental Chem. Corp.*, *supra*, 810 F.3d at 309 (internal quotations omitted).  A court must measure the benefit of uniformity that is promoted, and the

technical assistance obtained, against the need for an expedient trial and the interest of the parties involved. *Wagner & Brown v. ANR Pipeline Co*., 837 F.2d 199, 201 (5th Cir. 1988).

It is highly unlikely that either Congress or the FDA intended to create a scheme where a plasma-donation center could demand the FDA look at each donor deferral (rejection) to determine whether or not it is discriminatory. Not only does the FDA have no special skills to do this, it would be inefficient and would not create any more uniformity than the system already in place. Rather than create a stable uniform industry, forcing the FDA to assess each deferral dispute would lead to chaos, clogging the agency's ability to regulate the various industries it overlooks.

But there is more reason for this Court to reject primary jurisdiction—the FDA lacks an agency appeal process for plasma-donation deferrals. *See Rosado v. Wyman*, 397 U.S. 397, 406 (1970) (refusing to apply primary jurisdiction because HEW "has no procedures whereby recipients may trigger and participate in the department's review of state welfare programs."); *Arizona ex rel. Goddard v. Harkins Admin. Servs., Inc*., No. CV-07-00703-PHX-ROS, 2011 WL 13202686, at *3 (D. Ariz. Feb. 8, 2011) (declining to apply primary jurisdiction in an ADA cases involving the captioning of movies because the "parties cannot initiate and directly participate in an administrative process that will resolve their dispute."). This case is therefore the opposite of *Harris v. P.A.M. Transp., Inc*., 339 F.3d 635 (8th Cir. 2003), an ADA case involving a truck driver who claimed disability discrimination after receiving conflicting medical assessments regarding his suitability to drive trucks. The *Harris* court noted that, "most importantly in this case, DOT regulations provide appeal procedures" in resolving the dispute, and thus invoked primary jurisdiction. *Harris*, 339 F.3d at 638.

Here, the FDA has no such appeal procedure for conflicts between a potential plasma donor and a plasma center regarding the suitability of the donor, and the Defendant has not cited one.

The Defendant exclusively relies on 21 C.F.R. Part 640, Ex. K (Defendant's Answer to Plaintiff's First Set of Interrogatories No. 3), which does not provide any guidance, information, or process for appealing the deferral decision of a plasma donation center.

Plaintiffs are not asking the court to apply a specific set of technical standards.  They are simply asking that Defendant comply with the ADA, which includes requiring Defendant to cease its discriminatory exclusion of the Plaintiffs.  In *Gorecki v. Hobby Lobby Stores, Inc*., No. CV 17-1131-JFW (SKX), 2017 WL 2957736 (C.D. Cal. June 15, 2017), the court declined to apply primary jurisdiction in an ADA web-access case because the plaintiff did "not ask the Court to fashion a remedy that adopts a specific technical rule.  Instead, he requests an order requiring [Defendant] to…ensure disabled individuals have as full and equal enjoyment of its website as non-disabled individuals."  *Id*. at *7.  Other courts have reached a similar result in ADA cases. *See, e.g., Heightened Indep. & Progress v. Port Auth. of New York & New Jersey*, No. CIV A 07-2982(JAG), 2008 WL 5427891, at *4–5 (D.N.J. Dec. 30, 2008); *Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 20 (D.D.C. 2006). Plaintiffs here are simply asking that Defendant comply with the ADA.  Their claims involve discrimination—an issue familiar to the courts, but on which the FDA has no special expertise. The technical knowledge of the FDA would not assist this Court, which is another reason to reject the primary jurisdiction defense.  *Compare W. Pac. R. Co*., *supra*, 352 U.S. at 64 ("More recently the expert and specialized knowledge of the agencies involved has been particularly stressed.").

Invoking primary jurisdiction in the instant case would merely work to delay the proceedings, another reason for rejecting primary jurisdiction.  *Gorecki*, *supra*, at *6–7 (ADA case); *Kaiser v. CSL Plasma Inc.*, No. C15-0842RSM, 2017 WL 840198, at *5–6 (W.D. Wash. Mar. 2, 2017) (state-law discrimination case). This case simply comes down to whether CSL

discriminated against the Plaintiffs because of their disabilities, rather than because of any legitimate qualification or safety standard.  Interpreting the ADA is within the expertise of trial courts, and further grounds to reject primary jurisdiction.  *See Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, at *16 (E.D.N.Y. Aug. 1, 2017) ("Analyzing the text of the ADA and its regulations and deciding whether a business is in compliance with those laws is a task well within the competence of the judicial branch."); *Nat'l Ass'n of the Deaf v. Harvard Univ.*, No. CV 15-30023-MGM, 2016 WL 6540446, at *2 (D. Mass. Nov. 3, 2016) ("Federal courts are experienced in interpreting the ADA and Section 504, and statutory interpretation is routine practice.").

ADA claims involve a fact-intensive analysis that courts are in the best position to address. The FDA has no expertise in assessing discrimination cases under civil rights law, while courts routinely handle ADA claims.

In *Kaiser v. CSL Plasma Inc.*, *supra*, 2017 WL 840198, the court *rejected this same Defendant's primary-jurisdiction argument* in a case asserting disability discrimination under state law, despite the fact that the FDA had issued draft guidance directly related to the issue before that court (plasma donations by transgender individuals).  The court noted that "[n]ot every case that implicates the expertise of federal agencies warrants invocation of primary jurisdiction. Rather, the doctrine is reserved for a limited set of circumstances that requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency."  *Id*. at *5, *quoting Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (internal quotes omitted).

The case against primary jurisdiction is even stronger here because the FDA has issued no guidance related to plasma donations by someone using a cane or a service animal.  According to

the Defendant, Ex. K, the relevant FDA guidance documents are on the internet at https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Blood/default.htm, and the relevant FDA regulations are those in 21 C.F.R. Part 640.  None of those regulations or guidance documents relate to these issues.

A Westlaw search revels no case in which a court in this circuit has applied primary jurisdiction to an ADA case, and the Court should reject the attempt in this case.

## CONCLUSION

For the reason set forth above, Plaintiff Mark Silguero moves the Court to enter partial summary judgment determining, as a matter of law, that: (1) at the relevant time Mr. Silguero was a person with a disability under the ADA; (2) at the relevant time Mr. Silguero was a person with a disability under state law; (3) Title III of the ADA applies to Defendant's plasma centers; (4) Texas Human Resources Code Chapter 121 applies to Defendant's plasma centers; and (5) the "primary jurisdiction" doctrine is inapplicable.

Respectfully submitted,

BRIAN EAST
ATTORNEY-IN-CHARGE
State Bar No. 06360800
Southern District Bar No. 453108
LIA S. DAVIS
State Bar No. 06360800
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2718 (direct line)
(512) 454-3999 (fax)
beast@drtx,org
ldavis@drtx,org

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2017, a true and correct copy of the foregoing document was electronically filed using the Court's CM/ECF filing system, thus providing notice of electronic filing to the following:

Bruce J. Douglas
Stephanie Willing
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, Minnesota 55402

BRIAN EAST