IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK SILGUERO, | § | |
| *Plaintiff,* | § | |
| | § | |
| and | § | |
| | § | |
| AMY WOLFE, | § | |
| *Intervening Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-00361 |
| | § | |
| CSL PLASMA INC., | § | |
| *Defendant.* | § | |

**JOINT RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
BY PLAINTIFFS MARK SILGUERO AND AMY WOLFE**

BRIAN EAST
ATTORNEY-IN-CHARGE
State Bar No. 06360800
Southern District Bar No. 453108
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2718 (direct line)
(512) 454-3999 (fax)
beast@drtx.org

LIA S. DAVIS
State Bar No. 06360800
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2763 (direct line)
(512) 454-3999 (fax)
ldavis@drtx.org

ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................ii

TABLE OF AUTHORITIES ......................................................................................iii

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ..............................1

SUMMARY OF ARGUMENT ....................................................................................2

ARGUMENT ..........................................................................................................3

    I.    ADA Title III Covers Plasma-Donation Facilities..............................................3

    II.   Factual Disputes Exist As To Whether Mr. Silguero Was Refused Service Because of His Disability................................................................................8

        A.   First Rejection .....................................................................................8

        B.   Second Rejection ...............................................................................14

    III.  Factual Disputes Also Exist Regarding CSL's Supposed Safety Defenses to Ms. Wolfe's Claims ...............................................................................17

    IV.  Chapter 121 Applies to Defendant's Plasma Centers .....................................22

CONCLUSION......................................................................................................23

CERTIFICATE OF SERVICE ...................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................1, 14

*Arizona v. Harkins Amusement Enters., Inc.*,
   603 F.3d 666 (9th Cir. 2010) .................................................................14

*Beeman v. Livingston*,
   468 S.W.3d 534 (Tex. 2015).................................................................22

*Bonds v. Rodriguez*, No. 04–02–00156–CV,
   2003 WL 141043 (Tex. App.—San Antonio Jan. 22, 2003, pet. denied)..............................23

*Bragdon v. Abbott*,
   524 U.S. 624 (1998)................................................................................12

*Dornan v. 7-Eleven, Inc.*,
   524 F.3d 1034 (9th Cir. 2008) ...............................................................6

*Hoewischer v. Deerwood Vill Mall, LLC*,
   281 F.R.D. 665 (M.D. Fla. 2011)............................................................6

*Jankey v. Twentieth Century Fox Film Corp.*,
   14 F. Supp. 2d 1174 (C.D. Cal. 1998) .................................................5, 6

*Jankey v. Twentieth Century Fox Film Corp.*,
   212 F.3d 1159 (9th Cir. 2000) ................................................................6

*Jones v. United States Golf Ass'n*,
   No. 1:00-cv-00278-JRN, Dkt. #48, Order & Opinion (W.D. Tex. Aug. 30, 2000)...........4, 5, 6

*Judice v. Hospital Service Dist. No. 1*,
   919 F. Supp. 978 (E.D. La. 1996) ..........................................................21

*Larsen v. Carnival Corp., Inc.*,
   242 F. Supp. 2d 1333 (S.D. Fla. 2003) ..................................................21

*Levorsen v. Octapharma Plasma, Inc.*,
   828 F.3d 1227 (10th Cir. 2016) .............................................................3

*Magee v. Coca–Cola Refreshments USA, Inc.*,
   833 F.3d 530 (5th Cir. 2016) ...............................................................3, 7

*Martin v. PGA Tour, Inc.*,
    204 F.3d 994 (9th Cir. 2000) ..........................................................................................4

*McInerney v. Rensselaer Polytechnic Inst.*,
    505 F.3d 135 (2d Cir. 2007)...........................................................................................16

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001)........................................................................................................3

*Sadik v. Univ. of Houston*, No. CIV.A. H-03-4296
    2005 WL 1828588 (S.D. Tex. Aug. 1, 2005) ...............................................................23

*Shotz v. City of Plantation, Fla*.,
    344 F.3d 1161 (11th Cir. 2003) ....................................................................................16

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)..................................................................................................14

## STATUTES AND REGULATIONS

42 U.S.C. § 12101(a)(5).............................................................................................11, 12

42 U.S.C. § 12181(7)(1) ...................................................................................................4

42 U.S.C. § 12182(b)(3) .................................................................................................13

42 U.S.C. § 12203(a) ......................................................................................................16

21 C.F.R. § 630.10(f)(5) .................................................................................................11

28 C.F.R. § 36.208(b) ...............................................................................................13, 17

28 C.F.R. § 36.301(a).................................................................................................12, 14

28 C.F.R. § 36.301(b).................................................................................................12, 17

Tex. Hum. Res. Code § 121.002(5) ...............................................................................22

## LEGISLATIVE HISTORY AND OTHER AUTHORITIES

ADA Title III Technical Assistance Manual, § III-1.2000 (final Illustration),
    https://www.ada.gov/taman3.html ................................................................................5

*Brief of the United States As Amicus Curiae*, https://www.ada.gov/briefs/usgolfbr.pdf .............5, 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK SILGUERO, | § | |
| *Plaintiff,* | § | |
| | § | |
| and | § | |
| | § | |
| AMY WOLFE, | § | |
| *Intervening Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-00361 |
| | § | |
| CSL PLASMA INC., | § | |
| *Defendant.* | § | |

**JOINT RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
BY PLAINTIFFS MARK SILGUERO AND AMY WOLFE**

**STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT**

Defendant seeks summary judgment.  The issues for the Court to decide are whether, as a matter of law:

1. CSL's plasma centers are excluded from coverage by Title III of the ADA.
2. CSL established a valid safety defense under the ADA for rejecting Plaintiff Mark Silguero.
3. CSL established that Mr. Silguero was not opposing discrimination but was instead making a threat.
4. CSL established a valid safety defense under the ADA for rejecting Intervening Plaintiff Amy Wolfe.
5. CSL's plasma centers are excluded from coverage under Texas state law.

