United States District Court
Southern District of Texas

**ENTERED**

November 03, 2017

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK  SILGUERO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL NO. 2:16-CV-361 |
| | § | |
| CSL PLASMA, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This Court now considers motions for summary judgment filed by Defendant CSL Plasma Inc. ("CSL"), Plaintiff Mark Silguero ("Silguero"), and Plaintiff Amy Wolfe ("Wolfe"), Dkt. Nos. 34-36. For the reasons stated below, the Court **GRANTS** Defendant's Motion for Summary Judgment, Dkt. No. 34, and **DENIES AS MOOT** Plaintiffs' motions for summary judgment, Dkt. Nos. 35-36.

### I.   Background

A.   Undisputed Facts[1]

CSL operates a network of plasma-donation centers across the United States. Plasma donation involves a procedure called plasmapheresis, whereby a donor's blood is removed, their blood plasma is separated from their red blood cells, and the red blood cells are then returned to the donor's bloodstream. CSL compensates donors for their plasma, which it then sells to pharmaceutical companies.[2] Nelson Dep. 25:5-19, Dkt. No. 34 APP 37. The plasma-extraction process is regulated by the Secretary of Health and Human Services and by the Food and Drug Administration ("FDA"). *See* 42 U.S.C. § 262(a); 21 C.F.R. §§ 630.1-630.35. Specifically, the FDA

---

[1] The undisputed facts in this order are taken from the uncontested deposition testimony of Silguero, Wolfe, CSL medical staff associates Michelle Mailey ("Mailey"), Juliana Sanchez ("Sanchez"), and Melanie Garcia ("Garcia"), and CSL Divisional Medical Director Dr. John Nelson ("Nelson").

[2] Because individuals are compensated for supplying their plasma, it is inaccurate to refer to them as "donors" or to the process as "donation." However, the Court recognizes the common use of these terms, and adopts them for simplicity.

sets standards for donor eligibility, licenses plasma-donation centers, and audits those centers to ensure compliance with FDA regulations. *See* 21 C.F.R. § 630.1-630.35.

To comply with FDA regulations, CSL individually screens potential donors to determine whether they are eligible to donate plasma. Mailey Dep. 17:19-19:5, Dkt. No. 34 APP 20. At CSL, potential donors answer health-related questions in the reception area and their vital signs are tested. Nelson Dep. 30:16-23. Then, additional individualized screening is performed by a Medical Staff Associate ("MSA"), who observes the potential donor and may ask about a variety of factors that could affect their eligibility to donate, such as their medical history, current medications, and recent tattoos. *Id.* at 30:24-31:3; Mailey Dep. at 18:13-19:9. MSAs often consult CSL's medical guidelines on eligibility (which provide, for example, that a person is ineligible to donate if they suffer from anxiety requiring the use of a service dog) and may also contact CSL physicians by phone to discuss particular cases. Garcia Dep. 13:21-14:8; *see* Dkt. No. 34 APP 110.

Silguero is a longtime plasma donor who also suffers from bad knees. Silguero Dep. 11:16-21, Dkt. No. 34 at APP 81; *id.* at 13:5-14:17. The parties agree that Silguero qualifies as a person with a disability under the Americans with Disabilities Act (ADA) and the Texas Human Resources Code (THRC). *See* Dkt. No. 35 at 4; Dkt. No. 37 at 9.

Between January and April of 2014, Silguero donated plasma at CSL multiple times. *Id.* at 22:12-19. Then, after several months without visiting CSL, Silguero attempted to donate on January 2, 2015. *Id.* at 36:22-37:7. At that time, the condition of Silguero's knees had been deteriorating and they "were in bad shape. Needed to be replaced." *Id.* at 19:4-7. When Silguero visited CSL on January 2, 2015, he completed the donor screening process and met with MSA Mailey. *Id.* at 36:22-24, 38:1-39:7; Mailey Dep. 76:10-77:1. Mailey questioned Silguero regarding his unsteady gait and use of a cane, and informed him that he could not donate that day because it appeared that he could not safely transfer to and from the donation bed. Silguero Dep. at 39:5-19, 41:2-5; Mailey Dep. 77:3-6, 80:3-5. Silguero became

upset, shook his finger at Mailey, and told her that she was "going to be sorry." Silguero Dep. 39:22-40:1. Mailey then called the assistant center manager, Dennis Thomas, who spoke with Silguero. Mailey Dep. 78:16-79:4. CSL subsequently banned Silguero from donating at CSL. *See* Dkt. No. 34 APP 99.