Plaintiffs do not dispute the summary judgment standard that CSL describes in its motion, but CSL leaves out the fact that the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The court must also refrain from making credibility determinations or weighing the evidence.  *Id.*

1

## SUMMARY OF ARGUMENT

CSL's principal argument is that Title III of the ADA does not apply to plasma centers. Plaintiffs have largely briefed this issue in their own motions for summary judgment, and that briefing is incorporated here.  Coverage is supported by, among other things, the plain language of the statute, the decision of the only federal appeals court addressing this precise issue, and the position of the United States Department of Justice, which writes and enforces the Title III regulations.  Defendant argues that it is free to carve out areas of its facilities and declare them free from Title III regulation.  They cannot.  They also claim that because some people are screened out from donating, Title III has no application.  The courts reject that.

CSL does not really dispute that it initially rejected Mr. Silguero, and then rejected Ms. Wolfe, because of their disabilities.  Instead, CSL argues that both Plaintiffs' medical conditions presented a safety risk.  But the goal of the ADA is to prevent overgeneralizations and stereotyping, so businesses do not have unfettered discretion in fashioning safety exclusions.  Instead, Title III requires defendants to prove that such exclusions are individualized, based on science, and necessary.  CSL fails to make any such showing here.

CSL also claims that its second rejection of Mr. Silguero was because of threats, but that is intensely disputed and not subject to summary judgment. Defendant includes supposedly uncontested statements of fact that it knows are heavily contested.  It also describes facts in the light most favorable to the Movant, contrary to summary judgment standards.

Finally, CSL claims that state law does not apply, but the only cases it cites are nothing like the instant one.  CSL's plasma centers invite all to enter, so its reliance on a case holding that prisons—the most closed of all institutions—are not considered open to the public simply provides

it no support.  And CSL's reliance on a supposed threat or safety issues suffers from the same deficiencies as its similar arguments under the ADA.

## ARGUMENT

### I.    ADA Title III Covers Plasma-Donation Facilities

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).  Congress also found that such discrimination persisted "in such critical areas as . . . public accommodations," and there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals, and to integrate them "into the economic and social mainstream of American life." *Id.* at 675.  In the ADA, Congress provided that broad mandate, and one if its "most impressive strengths" is its "comprehensive character." *Id.*  And as the Fifth Circuit has observed, the ADA's legislative history acknowledges that Title III coverage should be "construed liberally." *Magee v. Coca–Cola Refreshments USA, Inc.*, 833 F.3d 530, 535 (5th Cir. 2016).

In their own motions for (partial) summary judgment, Plaintiffs have already explained why CSL's plasma centers are service establishments covered by Title III of the ADA.  That briefing—set out in Silguero's Motion for Partial Summary Judgment at pp. 13–20—is not repeated but incorporated herein by reference.  As stated there, this Court should deny CSL's Motion for Summary Judgment on this issue because of (among other things) the plain language of the statute, the holding and analysis in *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016), and the position of the Department of Justice, which issues the Title III regulations and enforces this law.

But one of Defendant's arguments deserves further mention because it is representative of what is wrong with its Title III analysis in general.  Defendant mistakenly claims protection from

3

the law by describing itself as a "mixed use" facility.  Defendant's Motion at 17–18.  CSL completely misunderstands that concept.

CSL points out that certain portions of its facility are open to a smaller group of the public than is the reception area.[1]  Yes, but "[t]he fact that entry to a part of a public accommodation may be limited does not deprive the facility of its character as a place of public accommodation."  *Jones v. United States Golf Ass'n*, No. 1:00-cv-00278-JRN, Order & Opinion at 5 (W.D. Tex. Aug. 30, 2000) (hereafter "*Jones*"),[2] *quoting Martin v. PGA Tour, Inc.*, 204 F.3d 994, 997 (9th Cir. 2000), *aff'd*, 532 U.S. 661 (2001).  "Neither does the later winnowing process of narrowing the field change the nature of the facility."  *Jones*, *supra*, *quoting Martin v. PGA Tour, Inc.*, *supra*, 204 F.3d at 999.  And the selection process here does not result in a particularly exclusive pool of donors (as does, for example, the PGA qualifying process); rather, "[i]t is in CSL's best interest to accept as many donors as possible."  Exh. B (Nelson Depo.) 85:12–22.  In fact, CSL admits that some 123 million Americans may be eligible to donate.[3]

The defendant in *Jones* argued that there are two separate areas at a PGA event—an area "inside the ropes" (fairways and greens) that is *not* a public accommodation, and an area "outside the ropes" (where the spectators gather) that is.  *Jones*, Order & Opinion at 4.  The court completely rejected this, holding that the entire course was a place of public accommodation.  *Id*. at 6–7.

This is further reinforced by, for example, 42 U.S.C. § 12181(7)(1), which confirms that a private school—by definition only open to a select group of the public—is a place of public accommodation.  It is also the position of the Department of Justice in its Amicus Brief filed in

---

[1] Defendant's Motion for Summary Judgment at 17.
[2] Judge Nowlin's Order and Opinion in *Jones*, PACER Dkt. #48, is attached hereto as Exh. A.  The defendant's appeal of that order was dismissed by stipulation in light of *Martin v PGA Tour*.  Dkt. #56.
[3] Defendant states that 38% of Americans are eligible to donate blood, which it further states is subject to "analogous" screening.  Motion at 4, n.3.  The current population of the United States is over 325 million.

*Jones* ("But, whether access to a facility may be strictly controlled, or only a narrow group of individuals may be eligible for admission, has little bearing on whether it is a place of public accommodation.").[4]  In its Title III Technical Assistance Manual, the DOJ gives the example of a medical-care provider that has two separate areas in its building—one a hospital for the public, and the other a set of administrative offices.  "If patients receive medical services in the same building where the administrative offices are located, the entire building is a place of public accommodation, even if one or more floors are reserved for the exclusive use of employees."  ADA Title III Technical Assistance Manual, § III-1.2000 (final Illustration), available online at https://www.ada.gov/taman3.html.

Many other courts have rejected similar attempts by businesses to carve out a portion of the public accommodation with entry requirements, and declare it exempt.  Several of those cases are collected in *Jones*, Order & Opinion at 4–5.