Wolfe has suffered from anxiety for several years, and adopted her service dog, Harley, in May 2015. Wolfe Dep. 20:3-23, 13:13-14:3, Dkt. No. 34 APP 89, 91. The parties agree that Wolfe qualifies as a person with a disability under the ADA and the THRC. *See* Dkt. No. 36 at 4-12; Dkt. No. 38 at 10.

On October 9, 2016, Wolfe went to CSL to donate plasma for the first time. Wolfe Dep. 29:9-12, 26:20-24. Because the CSL receptionist noticed that Wolfe had a service dog, Wolfe skipped the standard intake process and immediately met with MSA Sanchez to determine whether Wolfe could donate. *Id.* at 31:7-32:8, 37:16-38:15. Although Sanchez observed that Wolfe appeared calm, she sent Wolfe home until CSL could determine whether her service dog precluded her from donating. *Id.* at 33:13-34:11. Sanchez then discussed the case with Dr. Nelson. Sanchez Dep. 34:23-35:22, Dkt. No. 34 APP 68; *see* Dkt. No. 34 APP 122. Nelson informed Sanchez that Wolfe could not donate for as long as she required a service animal to treat her anxiety, and Sanchez relayed the decision to Wolfe by phone. Dkt. No. 34 APP 122; Wolfe Dep. 35:14-25. Nelson's decision aligned with CSL guidelines that a person is ineligible to donate if they suffer from anxiety requiring the use of a service dog. *See* Dkt. No. 34 APP 110.

B. <u>Procedural History</u>

On August 24, 2016 Silguero filed his complaint against CSL, alleging disability discrimination. Dkt. No. 1. He seeks injunctive relief under Title III of the Americans with Disabilities Act and both injunctive relief and damages under Texas Human Resources Code Chapter 121. *Id.* CSL filed its answer on September 27, 2016. Dkt. No. 8. On March 3, 2017, Wolfe moved to intervene as a plaintiff, arguing that her disability discrimination claims against CSL presented common

questions of law and fact. Dkt. No. 17; *see* FED. R. CIV. P. 24(b)(1)(B). The Court granted Wolfe's motion on March 28, 2017. Dkt. No. 21.

On August 14, 2017, CSL, Silguero, and Wolfe each filed a motion for summary judgment. Dkt. Nos. 34-36. On September 1, 2017, CSL filed its responses to Plaintiffs' motions, Dkt. Nos. 37-38. Plaintiffs filed their joint response to CSL's motion on September 5, 2017. Dkt. No. 39. On September 15 and September 19, 2017, Plaintiffs and CSL, respectively, filed their replies. Dkt. Nos. 41-42. The parties' deadline to file pretrial motions and the Joint Pretrial Order is November 2, 2017, Dkt. No. 44, and the Final Pretrial Conference is set for November 16, 2017 at 2:00 p.m., Dkt. No. 40.

This Court now considers the parties' motions for summary judgment.

## II.    Legal Standard

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and mandates the entry of summary judgment for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)) (internal quotation marks omitted).

The Court must view all evidence in the light most favorable to the non-moving party. *Piazza's Seafood World*, 448 F.3d at 752. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "When assessing whether a dispute to any material fact exists, [courts] consider all of the

evidence in the record but refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

"Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Celotex*, 477 U.S. at 325). The non-movant may not merely rely on conclusory allegations or the pleadings. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). The non-movant's burden is not satisfied by "conclusory allegations," "unsubstantiated assertions," or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotations and citations omitted). Courts are not required to search the record on the non-movant's behalf for evidence that may raise a fact issue. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988).

## III.   Analysis

### A.   Applicability of the Americans with Disabilities Act

The ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The Act defines eligible "public accommodations" according to twelve enumerated categories. 42 U.S.C. § 12181(7). These categories "should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001) (citations omitted). In this case, the first issue to be resolved by this Court is whether CSL is a service establishment. Section 12181(7)(F) defines a "service establishment" as

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel
> service, shoe repair service, funeral parlor, gas station, office of an

> accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.