The mixed-use concept applies to facilities that are *not* otherwise places of public accommodation (i.e., commercial facilities), but have a smaller area to which the public is invited.  For example, it applies to the situation in which a movie studio (*not* a place of public accommodation) has a studio tour, in which case the tour route is a place of public accommodation.  [This was the situation in *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174 (C.D. Cal. 1998), cited by Defendant.]  And it applies in the situation in which a produce company (*not* a place of public accommodation) operates a farm stand (a place of public accommodation).  "The conclusion in these circumstances—where the starting point is that the facility is not routinely a place of public accommodation, but the regulations provide that some of the operations

---

[4] Page 4, *Brief of the United States As Amicus Curiae*, online at https://www.ada.gov/briefs/usgolfbr.pdf.

nevertheless may be—is fully consistent with the broad reach of a remedial statute." *Brief of United States as Amicus Curiae (Jones), supra*, at 6.

> The regulations provide that a place that is otherwise not a place of public accommodation may carve out certain areas, or create certain separate entities, that are subject to Title III of the ADA. There is no basis for finding the opposite that a place defined as a public accommodation can have certain exempt zones carved from it. Thus, the Court finds that nothing in the ADA or its regulations provides that portions of a place of public accommodation may be exempt from coverage.

*Jones*, Order & Opinion at 6. *See also Jones* Amicus Brief at 6.

CSL also errs in its reliance on *Jankey*, which dealt with a defendant that was *not* a public accommodation, and a plaintiff who was seeking access to a place not open to the public. The Ninth Circuit's affirmance was based on the fact that the plaintiff did "not dispute that the Facilities are establishments not in fact open to the public," so the court's analysis "need[] go no farther." *Jankey v. Twentieth Century Fox Film Corp.*, 212 F.3d 1159, 1161 (9th Cir. 2000).[5] The court in *Jones* distinguished *Jankey* on this basis. Order & Opinion at 6 (Defendant's "basic premise is that it may take a facility that is initially and otherwise unquestionably a place of public accommodation and carve out of that facility certain zones that are exempt. Other Courts have rejected this argument. This Court agrees.") (citations omitted). *See also Jones* Amicus, at 7.

The fact is that screening members of the public before providing them full service is nothing like an employee-only restroom, or a private movie studio that is never open to the public. Defendant allows members of the public to enter the donor floor, offices, and interview rooms once the donor has been screened, and CSL Plasma admits that it accepts as many donors as possible. Defendant's Motion at 18.

---

[5] That also explains the outcome in the other cases CSL cites, *Dornan v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) (undisputed that *no* member of the public could use the employee-only bathroom); and *Hoewischer v. Deerwood Vill Mall, LLC*, 281 F.R.D. 665, 666 (M.D. Fla. 2011) ("The Court finds that Plaintiff is not entitled to inspect any vacant tenant spaces, as such spaces are not open to the public.").

Applying CSL's flawed logic would mean, for example, that a lawyer's reception area is subject to the ADA, but the lawyer's office where she meets with screened clients is not. Virtually all places of public accommodation have areas that are open to everyone, and other areas that are only open to some members of the public. A movie theater lobby is open to everyone, but the theaters themselves are only open to ticketholders; a school with strict qualification standards may have an admissions office open to everyone, but the classrooms are only open to enrolled students. This is not a basis for denying Title III coverage. Otherwise, almost every public accommodation could be considered a mixed-use facility, and they would be free to exempt from coverage those areas that are open to a subset of the public.

Moreover, Plaintiffs here are not claiming that CSL is denying them access to a physical space in its buildings; rather, Plaintiffs are complaining that CSL is denying access to its services. Comparing a plasma center to a mixed-use facility serves as a distraction from what is at issue: the Defendant's arbitrary decision to deny Plaintiffs access to CSL's *services*.

CSL's reliance[6] on *Magee v. Coca Cola Refreshments USA, Inc*. 833 F.3d 530 (5th Cir. 2016), is also misplaced, as Plaintiffs have previously briefed in their own Motions. *Magee* examined whether a *vending machine* is a *sales* establishment, an entirely different category of the ADA public accommodation provision. Nothing in *Magee* addresses *service* establishments. It also interprets the word "establishment" to refer to a physical building, not a Coke machine. *Id*. at 535. Of course, plasma centers satisfy that definition of "establishment."

Finally, CSL posits that public accommodation must fill a need for the customer, and provide a living for the operator. Defendant's Motions at 15–16. Although it cites no support for this standard, the facts here more than satisfy it. CSL fills a need for the customer, both financial

---

[6] Defendant's Motion at 14.

7

and altruistic.[7]   It also provides quite a good living to the operator, as CSL uses the product to generate billions of dollars in income.[8]

## II.     Factual Disputes Exist As To Whether Mr. Silguero Was Refused Service Because of His Disability

CSL rejected ("deferred") Mr. Silguero on two separate occasions relevant here.   The first was on the day Mr. Silguero attempted to donate.   The second was a day later.

### A.     First Rejection

CSL's first rejection occurred on January 2, 2015, Exh. C (Silguero Depo.) 36:22–37:1; Exh. D (Depo. Ex. 2), when CSL screener Mailey told Mr. Silguero that she was deferring him because of his gait, use of a cane, and inability to transfer onto the donor bed.   Exh. C (Silguero) 39:5–21; Exh. D.

But she had no reason to think he could not transfer—she never asked him about it or let him try.   Exh. C (Silguero) 48:22–49:1.   But CSL's procedure is to let the person try; that is how screeners can tell if they can do it or not.   Exh. E (Vargas Depo.) 40:2–13; *see also id.*, 22:14–23. In fact, Mr. Silguero was fully able to transfer, Exh. F (Silguero 2d Decl.) ¶ 2, and had done so many times in the recent past, Exh. C (Silguero) 49:6–9, as his CSL file clearly showed.   *Id.*; Exh. D; Exh. G (Depo. Ex. 1); Exh. H (Def.'s Resp. to Interrog. No. 1) (showing he donated nine times between January and April of 2014).   And his file at the time expressly stated that he *was* able to transfer.   Exh. D, lines 15–16.   CSL's briefing does not contest this, or even mention it.