42 U.S.C. § 12181(7)(F). At issue is whether a plasma-donation center qualifies as an "other service establishment."

Plaintiffs argue that a plasma-donation center falls within the plain meaning of "service establishment" because "[t]he extraction of plasma itself is a service." Dkt. 35 at 16. In support of its argument, Plaintiffs cite *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016), in which the Tenth Circuit held that "a [plasma-donation center] is a 'service establishment' for two exceedingly simple reasons: It's an establishment. And it provides a service." *Id.* at 1229. Plaintiffs argue that CSL provides a service by extracting a donor's plasma, and that the plasma itself "is in effect the payment [by the donor] for that service." Dkt. 41 at 6. Even if the direction of payment is relevant, Plaintiffs argue that plasma-donation centers qualify as service establishments because the donors pay for the service of plasma extraction with their own blood plasma.

CSL argues that a plasma-donation center does not qualify as a service establishment because it is "fundamentally different" from the listed examples in § 12181(7)(F). Dkt. No. 34 at 16. It claims that the Tenth Circuit in *Levorsen* "erroneously stretch[ed] the language of the ADA beyond what is reasonable" and that the dissent in that case correctly "recognized that plasma centers do not receive a fee from the public in exchange for services, unlike every other example in subsection (7)(F)." *Id.* at 21. Because donors do not pay plasma-donation centers, it argues, the centers do not have the necessary trait in common with the other examples listed in § 12181(7)(F). CSL alternatively argues that, at most, plasma-donation centers are "mixed-use facilities," so that the ADA applies to a center's public lobby, but not to its donation area. *Id.* at 23.

Although the ADA provides protections for persons with disabilities in a wide range of places, those protections are restricted to the categories specifically enumerated in § 12181(7). The Court must therefore determine the plain meaning of "other service establishment" as used in the ADA. *See Sample v. Morrison*, 406

F.3d 310, 312 (5th Cir. 2005) ("The appropriate starting point when interpreting any statute is its plain meaning.") (citations omitted). If the meaning is unambiguous, a court "must apply the statute according to its terms." *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) (quoting *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009)).

Two canons of statutory construction are particularly useful here: *ejusdem generis* and *noscitur a sociis*. *See also Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016) (applying those canons to determine whether a vending machine qualifies as a "sales establishment" under the ADA). Under the canon of *ejusdem generis*, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Ejusdem generis*, BLACK'S LAW DICTIONARY (10th ed. 2014).[3] Under *noscitur a sociis*, "a word is known by the company it keeps." *Ali v. Federal Bueau of Prisons*, 552 U.S. 214, 226 (2008) (quoting *S.D. Warren Co. v. Me. Bd. Of Envtl. Prot.*, 547 U.S. 370, 378 (2006)); *see United States v. Williams*, 553 U.S. 285, 294 (2008) (stating that *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated").

Here, the examples of service establishments listed in § 12181(7)(F) give precise meaning to the term "other service establishment" because the examples share a common trait: the provision of goods or services by the establishment in exchange for compensation. The public is invited to each service establishment—whether a laundromat, gas station, or hospital—in order to pay for services provided by the establishment. The catchall term "other service establishment" incorporates same trait—providing a service to the public in exchange for compensation.

Plasma-donation centers operate in reverse to the examples listed in § 12181(7)(F). At a plasma-donation center, a donor provides the good (blood plasma)

---

[3] The example given in Black's Law Dictionary is illustrative: "[I]n the phrase *horses, cattle, sheep, pigs, goats, or any other farm animals*, the general language *or any other farm animals*—despite its seeming breadth—would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens." *Id.*

and the center offers compensation. This Court disagrees with the Tenth Circuit that this is a "superficial distinction." *Levorsen*, 828 F.3d at 1229. According to the plain text of the ADA, that plasma-donation centers pay donors for their plasma—rather than offer a service in exchange for compensation—bars them from qualifying as service establishments under § 12181(7)(F). Therefore, CSL is not a "service establishment, the ADA's anti-discrimination provisions are inapplicable in this case, and CSL is entitled to judgment as a matter of law.

   B. <u>Applicability of the Texas Human Resources Code</u>

   Because this Court grants summary judgment for CSL on Plaintiffs' ADA claims, the Court must decide whether to keep jurisdiction over Plaintiffs' remaining Texas law claims. Under 28 U.S.C. § 1367(c), a court may decline to exercise jurisdiction over a state-law claim in certain circumstances, including when "the claim raises a novel or complex issue of state law" or when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(1), (3). Although the federal claims giving rise to this Court's subject-matter jurisdiction are dismissed, the Court elects to retain supplemental jurisdiction over Plaintiffs' remaining state-law claims. *See Baker v. Farmers Elec. Co-op., Inc.*, 34 F.3d 274, 283 (5th Cir. 1994) ("[Supplemental jurisdiction] may continue even after the federal claims upon which jurisdiction is based have been dismissed or rendered moot.) (citing *Hefner v. Alexander*, 779 F.2d 277, 281 (5th Cir. 1985)).