CSL's screener also said she was rejecting him because of his cane.   Exh. C (Silguero) 39:5–21; Exh. D.   But again, he had used a cane since 2013, Exh. C (Silguero) 15:23–25; Exh. I

---

[7] CSL's webpage for its Corpus Christi facility states:  "As a plasma donor, you give a valuable gift to those who require plasma-derived therapies to live healthier, happier lives. . . . New donors can earn up to $400 a month, by donating plasma!"  https://www.cslplasma.com/locations/17/donation-center-4977-a-ayers-st-corpus-christi-tx/.

[8] The Annual Reports linked to http://www.csl.com.au/investors/financial-reports.htm reflect several billions in income each year, and over a billion dollars in annual profits.

(Lisa Silguero Depo.) 15:25–16:3, and as shown above, had donated with it many times thereafter without incident.  CSL's senior staff and trainers all admit that using a cane is not itself a disqualifier.  Exh. B (Nelson) 62:16–22; Exh. E (Vargas) 22:7–13; Exh. J (Garcia Depo.) 23:23–24:8.  CSL has no screening procedures expressly mentioning a cane, Exh. B (Nelson) 63:8–10, nor do federal or industry standards restrict (or even reference) such use.  *Id.*, 67:20–23 (no FDA or other regulations); 143:9–14 (no FDA guidance documents); 144:22–145:2 (nothing in FDA audits).

The fact is that a person who uses a cane is permitted to donate, Sanchez 18:25–19:3, and other people with canes have donated at CSL, Exh. K (Sanchez Depo) 19:17–20; Exh. J (Garcia) 28:1–3, as has Mr. Silguero on several occasions, as shown above.  On at least one of those occasions CSL's own staff confirmed in writing that he was using a cane, but nevertheless was able to transfer onto the donor bed and donate.  Exh D, lines 15–16; Exh J (Garcia) 37:11–22 ("He had a cane, but he was able to get on and off the donor bed fine. He had steady gait. He had no issues."); *id.*, 38:16–19 (agreeing that "he was okay to donate").

Nor was his gait unsteady when using a cane, Exh. F (Silguero 2d Decl.) ¶ 1; Exh J (Garcia) 37:11–22 ("He had steady gait."), and he did not limp when using his cane.  Exh C (Silguero) 39:17–19 (no limping); Exh. I (Lisa Silguero) 16:25–17:2 (same).  He had donated many times before, and had a documented "steady gait," as shown above.  And was no less steady on his feet on this occasion.  Exh. F (Silguero 2d Decl.) ¶ 1.  In fact, Mr. Silguero later donated at another plasma center without problems, *id.*, ¶ 2; Exh. C (Silguero) 52:12–14, further undercutting CSL's position.  CSL apparently assumes that Mr. Silguero was deferred because he had an unsteady gait, Defendant's Motion at 6, but it ignores all of the contrary evidence.

Surprisingly, the CSL employee who deferred Mr. Silguero now denies that her decision had anything to do with a cane, limp, or ability to transfer, Exh. L (Mailey Depo.) 91:1–8, even though that is what she told Mr. Silguero, Exh. C (Silguero) 39:5–21, and that is what CSL's own records document. Exh. D, lines 3–4. Her new story is that she deferred him because of his need for future knee surgery. Exh. L (Mailey) 77:2–9.

This is just not true. She never said that at the time, never asked Mr. Silguero anything about surgery, and did not document this story in his file. It is not only inconsistent with what she said at the time, it is also inconsistent with CSL's standard practice. CSL's medical screening standards[9] list past surgeries but not future ones. Exh J (Garcia) 17:23–25. CSL also has a questionnaire for staff to follow, and it, too, makes no reference to future surgeries. Exh. E (Vargas) 19:11–21; Exh. M (Baker Depo.) 40:17–19. It is not normal protocol for screeners to ask about future surgeries. Exh. E (Vargas) 20:1–3; Exh. J (Garcia) 18:1–4. Likewise, FDA standards do not mention future surgeries. Exh. B (Nelson) 72:13–16.

If by some chance the donor brings up the issue, the screener is supposed to ask about the condition, the type of surgery, and whether it is scheduled or not. Exh. E (Vargas) 20:4–17. Screener Mailey does not indicate that she asked those things. Also, if surgery is not scheduled and there are no other disqualifiers, the person would be permitted to donate. Exh. K (Sanchez) 10:12–14; Exh. E (Vargas) 20:19–23. By contrast, Screener Mailey is of the opinion that "[n]obody who's pending surgery or had surgery can donate plasma." Exh. L (Mailey) 77:13–14. This is contrary to the law and inconsistent with CSL's stated policy and practice.

The reality is that this after-the-fact change in CSL's story is classic pretext evidence; why make up a new story if the old one was justifiable?

---

[9] CSL maintains a Medical Staff Reference (Depo. Ex. 4) to provide guidance to its medical screeners. Exh. B (Nelson) 16:7–16; Defendant's Motion at 5.

Although it does not brief it, CSL's Motion also hints at another new story—that Mr. Silguero's weight somehow justified its deferral. This appears in a single sentence in the introductory section relating to CSL policies. Defendant's Motion at 6. But this story also makes no sense. First, CSL's own documents describing the deferral do not mention his weight as a factor at all, Exh. D, lines 3–4, nor did the CSL employee making the deferral.[10] Moreover, although the FDA requires a *minimum* weight to donate, it has no *maximum* weight requirement. 21 C.F.R. § 630.10(f)(5); Exh. B (Nelson) 119:6–7. And in the year prior to his deferral, Mr. Silguero donated several times at similar weights.[11] On the date of his deferral, he had actually lost weight, Exh. C (Silguero) 41:8; Exh. F (Silguero 2d Decl.) ¶ 3. But CSL did not even permit him on the scale, Exh. F ¶ 3, further undercutting CSL's after-the-fact "weight" justification.