   THRC § 121.003 provides that "[p]ersons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state." Tex. Hum. Res. Code § 121.003(a). The Code defines a "public facility," in part, as a "retail business, commercial establishment, or office building to which the general public is invited . . . and any other place of public accommodation, amusement, convenience, or resort to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." Tex. Hum. Res. Code § 121.002(5).

Plaintiffs argue that a plasma-donation center qualifies as a retail business and commercial establishment to which the general public is invited and, alternatively, under the catchall "other place of public accommodation" to which the general public is regularly invited because the Texas Code's language is broader than that of the ADA. *See* Dkt. No. 35 at 21-22. To support their argument, they point to the dictionary definition of "accommodation" as "something supplied for convenience or to satisfy a need." *Accommodation*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990); *see* Silguero's Brief, Dkt. No. 35 at 31.

CSL argues that the Texas Code does not apply because plasma-donation centers do not invite the general public to donate; only some potential donors actually qualify for donation. Dkt. No. 34 at 30. CSL argues that plasma-donation centers are therefore similar to prison facilities, which impose strict eligibility requirements, and which the Texas Supreme Court has held were not public facilities. *Id.* at 29-30; *see Beeman v. Livingston*, 468 S.W.3d 534 (Tex. 2015).

In interpreting a Texas statute, a court "rel[ies] on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result." *Beeman v. Livingston*, 468 S.W.3d 534, 538 (2015) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010)).

The Texas Supreme Court has clarified that "the Legislature used the term 'public' to indicate a status of openness and accessibility, and not a public use." *Beeman v. Livingston*, 468 S.W.3d 534, 540. This understanding is confirmed by § 121.002(5)'s frequent statements that public facilities are places "to which the general public is invited." *See* Tex. Hum. Res. Code § 121.002(5).

The Court concludes that plasma-donation centers are not public facilities under Texas Human Resources Code § 121.002(5). First, plasma-donation centers are not places of public accommodation. An "accommodation" is "something supplied for convenience or to satisfy a need." *Accommodation*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990); *see also Accommodation*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A convenience supplied by someone; esp., lodging and food."). As

this Court notes above, a plasma-donation center does not supply any good or service for convenience or need. Rather, the donor sells blood plasma to the center. Because the roles of seller and buyer are reversed in the plasma-donation context, plasma-donation centers such as CSL do not qualify as places of public accommodation under Texas Human Resources Code § 121.002(5).

Second, plasma-donation centers are not retail businesses or commercial establishments to which the general public is invited. Although a plasma-donation center is arguably a commercial establishment because it buys blood plasma from those who meet FDA regulations for eligibility, it does not invite the general public to donate. At most, it invites the general public to find out whether they meet the criteria for donating. This does not represent the level of openness and accessibility reflected in § 121.002(5). Chapter 121.002(5)'s emphasis on places "to which the general public is invited" refers to whether the general public are generally invited to obtain the goods or services provided by a business, public accommodation, or other public facility. CSL and other plasma-donation centers do not provide a service for the general public to purchase—they simply offer to buy plasma from the eligible few. *See* Nelson Dep. 30:4-31:3, Dkt. No. 34 APP 39. Therefore, CSL does not qualify as a "public facility" under § 121.002(5), and the Court grants CSL's motion for summary judgment.

## IV.   Conclusion

For the above reasons, this Court:

- **GRANTS** Defendant CSL Plasma Inc.'s Motion for Summary Judgment, Dkt. No. 34;

- **STRIKES AS MOOT** Plaintiffs' motions for summary judgment, Dkt. Nos. 35-36;

- **STRIKES AS MOOT** Plaintiffs' Motion to Preclude Unreliable and Irrelevant Opinions of Defendant's Expert John Nelson, Dkt. No. 46; and

- **VACATES** all remaining Court settings in this case.

Judgment in this case will be entered separately in accordance with Federal Rule of Civil Procedure 58. The Court **ORDERS** the Clerk of Court to close this case after entering the judgment.

SIGNED this 2nd day of November, 2017.

Hilda Tagle
Senior United States District Judge