In sum, CSL motion does not dispute that its first rejection was because of Mr. Silguero's knee disabilities. Instead, CSL principally argues that it was justified because Mr. Silguero's gait somehow made him a safety threat. But the facts do not support that. Mr. Silguero did not have an unsteady gait, and CSL's briefing on the supposed dangers of an unsteady gait do not cite to any factual evidence actually related to Mr. Silguero. Rather, CSL describes how someone with an unsteady gait *might* have a problem donating, but fails to relate that to Mr. Silguero's actual situation. Defendant's Motion at 6.

Moreover, the law does not allow the kind of safety argument CSL asserts. The ADA was passed to eliminate "*overprotective rules and policies, failure to make modifications to existing facilities and practices, [and] exclusionary qualification standards and criteria . . ..*" 42 U.S.C. §

---

[10] Screener Mailey's story about why she rejected Mr. Silguero has changed dramatically—first it was his limp, cane, and ability to transfer; later it was his desire for surgery in the future—but she has never mentioned his weight.

[11] For example, CSL's records show that Mr. Silguero successfully donated on 11/30/11 (weight 372), on 1/24/14 (359#), on 1/30/14 (359), on 2/5/14 (359), on 2/12/14 (361), on 3/31/14 (371), on 4/2/14 (368), 4/8/14 (375). Exh. N (Depo. Ex. 5), Bates numbers 16, 165, 177, 189, 201, 213, 224, and 236.

12101(a)(5) (emphasis added).   A business is no longer free to adopt safety standards that are untethered to individualized, scientific evidence.   And that is true whether CSL's doctor agrees with the standards, in good faith or otherwise.

> Because few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but whether it is significant.   The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence.   As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession.   His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. To use the words of the question presented, petitioner receives no special deference simply because he is a health care professional.

*Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (decided in the context of ADA Title III).

CSL admits[12] that in order to impose "safety requirements," such requirements must be "necessary for safe operation," and must be "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."   28 C.F.R. § 36.301(b).   As shown above, Mr. Silguero was not actually in violation of any of CSL's safety requirement.   Mr. Silguero had osteoarthritis,[13] yet there are no FDA regulations relating to that condition, Exh. B (Nelson) 68:2–4, nor FDA guidance, *id.*, 143:9–14, nor audit reports.   *Id.*, 144:22–145:2.   In fact, CSL's own screening matrix (its "Medical Staff Reference") explicitly says that osteoarthritis is *not* a disqualifying condition.   *Id.*, 108:7–14.

Moreover, the safety justifications that CSL offers are *not individualized in any way*.   CSL cites[14] to the statement of its Medical Director that knee surgery "could" be to repair a torn ligament or loose cartilage, Exh. B (Nelson) 71:20–72:7, but he was speaking in generalities to

---

[12] Defendant's Motion at 18, *citing* 28 C.F.R. § 36.301(a) and (b).
[13] See Plaintiff Silguero's Motion for Partial Summary Judgment at 16–17, and Exh. E attached thereto (pp. 3, 6, 8, 10).
[14] Defendant's Motion at 6.

explain why further information may be requested if an individual talks about the need for surgery. *Id.*, 72:6–7 ("So it is important to fully elucidate what the issue is."). He made no mention of Mr. Silguero's actual condition. Nor did anyone ask Mr. Silguero for additional medical information. Exh. F (Silguero 2d Decl.) ¶ 3; Exh. C (Silguero) 42:14–15. In fact, as shown above, his desire to have surgery someday in the future did not even come up, Exh. C (Silguero) 42:11–13, and it was not the basis for his exclusion.

CSL also argues that it is not required to serve an individual who poses a direct threat to the health or safety of others. 42 U.S.C. § 12182(b)(3). True, but in assessing direct threat, CSL "must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 36.208(b). CSL offers no such evidence.

CSL quotes its doctor as saying that a significantly overweight donor with an unsteady gait presents a higher risk of injuring CSL staff, *if* that donor were to fall and *if* that staff member attempted to catch the donor or help the donor up. Nelson Decl. ¶ 4. This is exactly the sort of statement that the ADA's "direct threat" standard is intended to guard against. The law requires that the assessment be individualized and based on current medical knowledge or best available objective evidence. It must also consider the severity of the risk, the probability that the injury will actually occur, and whether policy modifications will lessen the risk. But there is not even a mention of Mr. Silguero here, no mention of the likelihood of his falling, no mention of the actual or increased risk, no mention of the likelihood of a staff member trying to catch or lift him, and no mention of the basis for the statement. This risk seems all the more far-fetched given that CSL

13

policy forbids staff lifting or carrying a donor, Exh. O (Schultz Depo.) 28:20–29:7, or assisting with transferring onto the scale, donor bed, or even through the door.  Exh. L (Mailey) 49:21–50:5; 48:21–25.  Furthermore, and as noted above, arguments based on his weight are inconsistent with the actual reasons given for his exclusion, and are unsupported by CSL policy.

CSL points out that under the ADA it may adopt eligibility criteria that screen out certain individuals with disabilities, but it admits (as it must) that any such criteria must be "shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered."  28 C.F.R. § 36.301(a).  Here, though, Mr. Silguero was not excluded by the operation of any of CSL's actual criteria.  CSL also attempts to find support in *Arizona v. Harkins Amusement Enters., Inc.*, 603 F.3d 666 (9th Cir. 2010),[15] but the dicta it cites is about modifying the nature of the services provided.  Mr. Silguero sought no such modification in this case.

### B.     Second Rejection

As to the second rejection, CSL claims that this was based on Mr. Silguero's "threat," but this cannot be the subject of summary judgment because the facts are vigorously disputed.  "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  It is hard to square that standards with the Defendant's Motion here, which is replete with allegations of fact that it knows are contested.  The following chart gives some examples:

| Defendant's allegations regarding Silguero | Plaintiff's evidence |
| --- | --- |
| He had a really severe limp (Motion at 10) | He did not limp, because he used a cane |
| He told the screener he needed surgery (p. 10) | He did not talk about surgery with her |
| He became verbally aggressive (10) | He was not verbally aggressive |

---

[15] Defendant's Motion at 18.

| He slammed the door (10) | He did not slam the door |
|---|---|
| He threatened the screener (10) | He did not threaten the screener |
| He was yelling (10) | He was not yelling |
| He was cursing (10) | He was not cursing |
| He admits to threatening the screener (19) | He denies threatening the screener |
| He did not ask to speak to a manager (10) | He did not ask *the screener* to speak to a manager, but asked to speak to one by phone as soon as he left; CSL refused |
| A manager was called in to deal with him (19) | He did not speak to a manager, then or ever |

As shown above, CSL initially rejected Mr. Silguero because of his limping, use of a cane, and inability to transfer onto the donor bed. Exh. C (Silguero) 39:5–21; Exh. D, lines 3–4. He knew this to be discrimination, Exh. C (Silguero) 36:24, and in response, he wagged his finger at the screener like he was scolding a child. *Id.*, 39:25–40:4; 45:23–25; 46:24–47:1. He cautioned her—in a normal voice, *id.* 40:11–12—that she would be sorry for her actions, *id.*, 39:22–40:4, because he intended to report her to her superiors. *Id.*, 40:5–8.

This kind of comment—and threats to talk to a supervisor—happened all the time to CSL staff. Exh. K (Sanchez) 27:24–28:5; Exh. L (Mailey) 64:3–6. Comments like "you'll be sorry" do not always result in deferral; it depends on the circumstances and follow-up information. Exh. O (Schultz) 56:5-13. And even this particular screener admitted that he may have meant that he would speak to her supervisor. Exh. L (Mailey) 86:3–9. His testimony is further reinforced by his telephone call a few minutes later, asking to speak to the manager. Exh. C (Silguero) 42:21–43:3. He was not permitted to do so, *id.*, 43:4–7, contrary to CSL policy, Exh. K (Sanchez) 28:4–5; Exh. O (Schultz) 68:21–69:6 (manager always speak to them, or if unavailable, asks them to wait or speak to an assistant manager); Exh. L (Mailey) 64:13–14, nor did the telephone staff member seek his contact information. Exh. C (Silguero) 50:17–51:2.

Shortly after this call, the staff member who answered the phone went to the screener, laughing, and told her that Mr. Silguero had called and indicated that he was going to contact the

15

corporate office.  Exh. I (Lisa Silguero) 11:1–17.  The medical screener also laughed, making fun

of his efforts and indicating that management would not do anything in response to his complaint.

*Id*.  Her joking behavior undercuts any claim that she perceived Mr. Silguero's behavior as a threat,

as does the fact that she does not even recall what the supposed threatening statement was.  Exh.

L (Mailey) 79:8–10.  After he was not allowed to speak to the supervisor by phone, he immediately

contacted Disability Rights Texas to assert his rights violation, Exh. C (Silguero) 60:22–24, which

is yet more evidence of his intent to oppose discrimination.

     The CSL staffer who discriminated against Mr. Silguero lied when she said that he was

yelling, and CSL knows full well that this is a disputed fact.  No one else testified that he was

yelling.  Mr. Silguero denied raising his voice, cursing, or slamming the door, Exh. D (2d Decl.) ¶

4; Exh. C (Silguero) 40:11–12, and his wife who was nearby (Exh. I, 9:10–25) heard no yelling.

Exh. I (Lisa Silguero) 10:1–3.  Moreover, when his wife overheard the screener discussing her

interaction with Mr. Silguero with another staff member, the screener said nothing about him

yelling.  *Id*., 13:3–4.  Finally, this screener's credibility is suspect because of her changing stories

described above.

     Of course, a 'threat' to lodge a complaint is itself protected activity, and refusing service

on that basis is unlawful discrimination.  "No person shall discriminate against any individual

because such individual has opposed any act or practice made unlawful by [the ADA] . . .."  42

U.S.C. § 12203(a).  This anti-retaliation provision is in Title V of the ADA, and it applies to claims

brought under Title III (and the other titles of the Act).  *See, e.g., McInerney v. Rensselaer*

*Polytechnic Inst*., 505 F.3d 135, 138 (2d Cir. 2007); *Shotz v. City of Plantation, Fla*., 344 F.3d

1161, 1181 n.31 (11th Cir. 2003).

### III.    Factual Disputes Also Exist Regarding CSL's Supposed Safety Defenses to Ms. Wolfe's Claims

In addition to rejecting Mr. Silguero, CSL also rejected the Intervening Plaintiff, Amy Wolfe.  CSL admits that its decision to exclude Ms. Wolfe was because of her disability; it has policy of excluding everyone with an anxiety disorder who uses a service animal to mitigate the effects of their condition.  Defendant's Motion at 6 ("CSL's general policy is to defer a donor who requires . . . a service animal for anxiety, until the need for . . . service animal decreases."), 21, 22.  CSL argues instead that its exclusion of Ms. Wolfe was justified on safety grounds.   For such a policy to be lawful under the ADA, CSL must show that it is both "necessary for safe operation," and "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  28 C.F.R. § 36.301(b).  But as shown below, CSL offers nothing but generalities, and admits that it knows nothing about the actual risks.

CSL also argues that Ms. Wolfe posed a direct threat to the health or safety of others.  But again, such a determination must be based on "an individualized assessment," and must also be "based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence."  28 C.F.R. § 36.208(b).  Finally, in making the assessment CSL must consider the "nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  *Id*.  As shown below, CSL offers no such evidence here.

To be clear, CSL does not claim that allowing service animals presents any problem in its plasma centers.   On the contrary, it allows them for individuals with physical disabilities, Defendant's Motion at 22; Exh. P (Depo. Ex. 9); Exh. K (Sanchez) 32:2–6; Exh. B (Nelson) 75:17–19, and its medical director finds them well trained, Exh. B (Nelson) 84:13–17, presenting no

issues. *Id.*, 75:13–17; 83:10–13 (They present "no problems to the donor or staff."); 83:14–15 (Nelson's experience with service animals "has generally been very good.").

Its medical officer also admitted that the use of a service animal can be effective in reducing the symptoms of the anxiety disorder, *Id.*, 78:16–22, even with severe anxiety. *Id.*, 87:6–13. Indeed, many of the patients with anxiety who he has seen in his career reported beneficial effects from the use of a service animal, *id.*, 80:2–6, and he does not doubt that benefit. *Id.*, 80:5–9. CSL further admits that in this case, Ms. Wolfe's service dog allowed her to stop taking medications and improved her symptoms. Defendant's Motion at 12.

Despite this knowledge, CSL made the decision to *exclude anyone who uses a service animal for an anxiety disorder*. It does so because Dr. Nelson believes that using a service animal indicates the anxiety disorder is serious. Exh. B (Nelson) 82:17–23; 84:8–10; 86:7–10. But he admits that he does not know how to quantify or objectively measure that link. *Id.*, 79:9–17; see also *id.*, 82:17–83:1. He also admits that he does not know how to measure the benefit that service animals provide. *Id.*, 80:7–11; 87:12–15. Furthermore, he admits that he has never studied how people with anxiety respond to service animals, nor is he aware of the literature about that. *Id.*, 80:12–21. He does not even know whether medical professionals suggest the use of a service animal, *id.*, 81:16–18, as Ms. Wolfe's doctor did here. Exh. Q (Wolfe Decl.) ¶ 10.

Dr. Nelson is likewise unaware of any studies about the potential for an adverse event by a donor using a service animal for anxiety. Exh. B (Nelson) 88:18–23; 91:22–92:3. And he admitted that CSL has never attempted to collect such information. *Id.*, 88:24–89:5; 92:3–7. He also has no such information from his own medical career, nor from any other source. *Id.*, 89:6–18. In fact, CSL does not keep records about adverse events by donors with anxiety disorders. *Id.*, 99:1–3. Dr. Nelson has no information suggesting that treatment for anxiety fails to reduce the

18

chances of donation problems.  *Id*., 99:7–14.  And he admits that there are donors with severe anxiety disorders who "have responded to treatment and donate quite successfully."  *Id*., 103:14–19.

In short, CSL has no objective evidence to support its policy.  Nor can CSL point to any FDA or industry standards relating to either anxiety disorders or the use of service animals, because there are none.  *Id*., 68:9–12; 74:15–19; 143:9–14; 144:22–145:2.  The FDA audits plasma-donation facilities, and issues audit reports of their findings, but there has not been any FDA input related to anxiety disorders, or the way they might have been handled.  *Id*., 95:23–96:2.

CSL's service-animal restriction is of relatively recent origin.  Dr. Nelson has worked for CSL or its predecessor companies for 17 years, *id*., 10:14–11:1, and for about half that time there was no policy prohibiting donation by individuals with anxiety who used service animals.  *Id*., 94:10–15.  It was added in about 2008 or 2009, *id*., but Dr. Nelson knows of no question or incident that it might have been in response to.  *Id*., 94:10–19.  Nor is there any documentation about the reason for it.  *Id*., 95:13–16.

CSL claims that it individually assesses its donors with anxiety disorders.  Defendant's Motion at 4; Exh. B (Nelson) 81:21–24.  That may be true *if the person has no service animal*.  In such cases—even those involving severe anxiety disorders—CSL claims to ask open-ended questions about the anxiety and its symptoms, Exh. B (Nelson) 103:20–104:13, and its screeners also look for physical symptoms like sweating, nervousness, fidgeting, palpitations, and vitals outside of range.  *Id*., 104:21–105:2; Exh. K (Sanchez) 36:2–6.  CSL screening staff confirmed that these are observable.  Exh. K (Sanchez) 36:4–8.  They are trained to look for them and ask questions, *id*., 36:9–19, and check for pupil reaction.  *Id*., 36:19–21.  Depending on their findings,

they may approve or disapprove donation. *Id.*, 36:22–37:1.   Clearly, then, an individualized assessment is *possible*.

But all of that goes out the window if there is a service animal.  For a donor with anxiety who uses a service animal, there is no flexibility; CSL rejects.  Exh. B (Nelson) 86:18–87:5. *See also id.*, 146:6–8 (never allowed).  In those cases it does not matter what the donor reports. *Id.*, 87:12–17.  In those cases it does not matter if the individual is calm or not. *Id.*, 86:2–10.

Here, CSL staff admitted that Amy Wolfe was at all times calm, Exh. K (Sanchez) 31:11, and quiet. *Id.*, 29:14.  In fact, CSL staff testified that other than her service animal Harley, there was nothing indicating Ms. Wolfe had anxiety, *id.*, 31:12–15 and other than her dog, no other reason why she could not donate. *Id.*, 34:1–3.  She told Ms. Wolfe that she did not appear anxious, and instead appeared under control.  Exh. R (Wolfe Depo.) 33:19, 22–25.  The screener later spoke to Dr. Nelson, but the call lasted less than five minutes, and he asked no follow-up questions about Ms. Wolfe's anxiety or PTSD, and nothing about how the service animal helped her.  Exh. K (Sanchez) 35:9–22.  Instead, under CSL's unbending policy, Ms. Wolfe is forbidden from donating until she no longer requires a service animal.  Defendant's Motion at 12, 22.  CSL's file on Ms. Wolfe confirms this.  Exh. S (Depo. Ex. 7) ("Dr. Nelson advised that donor is not allowed to donate until service dog is no longer required . . ..").

CSL claims that Dr. Nelson used information about Ms. Wolfe's history, diagnosis, and treatment to make his determination about Wolfe's eligibility.  Defendant's Motion at 22.  But this is untrue.  As shown above, Dr. Nelson admits that his is an inflexible decision made on the sole basis of the use of a service animal.

CSL also states that Ms. Wolfe is a heightened risk of an anxiety attack compared to other donors, Defendant's Motion at 8, but it cites absolutely no evidence for this, nor—as shown

above—does it have any.  It only cites general statements that are unrelated to Ms. Wolfe or her condition.  *Id*.  It references the later fact that Ms. Wolfe had a reaction to a dog biting her neck, Defendant's Motion at 22, but fails to explain that her neck (not an area involved in the donation process) is a trigger area related to her sexual-assault history, and also fails to note that Ms. Wolfe's service animal Harley prevented any strong reaction to the bite.  Exh. R (Wolfe) 25:2–6.  CSL also omits the evidence indicating that Ms. Wolfe is typically calm in medical or quasi-medical settings. *Id*., 25:9–13.  CSL states that Ms. Wolfe had some nervousness at CSL, but fails to mention that it was minor, and only arose when she was pulled out of the line because of her service animal. *Id*., 36:25–37:13.  Finally, CSL seems to take the position that anyone suffering mental anguish as a result of discrimination must somehow be evidence that the person would present a risk had the donation process been non-discriminatory.  Defendant's Motion at 13.  There is no support—in logic, evidence, or case law—for this rather shocking, Catch-22 argument.

CSL tries to find support in *Larsen v. Carnival Corp., Inc*., 242 F. Supp. 2d 1333 (S.D. Fla. 2003),[16] but that case is completely inapposite.  The plaintiff in *Larsen* required a bi-pap breathing machine for his sleep apnea.  He was barred from a cruise only because his machine was broken. That is the opposite of Ms. Wolfe's claim.  She was not seeking to donate despite the absence of a disability-related aid (her service animal); she was seeking to donate *with* it.  Under CSL's view, the cruise line could exclude anyone who uses an assistive device.  That is not what *Larsen* holds, and it is not the law.

CSL also cites *Judice v. Hospital Service Dist. No. 1*, 919 F. Supp. 978, 979–80 (E.D. La. 1996), involving a doctor who sought reinstatement of hospital privileges after receiving treatment for alcoholism.  Again the facts are not analogous.  The hospital in *Judice* did not refuse privileges;

---

[16] Defendant's Motion at 19–20.

it simply asked for more information (by way of an examination at no cost to the doctor), which the plaintiff refused.  Here, CSL did not ask for any additional information.  To the contrary, it was not interested in further information.

## IV.     Chapter 121 Applies to Defendant's Plasma Centers

Texas state law prohibits disability exclusions by a "public facility," defined to include, among other things, a "retail business, commercial establishment, or office building to which the general public is invited."  TEX. HUM. RES. CODE § 121.002(5).  Plaintiffs have already explained why CSL's plasma center is a "public facility" under that definition.  Silguero's Motion for Partial Summary Judgment at pp. 20–21, incorporated herein by reference.

CSL's only new argument for coverage, and really its *only* definitional argument, is its reliance on *Beeman v. Livingston*, 468 S.W.3d 534 (Tex. 2015).[17]  That is an incredible stretch because the facts in *Beeman* could hardly be more different.  *Beeman* held that a *prison* was not a public facility.  *Beeman v. Livingston*, 468 S.W.3d 534 (Tex. 2015).  The court reached this result by interpreting a different category of public facility ("a public building maintained by any unit or subdivision of government") from the one at issue here.  *Id* at 539.  The crux of that decision was that prisons are simply not buildings that are open to the public.  *Id*. at 542.  That is clearly true.  That is also entirely unlike the nature of a plasma center.  *Beeman* has no bearing here, both because of its extreme facts and because it deals with a different part of the statutory definition.  Here, in stark contrast to *Beeman*, CSL allows all members of the public to enter, and admits that it invites as many members of the public as possible to donate.

Defendant also argues that—with regard to Mr. Silguero only—its actions do not reflect discrimination on the basis of disability but rather on the basis of a "threat."  As to that, of course,

---

[17] Defendant's Motions at 23.

there are material factual disputes described above.  It cites to *Sadik v. Univ. of Houston*, No. CIV.A. H-03-4296, 2005 WL 1828588 (S.D. Tex. Aug. 1, 2005), but that case dealt with a completely different provision (§ 121.010), which by its terms applies only to tests that "evaluate[] an adult with a disability for a job position in business, government, or industry, or a test to determine that person's educational level."  The court found the provision inapplicable because the plaintiff was not alleging any of those things.  *Id*. at *10.

CSL's last state-law argument is that it has a safety defense.  It cites no such defense in state law—there are none—and the only case it cites, *Bonds v. Rodriguez*, No. 04–02–00156–CV, 2003 WL 141043 (Tex. App.—San Antonio Jan. 22, 2003, pet. denied) (mem. op.), is once again inapposite.  The *pro se* prisoner in *Bonds* claimed that he was illegally discriminated against because the prison failed "to immediately transfer him to another cell when he demanded it."  *Id*. at *2.  It comes as no surprise that nothing in state law required this, and in any event the prisoner was transferred as soon as the prison identified a cell appropriate to his needs.  The facts there do not reflect disability discrimination, but they are also nothing like the facts here.  And as discussed above, there are material disputes here regarding any supposed safety concerns.

## CONCLUSION

For the reasons set out above, the Court should deny in full Defendant's Motion for Summary Judgment.  Defendant has failed to show as a matter of law that its plasma centers are not covered by Title III of the ADA or by Chapter 121 of state law; failed to show as a matter of law that it had a valid safety defense justifying its rejection of Mark Silguero or Amy Wolfe; and failed to show as a matter of law that Mr. Silguero was not opposing discrimination but was instead making a threat that justified permanent exclusion.

Respectfully submitted,

BRIAN EAST
ATTORNEY-IN-CHARGE
State Bar No. 06360800
Southern District Bar No. 453108
LIA S. DAVIS
State Bar No. 06360800
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 407-2718 (direct line)
(512) 454-3999 (fax)
beast@drtx.org
ldavis@drtx.org

ATTORNEYS FOR
INTERVENING PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2017, a true and correct copy of the foregoing document was electronically filed using the Court's CM/ECF filing system, thus providing notice of electronic filing to the following:

    Bruce J. Douglas
    Stephanie Willing
    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
    Wells Fargo Center
    90 South Seventh Street, Suite 3800
    Minneapolis, Minnesota 55402

BRIAN EAST

24